FILED

DEC 29 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

JOHN M. BEAIRD, ROBERT MIHAILOVICH, §
and on Behalf of §
ALL SIMILARLY SITUATED INDIVIDUALS §
    (Filed as a CLASS ACTION) §
§
    PLAINTIFFS §
§
    vs. §
§
ALBERTO GONZALES (Individually), §
HARLEY G. LAPPIN (Individually), §
UNITED STATES OF AMERICA, §
FEDERAL BUREAU OF PRISONS, and §
Several Unknown Agents §
of the Federal Government §
§
    DEFENDANTS §

CASE NUMBER  1:06CV02268

JUDGE: John D. Bates

DECK TYPE: Pro se General Civil

DATE STAMP: *12 29 2006*

*JURY ACTION*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# C O M P L A I N T

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PLAINTIFFS' ORIGINAL PLEADINGS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TO THE HONORABLE UNITED STATES DISTRICT JUDGE OF SAID COURT:

RECEIVED

DEC 0 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

COMES NOW, JOHN M. BEAIRD, and ROBERT MIHAILOVICH, and JOHN M. BEAIRD and ROBERT MIHAILOVICH On Behalf Of ALL SIMILARLY SITUATED INDIVIDUALS, here-in-after referred to as "Plaintiff" or "Plaintiffs", this action being filed as a "CLASS ACTION" pursuant to Fed. R. Civ. Pr. Rule 23(a)(1)-(4) and files this Original Complaint. Such "Similarly Situated Individuals" (the putative class) being defined as "All individuals whom are, or have been, incarcerated within a Federal Bureau of Prisons facility within the last Twenty Four (24) Months, and/or whom may be subject to being incarcerated within a Federal Bureau of Prisons facility in the future, whom have, or may be subject to having their Constitutional rights, statutory rights, duties owed to them by the Defendants, or entitlements to which they are entitled to offended and violated by the past, present, or future conduct of the Defendants". The putative class represents in number approximately 200,000 Individuals.

Plaintiffs bring this action against the Defendants claiming multiple basis of causes of action and claims on several jurisdictional grounds. Plaintiffs have Exhausted All Available Administrative Remedies[*] prior to filing this action.

----------------------------------------

[*] "Fact that one class member had exhausted Administrative Remedies was sufficient to satisfy PLRA exhaustion requirement for the class of prisoners challenging conditions of confinement...". Gates v. Cook, 376 F3d 323 (5th Cir. 2004). It is "noteworthy" to note that the Gates litigation, supra, was granted class status, even with existence of the PLRA. The point being that, the PLRA **does not restrict** the entitlement of a prisoner to file an action as a "Class Action" invoking FRCP Rule 23. See also Plata v. Davis, 329 F3d 1101 (9th Cir. 2003) where prionser filed action as a Class Action and action was certified as a Class Action, the Class certified as: "all persons suffering from, or at risk of developing, serious illness or injury, excluding mental disorders, who were then or would be in the future confined at ... ".

Plaintiff claims that the Defendants' past, present, and ongoing conduct has, and ongoingly does, cause damages to the Plaintiff(s), in that, such conduct offends the Constitutional rights, statutory rights, duties owed to Plaintiffs by the Defendants, and entitlements of Plaintiff(s), all such being illegal and unconstitutional.

This conduct by these specific Defendants as listed in the caption of this cause of action having affected, and ongoingly affecting currently a **Putative Class of Individuals** numbering approximately 200,000 Individuals. Such conduct also having been done "under color of law". Such conduct as alleged in the specific Counts of this Cause of Action, infra, also resulting from "Official" Common Custom, Practices, and Policies,[**] such being with "deliberate indifference" to the resulting violation of the "Clearly Held Rights" of the Plaintiff(s) and the Putative Class.

Plaintiff invokes multiple causes of action herein as shown, infra, as well as a number of jurisdictional grounds. Plaintiff(s) show, infra, that Venue is proper in this Honorable U.S. District Court. This Honorable U.S. District Court also has personal jurisdiction over all Defendants in this Cause of Action as shown and detailed, infra.

The Plaintiff(s) further believe, on information and belief, that all such being with "deliberate indifference" to the potential for harm or potentially Constitutionally offensive results. Such conduct causing damages, injuries, physical injuries, pain and suffering that are all proximate cause of said conduct.

-------------------------------------------------------

[**] "Validity of prisons policies is not dependent upon whether they are written or verbal ... A policy is a policy -- the question is simply whether the record supports a finding that policy exists." <u>Talib v. Gilley</u>, 138 F3d 211, 212 (5th Cir. 1998).

3

The Defendants, thereby, "act with requisite culpable intent when they act with deliberate indifference to the inmates' suffering." Farmer v. Brennan, 511 U.S. 825 (1994); Wilson v. Seiter, 501 U.S. 294 (1991); Jordan v. Gardner, 986 F2d 1521, 1528 (9th Cir. 1993)(en banc).

## EFFECT OF PRISON LITIGATION REFORM ACT ("PLRA")

The Prison Litigation Reform Act ("PLRA"), 11 U.S.C. § 523; 18 U.S.C. §§ 3624, 3626; 28 U.S.C. §§ 1346, 1915, 1915A; 42 U.S.C. §§ 1997 - 1997h, places certain restrictions on inmate prison litigation petitions. The Plaintiff submits the following with regards to this important matter:

1)   This litigation is meritorious and not frivolous and supported not only be Verified Pleadings but also by numerous Sworn Affidavits of fact supporting the claims made which are attached as Appendixes to the Pleadings and hereby incorporated as a part of these Pleadings and Complaint. Numerous courts have previously repeatidly found such exact facts and claims as not frivilous but rather meritorious. See Whitley v. Hunt, 158 F3d 882, 884-885 (5th Cir. 1998)(Finding "Enviornmental Tobacco Smoke" Exposure claim was not frivilous), inter alia.

2)   The "Physical Injury Requirement" (42 U.S.C. § 1997e(e) ) provides that:  "No Federal Civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." This constraint applies only to damage claims explicitly for "mental" or "emotional" injury and not for "nominal" or "punitive" damages which are typically not "for" mental or emotional injury, but rather "to vindicate or punish egregious violations of the Constitution." Moreover, damages for "pain and suffering" are not "emotional" or "mental" injury, see Mata v. Saiz, 427 F3d 745, 754 n.4

4

(10th Cir. 2005). Finally, § 1997e(e) "does not apply to requests for declaratory or injunctive relief". <u>Greiger v. Jowere</u>, 404 F3d 371 (5th Cir. 2005); <u>Herman v. Holiday</u>, 238 F3d 660, 665-666 (5th Cir. 2001); <u>Harper v. Showers</u>, 174 F3d 716, 719 (5th Cir. 1999); <u>Davis v. Dist. of Columbia</u>, 158 F3d 1342, 1346 (D.C. Cir. 1998). The Plaintiff has incurred from the Defendants' conduct injuries, physical injuries, pain and suffering, and damages from each of the alleged Counts, infra.

Plaintiff submits that this Pleading, as filed, meets all tests and requirements pursuant to the PLRA, and that Plaintiff is entitled to file said claim as a "Class" Action.

When the Plaintiff refers, infra, to "damages", said term is defined to include, but is not exclusively limited to, pain and suffering, physical injuries, and deprivations. Plaintiff is entitled to recover, and also specifically seeks, compensatory damages, punitive damages (against the individual capacity defendants), consequential damages, continuing damages (environmental toxin exposure claims, inter alia), discretionary damages, nominal damages, costs of court, attorneys' fees, pre and post judgment interest, costs of appeal if any, and costs of collection or enforcement of any judgment(s). Plaintiff requests and seeks all as allowed.

PARTIES

The Plaintiffs are federal inmates, currently incarcerated within the Federal Bureau of Prisons at one of its facilities. The Putative Class is defined, infra, and potentially represents approximately 200,000 Individuals.

The Defendants are as follows:

ALBERTO GONZALES (Individual Capacity)
Alberto Gonzales is the Attorney General of the United States

HARLEY G. LAPPIN (Individual Capacity)
Harley G. Lappin is the Director of the Federal Bureau of Prisons

UNITED STATES OF AMERICA  ("UNITED STATES")

FEDERAL BUREAU OF PRISONS  ("FBOP")

SEVERAL UNKNOWN AGENTS OF THE FEDERAL GOVERNMENT
(Individual and Official Capacities)
The identities of these parties are currently being concealed.

The UNITED STATES & FBOP are named for the explicit conduct of ALBERTO GONZALES and HARLEY G. LAPPIN in their official capacities for their specific conduct while acting under "color of law".

## VENUE

Venue is proper in the District Court for the District of Columbia. Nearly all, if not all, of the conduct of the Defendants occurred within this district. The Defendants' "physical actions" being said conduct and the common customs, practices, and policies which those actions and such conduct relates to in this complaint. "Courts have found venue proper in Bivens actions where substantial conspiring, planning, or supervision of an event occurred, even if the event itself took place in another judicial district." Freeman v. Fallin, 254 F. Supp. 2d 52 (D.D.C. 2005) quoting Ewervary v. Young, 159 F. Supp. 2d 132, 151 (E.D. Pa 2001)(finding venue proper in a district where the federal defendants "conspired with, gave substantial assistance or encouragement to, and/or ordered or induced" the taking of a child in an international custody dispute). Here, in Plaintiff's complaint, such being identically similarly present. See also Nestor v. Hershey, 425 F2d 504 (Dist. Col. 1969)(finding that when individual is affected and aggrieved by an unwarranted interpretation of an applicable statute by the Director of an agency he may properly seek relief at the seat of government). Moreover, 28 U.S.C. § 1402(b) provides that venue is proper in "a judicial district which a substantial part of the events giving rise to the claim occurred". Additionally, venue is proper pursuant to 28 U.S.C. § 1391(b) which similarly provides venue within the district where the conduct giving rise to the complaint occurs. Finally, venue is also appropriate under the general venue statute 28 U.S.C. § 1391(e) for the UNITED STATES OF AMERICA and the FEDERAL BUREAU OF PRISONS, Defendants here.

Moreover, the choice of venue is a perogative of a Plaintiff which is not to be disturbed lightly. "Sua sponte transfers are generally reserved for exceptional circumstances and are strongly disfavored." In re Chatman-Bey, 718

7

F2d 484, 487 (D.C. Cir. 1983); see also Robinson v. Giamarco & Bill, P.C., 74 F3d 253, 260 (11th Cir. 1996)(Plaintiff's choice of venue is given great weight and generally should not be distrubed); Scheidt v. Klien, 956 F2d 963, 965 (10th Cir. 1992)(same); Gulf Oil v. Gilbert, 330 U.S. 501, 508 (1947)("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"); Time, Inc. v. Manning, 366 F2d 690, 698 (5th Cir. 1966)("the plaintiff's privilege to choose, or not to be ousted from, his chosen forum is highly esteemed"); see also 15 Wright, Miller & Cooper § 3848 (discussing varying emphasis courts place on Plaintiff's choice of forum). Venue is proper in this applicable district as so chosen by the Plaintiff.

## PERSONAL JURISDICTION

Specific jurisdiction exists when, as here in Plaintiff's complaint, where a defendant has committed at least one act in the forum district and the act is substantially related to the suit. See Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414 (1984); Lewis v. Fresne, 252 F3d 352, 358-359 (5th Cir. 2001)(making a single phone call from the forum district qualifies). The District Court has Personal Jurisdiction on all named Defendants of this Complaint.

## SERVICE OF PROCESS of DEFENDANTS

**ALBERTO GONZALES,**   Attorney General of the United States, may be served with process, both in his capacity as Attorney General, and in his Individual Capacity Pursuant to Fed. Rul. Civ. Proc. Rule 4(i)(1)&(2). Office of the Attorney General of the United States, U.S. Dept. of Justice, Constitution and Tenth street N.W., Washington D.C.. Also, process to be served on the U.S. Attorney General in satisfaction of Rule 4(i)(1)&(2) ante; and Process to also be served on the United States Attorney, Washington D.C. District, Civil Process Clerk, Judiciary Center Building 555 4th Street N.W. Washington, D.C. 20001.

**HARLEY G. LAPPIN,** Director of the Federal Bureau of Prisons, may be served with process, both in his capacity as Director, and hi Individaul Capacity Pursuant to Fed. Rul. Civ. Proc. Rule 4(i)(1)&(2).   Federal Bureau of Prisons, Central Office 654 Home Owner's Loan Corp. Building, 320 First Street N.W., Washington D.C. 20534.    Also, process to be served on the U.S. Attorney General in satisfaction of Rule 4(i)(1)&(2) ante; and Process to also be served on the United States Attorney, Washington D.C. District, Civil Process Clerk, Judiciary Center Building 555 4th Street N.W. Washington, D.C. 20001.

**United States of America,**  Process to be served upon the United States of America Attorney General and upon the United States Attorney of Washington D.C. District each of the addresses as indicated ante, and all pursuant to Fed. Rul. Civ Procedure Rule 4(i)(1).

**Federal Bureau of Prosons,**  Process to be served upon the United States General Attorney and upon the United States attorney of Washington, D.C. District each addressed as indicated ante, and all pursuant to Fed. Rul. Civ. Procedure Rule 4(i)(1).

All process served to the United States Attorney for the Washington, D.C. District and to the United States Attorney General may be by Certified Mail pursuant to Fed. Rul. Civ. Proc. Rule 4(i)(1)&(2); except that, service to ALBERTO GONZALES, Defendant must be made pursuant to personal service or other authorized method.

### DEMAND FOR JURY TRIAL

"The burden of proving justification for interfering with fundamental constitutional rights is on prison officials -- and thus, must be proved in court."  Cruz v Beto, 405 U.S. 319 (1971).  Plaintiffs, herein, exercise the right to grant to them under the U.S. Constitution's Seventh Amendment, and also under any and all other applicable authorities thereof, and **DEMAND A TRIAL BY JURY** of all CLAIMS AND CAUSES OF ACTION, and on the DETERMINATION OF DAMAGES and the LIABILITIES, THEREOF of EACH Defendant.

JURISDICTIONAL GROUNDS OF CLAIM

APPLICABLE AUTHORITIES AND JURISDICTION FOR CLAIMS

Plaintiff hereby requests that this Honorable Court liberally
construe and hold this Pleading to the less stringent standards
in accordance with Haines v. Kerner, 404 U.S. 519, 520 (1972).
This Pleading contains, pursuant to Fe. R. Civ. Pr. Rule 8, Plaintiffs'
statement of claims showing the pleader is entitled to all relief
sought.  Plaintiff shows, herewith, the multiple basis of jurisdiction
of the causes of action which give the Federal District Court
jurisdiction over said claims, and state a cause of action for
which relief may be granted;  as follows:

### 1.  FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act, 28 U.S.C. §§ 2402, 2410, 2411,
2671-2680, is invoked herein, inter alia, as claimed jurisdiction
and cause of action in part against the Bureau of Prisons, an
agency of the United States as may be allowed, as well as against
the UNITED STATES (the Plaintiffs reference, infra, to the UNITED
STATES means "UNITED STATES OF AMERICA"), as allowed pursuant to
28 U.S.C. § 2671.  The Federal Tort Claims Act, "FTCA", authorizes
suits against the UNITED STATES in various situations such as this,
including indsividual officials in official capacities, to which
the Plaintiff also invokes such against the other Defendants in
their official capacities.  The FTCA does not provide personal
liability against individual prison officials.  Carlson v. Green,
446 U.S. 14, 21-23, 64 L. Ed. 2d 15 (1980).

## 2. JURISDICTIONAL BASIS FOR ACTION AGAINST PRISON OFFICIALS

### (A)

In <u>Bell v. Hood</u>, 90 L.Ed 939, 327 U.S. 678, 681-82 (1946), the Court explained "where the complaint...is so drawn as to seek recovery directly under the Constitution or laws of the United States, the Federal court, but for two possible exceptions...must entertain the suit." Id. The "two possible exceptions" are claims that "clearly appear [] to be immaterial and made solely for the purpose of obtaining jurisdiction" and claims that are "wholly insubstantial and frivolous." Id. at 682-83. See also 28 U.S.C. § 1331. Neither of these exceptions applies to Plaintiff.

The claims by Plaintiff clearly meet the basic requirements of a federal question jurisdiction. The claims arise directly under the Constitution and the laws of the United States. See also <u>Oxendine v. Kaplan</u>, 241 F3d 1272, 1276 (10th Cir. 2001); <u>Simmat v. U.S. Bureau of Prisons</u>, 413 F3d 1225, 1231 (10th Cir. 2005).

### (B)

### INJUNCTIVE RELIEF

Another jurisdictional authority is a claim for an injunction, as Plaintiff makes, based on the Federal Court's equity jurisdiction, to enforce the dictates of the Constitution and Federal law. Federal Courts have long exercised the traditional powers of equity, in cases within their jurisdiction, to prevent violations of constitutional rights. See e.g. <u>Osborn v. Bank of the United States</u>, 22 U.S. (9 Wheat.) 738, 858-59, 6 L. Ed 204 (1824)(Marshall, C.J.); <u>Davis v. Gray</u>, 16 Wall. 203, 83 U.S. 203, 220, 21 L. Ed 447 (1872)("A Circuit Court of the United States, in a proper case in equity, may enjoin a

State officer from executing a State law in conflict with the
Constitution of a statute of the United States, when such execution
will violate the rights of the complainant."); Ex Parte Young, 209
U.S. 123, 151-56, 52 L. Ed 714 (1908); Bell v. Hood, 327 U.S. 678,
684, 90 L. Ed 939 (1946)(recognizing the "jurisdiction of the federal
courts to issue injunctions to protect rights safeguarded by the
Constitution"); Bolling v. Sharpe, 347 U.S. 497, 98 L. Ed 884
(1954)(holding that the Fifth Amendment and 28 U.S.C. § 1331 created
a remedy for unconstitutional racial discrimination in the D.C.
public school system).  Equity, thus provides the basis for relief -
the cause of action in appropriate cases within this Federal Court's
jurisdiction.    The application of injunction is not limited by
sovereign immunity in such case:

> "An action in a court of the United States seeking
> relief other than money damages and stating a
> claim than an agency or an officer or employee
> thereof acted or failed to act in an official
> capacity or under color of legal authority shall
> not be dismissed nor relief there-in be denied on
> the ground that it is against the United States or
> that the United States is an indispensable party."

### 5 U.S.C. § 702

This waiver is not limited to suits under the Administrative
Procedures Act, "APA."    See Chamber of Commerce v. Reich, 74 F3d
1322, 1329 (D.C. Cir. 1996)("The APA's waiver of sovereign immunity
applies to any suit whether under the APA or not."); see also U.S. v.
Murdock Mach. & Engr. Co., 81 F3d 922, 930 n.8 (10th Cir.
1996)(describing § 702 as a "general waiver of the government's
sovereign immunity from injunctive relief"); Simmat v. U.S. Bureau of
Prisons, supra at 1233.    Sovereign immunity, is, therefore not a bar
to Plaintiff's action for injunctive relief.

## (C)

### RELIEF IN NATURE OF MANDAMUS

The District Court also has jurisdiction under 28 U.S.C. § 1361:

> "The district courts shall have 'original
> jurisdiction' of any action in the nature of
> mandamus to compel an officer or employee of the
> United States or any agency thereof to perform
> a duty owed to the Plaintiff."

### 28 U.S.C. § 1361

Mandamus is the traditional writ designed to compel government officers to perform non-discretionary duties. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 168-69, 2 L. Ed 60 (1803). In Houston v. Ormes, 252 U.S. 469, 472-73, 64 L. Ed 667 (1920), the Court held that "suits to compel federal officers to perform some ministerial duty imposed upon them by law, and which they wrongfully neglected or refuse to perform...would not be deemed suits against the United States within the rule that the Government cannot be sued except by its consent." See also e.g. Roberts v. United States ex rel. Walentine, 176 U.S. 221, 44 L. Ed 443 (1900)(granting mandamus against the United States Treasurer); Washington Legal Foundation v. U.S. Sentencing Commission, 89 F3d 897, 901 (D.C. Cir. 1996).

Although through abolition of the traditional common law forms of action, the Writ of Mandamus is no longer technically available, but, Fed. R. Civ. Pr. 81(b) provides "Relief here-to-fore available by mandamus...may be obtained by appropriate action or by appropriate motion under the practice described in these rules." The generic "civil action" of the new rules (Fed. R. Civ. Pr. Rule 2), provides the form of action in which mandamus relief is now available. Federal Courts have often invoked 28 U.S.C. § 1361 as jurisdictional basis for challenges to prison conditions. See e.g. Kahane v.

<u>Carlson</u>, 527 F2d 492, 496 (2nd Cir. 1975)(First Amendment challenge to prison services and ordering that Federal officials provide "a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws"); <u>Workman v. Mitchell</u>, 502 F2d 1201, 1205 (9th Cir. 1974); <u>Waddel v. Allredge</u>, 480 F2d 1078 (3rd Cir. 1973)(per curiam)(exercising jurisdiction under 28 U.S.C. § 1361 to consider a suit brought by black Muslim inmates to compel accommodation of worship services and service of at least one pork-free meal per day); <u>Walker v. Blackwell</u>, 360 F2d 66 (5th Cir. 1966). Thus, the Plaintiff is not barred from obtaining judicial relief through mandamus.

### (D)

In sum, as a result of Congressional action in 1875 (creating a Federal question jurisdiction), 1962 (extending mandamus jurisdiction to all Federal District Courts), and 1976 (waiving sovereign immunity in cases for non-monetary relief against Federal officials and agencies), Federal District Courts now have jurisdiction over claims by Federal prisoners against prison officials and the Bureau of Prisons seeking vindication of the Constitutional or statutory rights under either 28 U.S.C. § 1331 and/or 28 U.S.C. § 1361, and may obtain relief in the form of either injunction and/or mandamus.

### (E)

#### DECLARATORY JUDGMENTS AND FURTHER RELIEF

The Federal District Court may also hold jurisdiction for and the Plaintiff may seek relief through "Declaratory Judgment," pursuant to 28 U.S.C. § 2201, which states:

> "In a case of actual controversy within its
> jurisdiction...**any** court of the United States,
> upon the **filing of an appropriate pleading,**
> may declare the rights and other legal relations
> of any interested party seeking such declaration,
> whether or not further relief is or could be
> sought.  Any such declaration shall have the
> force and effect of a final judgment or decree and
> shall be reviewable as such."

The Plaintiff may also seek further relief and the Federal

District Court is authorized to grant such relief based on

"Declaratory Judgment," as authorized by 28 U.S.C. § 2202, which

states:

> "Further necessary or proper relief based on a
> declaratory judgment or decree may be granted,
> after reasonable notice and hearing, against
> any adverse party whose rights have been
> determined by such judgment."

Hence, these statutes provide the District Court the authority

and provide the Plaintiff the right to seek such relief through

"Declaratory Judgment" and other relief based on such judgment.

### (F)

The District Court has jurisdiction, as discussed ante, over

over Plaintiff's claims against the Defendants for the non-monetary

relief sought.  Further, Plaintiff has met the burden, in order to

state a claim upon which relief may be granted, by exhausting all

administrative remedies as required. (see 28 CFR § 542.20; outlining

the Federal prisoner's Administrative Remedy Program for claims

arising out of prison conditions) pursuant to the Prison Litigation

Reform Act "PLRA," 42 U.S.C. § 1997e(a).  To satisfy the PLRA's

exhaustion requirement and to state a claim for relief, a prisoner

must: (1) make a "short and plain statement of the claim," Fed. R.

Civ. Pr. Rule 8, and (2) "attach [] a copy of the applicable

administrative dispositions to the complaint." See <u>Steel v. Fed.</u>

Bureau of Prisons, 355 F3d 1204, 1210 (10th Cir 2003)  quoting
Knuckles El. v. Toombs, 215 F3d 640, 642 (6th Cir 2003).   The
Plaintiff has complied with these prerequisites and has met this burden.

**3.**

The Bureau of Prisons is an "agency" of the Federal
Government.  For purposes of the APA, " 'agency' means each authority
of the Government of the United States, whether or not is within
or subject to review by another agency."  5 U.S.C. § 551(1).  "The
APA applies to the Bureau of Prisons."  Bunn v. Conley, 309 F3d 1002,
1009 (7th Cir 2002); White v. Henman, 977 F2d 292, 293 (7th Cir 1992);
Simmat v. U.S. Bureau of Prisons, supra at 1239 (10th Cir 2005).   Thus,
the APA is an appropriate way to contest the Bureau's implimentation
of program statements and statutory mandates.  Further, 28 U.S.C.
§ 1337 creates additional jurisdiction of the federal courts pursuant
to such execution of procedures and statutes.  The D.C. Circuit
reached the same conslusion that the **APA provided jurisdiction and
remedy for federal prisoner challenge** in Ramar v. Saxbe, 522 F2d
**695, 697 (D.C. Cir. 1975),** inwhich federal prisoners sought declaratory,
injunctive, and mandamus relief against the Attorney General and the
Director of the Bureau of Prisons.  See also Krilich v. Bureau of
Prisons, 346 F3d 157, 159 (6th Cir 2003); Gunderson v. Hood, 268
F3d 1149, 1152-54 (9th Cir 2001).  Judicial jurisdiction of the
district courts are available pursuant to action by way of the APA
and the government has, here also, waived the claim of any
sovereign immunity.  See U.S.C. § 702 and § 703.  Thus, actions
for declaratory judgments, writs of prohibitory or mandatory
injunction, mandamus, or habeas corpus are authorized against the
United States, the Federal Bureau of Prisons, and the appropriate
officer(s) by name or by title, in the United States District Courts.

17

4.

## BIVENS ACTION

A Bivens (Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 29 L Ed 2d 619 (1971)) claim lies against the Federal official in his **individual capacity**--not in their oficial capacity.  Bivens allows the Plaintiff to also sue the Defendants in their individual capacities for damages for the Constitutional violations.  Such is analogous to 42 U.S.C. § 1983. Because the Plaintiff may not assert personal liability against a prison official for violations of the prisoners' consititutional rights under the FTCA (see Carlson v. Green, 466 U.S. 14, 21-23, 64 L Ed 2d 15 (1980)), the Plaintiff **invokes jurisdiction of Bivens** and a Bivens claim against Defendants (as named in their personal individual capacities herein) as jurisdiction for relief and liability, and damages of Plaintiffs' constitutional claims.  The Supreme Court in Carlson, supra at 18-21, held that an inmate could pursue a Bivens action independent of a FTCA claim.  See also Butz v. Economou, 438 U.S. 478 (1978) holding the same.  The Court noted that the legislative history of the FTCA "made crystal clear that Congress viewes FTCA and Bivens as parallel, complementary causes of action."  Carlson Id. at 19-20 (citing S. Rep. No. 93-588 p.3 (1973)).  The Plaintiff hereby incorporates all claims, facts, and arguments made within this Pleading into a parallel Bivens claim herewith also made a part of this lawsuit.

18

5.

JURISDICTION INVOKED PURSUANT TO

28 U.S.C. § 1331

and

28 U.S.C. § 2674


and

AMERICAN WITH DISABILITIES ACT, 42 U.S.C. § 12101 et. seq.

and

SECTION 504 of the REHABILITATION ACT, 29 U.S.C. § 794

and

PURSUANT TO ALL APPLICABLE TEXAS TORT STATUTES and TEXAS STATUTES


The Plaintiff asserts and invokes jurisdiction and causes of action and liability of Defendants (as allowed) pursuant to each of the authorities, ante, for all Claims (Counts) as allowed by law, and as allowed to give Plaintiff an appropriate cause of action.

STATEMENT OF CLAIM

CLAIMS

Plaintiff, hereby, incorporates into each of the following claims (counts) all of the Pleadings referenced, infra, as the "Facts" Section as "Verified" facts, all of the Pleadings referenced, infra, as the "Jurisdiction Grounds of Claim" Section, all of the Pleadings referenced, infra, as the "Legal Standards Relevant to this Case" section, and the entire Section referenced, infra, as the "Appendixes" of and to this Pleading into each and every Count.

When Plaintiff refers to "policy", or "custom", or "practice", Plaintiff defines such as being an "Official" policy. When Plaintiff refers to "rights" the Plaintiff defines such as being rights that are "clearly held" and/or "clearly established" rights.  When the Plaintiff refers to "Damages" this means "Physical Injuries", "Pain and Suffering", "Duress", and other forms of damages.  When Plaintiff refers to "Agent", Plaintiff refers to such agent as in both their "Individual Capacity" and in their "Offical Capacity" and having acted under color of law on behalf of, or in concert with, or in aiding & abiding of, or as assisting in any manner any of the other Defendants in this Cause of Action, such that, at this time the agent(s)' identities are being concealed from the Plaintiff.  When the Plaintiff refers to "health needs" (such being distinguished from "medical treatment" or "health care" needs) such is defined as the needs which are basic human needs of physical health, mental health, emotional health, the necessities of having a living environment free from Environmental Tobacco Smoke ("ETS"), of having an environment free from any other types of environmental toxin such as Asbestos, Black Mold, Mold, disease, the needs of clean air, clean water, and the needs of having an environment free of the risk of any spread of an infectious disease, the needs of safety and being in a safe and healthy environment, the

21

needs of adequate living space, the needs of an adequate degree of quiet, the needs of an adequate quantity of quiet-time, the needs for an adequate recreation space, of adequate and proper (pursuant to applicable professional and social standards) ventilation & degree of temperate enviroment, the needs of having adequate and properly cooked food (unspoiled, not out of date, free of insect or rodent comtamination effects and nutritionally adequate and complete to professional standards), the needs of proper sanitation & hygine, the needs of adequate (to professional standards) plumbing, toilet & shower facilities per individual, the needs of being free of any other factors which may contribute to, accelerate, cause, exacerbate, or affect in a negative way the physical, emotional, or mental health of an individual, the needs of having a "Medical Care System" which is not inadequate or not in violation of the Eighth Amendment of the Constitution in any manner, and the needs of having properly trained and adequate quantities of staff according to professional standard operating requirements in order to assure that each of the above needs are maintained continuously without any interruption and without a risk of interruption to any individual.

When the Plaintiff refers to an "inadequate Medical Care system" or one being "systemically deficient" the Plaintiff defines such as a medical care system, and thus medical care made available to an individual, which is in violation of the Eighth Amendment and contains much or all of the following: inadequate (to societal standards of human decency and societal norms) sick call, triage, emergency care, urgent care, chronic care, preventive care, nurses, doctors, specialists, speciality screenings, follow-up care, examinations and tests, medical equipment, medications, speciality diets, terminal care, health education, dental care, dental preventive care, grievance procedures, unreasonable delays or disruptions in care or

medication, RN availability, medical doctor availability, speciality care availability, availability of medical supplies and equipment, training, supervision, staffing, quality control, quality control facilities, and inadequate protocols, or failures to to follow protocols, in emergency or urgent care or in any of the aforesaid items above. See Plata v. Davis, 329 F3d 1101 (9th Cir. 2003)(defining similar inadequate "medical care system" which was in violation of the Eighth Amendment in relation to a Certified Class which was then potentially, or could be possibly exposed or subject to, care from such inadequate "medical care system"). Such void of adequate "system" being itself a damage of which is an actual "deprivation".

When Plaintiff refers to a "Duty" Plaintiff refers to the duty, or duties, imposed pursuant to Federal Law and Statutes (such as, but not limited to, 18 U.S.C. § 4042, 18 U.S.C. § 3621, 42 U.S.C. § 12101 et. seq., 29 U.S.C. §§ 504 & 794, Freedom of Information Act, duties imposed by the Constitution, duties imposed by applicable State Laws, fire codes, duties imposed pursuant pursuant to the Code of Federal Regulations such as 28 CFR §§ .5 & .95, 40.7, 540.18(a), 540.19, 542.12, duties imposed by courts of law or established by res judicata (see Estelle v. Gamble, 429 U.S. 97, 103), inter alia, and duties imposed pursuant to common-law or societal standards, as well as such duty of the "exercise of ordinary diligence to keep prisoners safe and free from harm", as well as a duty "not to be negligent or deliberately indifferent in the exercise of the Defendants' responsibilities", and the duty to not act unreasonably in a duty owed).

When the Plaintiff refers to UNITED STATES, the Plaintiff means "UNITED STATES OF AMERICA" and Federal Bureau of Prisons, such that said Defendant UNITED STATES is named only for and in reference to the specific conduct, as alleged infra, of ALBERTO GONZALES (Individually), and ALBERTO GONZALES,

23

Attorney General of the UNITED STATES, HARLEY G. LAPPIN (Individually), and HARLEY G. LAPPIN, Director of the Federal Bureau of Prisons, and the specific conduct of "Several Agents of the Federal Government (Individually & Official Capacity) whose identities are currently being concealed from Plaintiff in direct relation to the specific allegations of same as referenced, infra.

COUNT 1

Defendants GONZALES, LAPPIN, and UNITED STATES initiated, caused to be initiated, implemented, caused to be implemented, allowed, caused to be allowed, and caused to be executed a policy, custom, and practice of massively overcrowding Federal Bureau of Prisons ("FBOP") facilities nationwide far beyond the safe and Constitutional levels and designed capacities of each such facility (cumulatively and individually), on information belief, with deliberate indifference to the risk that such conduct would, or may, as it has, offend the Plaintiff's Constitutional rights (Eighth and Fifth Amendment Rights), statutory rights, entitlements, and/or duties owed to Plaintiff. Such conduct being with actual or constructive knowledge that the Plaintiff did, or may, suffer damages from such conduct, and that Plaintiff would, or may, be deprived of a proper Constitutional level of "Health needs", Constitutional rights (supra), statutory rights, entitlements, and duties owed to Plaintiff, as Plaintiff has been, or that Plaintiff would be exposed and subject to an "inadequate health care system", as he has been, and that Plaintiff would be subjected to the "Effects of Massive Over-crowding", infra, as Plaintiff has been, and that such conduct is, and would be, "a cause in fact of the deprivations of rights inflicted", Spiker v. City of Texas City, 130 F3d 162, 167 (5th Cir. 1997), upon the Plaintiff. These Defendants being the "policy makers" and such conduct being the "moving force", see Piotrowski v. City of Houston, 237 F3d 567 (5th Cir.), cert. denied, 534 U.S. 820 (2001), of the violations and deprivations inflicted upon the Plaintiff.

This conduct being between February 25, 2004, and the present time and being also ongoing. The Plaintiff has suffered damages from this conduct of the Defendants named, supra, and continues to suffer damages. Such conduct having resulted in, and ongoingly resulted in, subjecting Plaintiff to an "inadequate

25

Medical Care System" from February 25, 2004, to present, and such conduct depriving Plaintiff of "health needs" between February 25, 2004, to present, subjecting Plaintiff to "effects of massive overcrowding" as specifically detailed and ennumerated in the facts section, infra, between February 25, 2004, and the present, depriving Plaintiff of duties owed to him by these Defendants and entitlements entitled by the Plaintiff between February 25, 2004, and the present, and causing Plaintiff's Constitutional Eighth and Fifth Amendment rights to be offended between February 25, 2004, and the present by subjection of Plaintiff to the deprivations and conduct as is referenced, supra, and the subjection of the Plaintiff to the an inadequate health care system, and to all of the conditions and effects of massive overcrowding referred to in the Facts section, infra, of which Plaintiff was subjected to each, and that each of these also being continuous and ongoing.    The Putative Class has been similarly aggrieved by this conduct and similarly, on information and belief, suffered the same damages.

COUNT 2

Defendants GONZALES, LAPPIN, and UNITED STATES implemented, caused to be implemented, allowed, caused to be allowed, caused to be executed, approved, and/or caused to be approved a custom, practice, and policy of failing to adhere to, and to apply, the specific individual determinations to designate Plaintiff to a facility pursuant to 18 U.S.C. § 3621(b) for the time period between February 25, 2004, and the present; further that said Defendants willfully failed to exercise their discretion pursuant to 18 U.S.C. § 3621(b) to to transfer or designate Plaintiff and other over-population levels within "secure" institutional facilities to either Community Correction Centers or Home Confinement while knowingly such custom, practice, and policy resulted in

26

facilities which were massively overcrowded and resulted in Constitutionally offensive conditions while the Defendants knew they had discretion, should have utilized such individualized discretion instead of avoidance of such, to do otherwise with other confinement options available.    See 18 U.S.C. § 3621(b); Goldings v. Winn, 383 F3d 17 (1st Cir. 2004); Monahan v. Winn, 276 F. Supp 2d 196 (D. Mass. 2003)(Gertner, J.); Elwood v. Jeter, 386 F3d 842 (8th Cir. 2004); Iacamboni v. U.S., 251 F. Supp. 2d 1015 (D. Mass. 2003)(Posnor, J.); Ferguson v. Ashcroft, 248 F. Supp. 2d 547 (M.D. La 2003); Mallory v. U.S., 2003 WL 1563764 (D. Mass Mar. 25, 2003)(Woodlock, J.); McDonald v. Fed. Bur. of Prisons, No. 03-CV-235 (N.D. GA Feb 14, 2003); U.S. v. Canavan, 2003 WL 245226 (D. Minn. Jan 22, 2003); Woodall v. Fed. Bur. of Prisons, No. 05-3657 (3rd Cir. Dec 15, 2005); Cato v. Menifee, No. 03 Civ 5795 D.C., 2003 WL 22725524 (S.D. NY Nov. 20, 2003); Grimaldi v. Menifee, 2004 WL 912099 (S.D. NY April 29, 2004); Fagiolo v. Smith, 326 F. Supp. 2d 589 (M.D. PA, 2004); inter alia.    The Defendants knew they clearly had other options available had they properly acted and not failed to act in their conduct, such conduct being done, on information an belief, with deliberate indifference to the resulting, and probable, Constitutionally and statutorily offensive conditions that would result from such custom, practice, and policy (conduct).    The Plaintiff suffered damages from such conduct from February 25, 2004, to the present, and suffers ongoing damages from such ongoing conduct, all such being proximate cause of such conduct, the "moving force" of such being the policy, custom, and practice (conduct).    All such being continuous and ongoing. The Putative Class has been similarly aggrieved by this conduct and similarly, on information and belief, suffered the same damages.

COUNT 3

Defendants GONZALES, LAPPIN, and the UNITED STATES Breached "Duties" owed to

27

Plaintiff by their conduct ennumerated and described in Count 1, supra, and similarly Breached Duties owed to Plaintiff by their conduct ennumerated and described in Count 2, supra, such that these actions ("conduct" for purposes of this Count #3) constitutes Breach of duty. See U.S. v. Muniz, 374 U.S. 150 (1963). This conduct (breach) having occurred in relation to Plaintiff between February 25, 2004, and the present, and such being continuous and ongoing. Such conduct has caused Plaintiff damages during the same time period. In respect to such conduct (breach) these Defendants were negligent, and negligent in the exercise of their responsibilities as well as deliberately indifferent to the probable resulting damages that would ensue due to such conduct. Further, these Defendants also, by such conduct, set in motion a series of events that the Defendants knew, or should reasonably have known, would cause others to deprive Plaintiff of Constitutional and statutory rights as well as entitlements or other duties owed to Plaintiff, such also being done, on information and belief, with deliberate indifference to the resulting, or potentially resulting harm to Plaintiff. The Defendants, furthermore, also acted unreasonably during such time period indicated, supra, in placing and designating or causing Plaintiff to be designated at such a location that would result in deprivations and constitutional violations, rather than to assign Plaintiff to a location such as home confinement that would not violate Plaintiff's clearly held rights. All such conduct and damages also being continuous and ongoing. The Putative Class has been similarly aggrieved by this conduct and similarly, on information and belief, suffered the same damages.

28

## COUNT 4

Defendants GONZALEZ, LAPPIN, and the UNITED STATES by their conduct alleged and ennumerated within Count 1 and 2, ante, ("conduct" for purposes of this Count #4) constitutes both Negligence and Negligence Per Se.  The Defendants, supra, liabilities to Plaintiff clearly arise from a "duty of care" owed to Plaintiff, as well as such conduct is also Negligence Per Se. The Defendants, supra, in their conduct, breached the duties owed to Plaintiff during the period between February 25, 2004, and the present, and such breach is also ongoing and continuous.  such breaches have caused damages to the Plaintiff, and similarly to the Putative Class also during this same time period.

## COUNT 5

Defendants GONZALES, LAPPIN, and the UNITED STATES by their conduct as ennumerated and described in Counts 1, 2, and 3, ante, Failed to Act, this refereed to within this Count as "conduct".  By this conduct these Defendants failed to act to prevent harm or damages from being inflicted upon Plaintiff both prior to such probability that damages might be realized by Plaintiff and after these Defendants had actual or constructive knowledge of the damages that had occurred, and that are also continuous and ongoing. Plaintiff has suffered damages from such conduct, such conduct and damages occurring between February 25, 2004, and the present as well as being continuous and ongoing.   These damages are proximate cause from the Defendants' supra, conduct.  This being similarly occurring during this same period to upon the Putative Class.

29

COUNT 6

Defendants GONZALES, LAPPIN, and UNITED STATES, by their specific conduct as referenced, infra, in Counts 1, 2, 3, and 8 conspired to violate the civil and constitutional rights of the Plaintiff, as well as those of the Putative Class, such conspiracy being within themselves and with other unnamed individuals. Similarly, these Defendants also aided and abetted in such conspiracy, as well as aided and abetted in the violation of the Plaintiff's Constitutional rights, duties owed to the Plaintiff, and entitlements of the Plaintiff (as ennumerated in each of the stated Counts, respectively). The Plaintiff has suffered damages from such conduct. This conduct and damages also similarly being inflicted upon and realized by the Putative Class. Such conduct and damages having occurred between February 25, 2004, and the present, and being continuous and ongoing.


COUNT 7

The Defendants in this action, on information and belief, conspired to, interferred with, caused to interfere with, and aided and abetted others to, deny Plaintiff access to the courts in violation of the Fifth Amendment and Federal law. Further, these Defendants then attempted to, and currently in part do, conceal the full unlawful conduct and information and documents regarding this Count and others. See Crowder v. Sinyard, 884 F2d 804, 812 (5th Cir. 1989)("[I]f state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining relief to which one is otherwise entitled, they have committed a Constitutional violation"); see also Harbury v. Deutch, 244 F3d 956, 959-960 (D.C. Cir. 2001)(Same). "[T]he Constitution guarantees plaintiffs the right of meaningful access to the courts, the denial of which is established where a party engages in pre-filing actions which effectively

Harbury v. Deutch, 244 F3d 956, 959 (D.C. Cir. 2001) quoting Delew v. Wagner, 143 F3d 1219, 1222 (9th Cir. 1998). "[I]f a party engages in actions that effectively cover evidence ... they have violated his right of access to the courts." Harbury, supra Id at 959 quoting Swekel v. City of River Rouge, 119 F3d 1259, 1262 (6th Cir. 1997); see aslo Vasquez v. Hernandez, 60 F3d 325, 328 (7th Cir. 1995)("[E]fforts by state actors to impede an individual's access to the courts ... may provide the basis for a constitutional claim under 42 U.S.C. § 1983"); Harbury v. Deutch, supra (Same).

The Defendants named in this action, including "Several Unknown Agents of the Federal Government" whom at this time the identities of which are being concealed from the Plaintiff, conspired with, aided & abetted, and otherwise assisted in illegally and unlawfully removing and obtaining original filed documents from inside the U.S. District Court Clerk's Office, District of Columbia, on or about February - March, 2006. Such original and time-stamped documents were an Original set of Original Pleadings which had been filed in said District Court in another cause of action, by the Plaintiff in this instant action. These documents had been reported missing from within the U.S. District Court Clerk's Office, and had not been sent or served upon the defendants of that cause of action, and such documents went missing for almost 45 days, this delaying and inhibiting the Plaintiff. Such documents also including Official Exhibits to such Pleadings. Such documents were "missing" and "stolen" until employees of the Defendants then admitted to illegally obtaining, possessing, concealing said documents which bore the original U.S. District Court Clerk's Seal and Time-Stamp. Then, on or about March 22, 2006, employees of the Defendants then gave these Court Documents not back to the U.S. District Clerk, from where they had been taken, but rather, gave such Time-Stamped Original documents of the Court to the Plaintiff. Upon receipt of such documents, the Plaintiff examined such to

31

discover that the Defendants had altered and inserted additional unauthorized, and falsified, pages to such court-filed documents. These falsified documents added to such which purported to have been executed and on a date in 2005, bore unmistakable physical evidence (Official B.O.P. Time-Stamps, inter alia) that showed such had actually been "falsified" on "March 16, 2006" -- the very day the entire file should have been locked away within the U.S. District Clerk's vault and file, such documents not then being public information. This conduct also violates 18 U.S.C. § 2071 (unlawful removal, concealment, and possession of documents deposited with a U.S. District Court Clerk's Office, as well as violates 18 U.S.C. §§ 241, 242, & 371 (conspiracy to violate civil rights). Because the Plaintiff must conduct discovery prior to the identities of these "Agents" being known, they are referred to here in both their "Official Capacity" and "Individual Capacity" in this particular Count, as they "acted under color of law" in the conduct referenced within this Count in total.

## COUNT 8

Defendants GONZALES, LAPPIN, and UNITED STATES, on information and belief, initiated, caused to be initiated, allowed, caused to be allowed, and allowed to be executed a policy, custom, and practice of denying Plaintiff access to documents accessible and obtainable (such documents such being officially and correctly requested) pursuant to the Freedom of Information act, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a et. seq., from the period July, 2005, to the present, and such being also continuous and ongoing. The Plaintiff during this period has repeatidly and continuously properly requested said documents needed in order to have meaningful access to the courts in prosecution of litigation, such documents being crucial. These Defendants have applied such policy in conduct which has deprived the

Plaintiff of Constitutional rights, statutory rights, duties owed to him, and entitlements to said documents in the "concealment" and "cover-up" as part of such conduct. The Defendants long ago indicated and acknowledged that Plaintiff was due and entitled to such various documents by law, Defendants have, with deliberate indifference, failed to exercise a duty owed to Plaintiff and further has deprived Plaintiff of his Constitutional rights and statutory rights in the process. Plaintiff has suffered damages from such conduct between July, 2005, and the present, and such is also continuous and ongoing. On information and belief, this conduct, and similar damages are also inflicted in a widespread practice upon the Putative Class during this time period as well.

RELIEF SOUGHT

and

MONETARY DAMAGES REQUESTED

## RELIEF SOUGHT

The PLRA, 18 U.S.C. § 3626, Pub. L. 104-134, Title VIII, § 802(a), 110 Stat. 1321-66, establishes criteria for the granting of **"prospective relief"** for prison conditions.  The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages".  18 U.S.C. § 3626(g)(7).  Thus, the monetary damages and Declaratory relief sought by Plaintiff is not regulated or effected by the PLRA in such respect.  The PLRA allows a federal court to order prospective relief it is 1) Narrowly drawn; 2) Extends no further than necessary to correct the violation of the Federal right; and 3) Is the least intrusive means necessary.  See Ruiz v. Estelle, 161 F3d 814 (5th Cir. 1998); Castillo v. Cameron County, Texas, 238 F3d 339 (5th Cir. 2001).  Hence, the Plaintiff, herein, has drafted **specific narrowly drawn requests for relief of ongoing Federal and Constitutional rights**, such that such Requests for Relief are the least intrusive means available to effectively correct  such violations without continuing violations remaining or occurring.

The "scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." battle v. Anderson, 457 F. Supp 719, 734 (E.D., Ok 1978); Hutto v. Finney, 57 L. Ed. 2d 522 (1978); Miliken v. Bradley, 433 U.S. 267, 53 L. Ed. 2d 745 (1978); Battle v. Anderson, 564 F2d 388 (10th Cir. 1977); Newman v. Alabama, 559 F2d 263 (5th Cir. 1977).

LIABILITY OF DEFENDANTS & MONETARY DAMAGES REQUESTED

Plaintiff , hereby, invokes the doctrine of **Res Ispa Loquitor** on **all claims** against **all Defendants** in this action. "The outer limits of liability in any given case are determined ultimately by pinpointing the persons in the decision-making chain whose deliberate indifference **permitted** the constitutional abuses to continue unchecked. The final determination 'generally is one of **fact, not law**' (Avery v. County of Burke, 660 F2d 111, 114 (4th Cir., 1981), but [] statues fixing the administrator's legal **duties** provide a useful guide in determining who had the responsibility and **capability to end the offensive practices**.' Though their conduct may be a breach of constitutional duties, they are not liable unless **an affirmative causal link** exists between their **inaction** and the harm suffered." Slaken v. Porter, 737 F2d 368, 373 (4th Cir. 1984); Rizzo v. Goode, 46 L Ed 2d 561; Simms v. Adams, 537 F2d 829, 831 (5th Cir. 1976). "The proof of causation may be direct or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." Slakan, Id at 376 quoting Wellington v. Daniels, 717 F2d 932, 936 (4th Cir. 1993). "Supervisory liability in the civil rights context **may extend to the highest levels of** [] **government**." Slakan, supra Id at 373 quoting Scheuer v. Rhodes, 416 U.S. 232, (1974).

"[T]hough [D]efendant[s] may argue that even if their conduct was actionable under [42 U.S.C.] § 1983, [D]efendant[s] [are] entitled to qualified immunity from money damages." Slakan, supra Id at 376. The Court in Slakan then expalined: "We disagree. In Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), the Supreme Court carefully defined the contours of the qualified immunity or good faith defense" '[Glovernment offi-i-l

functions generally shielded from liability for civil damages in-so-far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' see also Butz v. economou, 438 U.S. 478 (1978); Wood v. Strickland, 420 U.S. 308 (1975); Scheuer v. Rhodes, 416 U.S. 232 (1974). Harlow reaffirmed the principle that a public official cannot excape § 1983 liability by relying solely on his subjective good faith or lack of actual knowledge about the extent of his constitutional or statutory duties. His subjective state of mind is but one part of the formula, for he is presumed to know what the law requires and may be forced to pay money damages when his actions cross the well-marked boundries. Harlow, 457 U.S. at 815. See also Mceleven et. al. v Hutto, 757 F2d 954 (4th Cir. 1984)." Slaken v. Porter, supra at 376.

The Defendants are liable to the claims of the Plaintiff as alleged, here-in. Further, although having been put on notice by repeated Administrative Remedy Requests, the Defendants chose to ignore with deliberate indifference both their statutory and constitutional duties to Plaintiff. See 18 U.S.C. § 4042; 28 C.F.R. Ch. 1 Subpart Q § 0.95(a)-(d); § .5; inter alia. Moreover, knowing the complaints, the inadequate medical care systems, and the various other effects of massive overcrowding and other constitutionally offensive conditions, the Defendants have also a direct culpability and liability for a failure to act on such. Such "affirmative choice" being a direct action of these Defendants.

Therefore, Plaintiffs ask this Honorable Court to Grant the following relief:

A)  An award of Monetary Damages as Plaintiff requests and as enumerated within infra, in favor of Plaintiffs such that such award shall also include all cost of court, pre and post-judgement interest on the total award at the highest interest rate allowed by law, and post-judgement appeal & litigation costs in full if an appeal is taken, and post judgement collection costs if any are incurred by Plaintiff and;

B)  Issuance of a **Declaratory Judgement** against Defendants in favor of Plaintiffs, acknowledging and Declaring that the Plaintiffs' Eighth Amendment Constitutional rights have been violated, are currently being violated, and the violation is ongoing.

C)  Issuance of the following Orders for Relief through either **Mandamus, Injuctive, Declaratory Relief,** or Other Relief as follows:

1)  An Order that the population level of the institutional facilities of the Federal Bureau of Prisons be reduced to a level that "shall" not exceed ninety five (95%) percent of the **original design capacity** of each prison facility, and further order, that such cumulative population levels within all Federal Bureau of Prison facilities "shall" not exceed ninety five (95%) percent of the **original design capacity** *** cumulatively of all F.B.O.P. facilities;

2)  An Order for the Immediate Issuance of **1,000 Days** "Over-Crowding Good-Time Credits" *** to each individual of the Putative Class;

---

*** These same reduction controls have previously been utilized in previous federal court litigation. See Battle v Anderson, supra; granting a 1,000 days extra over-crowding good-time credits while at the same time granting a 10 for 1 credit for anytime the system exceeded 95% of the original design capacity. See Ruiz v Estelle, supra which granted immediate injuction against adding to population and a 8-1 credit for anytime the system exceeded 97% of original design capacity, inter alia.

3)   An Order for the Issuance of "Over-Crowding Good-Time Credits" of seven (7) days credit for each Putative Class individual for each One (1) Day served and that such credit "shall" be applied towards the inmates total sentence inposed and that such credit shall be in addition to, and not in lieu of, any other credit already earned or allowed by law and that such credits be immediately applied to past time served and be applied on a daily ongoing basis irrespective of the institution or facility where the time was served until the population level reach the afore mentioned 95% levels of its original design capacity (i.e. for Seagoville Texas FCI the original; design capacity would be 597 inmates therefore an Extra Good-Time Credit would be applicable and so ordered until the Seagoville FCI facility drops to (95% of 597);

4)   Issuance of an Injunction against every Defendant preventing all future violations of Constitutional Rights, Statutes, Duties owed to, and entitlements of each and every individual of the Putative Class;

5)   **Mandamus** that any building or structure containing "Asbestos Containing Materials" that an inmate is housed in, works in, or may be exposed to be immediately closed and professionally abated of all "Asbestos Containing Material" ("ACM") by a private company certified in ACM abatement;

6)   **Mandamus** that any building or structure containing **Black Mold**, or other types of **Mold** where an Inmate may be housed, work in, or be exposed to "shall" be immediately and professionally abated of any and all such molds by a private company certified in Environmental Toxin Abatement;

7)   Issuance of an Injunction Prohibiting all **Environmental Tobacco Smoke**, and any and all **Tobacco** Products from each and every facility within the F.B.O.P.;

8)   **Mandamus** that every necessary medical and dental procedure be brought into conformity with current civilian social standards of decency and shall be scheduled and completed within thirty (30) days of such medical or dental condition being made known to the Defendants for every individual in the Putative Class;

9)   **Mandamus** that the Defendants shall within thirty (30) days bring the staff levels up in each and every facility to a population/staff ratio acceptable and recommended as provided by the DOJ jail standards manual and other Correctional Institution Organizations, such staff ratios including but not limited to correctional officer, counselors, medical staff, inter alia;

10)   **Mandamus** that Overtime Pay be provided to all correctional officers during a transition period until full staff levels are reached pursuant to (#9), supra; respective of a current inmate population;

11)   **Mandamus** that Overtime Pay referred to in (#10), Supra, shall not be required to be taken as "Comp-Time" but shall be paid as normal wages in accordance with the industry-wide standard for overtime rates (i.e. 1.5 times normal hourly pay for overtime), or at the Correctional Officer's choice such "Over-Time Pay" may be exchanged for Comp-Time at the same

industry wide standard as above (i.e. 1 hour of overtime will result in 1.5 hours of comp-time;

12) Issuance of an **Injuction** upon Defendants prohibiting staff, whom are not designated and trained as Correctional Oficers, from performing the duties as a Correctional Officer or from Substituting for, or in place of, any correctional officer;

13) An Order that Defendants shall construct, in a timely manner, new Medical and Dental Treatment Facilities; and further that Defendants shall provide to the Court within thirty Days an adequate Medical accountability plan to provide proper (i) diagnosis, (ii) treatment, (iii) medication, (iv) follow-up care, (v) staff training for procedures to follow the implementation of such procedures for identifying serious, critical or situations warranting immediate treatment and care outside normal procedures; (vi) a quality assurance plan including an outside peer review, from parties acceptable and approved by the Court, on a monthly basis; (vii) a plan calling for 24 hour staffing of medical operations; and (viii) a reporting and accountability system to provide the Court with ongoing supervisory review and;

14) **Mandamus** that a Defendant shall provide 24 hour staffing of medical personal at all F.B.O.P. facilities;

15) **Mandamus** that only those medical specialists (Doctors), whom are trained in their respective specialized medical area (i.e. cardiologist fro heart, Psychiatrist for mental, inter alia), may authorize specific treatment or medications, or may change or remove an inmate from medications prescribed by a specialist, and such specialist shall be the sole source of main diagnosis and prescribed treatment and medications of a condition or symptom complained of by an inmate and;

16) **Mandamus** that Defendants shall comply with the statutes of all state and local fire marshals, and shall further pass a complete inspection at each facility for fire code compliance within Ninety (90) Days of every building, living unit. and other area and;

17) **Mandamus** that Defendants shall provide a desk, chair, locker, trash receptical, and bed in each room so that there is at least one of each for each inmate quartered in said space and;

18) **Mandamus** that defendants shall comply with the Safe Water Drinking Act and all applicable water and plumbing codes at every F.B.O.P. facility;

19) Issuance of an **Injunction** prohibiting Defendants for violating any provision within the Code of Federal Regulations which may be applicable to Defendants in any manner;

20) **Mandamus** that Defendants shall comply with 28 CFR 542.14 et seq. and shall make available to all inmates the forms BP-9, BP-10 and BP-11 by placing a continuous and stocked supply of said forms in a self-serve shelf or rack within each living unit and within the inmate Law Library and;

21)  **Mandamus** that Defendants shall deliver the full amount of nationally authorized "per inmate" dollar amount "per meal" that is nationally averaged and budgeted for every B.O.P. inmate in food, without reducing said amount for any reason; and further, that no food contract or food service contract shall be maintained or renewed whereby any current or former B.O.P. employee, or associate of said employee, shall benefit in any way or manner, either by enumeration or other form, either directly or indirectly from any such purchase or contract and;

22)  **Mandamus** that Defendants shall not "let" any contract or other transaction for any goods or services, for commissary supplies, medical care, testing, treatment, or any other similar area, whereby such product is not received at a generally equivalent acceptable wholesale in bulk price, and that further, no current or former B.O.P. employee or associate shall benefit in any way or in any manner, either directly or indirectly, from said purchase or contract and;

23)  Issuance of an **Injunction** prohibiting the defendants from any future or continued violation of Plaintiff's Eighth Amendment Constitutional rights and;

24)  **Order** that a "Special Master" be **Appointed** to oversee compliance with each and every order of the Court, and to oversee implementation of a long-term program of compliance in every aspect and;

25)  Any and All Other Relief, by way of declaratory Judgement, Relief by Mandamus, Injunctive Relief, or Other Relief, and Monetary Relief to which this Honorable Court may be authorized to issue and to which the Plaintiffs may be entitled to or would meet the Ends of Justice.

Accordingly, the Defendants are liable to Plaintiffs for monetary damages for cumulative claims (counts) in the amount of TWELVE MILLION ($12,000,000.00) DOLLARS, jointly and several liability; and further, the Defendants are liable to the Putative Class of Individuals for the cumulative claim (counts) as follows:


**ALBERTO GONZALES** (Individual Capacity)
    at $25,000.00 per Class Member;          $5,000,000,000.00
                                             cumulative total.


**HARLEY G. LAPPIN** (Individual Capacity)
    at $25,000.00 per Class Member;          $5,000,000,000.00
                                             cumulative total.


**UNITED STATES OF AMERICA** (Federal Bureau of Prisons)
    at $25,000.00 per Class Member;    $5,000,000,000.00
                                             cumulative total.


Several Unknown Agents of the Federal Government
    at $25,000.00 per Class Member;          $5,000,000,000.00
                                             cumulative total.

Plaintiff is entitled to compensatory damages, damages for pain and suffering, inter alia, injuries, duress, damages for mental and emotional injury, punative damages, consequential damages, continuing damages (Environmental, Black Mold, Disease, and other toxin claims), discretionary damages, nominal damages as well as (not included in said request, infra) costs of court, attorneys' fees, legal costs, pre and post-judgment interest at the highest legal rate, costs of appeal (if taken by any party), and costs (if necessary or incurred) of any collection(s) or enforcement action(s) on any judgment(s) awarded.

Plaintiff, hereby, seeks ALL OF THE ABOVE.

CONCLUSION

&

PRAYER

CONCLUSION

The Plaintiff has requested not only damages, but more importantly, relief from past, present, and ongoing Constitutional violations. In considering Plaintiff's request for Relief against ongoing and future conditions, Plaintiff asks this Honorable Court to **TAKE JUDICIAL NOTICE** of **the original intent** of Congressin incarceration within Bureau facilities in the following "Sense of Congress":

> "Sentencing of Nonviolent and Non-serious Offenders;
> Sense of Congress
>
> Section 239 of Pub. Law 98-473 provided that:
>
> 'Since, due to an **impending crises in prison overcrowding,** available Federal prison space **must be treated as a scarce resource** in the sentencing of defendants;
>
> Since, sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious offenders who pose the most dangerous threat to society;
>
> Since, in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service;
>
> Since, in the two years preceding the enactment of sentencing guidelines, the Federal sentencing practice should ensure that scarce prison resources are available to hours violent and serious offenders by the increased use of restitution, community service, and other alternative sentences in cases of nonviolent and nonserious offenders;
>
> NOW, THEREFORE, BE IT DECLARED,
> THAT IT IS THE SENSE OF THE SENATE, that in the two years preceding the enactment of the sentencing guidelines, Federal judges, in determining the particular sentence to be imposed, consider --
>> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>> (2) the general appropriateness of imposing a sentence other_than_imprisonment in cases inwhich the defendant has not been convicted of a crime of violence or otherwise serious offense; and
>> (3) the general appropriateness of imposing a sentence of imprisonment in cases in which the defendant has been convicted of a crime of violence or otherwise serious offense.'"

In considering the Sense of Congress in review of a "prisoner release order" in conjunction with the existence of the ongoing Constitutional violative conduct, as well as the existence and availability of proper application of 18 U.S.C. § 3621(b) in the process, the remedies which have been proposed, infra, by Plaintiff, ones which other courts also found to be successful in addressing directly similar problems and situations, such is, and would be, compatible with the Sense of Congress as ennunciated, ante, and would provide for a solution-in-part to address the claims made by the Plaintiff prospective in nature.

The Defendants are liable to Plaintiff for damages, as requested, infra, and Plaintiffs are entitled to prospective relief from said unconstitutional conditions, policies, customs, and practices as would be provided by GRANTING of Plaintiff's Requests for Relief, infra.

The Plaintiff in this action is an out-custody/minimum security, non-violent, first-time offender, as are many members of the Putative Class. Such are, as is the Plaintiff, the Fathers, Sons, Brothers, and Husbands of their loved ones, whom had entrusted the Defendants to provide Constitutional care and conditions and meet proper needs which represent a basic standard of humaneness and human dignity. Although the Plaintiff (as well as the Putative Class) has been entrusted to the care of the Defendants "as punishment" for the convicted offense, the Plaintiff (and the Putative Class) has not been entrusted to the Defendants "for punishment". But, because of the Defendants' conduct, as heavily documented within this Pleading, this is exactly what has instead happened. For such the Defendants are liable to the Plaintiff (and to the Putative Class) for damages, and the Plaintiff (and the Putative Class) is further entitled to prospective relief.

46

The Plaintiff, hereby, submits this action to this Honorable United States District Court for proper adjudication and relief, thereof, and further **submits** the issues as well as the **determination of monetary damages** to the **fellow Americans of the Honorable Jury** which shall be empanneled to determine DAMAGES, AMOUNT OF JUDGMENTS, and ISSUES OF FACT to which said jury has the sole jurisdiction to determine.    The Plaintiff asks the Honorable Jury **to send a message that this type of unconsitutional conduct will not be tolerated in today's society in our country.** Although the conditions of Abu Grahib Prison in Iraq, Guantanamo Bay in Cuba, may have been "perceived" as cruel and unusual punishment, the facts of this action, within our own country of the United States, should not be condoned or continued, and these truely represent what can be termed cruel and unusual punishment upon **fellow Americans. ... SO SUBMITTED.**

47

## VERIFICATION OF PLEADINGS

I, JOHN M. BEAIRD, and ROBERT MIHAILOVICH hereby attest, certify, and affirm, under penalty of perjury that, having personal knowledge of the facts herein, and that such are true and correct, and that this Complaint is filed under good faith and not for any other purpose.

DATE: November 15, 2006

JOHN M. BEAIRD

DATE: November 15, 2006

ROBERT MIHAILOVICH

48

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff PRAYS THAT this Honorable Court, after proper consideration and due process, GRANT Plaintiff ALL of the Relief Requested, infra, and upon trial by Jury pursuant to the Seventh Amendment of the Constitution of this action, that Plaintiff, further Prays That, such Honorable Jury Find in favor of Plaintiff on all Counts and Claims of Plaintiff, and award Plaintiff Judgment against All Defendants in this Cause of Action.

Plaintiff further Prays That this Honorable Court also GRANT Plaintiff any and all other relief to which this Honorable Court may also provide.

Respectfully Submitted,

_____          _____
JOHN M. BEAIRD                             ROBERT MIHAILOVICH

ggg

----------------------------------------

NOTE:    The Plaintiff appoliges for and asks for this Honorable Court's indulgence in the poor type-quality of these Pleadings because of the lack of enough working typewriters (there are no computer or word processors available in the inmate law library).    For over 1800 inmates there are only 8 working typwriters in the law library, and most of these suffer from wheel-font problems, therefore, after waiting sometimes long periods for access to a typewriter, one may not get the same font-wheel or a properly working typewriter.    In the one year it took to complete the research, investigation, and this presentation, the inmate law library sufferred for periods inwhich there were only three typewriters which had wheels that were not broken.

----------------------------------------

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

John M. Beaird

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **88888**
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE (PR)

## DEFENDANTS

Alberto Gonzales, et al.,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

CASE NUMBER  1:06CV02268

JUDGE: John D. Bates

DECK TYPE: Pro se General Civil

DATE STAMP: 12 29 2006

JURY ACTION

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
  Plaintiff

☐ 3 Federal Question
  (U.S. Government Not a Party)

☒ 2 U.S. Government
  Defendant

☐ 4 Diversity
  (Indicate Citizenship of Parties
  in item III)

## III CITIZE...
FOR PLAINT...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☐ **A.** *Antitrust*

☐ 410 Antitrust

☐ **B.** *Personal Injury/*
  *Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C.** *Administrative Agency*
  *Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
  Administrative Agency is Involved)

☐ **D.** *Temporary Restraining*
  *Order/Preliminary*
  *Injunction*

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

☐ **E.** *General Civil (Other)* OR ☐ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☒ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
  defendant
☐ 871 IRS-Third Party 26
  USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
  Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
  Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
  Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
  Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
  Exchange
☐ 875 Customer Challenge 12 USC
  3410
☐ 900 Appeal of fee determination
  under equal access to Justice
☐ 950 Constitutionality of State
  Statutes
☐ 890 Other Statutory Actions (if not
  administrative agency review or
  Privacy Act

| ☐ **G.** *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ **H.** *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I.** *FOIA/PRIVACY ACT*<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J.** *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K.** *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ **L.** *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ **M.** *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ **N.** *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ Multi district Litigation | ☐ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23  **DEMAND $**  Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES ☒ NO  If yes, please complete related case form.

**DATE** 12.29.06  **SIGNATURE OF ATTORNEY OF RECORD** WCD

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

# Appendix 1

LEGAL STANDARDS RELEVANT TO THIS CASE

## EIGHTH AMENDMENT JURISPRUDENCE

"Persons are sent to prison as punishment -- not for punishment."
Battle v. Anderson, 447 F. Supp. 516, 525, affirmed 564 F2d 388
(10th Cir 1977).  "The Court has the authority and duty to insure
that the Constitution does not stop at the prison gate, but rather,
insures to the benefit of all, even to those citizens behind prison
walls."  Ibid at 524 quoting Jackson v. Goodwin, 400 F2d 529, 532
(5th Cir 1968); Finney v. Arkansas Board of Corrections, 505 F2d 194
(8th Cir 1974).  This principle of "faith" in our Constitution
"through works" is what has set America apart from all other
nations in history.

Courts have grappled with the problems and conditions of
confinement in several ways.  Conditions have been found to be per
se unconstitutional, e.g. Rhem v. Malcolm, 371 F. Supp. 594 (S.D.N.Y.
1974) aff'd 507 F2d 333 (2nd Cir 1974), conditions as exacerbated
by overpopulation have been found to be unconstitutional, e.g.
Williams v. Edwards, 547 F2d 1206 (5th Cir 1977), Finney v. Arkansas
Board of Corrections, 505 F2d 194 (8th Cir 1974), Pugh v. Locke,
406 F. Supp. 318 (M.D. Ala 1976), and overcrowding per se has been
found to be unconstitutional, Gates v. Collier, 390 F. Supp. 482
(N.D. Miss. 1975) and Finney v. Arkansas Board of Corrections, supra.
"Today the Eight Amendment prohibits punishments which, although not
physically barbarous,'involve the unnecessary and wanton infliction
of pain', Gregg v. Georgia, 428 U.S. 153, 173, 49 L Ed 2d 859 (1976),
or are grossly disproportionate to the severity of the crime, Coker

A1-2

06 2268

FILED

DEC 2 9 2006

NANCY MAYER WHITTINGTON, CLERK

v. Georgia, 433 U.S. 584, 592, 53 L Ed 2d 982 (1977)(plurality
opinion).  Among 'unnecessary and wanton' inflictions of pain are
those that are 'totally without penological justification'.  Greg
v. Georgia, supra at 183, Estelle v. Gamble, 429 U.S. 97, 103, 50
L Ed 2d 251 (1976)."  Rhodes v. Chapman, 69 L Ed 2d 59, 68 (1981).
And accordingly, "the Eighth Amendment 'must draw its meaning from
the evolving standards of decency that mark the progress of a
maturing society'."  Rhodes v. Chapman at 68.  As the Supreme Court
recognized in Chapman, conditions of confinement "alone or in
combination may deprive inmates of the minimal civilized measure of
life's necessities.  Such conditions could be cruel and unusual
under the contemporary standard of decency".  Chapman at 69.

When reviewing such combination of conditions "[i]t is important
to recognize that various deficiencies in prison conditions, 'must
be considered together.'  Holt v. Sarver, 309 F. Supp. at 373.  The
individual conditions 'exist in combination; each affects the other;
and taken together they have a cumulative impact on the inmates.'
Ibid.  Thus, a court considering an Eighth Amendment challenge to
conditions of confinement must examine the totality of the circum-
stances.  Even if no single condition of confinement would be
unconstitutional in itself, 'exposure to the cumulative effect of
prison conditions may subject inmates to cruel and unusual punishment."
Rhodes v. Chapman at 79 (concurring opinion, Brennan, J., joined by
Blackmun, J. and Stevens, J.).

"In determining when prison conditions pass beyond legitimate
punishment and become cruel and unusual punishment the 'touchstone
is the **effect** upon the imprisoned.  The Court must examine the
**effect** upon inmates of the condition of the physical plant (lighting,

heat, plumbing, ventilation, living space, noise levels, recreation space); sanitation (control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping and working); safety (protection from violent, deranged, or diseased inmates, fire protection, emergency evacuation); inmate needs and services (clothing, nutrition, bedding, medical, dental, and mental health care, visitation time, exercise and recreation, educational and rehabilitative programming); and staffing (trained and adequate guards and other staff)." Chapman, Ibid at 80. "When 'the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well being of the inmates and/or creates a probability of recidivism and future in-carceration,' the court must conclude that the conditions violate the Constitution." Ibid.

   "[I]ncarceration is not an open door for unconstitutional cruelty or neglect." Ibid. And in seeking the relevent information about conditions in a prison and their effect "the court must be open to evidence and assistance from many sources, including expert testimony and studies on the effect of particular conditions on prisoners. For this purpose, public health, medical, psychiatric, psychological, architectural, structural, and other experts have proved useful to the lower courts in observing and interpreting prisons conditions." Chapman, Ibid at 79, "[T]he work of standard-setting organizations such as the Department of Justice, the American Public Health Association, the Commission on Accreditation for Corrections, and the National Sheriff's Association, [inter alia] is particularly valuable." Chapman at 80 n.12.

"Where state institutions have been operating under un-constitutional conditions and practices, the defense [] of **fund shortage[s]** and the inability of the district court to order appropriations by state legislators, have been **rejected by federal courts.**" Smith v. Sullivan, 523 F2d 373, 378 quoting Gates v. Collier, 501 F2d 1291, 1319 (5th Cir 1972). Thus, "inadequate resources **can never be an adequate justification for depriving any person of his Constitutional rights.**" Smith v. Sullivan, supra quoting Rozecki v. Gougham, 459 F2d 6, 8 (1st Cir 1972). See also: Alberti v. Sheriff of Harris County Texas, 406 F. Supp 649 (S.D. Tex 1976); Gates v. Collier, 501 F2d 1291 (5th Cir 1974); Smith v. Sullivan, 553 F2d 373 (5th Cir 1977); Ruiz v. Estelle, 503 F. Supp. 1265 (S.D. Tex. 1980); Battle v. Anderson, 457 F. Supp 719 (E.D. Oklahoma 1978); Battle v. Anderson, 447 F. Supp 516 (E.D. Oklahoma 1977), aff'd 564 F2d 388 (10th Cir 1977).

This is part-in-parcel of our nation's principle that "[h]umane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations." Rozecki v. Gougham, supra. Such American principles and values being what has seperated America from other nations in championing liberty, democracy, and human rights. The checks and balances system of a three-branch government set up by the Founding Fathers, has insurred continuation of these principles; for at times "judicial intervention has been responsible...'for forcing the legislative branch of government to reevaluate correction policies and to aproppriate funds for upgrading penal systems.' 3 American Prisons and Jails 163." Chapman, supra at 77. "Even prison officials have acknowledged that judicial intervention has helped them to obtain

support for needed reform.    GAO, Comptroller General Report to Congress".
Chapman, supra, at 77.

\* \* \* \* \* \* \* \* \*

Plaintiff lays squarely before this Honorable Court **clear and convincing
evidence** that the Defendants have violated, and continue to violate, the
Constitutional rights of Plaintiff.    Plaintiff has further invoked multiple
basis of jurisdiction and authority which permits and authorizes the Federal
District Court to entertain the claims of Plaintiff and to GRANT relief and
AWARD damages.

The United States Government, has in the recent past, taken the official
position in numerous cases as intervenor (see Battle v. Anderson, 457 F. Supp.
719 (D. OK 1978), inter alia) that the **very same unconstitutional conditions and
practices** claimed and evidenced here by Plaintiff as unconstitutional, **were
unconstitutional in** such prior causes of action brought against state
insitutions.    Now that the Plaintiff asserts the same unconstititional
conditions exist within the FBOP, **the Federal Government is barred by the
doctrine of judicial estoppel** from taking an alternate position that such
conditions (i.e. overcrowding, reduced living space per inmate, medical
conditions, mattresses on the floor, lack of ventilation, inter alia) would not
offend the Constitution.    What's true for the state systems, is equally true for
the federal system and such defendants.

As the Executive and Legislative Branches of government, for various
political and other reasons, have failed to act and remedy conditions which now
rise to the level of being in violation of the Constitution, and being that such
branches are themselves directly responsible for the present state of affairs,
the Judicial Branch is now in the unique and important position of **"checks and
balances"** to provide relief and remedy such practices and conditions.

The intent of the Framers in establishing a Judicial Branch of government that is separate and apart from all of the political and other concerns of the Executive Branch and Legislative Branch is to fulfill the Judicial Branches' primary function as -- being the Guardian of our Constitution and of the rights of the people it protects.

## DELIBERATE INDIFFERENCE

In order to prevail on an Eighth Amendment claim alleging cruel and unusual punishment, the Plaintiff must satisfy two requirements:

> "**First**, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act **or omission** must result in the denial of the minimal civilizied measure of life's necessities. For a claim... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm...
>
> **The second** requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the cruel and unusual punishments clause, a prison official must have a sufficiently culpable state of mind."
>
>      - <u>Farmer v. Brennan</u>, 128 L Ed 2d 811, 114 S.Ct 1970, 1977 (1994)
>      also at <u>Wilson v. Seiter</u>, 501 U.S. 294, 297, 115 L Ed 2d 271 (1991)

Thus, every Eighth Amendment claim embodies an **objective** and **subjective** component. <u>Wilson</u>, 501 U.S. at 297-298. The **former** focuses on whether **there has been a deprivation <u>or</u> infliction of pain** serious enough to implicate constitutional concerns, while the **latter** requires inquiry into **the defendant's state of mind** to determine whether the infliction of pain was "unnecessary and wanton". <u>Jordan v. Gardner</u>, 986 F2d 1521, 1525-1528 (9th Cir 1993)(en banc).

In considering whether the objective component has been met, the Court must focus on direct and essential human needs such as health, safety, food, warmth, enviornment, ventilation, exercise, and other such areas. See <u>Wilson</u>, supra 501 U.S. at 304. The question whether the **objective component** of an Eighth Amendment claim has been met presents an **issue of law** for the court to decide. See <u>Hickey v. Reeder</u>, 12 F3d 754, 756 (8th Cir 1993).

In contrast, the **"state of mind"** inquiry presents a
**"question of fact"**, and is "subject to demonstration in the usual
ways, including inference from circumstantial evidence". <u>Farmer</u>,
supra at 114 S. Ct. 1981. For most Eighth Amendment claims, the
plaintiff satisfies the culpability requirement by proving that
the defendants' actions (or omissions) constitute **"deliberate
indifference"**. This "baseline" standard, <u>Jordan v. Gardner</u>, 986 F2d
1521, 1527 (9th Cir 1993)(en banc), applies in cases alleging
inadequate protection from injury from other inmates, enviornment,
or inhumane conditions of confinement, that deprive an inmate of
a basic necessity of life, such as proper shelter, proper food,
health or excercise, etc. <u>Farmer</u>, supra at 1977; <u>Jordan</u>, supra @ 1528.

The Supreme Court has clarified the test for determing
**"deliberate indifference"** as **"essentially equivalent to the standard
for establishing subjective recklessness"** in criminal cases. <u>Farmer</u>,
supra at 1980. Thus, the Plaintiff must show:

> "The [prison] official knows of and disregards
> an excessive risk to inmate health or safety;
> the official must both **be aware of facts** from
> which the <u>**inference could be drawn**</u> that a
> <u>**substantial risk**</u> of serious harm exists, and
> that <u>**he must draw the inference.**</u>"
>
> - <u>Farmer v. Brennan</u>, supra at 114 S.Ct. 1980

In other words, the defendant must **"conciously disregard a substantial
risk of serious harm."** Id at 1980. Such a standard presupposes
that the defendant **has not acted reasonably** in the face of a
known risk. Hence, **deliberate indifference occurs where a prison
official "knows that inmates face a substantial risk of harm and
disregards that risk by failing to take reasonable measures to abate
it."** Id at 1984. This standard does not require a plaintiff to
"show that a prison official acted or failed to act believing that

harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." <u>Farmer</u>, supra at 1981. Nor does this standard mean that "prison officials will be free to ignore obvious dangers." Ibid. While the obviousness of the risk is not conclusive, a fact-finder may "conclude that a prison official knew of a substantial risk by the very fact that the risk was obvious." id at 1981-1982 and n.8.

> Similarly, a defendant would "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist."
> <u>Farmer</u>, supra Id at 1982 n.8;
> also at <u>McGill v. Duckworth</u>, 944 F2d 344, 351 (7th Cir 1991) ("Going out of your way to avoid acquiring unwelcome knowledge <u>is a species of intent</u>") cert denied, 503 U.S. 907 (1992)

Under 42 U.S.C. § 1983, inter alia, failure to train or supervise subordinates evinces deliberate indifference that leads to constitutional deprivations. See <u>Canton v. Harris</u>, 103 L Ed 2d 412, 489 U.S. 378, 390 (1989). Such **supervisory liability** is premised, not on a theory of <u>respondeat surperior</u>, but rather on recognition that **supervisory indifference**, or "tacit authorization" of subordinates' misconduct, may be a **causative factor** in the constitutional injuries they inflict on **those committed to their care**. See <u>Slakan v. Porter</u>, 737 F2d 368, 372 (4th Cir 1984), cert denied, 470 U.S. 1035 (1985)

As the Plaintiff so plainly shows in this action, "while a single instance [of medical care denied, delayed, or other type of act or deprivation], viewed in isolation, may appear to be the product of mere negligence, **repeated examples** of such [treatment or same type act or conduct] **bespeak a deliberate indifference by prison authorities** to the agony engendered by haphazard and ill-conceived procedures." Madrid v. Gomez, 889 F. Supp. 1146, 1254 n.52 (N.D. Cal. 1995) quoting Ramos v. Lamm, 639 F2d 559, 575 (10th Cir 1980), cert denied, 450 U.S. 1041 (1981).

In **class actions** courts have traditionally held that **deliberate indifference** can be shown by proving **either** a pattern of **negligent acts or serious systemic deficiencies** in the prison's programs or operations:

> "[D]eliberate indifference can be evidenced by 'repeated examples of negligent acts which disclose a pattern of conduct by prison [] staff' **or** it can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adeauate [] care'."
> Wellman v. Faulkner, 715 F2d 269, 272 (7th Cir 1983), cert denied, 468 U.S. 1217 (1984) citing Ramos v. Lamm, supra at 575

See also Todaro v. ward, 565 F2d 48, 52 (2nd Cir 1977)("systemic deficiencies in staffing, facilities, or procedures [that] make unnessary suffering inevitable are evidence of 'deliberate indifference'.")

**Both** of these (a pattern of negligent acts **and** serious systemic deficiencies) **exist at Seagoville FCI.**

Accordingly, to prove deliberate indifference, the Plaintiff must demonstrate not only the offensive conduct or conditions, in each area of the claim, and that such is constitutionally inadequate from an objective standpoint---based on either "a pattern of negligent

contact" or "systemic deficiencies" -- but also that the Defendants (1) knew the risk to the inmate health or safety that this inadequacy posed, and (2) acted with disregard for this risk.   In short, Plaintiff must show that the Defendants "conciously disregard[ed] a substantial risk of serious harm" to Plaintiff's health or safety.  <u>Farmer</u>, supra at 1980.

The systemic deficiencies in the various facilities as detailed, infra, as well as the common custom and practices of the Defendants, clearly meet the standard of "deliberate indifference".   Further, not only do the systemic deficiencies   evidence   the   deliberate   indifference   of   the   Defendant   to Plaintiff's various needs, but also the repeated examples of the various widespread conduct and practices, infra, provide factual basis that such is more than just a "random" occurrence.

The Defendants have repeatidly been made aware of both the systemic deficiencies that exist, the inadequate medical care system, inter alia, and the other Constitutionally offensive conditions of Plaintiff.   But instead of in good faith remedying the various offensive widespread practices and conduct, the Defendants choose to continue the status quo, using the age-old technique of either (1) "see no evil, hear no evil -- hence, there must be no evil" which is commonly referred to as the "bury your head in the sand technique", or (2) the "Congress doesn't give us enough money excuse" which is most commonly referred to as the "pass the buck technique".

The Constitutional violations, infra, upon Plaintiff, further result from a direct affirmative link to the Defendants' <u>inaction</u>, or failure to act to prevent.   Such Defendants <u>affirmatively chose to do nothing</u> or affirmatively chose to <u>ignore</u> the existance of such -- both forms of conduct form a <u>causal link</u> implicating liability of the Defendants to the Plaintiff.

Plaintiff has shown <u>both</u> the "subjective component" as well as the "subjective component" necessary to prevail on an Eighth Amendment Claim.

## REQUEST TO TAKE JUDICIAL NOTICE:

Plaintiff respectfully requests this Honorable Court to Take Judicial Notice of the following federal cases:

~~Jane Doe v. ....., .........~~

Lopez v. Bureau of Prisons (cite not currently known)(d.c. Brooklyn, Aug. 26, 2005).

These cases present similar claims by said plaintiffs, whereby the courts found a pattern of deliberate indifference and negligence within the **Federal Bureau of Prisons** facilities in said cases. This, further, bespeaks a **"pattern of conduct"** and **"repeated examples"** of inadeauate medical care system within the Federal Bureau of Prisons on a much wider scale than just Seagoville FCI helping to additionally meet the class action standard of proof of the **subjective component** of the Defendants "state of mind" as that of "deliberate indifference". This being a form of **"superviosory indifference" or "tacit authorization"** bespoke of in Slaken v. Porter, supra, that here also is a **"causative factor"** contributing to the consrtitutional injuries contributed upon Plaintiff.

A1-13

# Appendix 2

FACTS

EVIDENCE ENTERED INTO THE RECORD AS FACTS

DECLARATION:    STATE OF TEXAS

                COUNTY OF DALLAS

## AFFIDAVIT

    I, JOHN M. BEAIRD, being of sound mind, over the age of Twenty One (21) Years of age, and having personal knowledge of such, do hereby attest, affirm, and state, under penalty of perjury, that the following is true and correct

**THAT:**

    I am currently housed within a Federal Bureau of Prisons ("FBOP") institution, Seagoville, FCI, at the Camp portion. I am housed within a small room designed for only 32 individuals but which 80 are actually housed. We have **no desk or writing area.** The total living space is only a small area next to the bed, 2 ft. by 5 ft., but which has to be shared with another individual, which effectively, and actually, allows me only **Five (5) Square Feet of Total Living Space.** Further, there are no fire corridor access or egress alleys. Although there is one (1) tiny TV Room, it only adequately seats Eight (8) individuals. There is no **recreation space** within said building and neither is their access to any. The quiet times and level of degree of quiet is nonexistant, as well as exposure to environmental airborne toxin exposure is rampant.

    I have read each and every portion of the attached "Pleadings" in this Cause of Action ("Complaint"), and I incorporate by reference, herewith, the "Facts" Section, such that I have personally been subjected to all of the facts, conditions, damages, and conduct as referenced throughout such section. I further, herein, incorporate by reference, all definitions specifically defined within the attached Pleadings, as meaning the same definitions within this Affidavit. I have also read each of the Claims (Counts) made in the attached Pleadings and I incorporate by reference, herewith, such that I have been subjected to all of the facts, conditions, damages, and conduct as are referenced and alleged throughout each of the Claims referenced within each Count, respectively.

    I have been **subjected to:** an inadequate "Medical Care System" (see definition), deprivation of all "Health Needs" (see definition, and as referenced within the Pleadings), subjected to all "Effects of Massive Overcrowding" (see Pleadings Factual section) as detailed and described within the "Facts" section of the Pleadings, by, and due to, the Defendants' conduct, as claimed within such Pleadings, respectively. All of the above having caused me damages (see definitions). All of the above referenced conduct and damages having occurred between February 25, 2004, and the present, and such also being continuous and ongoing.

    The Defendants, as specifically identified in the attached Pleadings, interferred with, conspired to interfer with, aided others in such, and have denied me meaningful **access to the courts** by their continued conduct in violation of the Fifth Amendment. I adopt by reference, herewith, the specific allegations of fact which are the basis for "Count 7" in the attached pleadings, as **facts,** and thereby incorporate these facts by reference to this Affidavit. Such conduct and factual account as thus adopted, having occurred between the

A2-2

06 ≈≈68

FILED

DEC 2 9 2006

period February, 2006, and the present, and being continuous and ongoing as well. This has caused, and does cause, me damages during these periods.

The Defendants as identified in the attached Pleadings have denied me access to, and providing of, documents repeatedly requested pursuant to the Freedom of Information Act and Privacy Act, and further have **concealed and covered up the existence of documents** therewith requested. These documents also being material and crucial in order for me to have had, and have, "meaningful access to the courts" by such conduct. These actions being between the period from July, 2005, to the present, and being also continuous and ongoing as well. Because of this, I have suffered damages from such cumulative conduct during this same period.

I have been subjected to, affected by, and damaged by every factual condition, allegation, and fact which is contained within the "Fact" Section of the attached Pleadings during the period between February 25, 2004, and the present, such also being continuous and ongoing.

The "Defendants" as referred to within this Affidavit being ALBERTO GONZALES, HARLEY G. LAPPIN, SEVERAL UNKNOWN AGENTS OF THE FEDERAL GOVERNMENT", the UNITED STATES OF AMERICA and the FEDERAL BUREAU OF PRISONS (the latter two such defendants are referenced only to the specific exclusive conduct of each of the former defendants (in their official capacities) as are alleged within the attached Pleadings Complaint Section.

"Pleadings", as referenced, infra, means my "Original Complaint" which this Affidavit is therewith attached.

All of the conduct referenced, supra, which has affected me, and is the basis of my "individual claims" **also** has a **"requisite typicality"** to the Putative Class, such also suffering similar damages from such.

I have exhausted all "available" administrative remedies as necessary and required for all of the claims made in the attached Complaint ("Pleadings") that this Affidavit is, herewith, attached.

DATED THIS 15th DAY OF NOVEMBER, 2006.

JOHN M. BEAIRD

JOHN M. BEAIRD
14355179 Satellite Camp POB 9000
Seagoville, Texas    75159-9000

## SUMMARY

The claims made, infra, by the Plaintiff against the specific Defendants in this cause of action, are also claims that are typically requisite of every individual of the Putative Class, and thus, the Putativve Class as a whole. Thus, this action is filled as a Class Action against these named Defendants pursant to the entitlements of the Plaintiff to do so under the authority of Fed. R. Civ. Proc. Rule 23(a).

The conduct of the Defendants as alleged, infra, in the Claims Section results, on information and belief, in atypical results and conditions in every facility of the Defendants from the minimum and low facility at Seagoville FCI which Plaintiff is at, to the Administrative Super Maximum facility ADX Florence to which a Federal Arbitrator October, 2006 found that some housing units had been left unattended for entire eight-hour shifts, posts in what is called the "terrorist unit" were routinely left vacant, inmates weren't getting their meals on time, scheduled phone calls cancelled, exercise hours cut to many times instead of five times a week out of their cells for one hour to many times only once per week or even once per month because there was nobody to supervise them because of the rampant staff shortages.

Moreover, because of the Defendant's conduct, ADX for ten years had never had a killing. But now, recently, the ADX has recorded two prisoner deaths at the hands of other prisoners, inmate threats to staff has doubled each of the last two years, assaults on correctional officers has increased by nearly 30%. On information and belief, Mr. Mike Schnobrich, a Correctional Officer at ADX stated that the "inmates often turn hostile and dangerous when their basic needs are unmet".

Moreover, the Defendants recently during the period of conduct at issue in this case, instituted an additional policy of only filling the most "critical" staff positions within all prisons, this resulting, as in Florence ADX in almost a 25% to 30% reduction of needed and required staff in order to meet even the bureau's minimum safety standards. This, clearly as referenced, ante, in prisoner deaths has resulted in a failure to maintain a safe environment not only for the Putative Class but also for the hard working Correctional Officers whose families look forward to them coming home from work each day both unhurt - and alive. A report by the Department of Justice Office of the Inspector General released in October, 2006, also indicated the Defendants are not properly screening inmate mail and phone conversations - even at the super-max facility at Florence which currently houses known international terrorist. It confirmed a report that several of the 1993 World Trade Center bombers wrote a letter that was published internationally in Arabic newspapers praising Osama Bin Laden's 2001 World Trade Center attack as well as 90 additional letters which were also sent to communicate with international Islamic extremists with links to international terrorist suspects.

Conditions even in what should be the "best run" facility are described, on information and belief, by Mr. Cory Hodge, a recently retired Correctional Officer of ADX - Florence as: "[T]he way they're [(the Defendent's in this action)] running those places [(B.O.P. prison facilities)], it's like getting in a car in a snow blizzard, taking away the wipers, lights, and brakes and saying 'Go as fast as you can,'." Similar conditions and results are found at, on information and belief, every institutional facility between these atypical examples. The Defendant's conduct, subject of this action, has created resultant violative condidtions

A2-5

and results, of which, the violations, damages, and offensive conditions detailed, infra, are typically requisite to every facility of which the Putative Class is thus subjected to.    This being between the period of Feburary 25, 2004, and the present, and such also being continuous and ongoing.

Moreover, the violative conditions Constitutionally offensive results to which the Putative Class is now, and has been subjected to in the indicated period, and, has now also risen to "Human Rights Abuses" and violative of International Treaties prohibiting "torture and cruel or unusual punishment of any person, prisoner, or otherwise".    See Convention Against Torture, International Covenant on Civil and Political Rights, Dec. 16, 1966 arts.7, 10, G.A. Res. 2200A (XXI), U.N. GAOR, 21st sess. Supp. No 16, at 51 UN Doc. A/6316, 999 U.N. T.S. 171, available at www.unhchr/html.ch/html/menu3/b/a_ccpr.htm.    (Hereinafter referenced as "ICCPR".    The Defendant, UNITED STATES, ratified the ICCPR.    "Treaties are as legally binding as Federal Statutes." U.S. V. Dion, 476 U.S. 734, 738 (1986); TWA, Inc. V Franklin Mint Corp., 466 U.S. 243, 252 (1984).    Such Defendant has liability, duties, and legal obligations pursant to the ICCPR to the Plaintiff and to the Putative Class.

The Defendants GONZALES, LAPPIN and the UNITED STATES, further intensified exacerbated, and created Constititionally offensive conditions in facilities due to their intentional change in conduct and failure to adhere to statutory directive and authority 18 USC sec 3621(b).    This "change occurred" pursuant to the United States Attorney General memo issued Dec. 13, 2002 ("DAG opinon) which stated these defendants' "new interpretation" * of their obligations pursuant to 18 USC sec 3621(b).    In fact, numerous courts upon courts have

---

* "There is a certain disingenuousness about the 'occasion for this revisitation of policy." Monahan v. Winn, 276 F. Supp. 2d 196, 205 n.9 (D. Mass. 2003)(Gertner, J.).

admonished and put these Defendants on notice that this conduct was not
"authorized", in that, such "new interpretation" of 18 USC sec 3621(b) was
clearly erroneous and, thus, unlawful. (See listing contained within Count
2). "There can be no question that the [Defendant's] long standing practice
[previously] of designating certain offenders to serve all or part of a term
of imprisonment in community confinement was legal and even wise." Monahan,
supra, at 205. "[I]t is worth emphaszing that the use of community
confinement designations 'goes back contiunously for almost forty years', U.S.
v. TKabladze, Nos. CV 03-01152,CR 02-00434(A)(C.D. Cal., May 16, 2003)(Slip
op.). "All of the institutional parties concerned with criminal sentencing
- Congress, the Department of Justice, the BOP, and the Sentencing Commission
- recognized the propriety of this practice and actively promoted community
confinement as a sentencing option... See Iacaboni V. U.S., 251 F. Supp 2d
1015 (D.Mass 2003)(Ponsor, J.) at 1021-1022. "Monahan, supra at 205. This
being to conserve the scarce prison resources and facilities for the most
violent and dangerous offenders pursuant to the Sense of Congress and Sense
of the Senate (See these at section referenced, infra, as "conclusion"). The
courts have told the Defendants, supra, repeatedly that 18 USC sec 3621(b)
requires that such discretion be exercised by "individualized reviews" of
each and every individual as opposed to just an across the board exercise of
discretion to not adhere to the statutory mandate and duty imposed upon these
Defendants by 18 USC sec 3621(b).

The Defendants "Several Unknown Agents of the Federal Government", the identities of which are currently being concealed from the Plaintiff, conspired with, aided and abetted, and otherwise assisted the Defendants in illegally removing and obtaining from inside the U.S. District Courthouse Office of the Clerk District of Columbia the original filed Plaintiff Pleadings and Exhibits of an action by the Plaintiff, on or about February to March, 2006.

Such pleadings, exhibits, and consequently the Originally filed lawsuit then went missing for almost 45 days until employees of these Defendants then admitted to illegally obtaining and possessing said Court documents (already time-stamped and Entered as an Official Record of the U.S. District Clerk) and returned said Court Documents, not back to the U.S. District Clerk's office from where they had been unlawfully removed and taken from, but rather gave such Time-Stamped U.S. District Court Clerk documents to the Plaintiff on or about March 22, 2006. Upon receipt by Plaintiff of these Court-Documents (Original Pleadings in a separate Federal Court action), documents which had never been officially served upon the defendants in that case and had been reported as missing by the U.S. District Court and District Clerk for the District of Columbia, the Plaintiff examined such documents to discover that these Defendants had inserted additional unauthorized additions to such court-filed documents, and had also added additional falsified documents which purported to have been executed on a previous date in 2005, but which bore unmistakable evidence (Time-stamped, inter alia) that indicated these additional documents were illegally inserted by the Defendants in this action on or about March 16, 2006, -- the very day the entire file should have been locked away and secure within the U.S. District Court Clerk's, District of Columbia, Office vault of files which are not yet

public information.  This criminal conduct by these Defendants offends and impunes the integrity of the U.S. Federal District Court, the U.S. District Clerk, and is a very serious violation of the Plaintiff's Constitutional rights and access to the courts by such blatant and deliberate interference with that important Constitutional right.  See 18 U.S.C. § 2071 (unlawful concealment, and removal, and possession of Official Records deposited with a U.S. District Court Clerk's Office);  See also 18 U.S.C. §§ 241, 242, & 371 (conspiracy to violate civil rights).

Because the identities of the additional parties to this conduct, and criminal conduct at that, is being concealed from the Plaintiff, these parties (individual and official capacities) are identified in this Complaint as "Several Unknown Agents of the Federal Government" until, through discovery, the identities of the said parties are conclusively determined by the Plaintiff.

The Federal Bureau of Prisons encompasses numerous facilities which are designated anywhere from "minimum - out custody" camps to Supermax facilities. Each of these facilities, on information and belief, suffers from the same systemic problems of massive over-crowding and related issues which result in Constitutional violations, violations to statutes, violations of duties owed, and violations of entitlements. The current population of these facilities is approximately 200,000 individuals. Such facilities being anywhere from two to four their safe design capacities.

The Plaintiff in this cause of action is located at Seagoville FCI which is a facility located at 2113 North Highway 175, Seagoville, Texas 75159, near Dallas, Texas. This facility is composed of a jail unit, a low-security compound, and a minimum out-custody camp unit. Most of the individuals at such facility are non-violent, and mostly first-time offenders.

The Seagoville facility is composed of the following buildings: Living Units 5, 6, 7, 10, 12, and the Camp building; Building 9 is the Special Housing Unit (SHU) for Administrative detention and Segregation Housing. Building 9 also houses the Medical and Dental facilities upstairs in a small area. The facility also includes an Education building housing leisure & law libraries. All of the buildings, with the exception of Building 6 (which was built in approximately 1990) were constructed in the early 1930's as women's infirmery, and later used by the United States government as a Japaneese Interrment Center for imprisoning Japaneese-American citizens during World War II.

After such use the facility was converted to a Bureau of Prisons Camp which was, at that time, an unfenced facility for minimum security level inmates and later a chain-link fence was put up enclosing the facility turning it into a Low-Security facility instead of a Minimum-Security facility. Additional buildings in the facility of the same era (1930's - 1940's) consist of a very small Chappel, a small Auditorium; and a tiny Visitor's Room. All of these buildings are of general brick construction and are in great disrepair and delapidated in relation to structural issues, physical plant-utilities issues, sanitation and safety issues, and general existance as detailed individually infra. All of these buildings are far-past their originally intended maximum useful life expectancy.

Additionally, the facility includes Building 54, an inmate housing facility with individual rooms; Building 53, same, Building 61, a seperate small education Class-Room facility add-on; a small Commissary Building; a Dining Hall facility small in capacity and food storage and preparation facilities; a UNICORE building; small tech-trades education building; and a recreation area consisting of a very small hobby-craft building (about the size of two garages), a recreation pavilion that is not enclosed with a basketball court, a softball-grass field, a small open-air weight-pile on a concrete pad, and a few open-air handball walls, a tennis court, and a gravel track around the area circumferencing this recreation area.

The facility, as detailed infra, has been, and is, massively overcrowded at approximately THREE TIMES (3x) DESIGN CAPACITY and at approximately FIFTY PERCENT (50%) OVER "CRITICAL CAPACITY". Further, extensive other existing facility problems exist and all exaxerbate the effects of Massive Overcrowding in violation of the Eighth Amendment.

As of **August 15, 2005,** Seagoville FCI was at **281% of Design Capacity**[1], and **141% of Critical Capacity**[2] in total inmate population. This **massive overcrowding** is ennumerated as follows:

| Building | Population | Design Capacity | (Pop/D.C.) | Critical Capacity | (Pop/C.C.) |
|----------|-----------|-----------------|------------|-------------------|------------|
| 54 | 340 | 128 | **266%** | 256 | **133%** |
| 53 | 340 | 128 | **266%** | 256 | **133%** |
| 12 | 140 | 48 | **292%** | 96 | **146%** |
| 10 | 106 | 47 | **226%** | 94 | **113%** |
| 7 | 202 | 73 | **277%** | 146 | **138%** |
| 6 | 285 | 100 | **285%** | 200 | **143%** |
| 5 | 202 | 73 | **277%** | 146 | **138%** |
| 9[*] | 63 | 36 | **175%** | 36 | **175%** |
| | 1,678 | 597 | **(281%)** | 1,194 | **(141%)** |

(\*\*\* This Data is approximately the same as of November 11, 2006 \*\*\*)

---

[1] **"Design Capacity"** is calculated on a per cell basis allowing the professional reccomended level of 55 sq ft to 75 square feet per inmate of space in the cell, whereby the individual rooms were constructed, with the exception of Building 6 which are 2 person rooms, all others being 1 person rooms; such Design Capacity also taking into account available utilities such as bathrooms, sinks, and showers, as well as adequate space for fire corridors and exit corridors, and taking into account the ventilation capacity (designed) of the Building, and available day-room space at the professional standard of 35 square feet of day-room space per inmate; finally, such also takes into account the structural aspects of the building and the ability of such structure to properly and safely accomodate such designed capacity, including enviornmental aspects.

[2] **"Critical Capacity"** is simply the "double celling" of the inmates whereby the per square foot space available per inmate in the rooms would be half the reccomended standard and also the available per square foot day-room space being similarly reduced. This type of capacity is only to be reached for **very temporary periods of duration** and is meant as only a temporary (less than a few months) overflow level.

[*] **Building 9,** as discussed more infra, is the Special Housing Unit with the cells being only single person isolation cells of less than 60 sauare feet total area with a toilet, desk, and bed included within such space.

Plaintiff has been subjected to all of the following conditions during the period between February 25, 200⅝ to the present which compose the factual individual facts relevant to his individual claims:

## THE EFFECTS OF MASSIVE OVERCROWDING AND OTHER UNCONSTITUTIONAL CONDITIONS

Effects may be noted by referencing 1) Ventilation; 2) Plumbing; 3) Living Space; 4) Noise Levels; 5) Recreation Space; 6) Medical. This being a non-exclusive summation of such effects on Plaintiff.

Ventilation: Courts have noted the authoritative standard for proper ventilation of jails and prison areas are 60 Cubic Feet of Fresh Ventilation per person per minute, citing as its source the "American Public Health Standards for Health Services in Correctional Institutions".

The environmental deficiencies and inadequacies of the facilities are exacerbated by the massive overcrowding. Improper, deficient ventilation (and in respect to Building 9--"nonexistent" ventilation) increases the spreading of flus, hepatitis, and tuberculosis. Further, deficient ventilation, because of the nature of the old red brick building, which was an old Japanese Internment Camp is now dilapidated having no insulation and no air conditioning, creating a brick oven environment with excessive temperatures. Numerous courts have addressed the subject of proper ventilation and temperature conditions in the prisons. See Write_v_McMann, 387 F2d 519 (2nd Cir 1967); Write_v_McMann, 460 F2d 126 (2nd Cir 1972); McCray_V_Burrell, 516 F2d 537 (4th Cir 1975); Lewis_v_Lane, 816 F2d 1165 (7th Cir 1987); Ramos_v_Lamm, 639 F2d 559, 568 (10th Cir 1980); William_v_Edwards, 547 F2d 1206 (5th Cir 1977); Rhem_v_Malcolm, 371 F.supp 594 (S.D.N.Y. 1974) aff'd 507 F2d 333 (2nd Cir 1974); Alberti_v_Sheriff_of_Harris_County_Texas, 406 F. Supp (S.D.Tex 1975)

The complete lack of any ventilation in the SHU, Building 9, as detailed infra, constitutes cruel and unusual punishment.  As numerous courts have noted "air and food are necessities of life" Battle v. Anderson, 447 F. Supp. 516, 526 (E.D. Oklahoma, 1977). In describing a similar situation the subsequent Battle court noted "[t]he inmates are housed in one of the hottest areas on the top floor of the west Cell House, two to a cell, with no outdoor exercise and time out of the cell averaging no more than two hours per day.  While these inmates are not being disiplined, **these conditions are punitive in nature** and **would not be allowed <u>even if the inmates were being subjected to disiplinary sanctions</u>**." Battle v. Anderson, 457 F.Supp. 719, 728 (E.D. Ok., 1978).  These harsh conditions the court described are, in fact, **not as harsh as those conditions present at Seagoville FCI** as described infra, whereby inmates are housed two to three to a cell with a **mattress on the floor next to the toilet**, with **no ventilation, in temperatures as high as 105 degrees,** with **only one hour out of the cell per day**, and with **no showers except every third day.**  The court in Battle stated "to house inmates who get only 2 hours out of the day outside their cells in the most primitive conditions...is certainly **a violation of the constitutional prohibitions against cruel and unusual punishment and due process."** Id at 738.

"[C]ourts must asses whether the conditions are such that they are compatible with 'civilized standards of humanity and decency'. Estelle v. Gamble, 429 U.S. 97, 102 (1976)." Madrid v. Gomez, 889 F. Supp. 1146, 1260 (N.D. Cal. 1995).  "However, conditions that are 'inhumane,' Farmer v. Brennan, 128 L Ed 2d 811, 114 S. Ct. 1970, 1976 (1994), deprive inmates of 'basic human needs,' Helling v. McKinney, 125 L Ed 2d 22, 113 S. Ct. 2475, 2480-2481 (1993), or

fail to furnish a 'minimal civilized measure of life's necessities,'
Wilson v. Seiter, 501 U.S. 291, 298 (1991), are unconstitutionally
wanting under contemporary Eighth Amendment standards.    Young v.
Quinlan, 960 F2d 351, 363-364 (3rd Cir 1992)."   Madrid v. Gomez, Ibid.
What's more, many of the inmates housed in such Building 9, in such
unconstitutional conditions, are there not for any disiplinary
infraction or administrative sanction determination, but mearly
because they transferred to Seagoville or were received at
Seagoville through voluntairy surrender, and there exists no place
to put them because of the massive over-crowding.

    The lack of adequate ventilation in Buildings
as described infra, with the Buildings being the equivalent of a
"red brick oven" with no insullation to speak of to mitigate the
sun and the heat, such conditions constitute a constitutional
violation in violation of the Eighth Amendment.   The **stuffing of
inmates into day-rooms"** in buildings 53, 54, 5, 7, and 10, as
described infra, with **as little as 21 square feet of living** space
**per inmate** (including space for chair, bed, and locker) **with little
or no ventilation** for such quantity of inmates violates the Eighth
Amendment of the Constitution as cruel and unusual punishment.

    Such lack of ventilation in the detailed units infra, combined
with the massive-overcrowding "increases the risk of communication
of contagious diseases."   Capps v. Atiyeh, 495 F. Supp. 802, 810
(D. oregon, 1980).   "In [such] medical context, [this] has been
shown to increase the incident of both infectious communicable
diseases (e.g. flu, Hepatitis, tuberculosis, etc.) and stress-related
diseases (e.g. rashes, asthma, hypertension, etc.)."   Battle v.
Anderson, 447 F. Supp at 524.   not suprisingly, as detailed infra,

A2-15

in July-August, 2005, at Seagoville FCI, the number of **"reported"**
**cases of staff infections** on the facility was **169 --- greater**
**than TEN PERCENT (10%) of the inmate population!** and this is only
the "reported" cases--no figures can be estimated of those who
did not seek treatment but were infected. Additionally, as
indicated, it was reported that **THIRTY FIVE PERCENT (35%) to**
**FOURTY PERCENT (40%)** of the inmate population are **infected with**
**HEPATITUS "C"** communicable disease.

"Courts have...demanded a healty enviornment [in penal
facilities] with adequate sanitation, ventilation, lighting, and
utilities." Battle v. Anderson, ibid; Williams v. Edwards, 547
F2d 1206 (5th Cir 1977); Rhem v. Malcolm, 371 F. Supp. 594 (S.D.N.Y.
1974)(regarding ventilation); Hamilton v. Love, 328 F. Supp. 1182
(E.D.Ark. 1971)(same); Alberti v. Sheriff of Harris County, Texas,
supra (same). All have condemed the conditions as are described to
exist at Seagoville FCI as being in violation of the Eighth
Amendment of the Constitution's proscription against cruel
and unusual punishment.

<u>PLUMBING</u>:

The plumbing and water system is not only inadequate for the population levels of the massive over-crowding and the task, but it is also delapidated and is subject to constant, repetative leaks, stoppages, and breaches which further subject the enviornent and the inmates to health hazards. Further, corroded sewer pipes with open holes on the tops expose the surrounding enviornment within the respective buildings, and outside, to dangerous bacteria, germs, and health hazards to the inmates. As recent as September 5, 2005, the system of Building 9 was, again, stopped up and flooded the basement with sewage and inmates were again called in to clean up and wash out the sewage from the offices and other holding areas of Building 9 (SHU). Additionally, inmates in Building 10 and 12, adjacent to Building 9, were evacuated from 6P.M. to 9 P.M. that evening (with obviously no toilet facilities or wash facilities during that period) while emergency outside contractors worked on getting the stopped up system unclogged. This mess continued to the next day of Tuesday September 6, 2005, while the Building 9 facilities were mopped up the sewage discharge within, and while outside contractors continued to work on clogged pipes in the ground outside in the field...all the while, raw sewage discharge and smell was discharged into the enviornment creating a public nusiance and menance to the community...not to mention the inmates who had to endure such smell and health hazards during such periods.

The old and out-lawed "black cast iron pipes" which transport fresh drinking water to the buildings create an enviornmental health hazard for the inmates drinking such contaminated water. Further, the over-taxed sewer system places an extreme burden on the surrounding

local community of Seagoville's water plant.  The City of Seagoville, Texas, in 2004, requested the Defendants to reconstruct their water system and reduce the population because of concerns that such overburdened system would strain the community resources of Seagoville, Texas in their water and sewar plants.

The number of toilets is far inadequate for the population levels.  Waits of over **30 minutes to go to the toilet** are not un-common and constitute a deprivation of basic human necessities.  The number of showers is also far inadeauate for the population levels. Further, having to shower in **unsanitary conditions**, as described infra, with "ankel deep" sewer water in the bottom of the shower or sewage which has backed up throgh the shower drain periodically into the shower, and Black Mold, fungus, and insects within the showers constitutes a deprivation of the most basic standards of human dignity and a depreviation of the most basic standardss of health and cleanliness, as well as exposure to enviornmental toxins. The plumbing systems both within the respective buildings, and out-side underground, have been used **far beyond their intended useful life.**

Each of the enviornmental, health, and safety problems ennumerated regarding the plumbing systems **is exacerbated by the massive overcrowding levels of population beyond capacity.** These conditions work to create a violation of the Eighth Amendment prohibitation against cruel and unusual punishments.

LIVING SPACE:

As stated infra, the complete lack of living space for an
inmate is violative of the Eighth Amendment of the Constitution
and constitutes cruel and unusual punishment. The double-celling
and triple-celling of inmates in the SHU (Building 9) giving as
little as 30 square feet to 20 square feet per person, respectively
(such space also having to include the bed, toilet, sink, and desk),
and being housed like that 23 hours a day 7 days a week for long or
indeterminate periods of time constitutes a great offense to the
individual's eighth Amendment consitutional rights.  In such
respects, **a dog would have more room in a dog-house** (in proportion
to his size) than such inmates have in the current situation of
Building 9.  A **dog, would** though, arguably, **have better conditions,**
in that, it would **have fresh air** available through its open door
for cooling and fresh-air ventilation---a **"luxury" an inmate**
**housed in Building 9 (SHU) does not have.**

Inmates housed in the cramped, poorly ventilated, windowless
Day-Rooms have as little as **21 square feet per person total living**
**space** (such space must also include the bed, chair, and locker).
The double-celled per-person single-cell rooms have as little as
**35 square feet per person of total living** space (also having to
include the bed, chair, and locker).  There are **no desks or other**
**writing facilities available,** nor are there any shelves, bulliten
boards, or waste paper containers within the rooms.

As stated infra, inmates are confined in such small space for
**at least 13 hours per day.** Because **there is little if any day-room**
**space available (maximum of 13.5 square feet per person exists in**
Building 53 & 54 while **no additional day-room space** to speak of
exist in the other buildings), this timey living space of the

rooms themselves provide all the area that an inmate, who is
housed generally long term (between 5 to 20 years) has. Thus,
this tiny (21 square feet per person which includes space allotted
to locker, bed, and chair) is absurdly low and in violation of
the Eighth Amendment's prohibition of cruel and unusual punishment.

"The American Correctional Association (ACA) requires that
**60 square feet of cell space** be accorded [per person] prisoners
spending **no more than 10 hours per day in their cells,** and that
**80 square feet of cell space [per person]** be accorded prisoners
spending **more than 10 hours per day in their cells.** (see Manual of
Standards for Adult Correctional Institutions, ACA on Accreditation
for Corrections, Standard 4142)." Capps v. Atiyeh, supra at 809-810.
"The American Public Health Association **requires 60 square feet per
person** in dormitories (see Standards for Health Services in
Correctional Institutions, American Public Health Association,
Wash. D.C. 1976)." ibid. And in fact, the United States Government
itself states in "the draft Federal Standards for Corrections
require...**at least 60 square feet per inmate**" of cell space. (see
Federal Standards for Corrections (Draft) U.S. Dept. of Justice,
June, 1978)." Ibid.

Other professional organizations reccomend and require the
following **minimum square feet of space per inmate** of cell space:

> National Sheriff's Association; A Handbook on Jail
> Architecture 63 (1975)................... **70 - 80 sq ft**

> National Clearinghouse for Criminal Justice Planning and
> Architecture............................ **70 sq ft**

> National Advisory Commission for Criminal Justice Standards
> and Goals; Standard 11.1 pg. 353 ........ **80 sq ft**

> International Conference of Building Officials; Uniform
> Building Code section 1307 pg. 83........ **90 sq ft**

The Commission on Accreditation for Corrections; Manual
of Standards for Adult Corrections Institutions
#27 (1977)................................... 60 sq ft

National Institute of Justice; American Prisons and Jails
#85, n.6 (1980)(long term institutions)........ 80 sq ft

**U.S. Department of Justice; Federal Standards for Prisons
and Jails;** standard No. 2.04 pg. 17 (1980)..... 60 sq ft

National Council on Crime and Delinquency; Model Act for
the Protection of Rights of Prisoners,
18 Criminal & Delinquency 4, 10 (1972)
(floor space alone without furniture:).. 50 sq ft

Building Officials and Code Administrators, Inc. (BOCA);
Basic Building Code 1975 section 201.3 ....... 70 sq ft

"And **the United States Army, never known for 'coddling', adheres
to a 55 square foot** [per inmate] **standard** for confinement of
prisoners (see Report of Special Civilian Committee for the Study of
the U.S. Army Confinement System (1970)." Ibid.

Although the Court, in Rhodes v. Chapman, 452 U.S. 337, 69 L Ed
2d 59 (1981), dealt with a situation involving "double celling" such
inmates there had adequate other Day-Room space and ventillation, and
noise levels were adequate; "[t]he air ventilation was adequate....
the noise levels in the cellblocks was not excessive". Id at L Ed
2d 66. The Court further noted in its decision and in taking into
account the other facts and the effects of double-celling that
"[d]ouble celling **had not reduced significantly the availability of
space in the dayrooms or visitation facilities...And there was
no evidence of indifference by the [defendant] staff to inmates'
medical or dental needs."** Id at 66. **This, certainly, is** not
similar to Seagoville where the massive over-crowding and double-
celling (and even triple-celling) has **elimated available Day-Room
space, caused noise levels to be constant as that of a** train station,

caused **ventilation to be wholly inadequate**, the **plumbing system to be massively over-taxed and inadequate**, and visitation facilities to be dramitically inadequate for the over-crowded population levels.

The Court, in <u>Chapman</u>, explained it was "**the effect upon the imprisoned**", Id. at 81 (Brennan, J. and Blackmun, J., and Stevens, J. concurring in judgment), that **are the touchstone** of what must be examined to determine if a penal facility violates the Constitution's prohibitation of cruel and unusual punishment; not just a tacit look at double-celling practice.

The Plaintiff 's case, unlike that of <u>Chapman</u>, shows that the current massive over-crowding that exceeds the design capacity of Seagoville and its facilities, creates "**effects upon the imprisoned**" that are in violation of the Eighth Amendment and constitutes **cruel and unusual punishment upon Plaintiffs**.

> "**Minimum space to call one's own is a primary psychological necessity.**"
> <u>Battle v. Anderson</u>, 564 F2d 388, 395 (10th Cir 1977)

In Plaintiff ' case, this minimum space is clearly and wholly deficient and represents a deprivation of such "necessity". <u>Estelle v. Gamble</u>, supra, rests exactly on such premise that deprivations suffered by a prisoner constitute "punishment" for Eighth Amendment purposes.

NOISE LEVELS:

Indeed the continuous level of noise in each of the living units due to the vast number of inmates, having **no day-room space available**, having central areas (Buildings 53 & 54) crowded at all hours with **hundreds** of inmates making noise in the central area watching TV, playing cards, and other activities, (right outside individual rooms which are without doors) **constantly** is that of **a "train station roar"** -- even up to the hours of midnight each and every day. Such levels of noise, and more importantly **the lack of any type of quiet-time** what-so-ever, causes **sleep deprivation, increased anxiety and tension levels, psychological stress, and "quiet insufficient for psychological well being"** (Rhodes v. Chapman, 69 L Ed 2d 59, 82 n.17 (1981) quoting Capps v. Atiyeh, 495 F. Supp at 810-814); this being a violation of the Eighth Amendment to which Defendants are liable to Plaintiff

RECREATION SPACE:

The total diminished living space and lack of day-room space leaves effectively no "recreation space" for Plaintiff . Hence, the only recreation space available is the rec-yard. However, this is not a functional option for anything other than athletic recreation and is about a quarter mile from most every housing unit. Additionally, because of the massive-overcrowding, the recreation facilities on such rec-yard, being limited as they are and designed for a population one-third the current level, "cannot accomodate all inmates desiring to use them. Rather than serving as an arena for the release of tension, the prison rec-yard has become a breeding ground for conflict [and tension] as more inmates compete for the use of a limited amount of space and equipment." Capps v. Atiyeh, supra at 495 F. Supp at 811.

Thus, such over-crowding and inability to relieve anxiety and tension naturally exacerbated by prison itself, leads to depression, tension, and increases in disciplinary infractions, assaults, and the greater probability of violence and the anxiety that such potential threat causes. These depriving the Plaintiffs of adequate psychological well being and a form of punishment upon Plaintiff -- all in violation of the Eighth Amendment.

SAFETY AND ENVIORNMENTAL:

Plaintiff are exposed within the confines of their buildings to Enviornmental Tobacco Smoke ("ETS") that represents a significant future and current health hazard to Plaintiff., whereby such continued forced exposure has already occurred. In Helling v. McKinney, 125 L Ed 2d 22 (1993), the Supreme Court held that by alleging that prison officials acted with deliberate indifference in not taking substantive corrective action in allowing exposure of petitioner to ETS, the petitioner had stated an 8th Amendment claim onwhich relief could be granted. The Court, fell short of at the time, of finding that the risk of ETS was not one that "society chooses to tolerate". Indeed today, over a decade later, the Court would not find this now hard to find, as society has, indeed, chosen not to tolerate such risks associated with ETS, and court case after court case has reinforced society's overwhelming view that exposure to ETS is not only a health hazard and repugnant, but also violative of the constitutional rights of non-smokers.

Plaintiff are exposed to serious and significant fire code violations and the resultant risk of safety that such impose. Over-capacity day-rooms crammed full with inmates are beyond the safe capacity, are void of any fire-corridor space next to the beds to allow safe emergency egress. Over-capacity building units crammed far beyond any fire-code safe levels of occupancy create an ongoing risk should a fire or other emergency ensue.

Furthermore, since the building units and their fire exit doors are locked from the outside each night, and even the guard within the building cannot open them from the inside nor even open the main door as he does not have a key (only the compound officer outside the building units keep a key to open the doors at night), in case of an emergency, smoke enveloping, or fire...the Plaintiff are solely dependent on the Compound Officer who roams the entire compound, and can at times be over half mile away, to be able to provide access out in case of an emergency. And, being that the units themselves are already massivly over any designed fire capacity, by the time such officer did actually make it to open the doors...the emergency may have progressed significantly such that to get all occupants out prior to the time which critical injuries could envelope is very doubtful and unlikely.

Enviornmental hazards and exposure of Plaintiff to **Black Mold, Asbestos,** unsanitary sewage discharges and floodings and the associated health hazards that these present., deprive Plaintiff of a healthy and safe enviornment. Further, the health hazards associated with the delapidated plumbing system of both fresh water and sewage discharge, similarly affect Plaintiff. Further, "[i]n the medical context, overcrowding has been shown to increase the incident of both infectious communicable diseases (e.g. flu, hepatitis, tuber-culosis, etc.) and stress-related diseases (e.g. rashes, asthma, hypertension, etc.)" Battle v. Anderson, 447 F. Supp 516, 524 (E.D. Ok 1977). Such hazards and health risks deprive Plaintiff of a health and safe environment and results in a violation of Plaintiff's Eighth Amendment rights. This condition also being exacerbated by the clear violative deprivation of the proper amount of fresh air ventilation in the crowded rooms as well as in the Building 9 SHU. Thus, Plaintiffs' Eighth Amendment rights being violated also by such exacerbated conditions created and allowed to continue by Defendants with deliberate indifference.

MEDICAL

"Minimum space to call one's own is a **primary psychological necessity**."
Battle v. Anderson, 565 F2d 388, 395 (10th Cir 1977). "It is firmly
established that 'medical **needs**' include not only physical health needs, but
mental health needs as well. Hoptowit, 682 F2d at 1253; Balla v. Idaho State
Board of Corrections, 595 F. Supp. 1558, 1576-77 (D. Idaho 1984)." Madrid v.
Gomez, 889 F. Supp. 1146, 1255 (N.D. Cal 1995). The Defendants have denied
Plaintiffs such minimal necessary living space and day-room space as reccomended
by virtually every professional standard setting organization and which is
the "minimal civilized measure of life's necessities" compatible with "civilized
standards of humanity, and decency". Madrid v. Gomez at 1260 quoting
Estelle v. Gamble, 429 U.S. 97, 102 (1976). Such lack of required necessary
space also manifests increased stress-related diseases and disorders such as
rashes, asthma, and hypertension, etc. .

Such deprivations of a civilized and humane amount of living and day room
space causes and exacerbates the risk of and spread of infectious diseases
such as flu, hepatitis, tuberculosis, staff infection, etc., as well as causes
and exacerbates anxiety and mental debilitation of those deprived of such.

The lack of having necessary medical needs met, either in medical care
which suffers from systemic deficiency and/or that care which is deliberately
indifferent, results in needless suffering and pain. Such being completely
without any peneological interest what-so-ever. As Plaintiff has shown infra,
this also can rise to and equate to "physical torture".

Defendants can not justify the complete deliberate indifference and the
resulting suffering and harms that have resulted to Plaintiffs through Defendants
conduct. Had Defendants conduct begin within the civilian sector, as opposed to
being hidden within the B.O.P., **criminal liability** would be implicated. The effects
of the lack of proper medical care effect the Plaintiffs into the future as well
because timely and proper care was not granted when it should have been.

## VISITATION AND COMMISSARY

Tension levels and anxiety is increased by the frequent three and one half hour (3.5hr)        lines that visitors must stand in, in the heat of the open sun in the parking lot, to see inmates in the crowded and congested room because of the massive over-crowding. This directly affects the inmates' emotional and physicological well being, their ability to maintain family ties and the level of such ties, and affects the general level of tension within the population.

Commissary lines (inmates are allowed one commissary visit per week and the commissary is open Monday-Thurday from 11:15 A.M. to 12:30 P.M. and from 5:00 P.M. to 8:00 P.M.) usually results in **lines that are 3 to 4 hours long to get into** **commissary.** Thus, an inmate must choose whether to eat lunch or dinner and miss out on his weekday of commissary, or to miss lunch or dinner and stand in line with the hopes that he may be served before it closes before the end of the day. This causes increased stress and anxiety within the population exacerbated by such overcrowding.

### FOOD SERVICES

The dining hall which is designed for no more than **340 inmates** must serve five times this. This results in inmates not having more than ten (10) minutes to fifteen (15) minutes to eat breakfast, lunch, and dinner after having stood in line. This manifests into indigestion and other gastric disorders. Although the meals are suppose to be hot, they are usually delivered barely at room temperature and "soggy" (i.e. "soggy luke warm" fries, etc.) because so much food must be cooked and kept warm many hours in warmers and steamers prior to having enough to serve everyone. This being similar to what courts have expressed as violative of eighth Amendment conditions in such "effects of overcrowding". See Capps v. Atiyeh, 495 F. Supp. 802, 810 (D. Oregon 1980) ("Each of the 1400 or more inmates who line up for meals three times a day in the OSP dining room which can seat only 440 persons, risks the creation or aggravation of gastric illnesses by eating hurriedly (eating time has been reduced to 20 minutes) in a noisy, crowded, stressful enviornment").

Further, accommodations of religious diets is not done, as Jewish inmates are not provided similar meals, nor properly complete "Kosher" meals. This causing such inmates to violate their religious beliefs because of the already over-burdened food services -- a further effect of the massive overcrowding. See Attached Affidavits.

## STAFF

The over-burdened and over-taxed staff, whether counselors, medical staff, guards, etc., have massive increased case-loads, and the security and concerns resulting from such massive over-crowding frequently result in increase tensions between inmates and guards. This results in increased frequency of disciplinary sanctions for minor and normally insignificant violations (especially in order to send an inmate to Building 9 SHU in order to enable release of an inmate within such building 9 SHU waiting on bed space). Such burdened staff transmit anxiety and tension to the inmate population. These factors also result in further restrictive liberty conditions than what may be applicable to an inmate population of "low security" inmates.

OTHER EFFECTS OF MASSIVE OVERCROWDING


(EVIDENCE)

## VISITATION FACILITIES

The Design Capacity of the compound of Seagoville FCI which the visiting room was originally meant to handle is, as discussed infra, **597 inmates.** The visiting facilities is one small room, which, after the space for restrooms, guard-desks, closet, and inmate-restrooms and inmate dressing/inspection rooms is deducted leaves a space of only about **1100 square feet** of visiting space which encompasses a line of chairs. Only a very small fraction of the current massivly overcrowded facility may get into the visiting facility at a time. Because of the much smaller designed facility, and out-of-date type structure, the visiting area is usually highly frought with noise and children making noise which makes visiting somewhat difficult for both inmates and the visitors.

Additionally, the institution has instituted a policy that requires visitors to line up outside in line and wait, most times for **2 to 3 hours waiting to visit.** Additionally, when the institution "count time" occurs at 10:00 A.M. on Saturdays and Sundays and at 4:00 P.M. on weekdays, the visitors are all required to get out of line and go back to their cars. This being so, even though the visitors are on the outside of the institution in the parking lot; being for seemingly no logical reason what-so-ever that would have anyghting to do with any security concerns being that they are outside in the parking lot area already. This leads to angry confusion once the "count time" is over and people scramble back to get into some sort of line. When someone new arrives during count time in their car and then, once the former line-members get back into line, the new persons...jump in where-ever. This type of chaotic treqtment

of visitors has led to aggravation and reported fights breaking out in the visitor parking lot. It was reported that for just this type of activity, **a fight broke out in the visitor waiting line outside the facility on July 22, 2005.**

This chaotic enviornment is discouraging to potential visitors as well as to the inmate population, thus, causing continued family ties and community ties to be substantially negatively affected and deprived.

Ths common wait period for a visitor to be able to get into visit is 2 to 3 hours. Visitors must stand out in the hot sun or inclimate weather during this entire time period. This further affecting the Plaintiffs' family and community ties and relationships. This, being directly an effect of the massive over-crowding.

## DINING AND FOOD STORAGE FACILITIES

The Food Dining hall is overwhelmed by the massive over-crowding. The dining hall seats only approximately 340 people at one time. Because of the highly over-crowded conditions (in excess of 1,678 inmates) each meal must be divided into shifts. For example, between approximately 11:15 a.m. and 12:15 p.m. to 12:20 p.m., all inmates are cycled through the dining hall in divided shifts (different buildings are called approximately at different times to begin to enter the hall). However, many previous inmates are still remaining in the hall eating. Inmates must first stand in the line and then fight to find a seat. After this process, only about **10 minutes eating time exists** per inmate. Thus, every meal, three times a day, seven days a week must be consumed in the small period of 10 to 12 minutes by an inmate.

The dining hall is extremely noisy, overcrowded, and everything is "rushed". Consequently, as stated infra, the effects of eating in a crowded, noisy, stressful area seven days a week three times a day aggravates conditions and institutes conditions associated with gastric indigestion, and associated illnesses.

Because of the overwhelming population compared with the design capacity of the dining hall and food preparation facilities, the food is often served either cold or luke warm. Steamers attempt to keep the food hot--however with the massive population, this is rarely accomplished. So the result is to try cooking the large quantity of food far in advance of the meal and attempt to keep it warm as possible until all inmates then eat. This, results in soggy luke warm or cold food. Cold, soggy toaster-waffles, french-fries, meats, etc. is the norm.

The health problems associated with the gastric and intestinal illnesses have been held by courts to violate the Eighth Amendment in the past. See infra.

Although some of these other conditions may border on a violation of the Eighth Amendment, there is no question that these other items are clearly **the effects of massive over-crowding** of facilities that have been pushed **beyond** their maximum proper, functional design capacity.

The food preparation and food storage facilities are oftentimes consumed by **roaches** and other **insects.** In fact, even in what "is termed the 'cleanest' area of the food preparation area-- where the Kosher food is prepared on to the trays, certain staff members have verbalized their complete repulsion about going into such area when the lights have been off for a while, because of the **overwhelming infestation of roaches** which is commonly seen **throughout the room scurrying around** when the lights are turned on. One can only imagine what the cleanliness and infestation levels are in the actual food-storage areas. Numerous inmates have found roaches in their food--including a **roach wrapped up inside one Jewish inmates Kosher-wrapped food tray (dead) -- he can only have hoped that the roach was "Jewish" or Kosher itself!**

The cleanliness and vermin and rodent free food preparation and food storage facilities should be a primary concern of the Defendants. The current conditions are conducive to health problems and disease. Further, these type conditions, squarely violate the Eighth Amendment and "the determination of what constitutes cruel and unusual punishment is to be guided by a determination of the **'evolving standards of decency that mark the progress of a maturing society'."** Roper v. Simmons, 161 L Ed 2d 1, 16 (2005); Thompson v. Oklahoma, 487 U.S. 815 (1988); Trop v. Dulles, 356 U.S. 86, 100-101 (1958). A jury hearing such evidence would find it very difficult not to adjudicate that this is outside our currently evloved standard of decency of how they would expect their food and food storage cleanliness levels to be.

Plaintiffs additionally incorporate the attached affidavits referencing the various facets of the food preparation/food storage facilities as part of this section.

## BARBER FACILITIES

Nothing more pointed to the massive over-crowding can be
more apparrent and readily obvious than for a population of
**1,678 inmates** (although this has increased prior to this pleading
being filed but after it was drafted) **there are only THREE (3)
BARBER CHAIRS** available to serve such massive over-crowded
population.  Obviously, inmates are unable to be provided with
proper grooming because the facilities are so crowded that only
a limited number of inmates may be served each day...thus, many
times and many repeated attempts are necessary just to be able
to find a barber whom is not already booked.  This, deprives
Plaintiffs of one of the necessary necessities of life and
of the necessities of basic human dignity that society would
expect be provided adequately.

RE:    <u>BUILDING  9</u>

INFLICTION OF CORPORAL PUNISHMENT

LIVING CONDITIONS

EFFECTS OF MASSIVE OVERCROWDING


<u>HOUSONG UNIT</u>

LIVING CONDITIONS

EFFECTS OF MASSIVE OVERCROWDING

# BUILDING 9
## ("THE SWEAT BOX")

**"[T]he courts cannot close their judicial eyes
to prison conditions which present a grave and
immediate threat to health or physical well being."**
<u>Cambell v. Beto</u>, 460 F2d 765,768
(5th Cir. 1972)

Building 9 consists of small administrative offices and
psychology offices on the First floor; a small medical and dental
facilities            located on one half of the Second Floor; and
the Special Housing Unit (SHU) on the other portion of the Second floor.

The SHU is used for Admiinstrative Segregation and Administrative
Detention.  This is normally suppose to be used to temporarily
detain in isolation an inmate pending investigation or pending
disiplinary disposition (guilty or innocent) of an alleged rules
infraction.

The portion of the building containing the SHU and Administrative
Detention is completely without air-conditioning and, more im-
portantly, is **completely without any mechanical ventilation what-so
ever. Temperatures in the summer within each cell often exceed
100 Degrees or more 24 hours a day.** Each cell consists of a
bunk-bed, a toilet & sink, and a small metal desk. The room is
approximately 60 square feet in total area. Within this space, of
course, the desk, toilet, sink, and bed take up a portion of. Such
cells being approximately 8 feet by 7 feet, although designed for
only one inmate in isolation, provide minimal square footage per
inmate when two inmates are housed within such, and even less when
often times **three inmates are housed per cell with the third inmate
having to sleep on a mattress on the floor next to the toilet.**
Inmates can not go to the toilet without stepping on this poor soul's

mattress he is made to sleep on. Because of the massive over-
crowding, most new inmates who are transferred to Seagoville or
whom voluntairly surrender at such facility must go to Building 9
and are housed in these inhumane conditions to "await bed space".
Although committing no infraction, rules violation, etc. these
inmates are housed in isolation in these offensive conditions for
many times two weeks to a month until room on the compound comes
available. The occupants must endure this severe inhumane conditions
in cramped and little space for 23 hours a day (1 hour per day is
allowed for going outside for exercise in an enclosed area).
Showers are allowed and provided only once every three days even
in the round the clock 100 degree and above temperatures. To
compare how much space an individual has in a three-person isolation
cell with a mattress on the floor*next to the toilet, for example,
a standard single bed measuring 3ft x 6ft is 18 square feet. The
18.5 square per inmate of space available per inmate, which includes
part of such space being taken up by the toilet, sink, desk, and
bed is like living, sleeping, eating, and having toilet facilities
all within the confines of a space the size of a standard single bed.

As stated, the occupants must endure this inhumane treatment
23 hours per day 7 days a week with absolutely no ventilation
either coming into the room or out of the room. This dispicable
conditions reminds one of the Vietnam torture technique of enclosing
a prisoner within a metal box out in the sun in the heat of summer
with no ventilation what-so-ever where temperatures would often
exceed 108 degrees giving the name "the sweat box". Unfortunately,
our country has degenerated to this same level now in Building 9.
The cells have no ventilatiton what-so-ever---no air conditioning,
and no mechanical ventillation pushing air into the room. Because

---

* Courts have spoken of this inhumane practice many times; "I have, however included a
specific provision enjoining repetition of the mattress-on-the-floor-practice."
Capps v. Ativeh. 495 F. Supp. 802, 806n.4 (D. Oregon, 1980)

this building was constructed in the early 1930's, the most crudest of facilities having been preserved. During the period of when the facility (Seagoville FCI) was used as a Japaneese intern facility, these cells were used to administer disipline, and arguably, torture to uncooperative Japaneese American citizens whom found themselves illegally held there.

The windows of the cells are completely closed over with metal steel plates such that, the metal plates have approximately one quarter inch holes drilled in them through-out. There is no way, nor is there, any air circulation either in or out of a cell. At the opposite side of the closed off window there is the cell door which has only a small window port. One may put their hand or face up next to the window with the metal plates welded on it and barely detect the outside air but feel no air moving either in or out. In fact, at night, one can detect ( barely) air on the outside which feels cool (80 degrees feels cool compared to a cell where the stagnant air temperature may be 95 to 100 degrees or more) but not be able to get any of the fresh cooler air into the room. **Thus, even at night, the totally stagnant air within the cell continues to be unconcionably hot.** Inmates who spend a few days in a cell oftentimes find themselves **losing 5 to 10 pounds of body weight because of the round-the-clock sweating.**

No arrangements are made in any manner to provide for any ventillation or cooling of people housed in these cells. Although the hallway has two fans which blow air down the hallway for the guards who walk in the hall when they come out of their enclosed air-conditioned office, these fans have absolutely no effect on the individual enclosed cells. There is no pressure differential between the hall or cell and no forced air what-so-ever. For the unfortunate soul who has spent 30 days in such conditions

either waiting on bed space on the compound or awaiting adjudication of an alleged rules infraction, standard reports are the loss of as much as **20 pounds of body weight due to the excessive continued heat.**

. The building also contains enviornmental hazards to those who must spend any time.  Because of the humid conditions, excessive heat, and complete lack of ventillation, as well as the delapidated and aged structure, it contains **black mold** exposed to inmates. Additionally, the pipes and structure is contaminated with **asbestos.**

One major problem as well is that there is no "panic button" provided in each cell in case of emergency.  Since the guards are closed up down the hall in an air-tight air conditioned office, there is no way to summon help in case of a medical emergency, or the like should such occur.

Although showers are allowed every three days, they do little good because of the continued sweating in excessive, non-ventilated cells** An inmate's mattress becomes soaked on one side then he must roll it over to the other side to hope that side drys out somewhat in order to have a dry spot to sit and sleep on.

On August 23, 2005, at between 5P.M. and 7 P.M., on a day when a heat advisory/warning had issued for the Dallas area with a heat index of **108 Degrees**, an inmate housed in such Building 9 cell **had a heart attack** and had to be rushed to the local hospital since there is no critical care on-sight medical care available.

---

** "In Gordon, the inmate was exposed to subfreezing weather without hat or gloves for over one hour.  The court noted that the conduct at issue was not as harmful as a whipping or electrical shock; nonetheless, the pain inflicted was sufficient to violate the Eighth Amendment given, inter alia, the absence of any legitimate penological interest, and the defendant's callous refusal to provide the hats and gloves although they were readily available.  800 F. Supp. at 800."
      -Madrid v. Gomez, 889 F.Supp 1146, 1263n.205 (N.D.Cal. 1995)

**PHYSICAL PLANT**:

VENTILATION:

As discussed ante, there is no ventilation system in the individual cells located within Building 9. No fresh air is directly forced into or out of each cell unit. There are approximately 36 individual cell units located within Building 9 (18 on each floor). The rest of the building **is ventilated, and air-conditioned**. The rest of the building consisting of a few Administrative offices on the ground floor, some Pshchology offices on the basement and on the ground floor, and a small medical facilities clinic on the second floor which houses dental facilities as well. To give an idea of dental facilities capacitiy, **there are only THREE (3) DENTAL CHAIRS to serve a population of 1,678.**

PLUMBING:

The infrastructure of Building 9 being as it is over 75 years old is highly delapidated, this includes the plumbing. The plumbing pipes are corroded and are falling apart and frequently break spreading sewage through-out the building. In fact, on or around July-August, 2005, a major break happened and sewage flooded the basement of the building including Psychology offices. Inmates assigned to the building as orderlies had to do a hazardous-waste clean-up (of course without any safety gear) to clean it up. An outside company was called in to unstop the rest of the sewage within the lines and pipes. However, this effulent raw sewage was then dumped on the topsoil outside the FCI fences on FCI property creating an enviornmental "stink" and health hazard. The pipes have corroded, being so old, on the tops (some pipes have started to cave in from the top), as well as at the joints as well. Fresh water is piped in via the old outlawed pipes known as "black iron" pipes. The capacity of the building to

handle the inmate load is over-capacity.

Because there is no adequate ventilation within the inmate cell area within the building, the sewage smell and bacteria associated with such fumes, infiltrate the units and deposit on available area creating a health hazard.

LIVING SPACE:

The available space per cell, as stated, is a bare sixty (60) square feet at most. Most of this space is taken up by the toilet, the sink, the metal desk, and then the bed. Designed only for one individual it is usually occupied by two (2) and sometimes three (3) inmates. This gives a total square feet per inmate of only 30 square feet and 20 square feet respectively, and most of that is taken up by the equipment in the room. Such space is far below the standards of human decency and humaneness for housing individuals in 23 hours a day, 7 days a week for sometimes months on end.

SANITATION:

The Building 9 cells are obviously full of potential health hazards. The sewer system backs up effusing sewage into the building which comes into contact with the air and enviornment causing airborne germs and bacteria. The water piped into the building is from the old black piping (cast iron) outlawed decades ago because of health concerns. Black mold and asbestos is present within the structure of the building and by exposure to the enviornment and air, is able to be migrated              to the areas occupied by inmates thereby exposing them to extreme enviornmental hazards, not to mention the inmates whom are periodocally required to clean up or conduct maintenance on such system or building parts.

A2-41

## STRUCTURAL HAZARDS:

The Building is long past its available intended useful life at being over 75 years old. As stated, the red brick building acts like a kiln or oven in retaining heat. This structure has also become delapidated and enviornmentally dangerous because of the toxins and enviornmental hazards within such unit. The structure itself, although intact, is, because of these other important issues, structurally unable to be maintained without complete demolition and reconstruction.

# BUILDING 54
## (and BUILDING 53 )

Building 54 and Building 53 are basically identical. Therefore, in detailing the aspects and conditions of Building 54 here-to-fore, they are mirrored and basically identical in most every way to Building 53. These two buildings are fairly new, constructed around 2000. Although recent in construction, the complete lack of proper atention and maintenance in many areas combined with the massive overcrowding causes conditions of overcrowding which are inhumane.

Building 54 consists of a concrete structure designed to house 128 inmates. The building consists of 124 standard rooms measuring 7ft x 11ft with a slight indention then averaging 75 square feet in area. Design capacity of the building also includes 4 rooms which are handicap rooms with extra space for what would normally be wheel chair access. This totals to 128 rooms (cells) for the building.

The rooms are located around a rectanglular open area. The Building is two story and the top rooms are serviced by a 4 foot wide fire corridor-balcony area with stairs leading to the open area down in the middle of the building. To be clear, the entire building is actually complsed of two wings, each of which consist of 34 rooms on the top level and 30 rooms on the bottom level for a total of 64 rooms on each wing. The open area is designed to be fire corridor area and open walking area. The wings are connected by a hallway approximately 60 feet in length, ofwhich, the guard's office is located at the middle of the hallway. None of the rooms or living space or open area is visible from the guard office. None of the rooms have doors nor are they outfitted for any doors--they are open to the central middle area. Each room consists of one bunk bed and two lockers and two chairs. No desk is provided, no trash recepticle,

nor any bullitan board, shelves, etc. Only one ventilation inlet which provides air-conditioned air is in each room.

The Day-Room space was designed into the building for accomodating 128 inmates. This day room space consists of 14 Day Rooms. These day rooms are designed to house a combination of enclosed TV Rooms where TV's can be watched, and then rooms for cards or recreation, or for writing or reading.

The restroom facilities for the building are spread out between each floor on the wing and between each wing. They total as follows: 32 Showers, 48 sinks, 16 urinals, and 16 toilets.

Double celling inmates with two (2) inmates per room creates a "critical capacity" for the builging(s) of 256 inmates.

Currently, due to the massive overcrowding, this building is at 340 inmates. This represents 266% of the design capacity (166% over the designed capacity) and 133% of the critical capacity (33% over the critical capacity). The Defendants have resorted to removing all day-rooms and stuffed inmates into such rooms at an inhumane level. Further, the day room space being completely eliminated has caused inmates to use the open area and fire corridor area for recreation space and TV's. TV's have been taken out of the day rooms and mounted on the bottom of the fire corridor balconies. This leaves 100 to 150 inmates in the central open area of each wing at all hours of the day, including night-time sleeping hours. Inmates have no space to write, no desks to write on, no space to have for games or recreation, no space to have quiet, and what fire corridors existed are now occupied. The effects of this overcrowding are more fully discussed infra within this section.

The following lists the former day-rooms which have now been converted to crowding inmates in.  The square-foot per person figures, one must also remember, also includes the space which a locker and a bed must occupy--leaving little other room, and certainly completely void of any **fire corridor** exit space within the rooms as is required by municpde, county, and state fire code as well as building fire code:

| Room Size | Total Area | Inmates in Room | Square Feet per Person |
|-----------|-----------|-----------------|------------------------|
| 8ftx13 | 104 sq ft | 4 | 26 |
| 8 x13 | 104 | 4 | 26 |
| 10.5x16 | 168 | 8 | 21 |
| 12 x 18 | 216 | 10 | 21 |
| 12.5x22 | 275 | 12 | 23 |
| 10.5x18 | 189 | 8 | 23 |
| 8.5x10.5 | 89 | 4 | 22 |
| 8.5x10.5 | 89 | 4 | 22 |
| 10.5x16 | 168 | 6 | 26 |
| 12 x 18 | 216 | 10 | 21 |
| 16x18.5 | 296 | 12 | 24 |
| 10.5x19.5 | 205 | 6 | 34 |
| 8.5x10.5 | 89 | 4 | 22 |
| 8.5x10.5 | 89 | 4 | 22 |

The middle area of a wing, excluding the space devoted to fire exit and fire corridor space is approximately 20 feet x 115 feet totalling to approximately 2,300 square feet.  This totals to 4,600 square feet for the entire building.  This averages of 13.5 square foot per inmate of other-space, other than the living space withing their own room.  This other space would normally be day-room space category space; in other words, all of these rooms should be day-room recreation and tv-room space but they have all been "crammed" full of inmates and there is no day-room space.

### PHYSICAL PLANT:

#### VENTILATION:

Although the building is air-conditioned, there is little maintenance or preventive maintenance done. There are no air filters in the system and consequently the air blown is dirty and dusty. Often the air-outlets fill with a black dust type mold particles. Although there are two per wing mechanical vents which duct fresh-air into the building periodically through-out a cycle basis...these are all broken leaving absolutely no fresh air being ducted into the building enviornment at all.

The ventilation within the day-rooms which have been converted into living quarters, with, as detailed, as little as **21 square feet living space per inmate** is nearly non-existant. The room being designed as a small day room is taxed with one ventilation port, for example, to accomodate the air for 12 individuals. Most of the time the rooms are musty, damp, and stagnant. When an individual hangs there wet towel from a shower, the towel becomes molded and smelly because it is unable to dry, nor does it have adequate ventilation with which to dry out within such rooms. This goes as well for the bedding and any cloths an inmate has as well. What should ordinairly be **60 cubic feet of ventilation per minute per person, in these rooms becomes little if any** resulting in molded cloths, towels, bedding, and a resulting stagnant air enviornment. Although the other rooms receive minimum circulation even being double-celled, the housing of inmates within the day-rooms with little fresh air and no air circulation constitutes inhumane conditions and creates health hazards. Because, there are also no windows in these rooms...there is no avenue to create additional ventilation for the massive number housed in each room.

LIVING SPACE:

Because of the massive overcrowding, there is little available living space for an inmate. As discussed, room-quarters space is as little as **21 square feet per inmate** for his room. To put this in perspective, a standard size bed which is 4ft x 6.5ft has 26 square feet of area. The 21 square feet per inmate space also must accomodate the space for the bed and the locker and a metal folding chair. Hence, there is little if any room to stretch out or sit in a chair without being cramped. Further, average Day Room space equates, as discussed ante, to only **13.5 square feet per inmate**. This is absurdly below the 35 square feet per person minimum required by professional jail standards. It must also be noted that inmates housed in the~~converted former~~ day rooms have no windows and no natural light. Other rooms have small, non-opening windows. Certainly, occupation of inmates within the day-rooms with little living space, and no natural light adds to the effect of inhumane treatment.

NOISE LEVELS:

**Noise levels are exceedingly high...the sound of being in a train station** during daytime hours as well as into the evening and into the night mostly until around midnight. Because, for example, in the evening, night, and inclimate weather days there may be 100 to 200 inmates in the central open area congregating watching TV, playing cards, singing, slamming dominoes down on the folding tables or chairs, banging chairs moving them in or out, standing around in groups talking and laughing, shouting at football, baskettball, and other sports games, and the like... the noise levels are so loud that one can not even hear the overhead intercom speaker. This noise is constant and non-abating, hour after hour, day after day. Inmates spend from 8:30 P.M. to 7A.M.in such quarters as they are

"locked in" during these time periods (except for weekdays where instead of 7:00A.M. it would be 6:00A.M.). Additionally, inmates are there during the lunch period waiting to go to lunch which is 10:20A.M. to 11:45A.M. on average. Additionally, inmates are there locked in for the afternoon count period and until dinner is called which is between 3:30P.M. to 5:00P.M. This represents a total, on average, of about **13.25 hours per day** that inmates are confined within such small living space and day-room space. Such constant noise levels during most times of the day and night prevent one from having any quiet time or book reading time what-so-ever.

RECREATION SPACE:

**There is none.** Because all of the day-room space has been taken up in cramming inmates into the TV rooms and day-rooms, inmates must resort to playing cards on stairways, fire corridors, and outside other inmates front door areas of the rooms the rooms do not have doors. Hundreds of inmates congregate outside the fronts of rooms at all hours of the day. There is no space or area for any recreation, book reading, studying, writing, or other sort of productive recreational activity.

LAVATORIES:

Because of the massive overcrowding toilets are a luxury. The ration of **inmates to toilets is 21 to 1.** The ratio of **inmates to showers is 11 to 1.** Many times one will have to wait as long as 30 to 40 minutes to use the toilet or obtain a shower. Because of the poor ventilation within the showers due to the air conditioning being turned off and just the blower operating, the humidity levels within the showers becomes very high. This in combination with poor maintenance and lack of providing proper supplies causes **black mold** to grow within the shower area and in contact with where

inmates must shower.  Additionally, this constantly draws small
"fruit flys" or other described insects which constantly fly and
hover around the shower areas.  The black mold also gets into the
air ducts and exposes all inmates within the building to mold
spores so those with such allergies suffer, in addition the
fact that black mold is an enviornmental toxin creates a health hazard
for all inmates.  Thus, the lavatory area is a breading ground for
such enviornmental and health hazard which then becomes trapped
with the enviornment of the building without input of fresh air.

SAFETY:

The Fire Exit signs are inoperative because nobody has ever
bothered to replace the burned out bulbs.  The emergency lighting
in emergencies does not work because either the batteries are all
drained and cannot provide power or the bulbs are inoperative.  One
can not see the fire exits during the night, and in a condition of
a potentially smoke filled room (which would be aggravated because
the outside air ventilation vents, as discussed ante, are broke)
one would not be able to see any exit signs.

At 9:00P.M. until 6:00A.M. the next morning, the guard inside
the building does not have a key to open the fire doors in case of
fire or emergency smoke filled environment.  Although the fire
exits open to the area outside the building which is encirciled with
a sixteen (16) foot barbed wire fence (no one could get over it in
case inmates were evacuated to such outside area) the policy is to
only give the compound officer for the entire compound the key to
come and open the fire doors or any doors in case of fire or
smoke.  This could conceivably be as long as 10 minutes before the
compound guard gets from the other side of the facility on foot.

ENVIORNMENTAL:

Enviornmental Tobbaco Smoke ("ETS") saturates the building
because the Defendants allow (permit) because of lack of enforcement
and lack of personel to handle the massive population, the smoking
in restrooms of cigarettes and cigars to go on.  One can actually
sit in bed at night and smell "cherry-tobacco" cigar smoke which
emenates from the restrooms.  If one ventures into such restrooms
their shirt and hair will come out smelling like the Marlburro Man.
Because the building is a closed enviornment, and that as discussed,
fresh air inlet vents are broke to infuse periodic fresh air into
the building, ETS levels build up within the building and are
circulated to every room.  Constant exposure to such ETS has
existed for over one year with no reduction.

# BUILDINGS 5, 7, 10 & 12

Buildings 5, 7, 10, and 12 are all buildings which were constructed prior to World War II and are red-brick buildings. All of these buildings are beyond their intended useful life and are in delapidated conditions with varying substantive problems that exacerbate the effects of overcrowding and themselves present hazards and offenses to the constitutional rights of occupants in violation of the Eighth Amendment of the Constitution. The following table summarizes these buildings statistics:

| BUILDING | POPULATION | DESGN CAP. | CRIT. CAP. | #Toilets*(Inmate Ratio) | | Showers*(Ratio) | |
|---|---|---|---|---|---|---|---|
| 5 | 202 | 73 | 146 | 8 | 25:1 | 11 | 18:1 |
| 7 | 202 | 73 | 146 | 8 | 25:1 | 11 | 18:1 |
| 10 | 106 | 47 | 94 | 6** | 18:1** | 6 | 18:1 |
| 12 | 140 | 48 | 96 | 6 | 24:1 | 6 | 18:1 |

Notes: DESGN. CAP. = "Design Capacity"; CRIT. CAP. = "Critical Capacity"; Inmate Ratio are the respective ratios of Inmates to every one toilet and Inmates to every one shower.

** Building 10 bathrooms have been out of operation for several months and off and on repairs are made. This has resulted in **only 1 operational toilet being available** during this period for **106 people** for such period. Also, **asbestos** was discovered in the insulation of the piping in this building bathroom. The **asbestos** was visibly **exposed to inmates** and the drop ceiling was torn down. **Drop-bag technique of asbestos (which is illegal) was utilized to remove this exposed asbestos.** Not all of the asbestos was removed, and the micro-particles obviously migrated through-out the building.

NOTE: BUILDING 12; Building 12 was built "after" World War II in approximately the 1950's to 1960's, although the same general type of construction and components as the other buildings are present.

Building 5 and Building 7 are virtually identical buildings. Both have virtually identical floor plans, features, and population levels. Both buildings are in similar respective conditions in all aspects. Although these buildings were designed with "Day-Rooms" which could accomodate people, these day-rooms have been taken up with cramming bunk beds into such. Each building has 4 **Day-Rooms** which have been **crammed full with inmates of 14 inmates per Day-Room.** These day-rooms are **15 feet x 25 feet in dimension** for a total square footage per day-room of **375 sq ft.** In calculating the square footage per inmate in these day-rooms the square footage amounts to only 26 square feet per person, however, this does not allow for any fire corridor space for eggress or path-way to the door of the room. Further, since most of the available space is taken up by the beds, chairs, and lockers, there would be no space left available for any **fire corridor** what-so-ever, let alone any actual living space.

The individual rooms of these buildings measure 7.5 feet x 10 feet for a total square footage within the individual rooms of 75 square feet. since these rooms are double-celled, this leaves only 37.5 square feet per inmate in these rooms, and this square footage is also taken up by the bed and locker and chairs. Hence, the **available living space** within these buildings is remotely small and almost negligable.

These buildings have only two (each building) operating day-rooms each which are used as small TV rooms. These rooms comprise of one of about 225 square feet and the other of 400 square feet respectively. Very few inmates can occupy a TV room at one time, and obviously, there is no other day-room space for game-playing, cards, reading, studying, writing, or similar activities. Consequently, **there exists virtually no Day-Room space** in these buildings to speak of. Inmates are playing cards, dominoes, talking, etc. in the halls, on the stairs, in the bathroom, at all hours of the day.

Building 10 is of similar structure as Building 5 and 7 but is much smaller. Additionally, Building 10's day room, like the other buildings, has been crammed

full with 14 inmates.  Again, similar dimensions of this day-room to the day-rooms filled with inmates in buildings 5 & 7 exist, and such day-room is crammed full with 14 inmates leaving similar square footage available as discussed ante regarding buildings 5 & 7.

While buildings 5, 7, & 10 are all two-story red-brick un-insulated, non-air conditioned, non-ventilated buildings, Building 12 is a one-story red-brick building.  Building 12, is also of the same general condition and same general age as these other buildings.  Building 12 however has rooms which are of the size 11.5 ft  x  10 ft giving 115 square feet per room. These rooms are housed by three (3) inmates each giving only 38 square feet of space per inmate.  This space is, however, taken up by the bed, desk, chair, and lockers leaving little available living space per inmate.  There are only 4 tiny TV rooms in building 12.  There is no day-room space in this building.  As with buildings 5, 7 & 10, inmates are relegated to playing cards, reading, writing, etc. at all hours of the day in the small halls, the bath-rooms, and on the exitway doors.

\* \* \* \* \*

## PHYSICAL PLANT:

### VENTILATION:

Buildings 5, 7, 10, & 12 have no air conditioning and have no working operational mechanical ventilation systems.  Inmates, who can afford a fan put them on their desk or chair to blow non-fresh air on them.  No outside air is forced into the rooms.  Although building 5 and 7 have a mechanical blower system---the filters and system is so clogged up with dirt, lint, and dust that it creates not even enough suction on the air up-take to hold a tissue paper against such inlet.  Hence, there is virtually no air exiting from the vent ports. Additionally, since the buildings are so old, there is virtually no insulation to speak of to insulate the heat or sun from heating the red-bricks in the Dallas Texas heat; consequently, the buildings become essentially "red brick ovens"

baking their occupants. The useless and non-working vent system would, even if it actually worked, do nothing more than make the effectiveness of the "oven" bake the entire building occupants even more efficiently.

### LIVING SPACE:

As discussed supra, there exists less than 26 sq. ft. "living space" per inmate within these buildings, although this 26 sq ft would normally be allocated to fire-corridor space, and is taken up actually by objects such as the lockers, chairs, desks, and beds such that there is basically little available living space remaining for inmates to stretch out in or have available private space. As discussed supra, although the official required amount of "Day Room" space should be a minimum of 35 square feet per inmate times the number of inmates in such building, these buildings contain virtually no day-room space what-so-ever.

### NOISE LEVELS:

For the reasons as discussed in the analysis of Buildings 53 & 54, the same levels of noise are present in Buildings 5, 7, 10, and 12 and, in addition to such inmate-caused noise roar, the constant roar of individual's personal fans which lie in the rooms, on constantly, equate to that of being on a propellor driven airplane 24 hours a day.

### RECREATION SPACE:

As stated supra, there is essentially no available day-room space available.

### LAVATORIES AND PLUMBING:

The lavatories (quantity) are insufficient for the quantity of inmates housed in buildings 5, 7, 10, and 12. The plumbing is outdated and outlawed black cast iron piping and clay piping. The sewer lines within each of the buildings is so delapidated and corroded that constant leaks occur within such lines exposing the

Plaintiffs to health hazards and enviornmental toxins. There is Black Mold within such buildings and the wet walls and has been painted over when painting crews go to paint. This Black Mold is present because of the constant dampness and exposure to wetness, leaks, and humidity, and with no proper ventilation or air conditioning, such levels of mold spores expose the Plaintiffs to significant enviornmental toxins. Additionally, the wet walls contain plumbing pipes from the World War II Era and all have **Asbestos** insulation. Workmenship on the ceiling of the bathroom of Building 10 exposed the inmate workers and the occupants of such Building to Asbestos Insulation that "rained down" and infiltrated the building living space, as well as the bathroom (see Attached Affidavits).

The basements of Building 7 and 10 flood with water and sewage frequently. This is due to breaches in the delapidated piping within the buildings. The downstairs bathrooms in Buildings 5, 7, and 10 frequently back up with sewage and the toilets bubble. The basement of Building 10 where pipes have to be repaired when the breach contains an "enviornmental warning sign" regarding the enviornmental toxins of Asbestos, inter alia, warning that one must use a respirator before entering. It is obvious that these toxins are also able to enter the atmospheric enviornment throughout the building--exposing the occupants to significant health hazards. Additionally, the showers constantly flood and become ankle-deep with water thus, exposing the Plaintiffs to health risks of such dirty water and filth on their skin, thereby depriving the Plaintiffs of a healthy enviornment.

### SAFETY AND ENVIRONMENTAL:

The occupancy levels of each of these buildings is far in excess of maximum fire code levels and pose a serious hazard and risk to the Plaintiffs' potential well being and safety. Further, the inmate-occupied "cram filled" day-rooms present an additional serious hazard to inmates' safe well being. The lack of proper ventilation, as discussed infra, as well as the environmental toxins and health hazards discussed ante, deprive Plaintiffs as well of a humane environment.

## BUILDING 6

Building 6 was built around the end of the 1990's. This building is a red brick construction and it does have air conditioning. This building was, however, built generally by inmate-construction at the time of construction. The current condition of the building is generally astetically acceptable, the preventive maintenance and ongoing system problems, combined with the effects of massive over-crowding serve to deprive the inmates of significant constitutional protections.

Building 6 consists of 50 rooms of dimensions 14ft x 10ft for a total per room area of 140 square feet. The design capacity of each room is for 2 inmates per room (giving an average of 70 sq ft per inmate as acceptable long term jail standards require). These rooms, however, are crammed each with 5 inmates (giving only 27 sq ft per inmate of living space).

This building consists of a middle area open space for use as fire-corridor space as well as what normally would be available open-day-room space. However, this open area, which is approximately 19 ft x 58 ft for available space of 1,102 square feet, is crammed full of inmates on bunk beds with lockers and chairs. There are 40 inmates (along with associated lockers and chairs) on 20 bunk beds crammed within this area--outside in the open area with no privacy what-so-ever. This space is so crammed that there is barely a two (2) foot clearance between beds--certainly nowhere near adeauate fire corridor space for emergency eggress. Additionally, this two (2) foot clearance is taken up by the metal chairs themselves, essentially leaving no emergency eggress space.

The building has four (4) small day-rooms, which have not yet been crammed full of inmates, that house tv rooms. These rooms are as follows:

        20ft x 13.5ft    270 sq ft
        20ft x 13.5ft    270 sq ft
        12ft x 12ft      144 sq ft
        12ft x 12ft      144 sq ft

This leaves a total of 828 square feet of tv-room/day-room space for the the occupancy level of the building which is 285 inmates. Although the occupancy of Building 6 is 285 inmates the "design capacity" is 100 inmates. The critical capacity is 200 inmates. Thus, Building 6 is massively over both the designed capacity of the building as well as the critical [short term] capacity.

The number of toilets in Building 6 is 14, and there are also 14 showers. This makes a ration of 20 inmates per toilet or shower. Many times one must stand in line for sometimes 20 to 30 minutes to use the toilet or facilities. Because of the lack of maintenance the restroom showers frequently stop up and one must stand in ankle-deep water in order to take a shower; this frequently a source of health hazard, especially that a substantial number of inmate on the compound have staff infection.

The massive over-crowding and the inmates crammed into the middle area as well as into the rooms leaves no effective day-room space and inmates are up at all hours "recreating" in the halls, etc. which creates constant levels of noise even into the midnight hours. Such situation deprives the Plaintiffs of a proper amount of minimum living space, privacy, sanitary conditions, adequate additional day-room space (standards reccomend a minimum of at least 60 to 70 square feet living (room) space per inmate in addition to at least a minimum of 35 square feet of day-room space per inmate), as well as an enviornment which is not frought with high noise levels through-out the day and night. This deprives the Plaintiffs of the minimum acceptable societal standards of decency creating an Eighth Amendment violation and damages to Plaintiffs.

INADEQUATE MEDICAL CARE **SYSTEM**

FACTS and EVIDENCE

&

RELATED MATTERS

## MEDICAL AND DENTAL FACILITIES AND
## CARE PROVIDED

The medical facilities are housed in Building 9 on one wing of the top
floor. The medical and dental facilities encompass a space of approximately
the size of a regular doctor's office with a pharamacy section attached. To
serve a population of nearly 2000 inmates, the dentist facility has only **three
(3) dental chairs.** The facilities were in no way designed to handle the
qantity of inmates that it now must service. Consequently, the delivery of
proper care of medical and dental care to inmates greatly suffers. Further,
the staff is over-burdened, poorly supervised, and can be termed blatently
incompetent in the standard of care delivered to inmates as may be noted by
review of some of the representative supporting Affidavits attached as a
part of these pleadings. The facilities and care delivered, as well as the
funds needed to provide adequate medical care, are far below the level needed
and required to provide the constitutionally required medical care.

(a)

"The basic right of inmates to receive needed medical care while they are
confined in prison in indisputable." Battle v. Anderson, 457 F. Supp. 719, 736
(E.D. OK, 1978) quoting Estelle v. Gamble, 429 U.S. 97, 50 L Ed 2d 251 (1976);
Battle v. Anderson, 564 F2d 388 (10th Cir. 1977). A necessary corollary of
that right is that "prison officials have an affirmative duty to make available
to inmates a level of medical care which is reasonably designed to meet the
routine and emergency health care needs of inmates." Battle v. Anderson, 457
F. Supp. 719, 736. This is because **"[p]ersons are sent to prison as punishment,
not for punishment."** Battle v. Anderson, 447 F. Supp. 516, 525 (E.D. OK, 1977).
And this is also because "[a]n inmate must rely on prison authorities to treat
his medical needs; if the authorities fail to do so, those needs will not be

met. In the worst cases, such a failure **may produce actual 'physical torture'** or 'lingering death', In re Kimmler (136 U.S. 436, 34 L Ed 2d 519), the evils of the most immediate concern to the drafters of the [Eighth] Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. cf Gregg v. Gerogia, (428 U.S. 153, 171-74, 49 L Ed 2d 859). The infliction of such **unnecessary suffering** is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that '(i)t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself'." Battle v. Anderson, 457 F. Supp. 719 at 736.

Such suffering and pain, and even that equivalent as torture, has, and is, being inflicted upon inmates by Defendants at Seagoville FCI. The effects of massive-overcrowding and the deficiencies in the medical care system at Seagoville FCI (systemic deficiency) which results in repeated occurences of negligent and **wanton** treatment of Plaintiffs, ofwhich but just a few examples representative of such are attached as part of these Pleadings via Affidavits, represent a mindset of the Defendants of **deliberate indifference** to Plaintiffs medical care --- a necessity of life. "The [D]efendants knew they were subjecting the inmate population to a substantial risk of serious harm by virtue of their **utter failure to provide for adequate medical** [] **care.**" Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995).

(b)

The Defendants routinely force inmates off **needed medicine** and medical care through actively **halting issuance of prescribed and needed medication**, as well as by not prescribing needed medications when they should be prescribed in order to accomodate the medical treatment. This is also done in reference to medical procedures which are needed or have been prescribed. One of the reasons for this unconciounable conduct is that because the **War in Iraq** has diverted

significant required B.O.P. funds needed to provide inmates the proper and
constitutional medical care, B.O.P. management and surperiors pressure and
"move" medical staff away from spending money on medicines and treatment pro-
cedures needed by inmates rather than require that such medical care be
maintained at the constitutional level. Prisoners, and thereby Plaintiff, are
left to suffer without receiving needed care, services, and medication.
"Interference with the needed medical treatment in and of itself constitutes
**deliberate indifference**". Estelle v. Gamble, supra 429 U.S. at 104-105;
("intentional interference with prescribed treatment manifests **deliberate**
**indifference**). "[L]ack of financing [is not] a defense to a failure to provide
minimum constitutional standards [of care]." Battle v. Anderson, 447 F. Supp.
at 526; Jackson v. Bishop, 404 F2d 571, 580 (8th Cir 1968); Finney v. Arkansas
Board of Corrections, 505 F2d 194 (8th Cir 1974); Alberti v. Sheriff of Harris
County, Texas, 406 F. Supp. 649, 669 (S.D. Texas 1975); Hamilton v. Love, 328
F. Supp. 1182, 1194 (E.D. Ark 1971).

> "Having stripped [prisoners] of virtually every means of
> self-protection and foreclosed their access to outside aid,
> society may not simply lock away offenders and "let the
> state of nature take its course'."
>
> Farmer v. Brennan, 114 S. Ct. 1970, 1977 (1994)

But, **this** is precisely **what the Defendants have done** in this instant
case, as may be evidenced by some of the Attached Affidavits
regarding the **deliberate indifference of Defendants** in the denial of the
necessity of proper and constitutional medical care, inter alia.

(c)

A **systemic failure** to provide proper medical care occurs when the system
for delivery of such is defficient and does not embody the elements needed for
such proper functioning, **and/or** when the system is burdened with **massive over-**
**crowding** that compromises the designed capacity of the system. **Both deficiencies**
**are present at Seagoville FCI.**

A2-61

(d)

As may be noted in the case of **Mr. Johathan Blount,** (see attached Affidavit) prescribed and **essential heart and stoke medication** was **purposefully** **with-held** **from Mr. Blount** which precipitated and caused a heart-attack of Mr. Blount, whereby **he died on the operating table.** Further, when Mr. Blount tried to **seek emergency care at the onset of the heart attack,** the Defendants' conduct not only was that of **deliberate indifference,** but easlily meets the standard to be termined **criminal negligence.**

Again, in the case of **Mr. Jesus Garza,** (see attached Affidavit) although Mr. Garza sought emergency treatment for what was ultimately determined to be a **burst appendix** resulting in **peritonitis** and **massive internal infection,** the Defendants **wantonly** were **deliberatly indifferent** to his medical condition and to **his suffering** and to the urgent emergency care that was needed. **Amazingly,** even after determining that Mr. Garza **was in dire need of urgently getting to the hospital within the hour for emergency treatment...Defendants were deliberately indifferent in "lolligagging around" for over THREE (3) HOURS** having him wheelchaired over to the detention center unit next to Seagoville FCI to change cloths and wait for a van and guards to transport him eventually to the hospital emergency room. **NO AMBULENCE, EMS, OR EMERGENCY TRANSPORTATION WAS CALLED OR PROVIDED WHAT-SO-EVER.**

(e)

A "constitutional claim is stated when prison officials intentionally **deny access to medical care** or **interfere with prescribed treatment."** Todaro v. Ward, 565 F2d 48, 52 (2nd Cir. 1977). "Inadequate resources no longer can excuse the denial of constitutional rights." Ibid. These two cases, ante, being representative of the care provided to Plaintiffs personifies the unconstitutional "cruel and unusual punishment" that the Todaro court bespeaks as being violative of the Constitutional rights of Plaintiffs.

A2-62

"Notably, in the context of class actions alleging a violation of the Eighth Amendment based on a pattern of inadequate care, a plaintiff class **may prevail** by showing **a series of incidents of negligent medical care,** none of which would be individually actionable. See e.g. DeGidio v. Pung, 920 F2d 525, 532-33 (8th Cir. 1990); Todaro v. Ward, 565 F2d 48, 52 (2nd Cir. 1977). For as the case law makes clear, an individual plaintiff can not recover by showing that a defendant provided negligent medical care or committed malpractice in a specific instance. Estelle v. Gamble, 429 U.S. at 106; Toussaint IV, 801 F2d at 1111; Franklin v. State Welfare Div., 662 F2d 1337 (9th Cir 1981). However, **a plaintiff class can rely on such instances** and **systemic deficiencies** to show that prison administrators are deliberately indifferent **to** a pattern of inadequate medical care and obtain injunctive relief on a classwide basis. DeGidio, 920 F2d at 532-533; Todaro, 565 F2d at 52 ('And while instances of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a **deliberate indifference** by prison authorities to the agony engendered by haphazard and ill-conceived procedures'); Ramos v. Lamm, 639 F2d 559, 575 (10th Cir. 1980), cert denied 450 U.S. 1041." Madrid v. Gomez, 889 F. Supp. 1146, 1254 n.200.

"Indicia of 'serious' medical need include '[t]he existence of injury that a **reasonable doctor** or **patient would find important and worthy of comment or treatment;** the presence of a medical condition that significantly affects **an individual's daily activities;** or the existence of **chronic and substantial pain...'** McGuckin v. Smith, 974 F2d 1050, 1059-1060 (9th Cir. 1992)." Madrid v. Gomez, supra at 1255 n.201.

Plaintiff has shown very clearly and substantially in these pleadings and the accompanying Affidavits a **pattern of repeated examples of negligent care, delayed care, denied care,** as well as substantive **systemic deficiencies** of the medical delivery system itself which all bespeak the **deliberate indifference** of the Defendants. Further, repeated examples within such Affidavits, which are

A2-63

typical, are shown of medical conditions of inmates that affect their daily activities (including, but not limited to failing to provide inmates with needed dental plates for chewing food and making them "gum" their food for over 7 months) such conditions that would be "worthy of treatment" by a **reasonable doctor** or **patient** but are left without proper treatment, or such timely treatment being denied; Plaintiff has also shown repeated examples of needless **pain and suffering** sufferred by inmates because of denied treatment or improper treatment. These facts "bespeak a deliberate indifference by prison authorities". Todaro, supra at 52.

### (f)

Defendant's medical care system is substantively deficient in the effective, immediate, and proper identification of emergency and urgent care cases; the system of triage is basically non-existant; the system lacks the responsiveness and organization needed for immediate care and for follow-up care required or prescribed in serious medical cases (as well as less serious cases); it fails to provide "ready and timely" access to outside facilities both in urgent care, regular care, and emergency care situations; it lacks the structure and ability for inmates to make medical problems and urgent care problems known to the proper staff member to enable such delviery of such care, or after-hours critical or urgent care which becomes necessary; institution staff, as evidenced by some of the Affidavits infra, are not knowledgable in procedures for responding to urgent care and emergency care situations (or) such procedures do not even exist at all nor is proper training in such provided; "after hours" medical staffing is non-existant (i.e. if your "appendix bursts" the inmate had better hope and pray that it bursts during "office hours" because his life depends on that); needed medical care from outside sources or prescribed medicine that may be needed or prescribed is routinely denied or not provided; the competency of the

medical staff, as may be observed by the various Affidavits infra, is in very serious question and Plaintiff believes such to be clearly the case; a quality control system is either completely void to insure proper quality medical care is delivered, or such "quality controls" in place are nothing more than a "facade" to facilitate the manipulation of presenting a false picture or image of service provided and the "burying" of rampant deliberate indifference that occurs; the proper funding of the system is either completely deficient or internal fraud depleats the proper operational amounts needed, whereby either way, the proper delivery to Plaintiffs of proper goods and services suffers; the massive over-crowding of Seagoville FCI exacerbates the problems and the systemic deficiencies, as well as overwhelms the designed capacity of the medical system and facilities themselves.

Moreover, medical staff members whom are not medical doctors (TODD RIDGE, SCOTT CROW), routinely make diagnosises of patients, and prescribe treatment and medicine, whom have symptoms or conditions that are far outside their area of training (i.e. heart ailments) rather than properly sending such individuals promptly to outside facilities for such evaluation, treatment, and prescription of needed medication. Such areas are so "specialized" that a "reasonable doctor" (Madrid v. Gomez, supra at 1255 n.201), in a general practitioner setting, would themselves not feel competent, nor be competent, to properly evaluate and treat, and prescribe treatment, in such more specialized areas of medical care and treatment (i.e. evaluating the heart and prescribing treatment for heart ailments). A "reasonable doctor" would not think twice about referring such patient to a properly trained physician in such specialized area for evaluation and prescribed medical treatment. This practice, and present system, by the Defendants denies Plaintiffs proper medical care and can, as evidenced by the attached Affidavits infra to these pleadings, result in a pattern of mis-diagnosis, improper medical evaluations, improper prescribed treatment or medicines (or no treatment or no proper medication), that has effectively caused a systemic

failure of the medical care system which denies the Plaintiffs proper medical care resulting in the infliction of cruel and unusual punishment in violation of the Eighth Amendment. The comensurate mental state of the Defendants in such conduct is the **deliberate indifference** to the Plaintiffs medical needs.

<div align="center">(g)</div>

Estelle v. Gamble, supra, rests on the premise that **deprivations suffered by a prisoner constitute "punishment" for Eighth Amendment purposes**. This being true in the context of adequate living space, ventilation, and other necessities of life, a safe enviornment, proper mental and physical needs, as well as adequate and proper medical needs being met, medical needs of both urgent-care and every-day care that must be provided.

The "Deliberate indifference to serious medical needs of prisoners violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Estelle v. Gamble, supra. The Supreme Court further reasoned in Helling[*] that "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition [] that **is likely to cause serious illness and needless suffering the next week or month or year**." Helling, supra. "The Eighth Amendment **protects against future harm** to inmates is not a novel proposition." Ibid. "We reject [the contention] that only deliberate indifference to current serious health problems is actionable under the Eighth Amendment." Ibid. Hence, conditions or medical conditions which, if not properly attended to or treated by Defendants, that would likely result in future serious illness or **needless** suffering in **the future implicate an Eighth Amendment violation**. The Defendants, in this respect, of delaying or not providing needed medication or proper timely treatment violates the Eighth Amendment protections that Plaintiffs were (are) entitled to.

---

[*] Helling v. McKinney, 125 L Ed 2d 22 (1993)

(h)

Notably, the responses to Administrative Remedies which were filed regarding the obvious existence of **systemic deficiencies in the medical care** system are completely frought with **deliberate indifference** to the existence of such and the resulting Constitutional violative conduct and Constitutionally violative standard of care owed by providing a medical care system without systemic deficiencies. For example, DAN JOSLIN, Warden, **Plainly Admits that it** took THREE (3) HOURS TO GET A CRITICALLY ILL INMATE TO THE HOSPITAL SUFFERING FROM A BURST APPENDIX, and that it took the Medical department **over one hour** just to organize transportation to the hospital **which is only 15 minutes away!** Mr. JOSLIN states in response to JESUS GARZA's BP-9 (See Appendix _5_ ), and in fact acknowledges, that "[y]ou (Garza) visited Health Services on April 28, 2005, **exhibiting symptoms consistent with appendicitis**." "You (Garza) **were** seen by a Physician's Assistant at approximately 9:00 A.M.". "At **approximately** **10:00 A.M.**, the Medical Doctor ordered you to be sent to the local hospital **via** **van**". Mr. JOSLIN does not seem to find any problem with this **waiting around** for ONE HOUR BEFORE normal "van" transportation is "eventually" ordered for someone "exhibiting the (life threatening) symptoms consistent with appendicitis"! And, obviously, neither does the Medical Staff either by their actions. This typifies the examples of **systemic deficiencies and deliberate** **indifference and negligent medical care** provided, as is further evidenced by numerous other Affidavits, infra. Such lackadasical attitude to **wait around** for an hour or so before even **ordering** that an **individual whom is experiencing** **severe pain and life threatening medical** status, cannot come any closer to representing what the Eighth Amendment's proscription against **cruel and unusual** punishment was meant to protect against.

Mr. JOSLIN goes on to admit the exorbatant time that it took (2 HOURS) from that point, to get Mr. JESUS GARZA to the local hospital even after "the

decision" was eventually made (perhaps after morning tea!) to get Mr. GARZA, whom was in severe pain with a burst appendix and whose life was clearly in danger: "You (GARZA) arrived at the local hospital at approximately 12:05 P.M." (NEARLY THREE (3) HOURS AFTER MR. GARZA"S MEDICAL STATUS AND CONDITION WAS DIAGNOSED!). Mr. GARZA must truely take comfort in the future, such "fine and proper" medical treatment will "consistently" be forthcoming for the the Warden, Regional, and National responses all claim "you [have] and will be provided medical care consistent with policy". -- This "policy" can only which is referred to can only be that of "deliberate indifference".

Additional representative evidence of such complete systemic deficiency and failure to provide and make available an adequate medical care system to the Plaintiff, is found in the Affidavit of Mr. Bobby Joe Burton (see Appendix _ 9 _) and the respective Inmate Request to Staff and the respective responses from ASSISTANT WARDEN MARNE BOYLE, which typifies the "diagnosis without examination" of critical medical care needs and problems which the Defendants have caused to be "perfected". As Mr. burton was at a health class, on or about Friday December 10, 2004, he was examined in that class by a doctor from the civilian world (Doctor Owens) giving the class, in conjunction with a staff counselor member, Mr. Benjamin. The doctor examined Mr. Burton's blood pressure and diagnosed that it was exceedingly and abnormally high and life threatening (200/120); normal blood pressure being 120/80. They (Owens & Benjamin) immediately told Mr. Burton that he needed to be seen by the Medical Facility at once. They themselves called Medical to inform then that Mr. Burton needed to be seen without delay. In fact, Mr. Benjamin was so conserned about possible personal liability should Mr. burton not go to medical that he took extreme care to personally document via E-mails in notifying JOSEPH TRUEBLOOD and MS. FERNANDERS (Medical directors) that he had requested Mr.

Burton go immediately to Medical Facilities and that he had also requested Medical Facilities to attend to Mr. Burton.

However, in MARNE BOYLE's response to Mr. Burton's Inmate Request to Staff complaint filed after the failure of the medical care system to provide any care what-so-ever, not even any examination that day or even allowing Mr. Burton to be seen by any medical care provider, MARNE BOYLE, Assistant warden, explains "the B.O.P. way": without any medical exam ever having been conducted on Mr. Burton, nor with Mr. Burton even having been seen by Medical Facilities, the "clarivoiant" Medical Care Facilities "diagnosed" Mr. Burton: "[a] decision was made for you (Burton) to make regular sick call (which was three days away on Monday morning from that Friday!)". And, according to MARNE BOYLE ---"[t]his was a sound medical judment"! Further, BOYLE chastizes Mr. Burton for even attempting to seek treatment that friday morning (while having such high and potentially life threatening blood pressure): "You are always trying to get seen as an emergency versus making regular sick call. I suggest that you make a better effort assisting Health Services staff with your medical issues and seek medical care the proper way". Apparently BOYLE forgets that it was not Mr. Burton whom contacted medical facilities about this urgent care need and requested he be immediately seen that Friday morning, but rather staff members themselves. Unfortunately, Mr. Burton suffered all weekend with the potentially life-threatening high blood pressure and associated pain and suffering from such until the following Monday. Another intorduction of evidence of the systemic deficient medical care delivery system caused to exist upon the Plaintiff.

(i)

Typical of the Defendants' failure to provide or to address the complete systemic deficiency of the medical care delivery system (thereby depriving Plaintiff of access to proper medical care and a systemic-deficiency care system free from negligent practices and frought with deliberate indifference to any real of proper medical care), on November 16, 2005, **another victim of the defendants'** deliberate **indifference died by a heart** attack **which was not promptly attended to.** On such date, at approximately 2:00 P.M., Mr. JAMES FRISTOE, whom was serving a short 20 month sentence, and whom was an older black gentleman with past heart problems, became the latest victim of the Defendants' systemically deficient medical care delivery system, and of the Defendants' **deliberate indifference** and **will not be going home to his loved** ones.

Mr. Fristoe had to walk each day, about one third of a mile, to "pill call" from Building 54 to Building 9. In the process of getting to the medical facilities in Building 9 on this day walking in inclimate climate Mr. FRISTOE passed out and fell to the ground halfway at the "pavillion area". Inmates yelled fevorishly to summon help. The Plaintiff witnessed these activities from the library area. A guard finally came over, and after Mr. FRISTOE had **layed** there **on the ground without any emergency care being provided for a period of about TWENTY (20) MINUTES,** a medical cart was finally summoned to get him to an ambulance which would come to meet them about a quarter mile away at the back gate. Unfortunately for Mr. Fristoe, and his family, **20 minutes without immediate** emergency medical care being rendered was too long for him to survive such heart attack. Although approximately 6 staff members gathered around Mr. FRISTOE --- none of them bothered to **render any sort of first aid, CPR,** or other needed emergency medical care for this entire period as he lay on

the ground dying.    Similarly, when the nurse "slowly sauntered" from from Building 9 to come to his aid, she had no emergency medical bag, no cardiopulmanary recessatation equipment, --- she only brought her walkie talkie that is always carried by any normal staff member.  Any reasonable person would have understood that Mr. FRISTOE had suffered a heart attack and immediate medical procedures of CPR and possible defribulation and administration of Oxygen needed to be rendered immediately.  But the Defendants' did none of this as their system being completely systemically deficient.    Thus, a **physical injury** (death) was suffered this day to which has also significantly impacted and affected the Plaintiff.

A side note:  Mr. FRISTOE, whom only recently arrived at Seagoville FCI several months prior, spent the beginning of his time (because of the massive overcrowding) "locked away in the Basement of Building 9 -- 'lower 9', **on a mattress, on the floor, sleeping next to the filthy toilet every night"** as detailed in general, infra regarding the unconstitutional conditions of such and new arrivals.

The Defendants' conduct resulted in a systemically deficient medical care delivery system being imposed upon Plaintiff, such that it effectively denied Plaintiff proper medical and health care.  A system frought with deliberate indifference, common misdiagnosis, etc. being present, and one in which even the most rudamentary diagnosis would be seriously questioned and indoubt with most probable improper care being rendered, is in itself, a denial of a system of medical care being available to an individual.

(j)

A medical system in a prison facility, to be able to deliver proper medical care should have ten (10) important elements, these are:

(1)    Prisoners must be able to make their medical problems known to medical staff in a timely manner and without delay in emergency cases, whereby the medical staff makes the decision of the urgency;

(2)    There must be a systematic program for screening and evaluating by properly trained and supervised medical staff;

(3)    The facility must be adequately and sufficiently staffed at all times;

(4)    If referred to outside facilities for treatment or emergency care, the system must provide reasonable speedy access to these facilities, and in case of urgent or emergency cases must provide immediate delivery to such outside facilities;

(5)    The system must provide an adequate system for responding to emergencies by all institutional staff, including medical staff, and written procedures for emergencies should be in place and all institutional staff, and medical staff, should be thoroughly familiar with such procedures;

(6)    Ready access to medical care precludes prison officials from preventing treatment which is medically necessary;

(7)    Medical staff must be fully competent to deal with various problems and emergencies and should maintain continuing education;

(8)    Implementation of procedures to review quality of medical care being provided should take place as well as peer review from external outside sources should occur regularly; such accountability review is necessity ( see Lightfoot v Walker, 486 F. Supp 504, 517-518 (S.D. Ill. 1980));

(9)    Medical records must be sufficiently organized and thorough and be available at a sick call or other situation;

(10)   Proper funding must be maintained to insure the proper functioning of the system and the needed care provided along with medicines, medical treatment, and outside facility care without undue delay.

All of these being systemically deficient in being provided to Plaintiff by the conduct of the Defendants.

A2-72

These practices violate the Plaintiff's Constitutional rights and further exacerbate the infliction and continuation of cruel and unusual punishment by depriving Plaintiff's Due Process on each and every accrued and meritorious claim or cause of action.   "When administrative inaction has precisely the same impact on rights of parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."   Environmental Defense Fund v Hardin, 428 F2d 1093 (D.C. Cir), 138 U.S. App D.C. 391.   This being, in essence, the effect imposed upon Plaintiff by such unlawful practices.   Such practices being also violative of law actionable under the Administrative Procedure Act: "Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in conjunction with any agency proceeding."   5 U.S.C. § 555(e).

# Appendix 3

## CERTIFICATION

## OF EXHAUSTION OF ALL ADMINISTRATIVE REMEDIES

ON THIS DATE, DECEMBER 20, 2005, I, JOHN M. BEAIRD, having submitted a BP-9 to the Local level, a Bp-10 to the Regional level, and having received such responses respectively, did submit a BP-11 to the National Washington D.C. level. This response was originally due back on November 26, 2005, however a notification of extension of 20 days was provided, such that the new Due Date being NOVEMBERXX DECEMBER 16, 2005.

As of this date, NO RESPONSE OR REPLY HAS BEEN PROVIDED. Subsequent to the Code of Federal Regulations regulating such responses, a failure to respond is deemed a denial.

THEREFORE, ALL ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED prior to institution of Federal District Court Action as required.

I, CERTIFY THAT THE FOREGOING IS TRUE AND CORRECT, AND THAT AS OF THIS DATE, DECEMBER 20, 2005, I, JOHN BEAIRD, HAVE NOT RECEIVED ANY REPLY OR RESPONSE, EITHER VERBAL OR WRITTEN, FROM NATIONAL (Washington , D.C.) ON THE REQUEST FOR ADMINISTRATIVE REMEDY (BP-11) SO SUBMITTED.

_____          20 Dec, 2005
JOHN M. BEAIRD                            _____
                                         DATE


I, a Notary Public of the State of Texas, certify that the above named individual did present himself, and after proper identification, did state, affirm, attest, and execute this document before me, a Notary Public, State of Texas, on the date as indicated below:


_____          DATE: 12-20-05
NOTARY PUBLIC, STATE OF TEXAS

                                         (seal)

PAMELA D RICHARD
Notary Public
State of Texas
My Commission Expires
April 3, 2007

06 2268

FILED
DEC 29 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | BEAIRD, JOHN M. | 14355-179 | D - 54 | FCI SEAGOVILLE |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST** This BP-9 is a consolidated submission pursuant to Two (2) Attached BP-8's, one dated 7/14/2005 and the other dated 7/22/2005, as they both pertain in essence to the same subject—**"the effects"** of **massive overcrowding. NOTE:** I WAS NOT SUPPLIED WITH A WRITTEN RESPONSE TO EITHER OF THESE BP-8's. The "effects" of massive overcrowding are present at Seagoville (here) as well as throughout the B.O.P. system. Hence this BP-9 utilizes Seagoville as representatitive (and partially in particular) without waiving the scope of the complaint.

Seagoville FCI is massively overcrowded. "The 'touchstone' of the Eighth Amendment inquiry is 'the effect' upon the imprisoned'." ~~EXTREME~~ Rhodes v. Chapman, 452, U.S. 337, 366, 69 L Ed 2d 59 (1981). Moreover, as the [Supreme] Court recognized in Chapman, conditions of confinement "alone or in combination may deprive inmates of the minimal civilized measure of life's necessaties. Chapman at L Ed 2d 69. The "effects" of overcrowding are now manifested in multiple areas as follows: Physical Plant (ventilation[1]; plumbing[2], living space[3], noise levels[4], recreation space[5]); Sanitation (control of vermin & insects[6] & clean enviorment)[7]; food-prep & dining[8]; medical facilities[11], lavatories & showers[12]; safety[9]; fire-protection[10]; Enviornental Aspects of Overcrowding[13]; Visitation[14]; Staffing[15]. Such combined effects constitute a violation of the Eighth Amendment. Population levels should be immediately reduced by 35% inter alia.
A REPLY IS REQUESTED WITHIN THE PRESCRIBED 20 CALANDER DAYS. NO REPLY...WILL BE DEEMED A REPLY FOR BP-10 and Administrative Procedures required to satisfy 42 U.S.C. § 1997e and 42 U.S.C. § 1983. I have provided a copy of this as a courtesy to my Congresswoman, the Hon. Shiela Jackson Lee, and my Senators, the Hon. John Cornyn, and Hon Kaye Bailey Hutchison. THANK YOU IN ADVANCE FOR YOUR ASSISTANCE TO THIS MATTER. Attachments: Continuation Pg. & BP-8's.

| 27 July, 2005    *CC; FILE* | JOHN BEAIRD SIGNATURE OF REQUESTER |
|---|---|
| 7/27/2005 DATE | |

**Part B– RESPONSE**

| DATE | WARDEN OR REGIONAL DIRECTOR |
|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: 384260-F1

---

CASE NUMBER: 384260-F1

Part C- RECEIPT
Return to: Beaird John                14355-179        D54        SEA

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

SUBJECT: Overcrowding/ Noise in Unit

8-2-05

## FOOTNOTES:

1) American Public Health Standards for Health Services in Corrections Institutions defines "adequate ventilation" as 60 cubic feet per man per minute. There is no mechanical ventilation drawing fresh air into the cells in Bldg. 9. Inmates (many times 3 to a cell with a mattress on the floor next to a toilet in a room of approx. 65 sq ft) have absolutely no fresh air forced into the room. Temperatures exceeding 100 deg in summer (and in heat wave warnings) are common and inmates must endure such for 23 hrs a day sometimes for weeks on end; Bldg. 5, 7, 10 have inadequate mechanical ventilation systems often completely stopped up by dirt or none at all; Bldg. 53 & 54 mechanical system is poorly maintained—fresh air ports (2 ea) are broken and the system has no air filters. All systems are inadequate for the number of inmates housed in each specific unit.

2) Plumbing: Bldgs. 5, 6, 7, 10 plumbing systems are so delapidated that the showers often flood ankle-deep with water, toilets frequently back-up with sewage; the basements of Bldg. 9 (recently on 7-26-2005) and bldg 7 frequently flood with water from broken pipes or sewar pipes or outside leakage. The sewar discharge by the institution into the enviornment is substantially above any expected design capacity of the facility putting a drain on the city.

3) Living Space: As the [Supreme] Court has noted "[T]he work of standard-setting organizations...is particularly valuable." Chapman, supra at 80 n.12. The following professional organizations recommend the minimum area of square footage per inmate of living space (cell space) for long term housing: American Public Health Assoc., Manual of Standards for Adult Correctional Institutions, standard No. 4142, pg 27 (1977)(min 60 to 80 sq ft); National Sheriffs' Assoc., A Handbook on Jail Architecture (70 to 80 sq ft); U.S. Dept. of Justice, Federal Standards for Prisons and Jails, Standard No. 2.04 pg 17 (1980)(60 sq ft); National Institutie of Justice, American Prisons and Jails 85 n.6(1980)(80 sq ft); Building Officials and Code Administrators (BOCA), Basic Building Code 1975 § 201.3 (70sq ft); Committee for the Study of the U.S. Army Confinement System (1970)(55sq ft). The massive overcrowding has caused per inmate per square foot living space to be as low as follows in respective buildings (approx.): Bld. 5 (25 sq ft); Bld. 6 (22sq ft); Bld 7 (25sq ft); Bld 9 (21sq ft); Bld 10 (25sq ft); Bld 53 (22sq ft); Bld 54 (22sq ft). Further, professional authorities call for a minimum of 35 square feet per inmate of Day-Room space. There is no existing day room space in any building as all has been utilized to put additional inmates in. Moreover-physical plant problems with the structure of most buildings exist as most all are over 75 years old—far beyond their intended useful life expectancy (excluding Bldgs 53, 6, & 54). The second floor of building 10 has settled down approx. 3 inches and the structural integrity of the building is questionable.

4) Noise Levels: Because of the massive over-crowding such levels are most of the time, especially in the evening and ibn the night until about 11 P.M. the noise level of a train station.

5) Recreation Facilities: are far overburdened, and over-crowded because of the mass overcrowding and such often creates more frustration than that to which recreation is designed to release in the inmate group.

6) Sanitation: Constant smoking in the Unit Bathroom(s) [i.e. Bldg. 54] creates mandatory exposure to second hand smoke and gets into the air-vent system through-out the whole building. See Helling v. McKinney, 509 U.S. 25 (1993). Buildings 5,7,9, & 10, because of the re-occuring flooding, dampness, lack of proper ventilation, lack of air-conditioning, age, and general condition within the structure have been know to contain what is probably black mold; these buildings, it is also believed, contain asbeatos insulation areas and within the wet-walls. Buildings 53,54?, & 6 contain black mold within the shower areas and subsequent venting areas as the air conditioning is not run at all times to relieve the humidity build up in such areas. Additional vermin and insect problems have been known in the building areas as well as in the food facilities and food storage areas.

7) The small dining facility is overtaxed with 1600 inmates causing eating times to be reduced to around 20 minutes, thereby risking creation or aggravation of gastric illnesses by eating hurriedly in a noisy, crowded, stressful area.

8) Medical facilities are too small for the 1600 population in area as well as in staffing. It routinely takes 14 months just to get a routine teeth cleaning; repeatidly it has teken inmates 7 months to get dental plates after pulling of all teath during which 7 month period an inmate is forced to "gum" food or starve. On July 20, 2005, it was indicated the number of reported cases of "staff infections" on the compound was 170 — over 10% of population.

9) The Ratio of inmates to lavatories and toilets in each building is way over-design capacity sometimes forcing one to wait long periods to use the restroom or being able to take showers.

10) Safety: The population above the design capacity leaves fewer correctional officers per inmate. For example, the ratio in Bld 54 is 1:336 where at the camp it is 1:180 at a lower security unit all-together. The security level to be eligible for a low has just been increased from 8 points max to 12 points max thereby letting more violent offenders integrete within the population (this as a means to relieve over-crowding at the medium institutions). Additionally, illegal immigrants are housed at the low whereby nothing is known about the level of criminal past or violence from their home country because such is not part of their PSI as are American offenders' past violations.

11) Fire Protection: appropriate fire corridors in the housing units are virtually non-existant because of the massive over-crowding both in sleeping quarters within the general housing unit area; Fire Exit signs [Bld 54] do not work because the lights or illumination is non-existant and can't be seen in the dark in an emergency; the respective building occupancies dramatically exceed the local fire code standards as configured.

12) Enviornmental Aspects: Massive overcrowding creates an increase risk of communicable diseases (flue, hepatitus, tuberculosis, etc.) as well as stress related diseases (rashes, asthma, htpertension). Additionally, the lack of quiet time or space oftentimes causes the only available such time to be after mid-night—thereby, exacerbating sleep deprivation. Because of the elimation of all day-room space, inmates are up outside the room doors until 11 P.M. most all nights creating constant noise levels as that of a train station. The combined effects operate to effect an environment of needless physical, mental, and phsycological suffering where degeneration of well being occurs.

13) The Visiting Facilities are dramatically over-taxed by the massive overpopulation causing allienation of family ties. A mere 1200 sq ft seating area exists for a population of 1600 and waiting lines for visitors average three (3) to three and one half (3.5) hours to get in. Visitors frequently are waiting in line and then told they must all get out of line when the institution begins its prisoner-count inside (although the visitors are outside in the parking lot). This precipitates scuffels and arguments when they all re-line up. In fact, it is understood that on July 22, 2005, a fist fight broke out in the visiting line area of the parking lot for just such reason. This creates an unfriendly enviornment and damages what little community and family ties an inmate may have with his family.

14) Staffing: There are only 3 barber chairs for a population of 1600! Massive overcrowding tax the resources of staff. Counselors are burdened with case-loads beyond a reasonable capacity. This creates a frustration level

THREE (3) DAYS

BP-S148.055 INMATE REQUEST TO STAFF CDFRM
SEP 98   THIS IS A &EQUIVALENT "SENSITIVE"
U.S. DEPARTMENT OF JUSTICE   REPLY REQUESTED WITHIN 3 DAYS
FEDERAL BUREAU OF PRISONS

TO: (Name and title of Staff Member)   DATE: 7/12/2005
Ms. Boyle, Act Warden

FROM: JOHN BEAIRD   REGISTER NO.: 14355179
WORK ASSIGNMENT:   UNIT: D - 54
YARD - PM

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

Dear Sir:

I have been subject to second-hand smoke inhalation from continued smoking (cigarette
and cigars) in the bathrooms of Building D-54 which has been allowed to go on repeatedly,
unchecked, essentially condoned, and usually without any "individual" consequences to
the individual smoker.

Only recently was a Memo issued to halt such previously allowed practices. (See
Exhibit "A" "July 12, 2005 Memo" re: tobacco in restrooms referencing the "New" sanitation
policy which is effective "immediately" as of 7/12/2005). Such Memo implicitly implying
a "change". Sometimes I have observed "cloud's" of smoke from the bathroom/restroom.
Others, I can not go into than see smokers to brush my teeth &"billowing" from the restroom.
Even after this memo was issued, smokers leave the confines of their office in order to observe
discipline to such smokers was issued, this smoking practice continues; without any individual
and is strained with overcrowding, strain on resources, and on available staff,

RECOMMENDED SOLUTION: 1) Hire additional guards so there is one for each the "w" and
"g" side with their offices on each side; 2) Eliminate immediately all tobacco products;
for sale &try; in the B.O.P. and use by inmates; 3) Reduce the inmate population by 1/2; 4)
leave the unit doors unlocked at all times (especially since this is a low) so that.

It is wrong and negligent of the B.O.P. to continue to sell a product (tobacco,
cigarette, cigars) whereby that same product directly puts my health in jeopardy for future
health action (cancer) &can be halted in its future sales/and whether non-smoking inmate
if no compulsion has to endure such products and be halted in its future sales/and whether such
some of the benefit would of such health such produits

DISPOSITION:

---

THREE (3) DAYS   "SENSITIVE"

BP-S148.055 INMATE REQUEST TO STAFF CDFRM
SEP 98   FEDERAL BUREAU OF PRISONS
U.S. DEPARTMENT OF JUSTICE

TO: (Name and title of Staff Member)
Mr. Stafford   DATE: 14 July 2005

WORK ASSIGNMENT:   REGISTER NO.: 14355179
Beaird, John Stafford   UNIT: D-54

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

That's only a continual battery and practice is unreasonable noise
10:30 P.M. at night "blaring" loud talking loud voices singing etc with
television display at night keeping half the dorm up.

The noise level of the federal guards into other there is no reason
why "most that". This continue to exist too loud; thru this is allowed to
repeatedly and would be a result of callous indifference and failing
action; and is violative of basic human rights and health conditions; This is
additional grounds to the "violation" of "right to live" and where they should...

= the inmate population by 2/2 + 3) Turn TV's off at 9 P.M. This report
all necessary (disagreements) for prompt administrative action this report
which was shown as of 07/11/05 See U.S.v. abovehald
(remedy)

(Do not write below this line)

DISPOSITION:

Signature   Staff Member   Date

ond Copy - "File" Copy - Inmate
is form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

U.S. Department of Justice

Federal Bureau of Prisons

Federal Correctional Institution

Seagoville, Texas  75159

July 12, 2005

MEMORANDUM FOR BUILDING 54 INMATES

FROM:       Shannon W. Phelps, C/D Unit Manager

SUBJECT:    New Sanitation Regulation

Effective immediately, cigarettes, cigars, matches, or any other tobacco products are not allowed in the bathroom of Building 54. Anyone discovered with these items while in the bathroom will be subject to a disciplinary report for Failure to Follow Posted Sanitation Regulations, Code 317. If you have any questions concerning this unit sanitation regulation, please contact your counselor.

Effectivo inmediatamente, los cigarrillos, los cigarros, los fósforos, o ninguna otra producto del tabaco no se permiten en los cuartos de baño del edificio 54. Cualquier persona descubierta con estos artículos mientras que en el cuarto de baño estará conformes a un informe disciplinario con que la falta siga las regulaciones fijadas del saneamiento, código 317. Si usted tiene cualesquiera preguntas referentes a esta regulación del saneamiento de la unidad, entre en contacto con por favor a su consejero.

EXHIBIT A

BEAIRD, John                                    FCI Seagoville, Texas
Register No.: 14355-179
Remedy No.: 384260-F1

This is in response to your Request for Administrative Remedy receipted August 2, 2005, wherein you allege that due to overcrowding at FCI Seagoville, you have experienced problems with the amount of living space, restroom facilities, noise levels, recreation facilities, sanitation levels, medical, safety, food and dining, visitation and staffing levels. You request that population levels be immediately reduced by 35%.

We are tasked with managing an increasing population within the Bureau of Prisons. There is a national plan to alleviate the growing population, including the activation of new facilities throughout the country. A recent review of FCI Seagoville revealed the institution is compliant with the applicable national standards regarding living space, sanitation levels, medical, safety, and staffing levels.

While we understand your frustration with the current population level, we are committed to ensuring the safety of the inmates and the security of this institution remains our highest priority. Please continue to communicate with your Unit Manager any concerns you may have so we may address them appropriately.

Based on the above information, the relief you seek is denied.

If you are not satisfied with this response, you may appeal to the South Central Regional Director, 4211 Cedar Springs Road, Suite 300, Dallas, Texas 75219, via BP-DIR-10, within 20 calendar days of the date of this response.

_____                         _____
Dan Joslin, Warden                              8/22/05
                                                        Date

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball–point pen. If attachments are needed, submit four copies. One copy of the completed BP–DIR–9 including any attachments must be submitted with this appeal.

From: __BEAIRD, JOHN M.__     __14355179__     __D-54__     __FCI Seagoville__
      LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A—REASON FOR APPEAL**

28 CFR § 542.18 (Response time) states that "response shall be made by the Warden or CCM within 20 calender days" after submission of BP–9. Further, it states "[i]f the ~~xxxxxxxxxxxxxxxxxxxxxxxx~~ time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time may be extended once by 20 days at the institution level" Ibid. Further it states that an extension is not automatic. "Staff shall inform the inmate of this extension in writing." Ibid. And then: "[i]f the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level. As I have not received written notice of an extension, and that an extension is not automatic, the time for Reply, pursuant to 28 CFR 542.18 is 20 days. This period has expired and no response was received. Therefore, pursuant to 28 CRF § 542.18, "the absence of a response [is now deemed] to be a denial at [this] level".

This Remedy Appeal pertains to the subject: "the effects" of massive overcrowding" as indicated and set forth in the BP-9 which was filed on XXXXXXX  July 27, 2005 (see original BP-P and attachments). These past, present, and continuing conditions and effects violate the Eighth Amendment proscriptions against cruel and unusual punishment. Population levels should be immediately reduced 35% to 40% as well as violative other conditions as detailed (see BP-9) immediately corrected.

NO REPLY WITHIN THE PRESCRIBED TIME PRIOD WILL BE DEEMED A DENIAL PURSUANT TO 28 CRR § 542.18. I have, again, provided a copy of this as a courtesy to my Congresswoman and Senators. THANK YOU IN ADVANCE

__8/17/2005__                                       
    DATE                                           SIGNATURE OF REQUESTER

**Part B—RESPONSE**

---

DATE

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

RECEIVED AUG 1 8 2005 BUREAU OF PRISONS LEGAL DEPARTMENT SCRO

DEC ... SEP – 6 2005

REGIONAL DIRECTOR     R2

CASE NUMBER: __384 260-R1__

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____
        LAST NAME, FIRST, MIDDLE INITIAL         REG. NO.         UNIT         INSTITUTION

SUBJECT: _____

September 2, 2005

Mr. Harold Thompson,                    **CERTIFIED MAIL No. 70001670000487428303**
Regional Director                       <u>RETURN RECEIPT REQUESTED</u>
(or Acting Director)
South Central Regional Office
4211 Cedar Springs Rd.   STE 300
Dallas, TX  75219

RE:          **ENCLOSED BP-10 FOR IMMEDIATE FILING**

Dear Mr. Thompson;

       Enclosed find my BP-10 for immediate filing.  You had returned
such to me along with a notification which indicated that I did not
provide a copy of the Warden's response which you indicated as having
occurred on August 22, 2005.

       As I indicated in my original letter to you which accompanied
this BP-10 previously, I submitted my BP-9 to the Warden, Mr. Dan
Joslin, on **JULY 27, 2005.  As of TWENTY (20) DAYS LATER, AUGUST 17,
2005,** I had received **NO RESPONSE FROM THE WARDEN.**  Pursuant to
28 CFR § 542.18 ("Response Time"), "[n]o response may be considered
a denial if not responded to within the prescribed [20 day] period".
Your office then received my Certified Mail BP-10 on **AUGUST 18, 2005.**
Then, on **August 29, 2005,** I received an inner-facility mail of,
"suprisingly", the Warden's Response, which, unexplainably was dated
a week earlier, **August 22, 2005.**  Coincidently then, I received from
your office on **August 31, 2005,** the letter (notification) as is
referenced above.  It is hard to believe that the inner-facility
mail here at Seagoville FCI actually takes **ONE WEEK** to get to me.
But, continuing on, in order to properly exhaust administrative
remedies prior to any potential litigation, I, hereby, send again
to you via certified mail the BP-10 which complains of the "Effects
of the massive Overcrowding" in violation of the Eighth Amendment
of the Constitution of the United States.

       As the budgets of many agencies have been cut substantially
from what is required, the Bureau of Prisons budget cuts, and failure
to fund the full appropriations, due to such funds being **diverted to
the Iraq War** exacerbate the Eighth Amendment violations of individual
American citizens within the B.O.P.; such effects being substantive.

       As a courtesy, and as requested, I am, **again,** forwarding a copy
of all of this correspondence to the Honorable Shiela Jackson Lee,
Congresswomen and Member of the House Judiciary Committee.  Thank
you in advance for attending to this serious matter.

Sincerely,

JOHN BEAIRD
#55179  FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

cc:  HON. Shiela Jackson Lee

BEAIRD, John          Reg. No. 14355-179        FILED: 9-16-05

384260-R2              PART B-RESPONSE

You are appealing the Warden's response to your complaint
concerning the population level at the Federal Correctional
Institution (FCI) Seagoville.  You contend the current population
levels subject you to cruel and unusual punishment and request
the population be reduced by 35% to 40%.

We have thoroughly reviewed your appeal.  We find the Warden
adequately responded to your complaint.  The population level at
FCI Seagoville is consistent with the Bureau of Prisons mission
of providing a safe, secure, and humane environment.  You present
no evidence to support your claim that inmates are subject to
unsafe conditions.  In addition, staff are continuously assessing
the inmate population and implementing appropriate procedures to
address the inmate population level.  We encourage you to
continue to work closely with institution staff.

Based on the above information, your appeal is denied.

In the event you are dissatisfied with this response, you may
appeal to the Bureau of Prisons, Administrative Remedy Section,
320 First Street, N.W., Washington, D.C. 20534.  Your appeal must
be received in that office within 30 days from the date of this
response.

_____09/30/05_____                    _____
Date                                   G. Maldonado, Jr.
                                       Regional Director

SENSITIVE - LIMITED OFFICIAL USE

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

| From: | BEAIRD, JOHN M. | 14355-179 | D - 54 | SEAGOVILLE FCI |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

Part A - REASON FOR APPEAL SENT VIA CERTIFIED MAIL No. 7000-1670-0004-3960-2867

On 10/6/2005 I received the Response from Region (attached) to my complaint of violations of the Eighth Amendment proscriptions against infliction of cruel and unusual punishment by way of present and ongoing conditions within the B.O.P. system and at SEAGOVILLE FCI and by way of "the effects of massive overcrowding". The Regional response, unfortunately, states that "you present no evidence to support your claims...". This response is defective for two important reasons; 1) The BP-9 referenced by Footnote, 14 critical areas of such evidence [see attached footnotes to BP-9] and; 2) "[a] defendant would 'not escape liability if the evidence showed that he merely <u>refused to verify underlying facts</u> that he strongly suspected to be true, or declined to confirm inferences of risk that he stongly suspected to exist'." <u>Farmer v. Brennan</u>, 114 S. Ct 1970, 1982 @ n.8 (1994); also at <u>McGill v. Duckworth</u>, 944 F2d 344, 351 (7th Cir 1991)("Going out of your way to avoid acquiring unwelcome knowledge is a species of intent") cert denied, 503 U.S. 907 (1992). Further, "once [D]efendants were aware of the ri they were obligated to consider the risk seriously, and to conduct adequate inquiries." <u>Madrid v. Gomez</u>, 889 F. Supp 1146, 1267 n.213 xxxxxxxxxxx (N.D. Cal. 1995) quoting <u>Farmer</u>, sup at 1982 n.8. This is ever-so-important since "[s]upervisory liability in civil rights context may <u>extend to the highest levels</u> of [] government." <u>Slakan v. Porter</u>, 737 F2d 368, 373

| 10-6-2005 | | |
|---|---|---|
| DATE | | SIGNATURE OF REQUESTER |

Part B - RESPONSE

| DATE | | GENERAL COUNSEL |
|---|---|---|
| | | CASE NUMBER: _____ |

ORIGINAL: RETURN TO INMATE

CASE NUMBER: _____

Part C - RECEIPT

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

CONTINUATION PAGE OF BP-11;  JOHN BEAIRD

.4th Cir. 1984) quoting Scheuer v. Rhodes, 416 U.S. 232, 40 L Ed 2d (1974).
    As of August 15, 2005 Seagoville FCI was at 281% Design %Capacity in population and
at 141% Critical Capacity. I.E:

| Building | Population | Design Capacity | Critical Capacity |
|----------|-----------|-----------------|-------------------|
| 54 | 340 | 128 | 256 |
| 53 | 340 | 128 | 256 |
| 12 | 140 | 48 | 96 |
| 10 | 106 | 47 | 94 |
| 7 | 202 | 73 | 146 |
| 6 | 285 | 100 | 200 |
| 5* | 202 | 73 | 146 |
| 9 | 63 | 36 | 36 |
| | 1,678 | 597 | 1,194 |

*NOTE: BUILDING 9 is a SHU and the rooms contain only about 60 sq ft inclusinve of a desk,
toilet, and bed. Although adequate for 23hour housing around the clock confined housing for
only 1 inmate, these units, as of the date of the BP-9 Filing, and as of today, routinely
house 3 inmates with one of the three occupants forced to sleep on the floor on a mattress next
to the filthy toilet. Additionally, mattresses are alligned up on the floor in the halls of
the "lower 9" section of the building. This building has no mechanical ventilation and temper-
atures within the cells routinely reach 100degrees to 105 degrees ----all without fresh air
ventilation. This building also contains outdated plumbing and sewage frequently backs up and
bursts out of the pipes within the building and in the basement. Further, the building contains
asbestos and Black Mold, and other enviornmental and health hazards.

    Inmates are housed through-out the compound in day-rooms which have as little as 21 square
feet per inmate and do not have windows, desks, adequate ventilation (65 cubic feet per person
er minute), and are a fire trap and are without proper fire corridor or eggress facilities.
here is further, NO DAY-ROOM space at all in the buildings as should be required.

    Although this is a brief synopsis of the material, the BP-9 filed by me should be
ferred to the indepth analysis with the individual sections referenced in the Footnote
ction for a more complete listing of constitutional abridgments and effects there-of.

    Although anclaim that Seagoville FCI was recently looked at by the ACA Commission in a
ecent inspection, this inspection either is meant as a fascade of what it should be or is
onducted without full awareness by such "inspectors". For when one of the ACA Inspectors was
ked the question and informed of the conditions in Building 9 (SHU), a mr. Sandol, whom was
so an apparrent former warden on Thursday August 4, 2005, his response was "well--don't go
the 'hole'." This represents a deliberate indifference of the inspectors whom are suppose
be inspecting.

    Further, the medical facilities and system suffers from both systemic deficiencies and
a care (or lack of care) is frought with repeated cases of deliberate indifference and
nplete negligence.

    This represents the final administrative remedy prior to litigation. These represent
ious constitutional violations towhich relief is requested for each.

                                            JOHN BEAIRD          10-06-2005

EXTENSION OF TIME FOR RESPONSE – ADMINISTRATIVE REMEDY

DATE: NOVEMBER 23, 2005

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

TO  : JOHN M BEAIRD, 14355-179
      SEAGOVILLE FCI     UNT: D     QTR: D04-012L

ADDITIONAL TIME IS NEEDED TO RESPOND TO THE CENTRAL OFFICE APPEAL
IDENTIFIED BELOW.  WE ARE EXTENDING THE TIME FOR RESPONSE AS PROVIDED
FOR IN THE ADMINISTRATIVE REMEDY PROGRAM STATEMENT.

REMEDY ID        : 384260-A1
DATE RECEIVED    : OCTOBER 17, 2005
RESPONSE DUE     : DECEMBER 16, 2005
SUBJECT 1        : SAFETY, SANITATION, ENVIRONMENTAL CONDITIONS
SUBJECT 2        : OTHER OPERATIONS
INCIDENT RPT NO:

# Appendix 4

DECLARATION:    STATE OF TEXAS

COUNTY OF DALLAS

### AFFIDAVIT

I, ROBERT MIHAILOVICH, being of sound mind, over the age of Twenty One (21) Years of age, and having personal knowledge of such, do hereby attest, affirm, and state, under penalty of perjury, that the following is true and correct

**THAT:**

I am currently housed within a Federal Bureau of Prisons ("FBOP") institution, Seagoville, FCI, at the Camp portion. I am housed within a small facility designed for only 64 individuals but which 160 are actually housed. I have **no desk or writing area.** The total **living space** is only a small area immediately surrounding my bed, 2 ft. by 5 ft., however even this small space has to be shared with another individual who is double bunked with me, which effectively, and actually, allows me only **Five (5) Square Feet of Total Living Space.** Further, there are no fire corridor access or egress alleys and the single door exit would never accommodate an emergency exit from the building for one hundred and sixty (160) inmates. There is one (1) tiny TV Room, but it only adequately seats Eight (8) individuals. There is **no recreation space** within said building and neither is their access to any. The quiet times and level of degree of quiet is nonexistant even during sleeping hours. Minimizing exposure to environmental airborne toxin exposure, which is problematic and runs rampant, is impossible in the housing facility.

I have read each and every portion of the attached "Pleadings" in this Cause of Action ("Complaint"), and I incorporate by reference, herewith, the "Facts" Section, such that I have personally been subjected to all of the facts, conditions, damages, and conduct as referenced in such section. I further, herein, incorporate by reference, all definitions specifically defined within the attached Pleadings, as meaning the same definitions within this Affidavit. I have also read each of the Claims (Counts) made in the attached Pleadings and I incorporate by reference, herewith, such that I have been subjected to all of the facts, conditions, damages, and conduct as are referenced and alleged throughout each of the Claims referenced within each Count, respectively.

I have been **subjected to:** an inadequate "Medical Care System" (see definition), deprivation of all "Health Needs" (see definition, and as referenced within the Pleadings), subjected to all "Effects of Massive Overcrowding" (see Pleadings Factual section) as detailed and described within the "Facts" section of the Pleadings, by, and due to, the Defendants' conduct, as claimed within such Pleadings, respectively. All of the above having caused me damages (see definitions). All of the above referenced conduct and damages continue unabated to present with no foreseeable relief in sight.

The Defendants as identified in the attached Pleadings have denied me access to, and providing of, documents repeatidly requested pursuant to the Freedom of Information Act and Privacy Act, and further have **concealed and covered up the existence of documents** therewith requested. These documents also being material and crucial in order for me to have had, and have, "meaningful access to the courts" by such conduct. Because of this, I have suffered damages



06 2268

from such cumulative conduct during this same period.

The Defendants, as specifically identified in the attached Pleadings, interferred with, conspired to interfer with, aided others in such, and have denied me meaningful access to the courts by their continued conduct in violation of the Fifth Amendment.  Such conduct and factual account as thus adopted, being ongoing and contiuing to present.  This has caused, and does cause, me damages during these periods.

I have been subjected to, affected by, and damaged by every factual condition, allegation, and fact which is contained within the "Fact" Section of the attached Pleadings during which are ongoing and continuing to present, such also being continuous and ongoing.

The "Defendants" as referred to within this Affidavit being ALBERTO GONZALES, HARLEY G. LAPPIN, SEVERAL UNKNOWN AGENTS OF THE FEDERAL GOVERNMENT", the UNITED STATES OF AMERICA and the FEDERAL BUREAU OF PRISONS (the latter two such defendants are referenced only to the specific exclusive conduct of each of the former defendants (in their official capacities) as are alleged within the attached Pleadings Complaint Section.

"Pleadings", as referenced, infra, means my "Original Complaint" which this Affidavit is therewith attached.

All of the conduct referenced, supra, which has affected me, and is the basis of my "individual claims" also has a "requisite typicality" to the Putative Class, such also suffering similar damages from such.

I have exhausted all "available" administrative remedies as necessary and required for all of the claims made in the attached Complaint ("Pleadings") that this Affidavit is, herewith, attached.

DATED THIS 15th DAY OF NOVEMBER, 2006.


ROBERT L. MIHAILOVICH
33446-177 FCI Camp
P.O. Box 9000
Seagoville, Texas 75159-9000

EVIDENCT OF "INADEQUATE MEDICAL CARE SYSTEM"

# Appendix 5

## AFFIDAVIT OF JESUS J. GARZA
### 41022-179
FCI Seagoville, Seagoville, TX 75159

I, JESUS J. GARZA, Affiant, Do Hereby Attest and Affirm that the following facts are true and correct to the best of my knowledge. I know the difference between the truth and untruth, and am over the age of 21, and do solemly affirm that the foregoing is true and correct to the best of my knowledge:

THAT:

On April 26, 2005, at approximately 3:00 P.M., I started to have severe stomache area pains and went over to the Medical facilities in Building 9. Upon my arrival I met met Mr. **SCOTT CROW** and Mr. **TODD RIDGE** who were at the Pharmacy Window at pill line. I advised them that I was having severe pain in the stomache area that was very abnormal, especially since I am young. Neither Crow or Ridge examined me but rather asked me a couple questions of how long I had the pain, and then said I must have "acid reflux" and prescribed me to take an antiacid.

At approximately 6:00 P.M. the same day, after I had went back to my unit and layed down in pain for 3 hours the pain was too much to bear and I went back up to medical. He said there was no one there to see me. He then gave me Zantax and the pain medicine Naproxen. I went back to my unit and layed down and went to bed and tried to sleep but the pain was too intense.

Later that night I started to throw up (about three or more times). I could not go to dinner because of the severe pain. I was sweating profusely, felt very faint and weak, couldn't pee, and was in extreme pain. I tried to just lay there in this condition hpoing that the medicine that I was prescribed would eventually work.

The next morning [April 27, 2005] I could not get out of bed at 6:00 A.M. (the only time sick call is) in order to walk about a half a mile across the FCI Seagoville compound complex to where Building 9 is (in reference to Building 54 where I'm housed) because I was very faint, light-headed, and in extreme pain in order to go to sick call. At this time I was apparently running a very high fever and was very hot. I did not eat at all this day because of my condition of being very weak, sick, and in extreme pain.

At around 10:00 P.M. on this date [April 27, 2005] my condition worsened even more and my room-mate called the guard to come check on me because he told him I was critically ill and looked like I should go to the hospital. This room-mate (Mr. Lopez) could not get the guard to come check on me even after giving him this information. Because I felt something was seriously wrong, I got help to help me to the guard's station and at that time was in treamendous pain, felt very weak and faint like I was going to pass out, and was very hot with a high temperature. I asked the guard to call the Lieutenant so I could get medical attention either at medical or the hospital. The guard called the Lieutenant (Lt. "Raseberger" [sic]) and the

Lieutenant said that I would have to wait until the next morning at 6:00 A.M. and go to sick call. The time here was about 10P.M. I went back to lay down in bed. However, at about 11:30 I again got help and went to the guard station and requested medical help and ask if the lieutenant could come over and check on me to verify that I was seriously ill and required medical treatment. The guard phoned the lieutenant but I again was informed that there was no one here to treat medical needs and I would have to wait until 6:00 A.M. the next morning [April 28, 2005] and go to sick call.

At 6:00 A.M. [April 28, 2005] I made it over to sick call. I had a very high temperature and was even worse off. I talked to TODD RIDGE and I was bending over in pain and asked to go to the hospital. Todd Ridge, however, just gave me an appointment slip and told me to come back later that morning at 9:30 A.M. (3.5 hours later). I asked if he (Ridge) was not even going to examine me and he said just come back at 9:30 A.M. when my apointment was. I then saw Mr. SCOTT CROW and asked him about this and explained my condition, which was evident, and he said that whatever "Ridge" said goes.

I then want back to my unit building across the compound and tried to be still and lay down until my appointment. At approximatly 7:00 A.M. I felt my stomache get very bloated and very hard and that is perhaps when my Appendix Burst. I almost passed out in the intense pain.

I went back to medical at about 9:00 A.M. even though my appointment was at 9:30 A.M. . When I got there I amost passed out from the pain. I saw Mr. Nugen, a Physician's Assistant when I walked in and told him the situation. Mr. Nugen took and immediately checked me out and examined me with a stethoscope, Blood Pressure machine, etc. He then went and got Doctor Capps. Doctor Capps called Mr. Crow about the situation and asked why hadn't he done something else. Dr. Capps told SCOTT CROW to get me to the hospital within the hour. (This was 9:00 A.M.).

They let me lay down there in medical in a cell area with a matress. An ambulence or EMS was not even called nor did they procure one. I was instead whelled in a wheelchair over to the jail unit (about a half mile away from the medical unit in Bld. 9) to R&D (Receiving and Delivery) of where inmate transfers in and out are handled. Not where medical emergency patients should be sent. I was made to change cloths into a jump suit and then shackkled. I then had to wait for a guard to get a van to transport me. Finally, at approximately noon 12:00 I arrived at Mesquite Hospital. I looked at the clock on the hospital wall. This is not how an emergency life-threatening or intensly in pain person should be treated in having them go change cloths and wait 3 hours in R&D before they are transported to the hospital...all the while making them suffer in intense pain and with potential life threatening medical conditions.

page 2 of 4

I was whelled into the emergency room. The cloths I had just been forced to change into were all cut off me. I had an emergency operation for a burst appendix and peritonitis caused by the massive infection incident to the burst appendix.

I spent 17 days in the hospital. All of my insides were very infected and the Doctor, Doctor Shakur, of the Mesquite Hospital, said that I was very, very lucky to have lived because most people would have died in the situation that I had been in. He stated that I was lucky I had a strong immune system. While at the hospital I vomitted up the I.V.'s even before I could be put back on solid food 17 days later.

Doctor Shakur had given me instructions and given the Bureau of Prisons personel instructions with me when I returned that he [Doctor Shakur] needed to see me in 2 weeks to examine me regarding the operation. He had given me antibiotics to take and prescription on my return with explicit instructions to me and to the B.O.P. that I was not go go into the heat or into the sun for 14 days. But upon my arrival back at FCI Seagoville, this was totally disregarded and every day for three (3) times a day I had to walk about half a mile back and forth from my building (Building 54) to the medical facilities (Building 9) in the heat and middle of the day to get my pills (antibiotics) each time they were due, rather than have them given to me or brought to me. Further, I had to go to meals also three (3) times a day as well. Thus, Doctor Shakur's instructions were totally ingnorred by the B.O.P. . Additionally, twice when I went to pill line to receive my medications, which I was specifically instructions that I was not to miss a single dose to let the level of it drop in my blood, the nurse that was suppose to be giving out pills was not there because they were over at the jail unit...hence everyone who was suppose to get their pills at such time went without! One other time I could not get to pill line myself because it was storming and pouring doun rain so hard that it would have been too difficult to make it that far over and back again.

Although Doctor Shakur instructed that I return in 14 days, the B.O.P. did not make arrangements for any further visits back. Hence, I have never been followed up with follow-up care.

In August 2005, I had a high temperature and infection (as my infection had never fully gone away) and I went to sick call and got there at 6:25A.M. . There, again, was Mr. RIDGE picking up Inmate I.D.'s. When he got to me at the end of the line, he just looked at me and walked away. I followed him back up and asked him why he did not take my I.D. as well and if he was going to see me. He told me to get back in line. I said it is not 6:30 A.M. yet (the end of sick call). He responded "I know." At about 7:10 A.M. I was the last one, and I walked in from sitting on the chair and he gave me a "smirk" and said "I can't see you...I don't have time for you Garza." He told me to just wait there and somebody will see you sometime today. I waited, and went to see Ms. Fernandez and she said she didn't have time.

**I was the only one there.** Mr. TODD RIDGE had been going back and forth through-out this time. even though I was the only one there, nobody bothered to attend to me. I went to talk to Doctor CAPPS and he have me a smirky look and said he had no time and told me to wait outside. I saw a Phillipino man and asked him to see me. He examined me and determined **that I had infection in my tonsils.** He told me that he checked but that TODD RIDGE **never put me on the sick call list at all.** Even though I had been waiting there all this time with the understanding that I had been put on the sick call list for somebody to see...this was a lie. This treatment by TODD RIDGE was in retalliation to him being found to be incompetent in his prior treatment of me when my appendix burst. I believe that this is maliciousness and deliberate indifference.

This entire failure to provide medical care by those involved and by the Bureau of Prisons is deliberate indifference to my rights to such care and an infliction of pain and suffering upon myself. This is inhumane and unconstitutional.

**AFFIANT FURTHER SAITH NOT.**

**EXECUTED, ATTESTED TO, AND AFFIRMED** on this 20 Day of September, 2005.

_____
JESÚS J. GARZA

BEFORE ME, A NOTARY PUBLIC OF THE STATE OF TEXAS appeared the above individual, and upon proper identification of such as being said individual, and upon placing under Oath, did Attest and then execute this Affidavit on the date shown above.

_____   (seal)
NOTARY PUBLIC, STATE OF TEXAS

PAMELA D RICHARD
Notary Public
State of Texas
My Commission Expires
April 3, 2007

Page 4 of 4

U.S. DEPARTMENT OF JUSTICE                          REQUEST FOR ADMINISTRATIVE REMEDY
Federal Bureau of Prisons

---

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | GARZA , JESUS J. | 41022-179 | D - 54 | SEAGOVILLE FCI |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

   I have and continue to have inadequate medical care which is provided by the B.O.P., the staff of Seagoville FCI, Doctor CAPPS, SCOTT CROW, and TODD RIDGE. These parties have provided wanton and neglectful medical care with **deliberate indifference**. This violates and has violated my constitutional rights, including my Eighth Amendment right against cruel and unusual punishment. All parties are liable for damages. I am entitled to declaratory relief, relief by mandamus, and injunctive relief. This request shall fullfill the administrative requirement prior to any litigation.

   The following relief is DEMANDED: 1) MONETARY DAMAGES (apportioned as you may deem betwe all aprties) from the parties (individual and official capacities) IN THE AMOUNT OF $1,000,000.00; 2) FUTURE MEDICAL CARE (proper medical care); 3) The termination of a) Mr. JOSEPH CAPPS with cause, ~~MXXMFXXXXEXITXXIXXX~~ b) Mr. SCOTT CROW with cause, c) Mr. TODD RIDGE with cause. As Warden, you have liability and primary responsibility for this. Failure to proceed with these actions against individuals whom are culpable will be deemed deliberate indifference. And finally 4) A Compassionate Reduction in my sentence of at least 75% of the sentence which was imposed.

   This Request is hereby accompanied by my **ATTACHED AFFIDAVIT (4 pages).**

   This matter was inhumane and violates the very standards of human decency and was illegal

| _10/01/05_ | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B– RESPONSE**

---

| DATE | WARDEN OR REGIONAL DIRECTOR |
|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                                    CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                                                             CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

---

| DATE | |

**GARZA, Jesus**                                              ¬ **FCI Seagoville, Texas**
**Register No.: 41022-179**
**Remedy No.: 391481-F1**

This is in response to your Request for Administrative Remedy receipted October 12, 2005, in which you indicate you have received inadequate medical care from staff at this facility. Specifically, you state that staff have provided neglectful medical care with deliberate indifference. You are requesting monetary damages in the amount of $1,000,000, future medical care, the termination of Health Services staff members, and a compassionate reduction in your sentence.

Research into your allegations reveals that you arrived at this institution on March 25, 2005. You visited Health Services on April 28, 2005, exhibiting symptoms consistent with appendicitis. On this date you were seen by a Physician's Assistant at approximately 9:00 a.m. Following the examination by the Physician's Assistant, consultation was made with the Medical Doctor regarding your medical condition. At approximately 10:00 a.m., the Medical Doctor ordered that you be sent to the local hospital via institution van. You arrived at the local hospital at approximately 12:05 p.m. and remained in the hospital until you were released back to the institution on May 14, 2005. On August 11, 2005, you returned to Health Services complaining of a sore throat. You were examined by the Physician's Assistant and given medication for your condition.

You are requesting monetary damages in the amount of $1,000,000. All requests for monetary damages must be made according to the guidelines for the Federal Tort Claim Act. Additionally, you have requested future medical care. You are and will be provided medical care consistent with policy as long as you are incarcerated within the Bureau of Prisons. Furthermore, you have requested termination of specific staff members at this facility. You will not be notified of any action taken against staff members as a result of your allegations. Finally, you have requested a compassionate reduction in your sentence. A review of Program Satement 5050.46, Compassionate Release: Procedures for Implementation, states "a motion for a modification of a sentence will be made to the sentencing court only in particularly extraordinary or compelling circumstances that could not be reasonably have been foreseen by the court at the time of sentencing." A review of your case does not reveal any extraordinary or compleeing circumstances; therefore, a request for compassionate release is not warranted at this time.

Based on the above information, the relief you seek is partially granted. Specifically, as indicated above you will continue to receive future medical care. Your request for monetary damages is denied at this level; however, information has been provided above on the proper procedures for filing a claim. Finally, your request for termination of specific staff members and a compassionate release are denied.

If you are not satisfied with this response, you may appeal to the South Central Regional Director, 4211 Cedar Springs Road, Suite 300, Dallas, Texas  75219, via BP-DIR-10, within 20 calendar days of the date of this response.

Dan Joslin, Warden

10/26/05
Date

GARZA, Jesus          REG. NO. 41022-179          FILED: 01-3-06

391481-R2             PART B-RESPONSE


You are appealing the Warden's response to your complaint in
which you state medical staff treated you with deliberate
indifference and did not provide adequate medical care for your
appendicitis.  You are requesting monetary compensation, medical
care, and a compassionate reduction in your sentence.

Consultation with the Clinical Director and a review of your
Administrative Remedy Appeal was conducted.  As the Warden
stated, on April 28, 2005, as soon as it became evident you were
exhibiting symptoms associated with an appendicitis, the Clinical
Director ordered that you be transported to the community
hospital.  You were admitted to the community hospital on
April 28, 2005, and remained there until you were released back
to the institution on May 14, 2005.

The Clinical Director has determined you received appropriate
medical care and you have made a complete recovery.

Your request for monetary compensation should be submitted
through the tort claim process.  You can obtain the proper forms
from your unit team.

You will continue to receive medically necessary medical care.

As the Warden explained, you do not qualify for a compassionate
release.

Our review finds the Warden has appropriately addressed your
concerns, and we concur with the Warden's comments.

You are entitled to no further relief, and your appeal is denied.

In the event you are not satisfied with this response, you may
appeal to the Bureau of Prisons, Administrative Remedy Section,
320 First Street, N.W., Washington, D.C. 20534.  Your appeal must
be received in that office within 30 days from the date of this
response.


___01/31/06___                    _____
Date                              G. Maldonado, Jr.
                                  Regional Director


**SENSITIVE- LIMITED OFFICIAL USE**

# Appendix 6

**AFFIDAVIT OF JONATHAN PRICE BLOUNT**
**aka RICHARD G. SIMMOUNS**
**33289-077**
FCI Seagoville, Seagoville, TX  75159

I, **JONATHAN PRICE BLOUNT**, aka RICHARD G. SIMMOUNS, **Affiant**, **Do Hereby Attest and Affirm that** the following facts are true and correct to the best of my knowledge.  I know the difference between the truth and untruth, and am over the age of 21, and do solemly affirm that the foregoing is true and correct to the best of my knowledge:

**THAT:**

I am age 43 years, of age.  In 2000 I had a stroke at Texarcana FCI.  At that time I spent two weeks in intensive care and 4 to 5 months in the hospital recuperating and rehabilitating.  From that experience, I am well aware of symptoms of a stroke and heart failure.
On November 2, 2004, I was transferred from Beaumont Texas FCI to Seagoville FCI.  I had been at Beaumont FCI approximately 3 months. I had been prescribed medications prior to my entry into Federal Prison by civilian doctors for care of my heart, and for care of Bi-Polar treatment.  This medication had been continued at Beaumont FCI. This medication, which was critical to my continued care was:
1) "Cloinidine" [sic]... Blood Pressure Treatment
2) "Anadol" [sic] ... Heart Medication
     (each of these medications I had been on since age 36)
3) HTZ 75-50 ... Blood Pressure & Heart Medication
     (this was prescribed at Texarcana FCI)
4) "Lasix" ... A water Pill to prevent the retention of water and
     to assist in keeping lowered blood pressure
     (this was prescribed at Texarcana FCI)
5) "Nitro Glyserin" [sic] ... For Congestive Heart Failure
6) "Elavil" [sic] ... Psycotropic Medication for Bi-Polar
     treatment, prescribed prior to entry into custody
     and maintained in custody while at Beaumont FCI
7) "Depaco" [sic] ... Psychotropic Medication, prescribed by
     civilian doctors prior to entry into custody and
     continued while at Beaumont FCI
8) Aspirine (Heart Aspirine 81mg)... For Heart, prevention of
     heart attacks and prevention of strokes.

Upon my transfer to Seagoville FCI, and on approximately November 6, 2004 (11/6/2004) I had a meeting with **JOSEPH CAPPS, M.D.**, of Seagoville FCI.  At this meeting, without any comphrehensive exam, Doctor Capps advised me he was taking me off all of my medication. Although he is not a psychiatrist, this also included the Psychotropic medication, even though no exam was administered and neither was any psychiatric doctor consulted.  I contested this decision by him, one which was not based on any medical examination or pshchiatric examination, and one which conflicted with every doctor whom had prescribed medication to me in the past, including Beaumont FCI doctors, and their reasons of why it was essential that I take such medication.

THIS IS PAGE 1 OF 3

Dr. Capps took me off all of this medicine at once and I could not get any of it filled. I protested this and went to Dr. Jaffe, the head of Psychology, and he set up a teleconference with Doctor Peters, a Psychiatrist whom is the B.O.P. Region Psychiatrist, and Doctor Peters Ordered that all the medicine be reinstated.

But, when I then tried to get my medicine, I was informed that Dr. Capps had cancelled the order. I filed a BP-8 (Informal Resolution Request to Staff) on this issue with Doctor Capps and the neglect in treatment and going against the Orders of Doctor Peters. As the next level in administrative remedies after the BP-8, I tried to get a BP-9 Form from My Counselor, Mr. Squires, but he wouldn't give me a BP-9 Form to follow up the chain on the Administrative Remedies. This prevented me from seeking redress on this issue. I went to the Unit Manager, **Shannon Phelps**, and told him that I was being blocked from obtaining a BP-9 in order to file my administrative remedy on the situation on my lack of medical treatment. Mr. Phelps told me that he wouldn't give me one either. I then went directly to **Warden Dan Joslin**, and informed him of the entire situation (I did this in "main line" during lunch) and of the situation that I was being prevented from obtaining a BP-9 in order to file my official administrative remedies after properly doing the BP-8 first. He told me just to "work it out with Team" -- "Team" being, Mr. Shannon Phelps--the Unit Manager and Mr. Squires-- my counselor. I went back to Mr. Phelps with this statement from the Warden, and Mr. Phelps still would not give me a BP-9, and said "I'm not getting involved" and to "work it out with 'Capps' ". Again, Doctor Capps would still have nothing to do with me after this again refusing to put me back on my needed medicine for my heart and psychotropic medication.

Then, on November 23, 2004, in the afternoon I had symptoms that came on of my "arm goin numb, fingers numb, was very cold with chills, had bad headache, felt a great pressure on my chest, and my legs became swolen. I went over to medical (Building 9) to seek medical care as I thought that I was experiencing a heart attack or a stroke again with such symptoms. Doctor Capps was there, I told him I thought I was having a heart attack or stroke and the symptoms. **He did not examine me at all**. He just asked "where do you hurt" and I told him everything as stated above, and he said "you probably just pulled a **muscle**--and then said that I had **indigestion** and to go back to my unit and quit your **wining, crying,** go back to your unit or I'm goin to put you in the "**hole**" [SHU] because I'v got other people that **are sick**." Dr. Capps performed no examination what-so-ever and came to these medical conclusions based on no objective investigation.

I went back to my unit, then at around 2 A.M. to 3 A.M. the following morning,-- I lost body functions and soiled the bed and **went limp.** One of the other inmates, Mr. perry Johnson, raised cain with the guard and they took me "unconcious" to medical (Building 9). A lady, Doctor Duckworth, then looked at me and I was taken to **Mesquite Hospital** [this was November 24, 2004]. At the hospital I went to the Emergency Room and into intensive care.

On Thanksgiving Day, November [November 24, 2004] at around late 11P.M. to Midnight, an **Iranian Doctor** explained the situation that **I had had a major heart attack** and had several arteries clogged and they needed to do emergency surgery...and there was a good chance that I may not live. Surgery was performed around midnight and I awoke the next morning around 10:00 A.M. in intens...

At the hospital with me from the B.O.P. was Mr. Toni Stafford. Although I had requested in doing the papers with the Doctor that I should not be brought back to life, **I died on the operating table and Mr. Toni Stafford, with the B.O.P. said to bring me back to life** I stayed in the hospital for about One and One Half (1.5) Months after such operation.  The hospital Doctor told me that my heart attack was caused by me being taken off the medicine that I should have been taking but was denied.

Dr. Roberts put me back on <u>all</u> the medicine that Doctor Capps and the B.O.P. had taken me off and denied to me.

However, when I arrived back at Seagoville FCI, and went to try to get the medicine that Doctor Roberts had prescribed, Dr. Capps again took me off all of the medicine and denied me the medicine I needed and that Doctor Roberts had prescribed.  Again, I tried to file a BP-9 and tried to get a BP-9 from Mr. Squires, Mr. Phelps, and Warden Dan Joslin, but all refused to give me one in order that I pursue this new issue (after I had had a heart attack alredy).  I then filed a "Sensitive BP-10" directly to Region since I was prevented from obtaining a BP-9 to file.  Region responded to try and work it out with Doctor Capps (medical at Seagoville FCI). I then went to Doctor Capps on this and he stated "listen, Region doesn't run medical, the Warden doesn't run medical, no one runs medical here [at FCI Seagoville] except me [Doctor Capps].  I'm the one that says what goes on in medical".  He again refused to provide me with my medicines which had been prescribed by the various authorities and doctors as stated herein.

I believe that the treatment and medical care of Seagoville is wanton and neglectful and consists of deliberate indifference to the inmates.  The actions as happened to me, more-over, cross the line into criminal culpability of the various parties, and if they would have been in a setting (other than here at Seagoville FCI) they would have been charged criminally and their licenses revoked, as well as the agency itself would be found criminally liable and shut down.  The inactions and actions taken by Doctor Capps, Shannon Phelps, Dan Joslin, Mr. Squire, were the direct and proximate cause of my heart attack and suffering.  This violated my constitutional rights and all rights of humane treatment.

**AFFIANT FURTHER SAITH NOT.**

**NOTARY PUBLIC UNAVAILABLE: EXECUTED UNDER PENALTY OF PERJURY.**
EXECUTED, ATTESTED TO, AND AFFIRMED on this _____ Day of September, 2005.

_Jonathan Blount_
JONATHAN PRICE BLOUNT

BEFORE ME, A NOTARY PUBLIC OF THE STATE OF TEXAS appeared the above individual, and upon proper idendification of such as being said individual, and upon placing under Oath, did Attest and then execute this Affidavit on the date shown above.

(seal)

# Appendix 7

**AFFIDAVIT OF**     **CLINTON ROY MERIWEATHER**
                    **34776-077**
                    **FCI SEAGOVILLE   POB 9000**
                    **SEAGOVILLE, TX   75159-9000**

---

I, CLINTON ROY MERIWEATHER, do Attest, Affirm, and State under penalty of perjury that all of the following is true and correct. I further attest that I am over the age of 21 years of age, of sound mind, and knowing the difference between the truth and untruth, in such affirmation above, state the following as being so true:

**THAT,**

I was a personal witness to observing inmate **JAMES R. FRISTOE** fall to the ground with a heart attack and to the attendant immediate circumstances and surrounding events that transpired.

On or about November 22, 2005, I was standing on the Building 9 steps coming from Unicore and at "Pill Call" at 2:00 P.M. I saw Mr. Fristoe fall to the ground at the corner of the Gazebo (Pavillion area) in the middle of the Seagoville compound on his way ~~back to this (Building) #9 for~~ Pill Call. His fall visually [handwritten margin note: *on his way "to" pill call*] appeared to be one of a severe medical emergency type. Upon such, I observed the Correctional Officer whom was in or outside of Building 5 at the time, I believe it was Mr. Chapman, but I could be in error, break into a run going to him. I observered a radio call being made to what I believed was medical for urgent medical attention being needed on the compound.

Although a number of Seagoville staff had accumulated and were "standing around" Mr. Fristoe, these including Ms. Brady (now Ms. Melendez), Ms. Cheryl Parkman, Mr. Ramos, Ms. Cox, and some others, **none bothered to administer CPR, or any manner of emergency first aid treatment** to Mr. Fristoe, even though it was clear that Mr. Fristoe had suffered a heart attack and was in a medical emergency state which I recognized as a reasonable person would necessitate such type of emergency medical care being immediately required. After some time, I observed a "black haired nurse" coming out of Building 9 (Medical services). She **"walked"** in a gingerly and strolling manner, appearing in no hurry what-so-ever, from Building 9 to where the Gazebo was approximately 2,000 feet away. **She brought with her no medical gear, no Oxygen equipment, no CPR revival equipment, and had only her radio walkie-talkie with her.** By the time she arrived at where Mr. Fristoe was it was approximately 15 Minutes After he had fallen and after the initial call went out for help!

Inmates brought stretchers to the site from Building 9 later after this. Then, the guards made all us inmates standing around watching get in the Rec Yard behind the fencs, and then made us all go into the hobby shop there at the Rec Yard.

**Approximately 45 Minutes After Mr. fristoe had first fallen with a heart attack, an Ambulance arrived at the back gate.** This I could see. I saw the ambulance come to the back area by Building 9. I later saw them bring Mr. Fristoe on a stretcher to the ambulance-- they had no oxygen or any other type of emergency medical equipment or devices on Mr. Fristoe, nor was there any emergency treatment being provided by any of the seagoville FCI staff. Mr. Fristoe was put into the ambulance. I then saw Ms. Lt. Bennet get into the ambulance. she stayed in there for approximately 5 minutes and then she got out. Then the ambulance departed. No emergency medical care was provided to Mr. Fristoe during this time between when he fell and when he was loaded into the ambulance. At the memorial service for Mr. Fristoe held on November 27, 2005, Chaplain (Ms.) Manning stated that she had personally talked to and with Mr. Fristoe at the hospital before he died and said he was "at peace with his maker", this meaning that he was **alive when he left Seagoville.** I believe that the total lack of any emergency medical treatment to Mr. Fristoe was material and proximate cause to his ultimate death. This was wrong.

AFFIANT SAITH FURTHER NOT.   DATE: _6-11-_ , 2006          _[signature]_
                                                        CLINTON ROY MERIWEATHER



*Memorial Services*

*for*

*Mr. James R. Fristoe* - *November 22, 2005*
*Mr. Mark E. Musson* - *November 24, 2005*

*November 27, 2005*
*1:00 pm - All Faith Chapel*

Prayer            *Chaplain Schanfish*

Song              *"In The Garden"*

             *Time Of Remembrance*

Song              *"What A Friend WE Have In Jesus"*

Message           *Chaplain Manning*

Prayer            *Chaplain*

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
DEC 2 9 2006
FILED

06 2368

# Appendix 8

AFFIDAVIT OF    **CLINTON ROY MERIWEATHER**
**34776-077**
**FCI SEAGOVILLE   POB 9000**
**SEAGOVILLE, TX   75159-9000**

---

I, CLINTON ROY MERIWEATHER, do Attest, Affirm, and State under penalty of perjury that all of the following is true and correct. I further attest that I am over the age of 21 years of age, of sound mind, and knowing the difference between the truth and untruth, in such affirmation above, state the following as being so true:

**THAT:**
I personally knew Mr. **MARK E. MUSSON**, whom died on or about November 24, 2005. Attached herewith is a copy of the Memorial Notice that was posted which I kept.
Mr. Musson was known as "Moose" to many on the Seagoville FCI compound. On Thanksgiving morning, on or about November 24, 2005, I was sitting out in front of Building 6 at the tables at approximately 7:15AM to 7:30Am. I observed Mr. Musson going by with a guard. I hollard to him "Moose, where are they taking you to?" He responded verbally to me stating: "they're transferring me to a medical facility". At that time he looked real yellow and jaundiced. I am aware that Mr. Musson related to me that the B.O.P. staff was not treating his medical condition and had taken him off medicine that had been proscribed to him and put him on something different. He sufferred from pain and sufferring from the B.O.P. staff's failure to properly treat his medical condition and this complete deliberate indifference ultimately cost Mr. Musson his life.

This was completely wrong. Mr. Musson clearly needed to be provided critical medical care the day he was led by me, in that, he should have already had been taken to a hospital days earlier for emergency treatment instead of letting him get in the poor and debilitated condition that I witnessed him, and inwhich a reasonable person would have known needed such urgent care.

AFFIANT SAITH FURTHER NOT.

DATE: 6-11        , 2006

_Clinton Roy Meriweather_
CLINTON ROY MERIWEATHER

06 2268

FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Appendix 9

AFFIDAVIT OF BOBBY JOE BURTON, JR.
75272-079
FCI Seagoville POB 9000
Seagoville, TX 75159-9000

I, BOBBY JOE BURTON, JR., Affiant, Do Hereby Attest an Affirm under penalty of perjury that the following facts are true and correct to the best of my knowledge, and being that I am over the age of Twenty One (21) Years of age, of sound mind, and knowing the difference between the truth and untruth, do solemly affirm and attest that the foregoing is true and correct to the best of my knowledge:

**THAT:**

On or about Friday December 10, 2004, I attended my weight loss class. My instructor was a Medical doctor from the outside civilian sector. His name was Doctor OWENS. In this class Doctor Owens took my **blood pressure**. He remarked that "**my blood pressure was so high at that time that I needed to be seen by someone in medical immediately!**"

Doctor Owens immediately informed one of the Seagoville FCI drug counselors in the Psychology Department, **Mr. BENJAMIN.** Mr. Benjamin said "**that he was going to immediately E-Mail Mr. TODD RIDGE in the medical dept.**" Mr. Benjamin called **TODD RIDGE** on the phone about my situation. Mr. RIDGE told Mr. Benjamin to tell me to **make sick call Monday morning** (this day was Friday---Monday would be **Three (3) Days Later**). Mr. Benjamin pressed the matter with **TODD RIDGE** and explained to him that my blood pressure was now **200/120 (normal blood pressure being 120/80).** Mr. Benjamin explained that this was **very, very high! And life threatening;** and that this could be an emergency situation. Mr. RIDGE would not see me that day, so Mr. Benjamin called and E-Mailed **DOCTOR JOSEPH TRUEBLOOD** "to cover himself in case anything happened to me" is what he said. Mr. Benjamin **also** contacted and E-Mailed **Ms. Fernaders** in the medical department to cover himself and to see about getting me immediate medical attention. I must say that Mr. Banjamin did his best at trying to help me for the seriousness of my immediate medical problem and so did Dr. owens.

I was very worried and did not want to have a stroke and die here but Mr. **TODD RIDGE** would not see me until after the weekend until Monday morning. So I went back to my housing unit. It had been about three months since Mr. Ridge had taken my blood pressure, and this pressure now was very, very high. Over the weekend at my housing unit I tried to lay down and get rest. I felt very weak feeling over the weekend, had dizziness, and had very, very bad headaches all weekend.

I discovered that my blood pressure must have gotten out of control because a guard had "shaken down" my locker in an inspection he did on Thursday night before that Friday, and in the process he had opened and knocked over my blood pressure medicine on the floor (medicine was "Clonidine") and when I had come back to my room it was still on the floor (dirty) so I cleaned up the floor and had to throw the medicine away because it was contaminated with dirt...thus, I did not have any blood pressure medicine to take.

On Monday morning I went to sick call. I was given a new prescription of my blood pressure medicine **which did not get filled until Monday afternoon.** So it **was not until Monday night that I started to feel a little bit better when the blood pressure medicine started to get into my system.** This was not right how I was done and is clear deliberate indifference and violated my constitutional rights.

ATTESTED TO AND AFFIRMED AS TRUE IN PENALTY OF PERJURY ON THIS THE 4 Day of October, 200

_Bobby Joe Burton Jr_

Burton, Bobby
Register No.: 75272-079
Response to Inmate Request to Staff

I have reviewed your Inmate Request to Staff dated December 10, 2004 in which you claim medical staff were negligent toward your medical needs. You claim your life was in jeopardy and would like this situation corrected.

Research reveals that you attempted to be seen on December 10, 2004 for high blood pressure. A decision was made for you to make regular sick call. This was a sound medical judgement based upon your medical history. You are currently prescribed medication for your high blood pressure. You are obese which already hampers the treatment of hypertension and considering those issues your blood pressure of 200/120 did not warrant an emergency appointment. It also should be known that a little while later, your blood pressure was taken and it was noted to be way down. At which time you were informed that your condition did not warrant an emergency appointment.

While looking into your complaint, it was noted that you are always trying to get seen as an emergency versus making regular sick call. I suggest that you make a better effort assisting the Health Services staff with your medical issues and seek medical care the proper way.

_____
Marm Boyle, AWO

December 16, 2004

---

BP-148.055
88
U.S. DEPARTMENT OF JUSTICE

INMATE REQUEST TO STAFF CDFRM

FEDERAL BUREAU OF PRISONS

| (Name and Title of Staff Member) | DATE: |
| C. W. Mc Bell | 12-10-04 |
| FROM: | REGISTER NO.: |
| Bobby T. Burton | 7K-272-079 |
| WORK ASSIGNMENT: | UNIT: |
| Building 6 - Cur/ | 6/6 |

BCTE: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to satisfy respond to your request)

On July 8, 2004 I attracked my cuteple lost plate on December 10 2004 __
my blood pressure. He said that my blood pressure was so high, that I needed __
to overcome immediately. He ordered one of his stop examining. He sent __
Mr. Benjamin the Benjamin said that he was going to email and call Mr. Boyle. __
Benjamin talked with Mr. Boyle on the phone about my Situation. Mr. Cofer said "that" __
Benjamin to tell me (Bobby Burton) to make sick call during during" Mr. Benjamin __

(Do not write below this line)
*************************************************************

DISPOSITION:

_____
| | Date: |
| | |

Signature of Staff Member:

Record Copy - File; Copy - Inmate

# Appendix 10

## AFFIDAVIT OF GEARY MACK BAILEY

# 03898063

FCI SEAGOVILLE   POB 9000
SEAGOVILLE, TX   75159-9000

I, GEARY MACK BAILEY        , Affiant, Do Hereby Attest that the following facts are true and correct to the best of my knowledge, and being that I am over the age of Twenty One (21) Years of age and know the difference between the truth and untruth, do solemly affirm that the foregoing is, infact, true to the best of my knowledge:

**THAT,**

In the Spring of 2004 I was working out on the weight pile area and started to have symptoms of tightness in the chest, getting fatigued. A couple of months later someone in commissary line (inmate) noticed that I had blood in my eye and sort of around it. The next time I workde out, I experienced the same symptoms as stated above but also noticed that I had blood around the eye and it was red. I went to medical department and saw TODD RIDGE. He put a stethescope to me and listened to my heart and took my blood pressure and then pronounced "you're ok". I kept working out and my eye from then began to turn not red but black. I felt like something was very wrong and so later (around September 2004) I saw Ms. Fernandez from medical staff walking in front of the Education Dept. and stopped her and asked her about my condition and she saw my eye which was black. She said to see Doctor CAPPS. I then went up and talked to Dr. CAPPS and saw him and Mr. WEAVER. Weaver put an EKG on me and then he said I had a "blocked artery". He showed this to Dr. CAPPS and he said that you never know for sure with these things. They put a black box on me to monitor me for 24 hours. Then I took it back the next day. Then a couple weeks went by and I got a card in the mail that said I'd be seeing a Cardioligist. They had given me some NITRO-GLYSCIRINE PILLS, sometime around this time also. A couple of more weeks went by and I started having CHEST PAINS and went to talk to SCOTT CROW and he said just "eat your nitro pills". Every time I would lie down for about the next six weeks I started to feel chest pains. I still had not seen any cardioligist.

On the Sunday night before the Wednesday that I went to the hospital the first time [around October 2004] I had very, very bad chest pains and then later in the night around 2 A.M. (Monday) I awoke hurting through my arms, chest, shoulders, etc. I went over to see Mr. Weaver the next day and told him the symptoms. Mr. Weaver gets up and walks around his desk, shuts the door, sits down and says "look, there's nothing I can do for you, you should have already gone out"—you definitely got something going on, if you can make it to after 10P.M. count time is over then go to your C.O. (Guard at the unit) and they'll call me at home and I'll tell them to take you on out."

On that Wednesday night next, I started having chest pains and had already taken then 4 nitor pills. I waited till after 10 P.M. and went to tell the guard about my symptoms and condition. He called someone although I don't believe it was Weaver and relayed my conditions and they said to just take more nitro pills; I responded that I had already taken the maximum dosage of 4 pills that they said I should never exceed. Then, they made me walk up (about one quarter mile outside across the compound) to the Lieutenant's office. I got out of breath several times along the way and we had to stop so I could catch my breath. Then when I got there they then walked me up to the front of the compound, about another quarter mile away, to the sally-port where an EMS Ambulance was there. There, a Female Paramedic (name unknown) on this date exasmined me and asked many questions about my condition and symptoms that I'd been having. She then looked to the B.O.P. people and exclaimed 'what's the matter with you people (B.O.P.), this is serious and I'm going to have to write you up again— why do you keep doing this to people". They took me to the emergency room of the Hospital (unknowne name) and I was admitted to Intensive care. Within a couple days they did exploratory surgery and I was there about 8-9 more days because during the surgery a major artery had ruptured in my leg area. They then took me to another Hospital (name unknown) where I had re-surgery for blocked arteries. CONTINUED ON PAGE TWO OF TWO. .........

Affiant Saith Further Not.          Date: 10-1-05

Mack Bailey
MACK Bailey

AFFIDAVIT OF GEARY MACK BAILEY 03898063, PAGE 2 of 2:

Then I came back to Seagoville FCI after this major surgery. I had a big bandage on my leg-groin area where the rupture had earlier occurred. This was about 2P.M. in October, 2004. When we got back to R & D (Receiving & Departure) section, about a half mile away from my living unit, they checked me in and I asked for a wheel chair to make it back a half mile to my living unit.....they responded "you'll be ok-just walk". I then had to walk very, very slowly back to my living unit. This walk made my surgery bandaged area and insides in very bad pain. when I got to my building (BLD 54) I asked the guard if I could get a wheelchair in order to make it across the compound about one quarter mile for chow in order to eat. He said that all he could do is let me out early to be able to have more time to walk across the compound to chow. It took me very long to get accross the compound to eat dinner and when I made it back I was starting to get black and blue down where my surgery had taken place and was bleeding and getting chills and had severe pain.

Somehow,and I am not sure how, I was taken to an the EMS Ambulance outside the main gain. There, again, was the girl EMS Paramedic whom, after reviewing my situation and the history, as well as what had happened, she got all over the B.O.P.'s case for the total deliberate indifference and was very angry at them for their lack of proper care of me. She stated that there was absolutely no reason for this type of activity of the B.O.P. . I was taken to the hospital and had a ruptured artery. This was because the stint that had been put in my heart on the earlier surgery and the walking around had ruptured an artery.

The doctor fixed it and told me and the B.O.P. that I needed to be brought back for follow-up within 10 days, this was October 2004. I HAVE NEVER BEEN TAKEN BACK, and after repeated requests to the medical staff CROW, RIDGE, AND CAPPS, I was still never taken back. Then, in January 2005, having never been taken back for the follow-up as prescribed by the Doctor at the hospital where the surgery occurred, I started to again have symptoms that included more pain and shortness of breath...etc. .. After then going back for this to the hospital...they (the Doctor) said I had fluid around the heart and the Doctor prescribed medication for me to take. however, the B.O.P. upon my return has kept changing the medication around and the dosage and is not the same as that which the Doctor originally prescribed and now when I take this new medicine the B.O.P. and Ridge, Crow, and Capps of the medical facility have prescribed it gives me an irregular heartbeat when taking the medicine and I have reported this to them to no avail and am very in fear of taking this that something even worse will happen.

I have been denied proper medical care, Doctor Capps, TODD RIDGE, and SCOTT CROW, as well as the B.O.P. have been completely indifferent to my medical needs, my condition, and to my care and this is not right.

_10-1-05_
DATE

NOTARY UNAVAILABLE:; INMATE RULE UTILIZED:    SIGNED ON THIS _1st_ DAY OF _Oct_, 2005
                                             UNDER PENALTY OF PERJURY.

_Mack Bailey_
GEARY MACK BAILEY , AFFIANT

# Appendix 11

AFFIDAVIT OF    **WALTER WARING**
15397-045
FCI Seagoville
POB 9000
Seagoville, TX  75159-9000

I, **WALTER WARING**, **Affiant**, **Do Hereby Attest and Affirm under penalty of**
**perjury that the following facts are true and correct** to the best of my knowledge,
and being that I am over the age of Twenty One (21) Years of age, of sound mind,
and knowing the difference between the truth and untruth, do solemly affirm and
attest that the foregoing is true and correct to the best of my knowledge:

**THAT:**

I arrived at Seagoville FCI on or about September 2003 as a **self surrender.**
At my initial medical review and evaluation the Dentist said that I had to have all
of my **teeth pulled and must have dentures** because of my cavaties and gum problems.
My age is 44 years of age.  An appointment was scheduled.

In December 2003, the dentist here at Seagoville FCI **pulled all of my top teeth**
**out**, but when I asked for pain medicine he said I **could only have Ibuprofen (Motrin)**
**600mg for pain.**  I had just had 11 teeth pulled and was in **severe pain** but they only
would prescribe Ibuprofen...which does not give hardly any pain relief what-so-ever.
I was in pain for about **3 to 4 weeks** straight.  I could not eat, nor could I put
anything in my mouth which was hot.  It was very, very difficult during this 3- 4
weeks without eating much and in such pain and **with no teeth.**

Then about a month later in around January 2004, I went back and had **all the**
**bottom teeth (about 11) pulled out.**  Again, I was in severe pain for another **3 - 4**
**weeks straight without any pain medicine except ibuprofen.  I could not eat** because
of the pain and because I had **no teeth.**  It had now been that I had gone without
any teeth for about two months straight.

Around February 2004 they did the first impression for dental plates.  [I
**would never have agreed to have had my teeth pulled and been put through this**
**ordeal to this point if I had known that they were not going to give me any "real"**
**medicine for pain other than normal ibuprofen, and that I would have had to go over**
**TWO MONTHS WITH NO TEETH AND COULD NOT EAT!**].

Then the dentist told me something incredible....It would take about SIX (6)
MONTHS FOR ME TO GET DENTAL PLATES.  He said it would take this long because the
dental plates are made by inmates in **El Reno FCI** in Oklahoma and it "depends on
the 'conditions' at the prison" (i.e. whether they have a lot of "lock downs', etc.)
for the time for the teeth to get made.

Feb. 2004 they did the first and second impression...because the first impression
was accidenly broke.  The on March 2004 they did the Third (3rd) impression.  I
don't know why so many impressions had to be made...in the civilian world the
dentist can have teeth made for a patient in less than a week!  Then it took
**three months to get the wax mold back from El Reno** — this was maybe around June 2004.
This mold was then used in my mouth to properly position the teeth within it to get
the fit right.  By now this was SIX MONTHS AFTER MY TEETH HAD BEEN PULLED AND I HAD
NO TEETH DURING THIS TIME...AND THE DENTIST TOLD ME I WOULD JUST HAVE TO "GUM MY
FOOD"!  During this period of time I had not been able to eat any solid food at
all, Icouldn't eat or drink anything hot or cold and could not go to the dining
hall for about the first three months because of the pain...I could only eat and
did survive on cold soup and cold oatmeal for this entire period.  During this
period I lost about 25 POUNDS.

*Walter Waring*    Page 1 of 2

Page 2 of 2 of WALTER WARING; AFFIDAVIT

Then, around 9 months later from when the wax mold was taken--- about February or March 2005 I got the dentures to be fitted.  This was over 14 MONTHS AFTER ALL MY TEETH HAD BEEN PULLED....I had gone without teeth, forced to "gum my food" for over a year and two months.  By this time I had lost 32 Pounds.

The dentist said they had problems in El Reno...that is why it took longer. But there was a BIG PROBLEM.....THE DENTURES DID NOT FIT!  They were very, very loose, they were too big in some places in the thickness of the plate and consequently were too heavy and would not stay in my mouth.  The dentist tried everything he could to get them to fit...he ground and ground them down but they still would not fit.  Hence, in March 2005 he sent them back (to El Reno) to get a "hard liner" put in them to make them fit tighter instead of correctly getting them remade.

About a month later, June 2005, A YEAR AND A HALF AFTER HAVING ALL MY TEETH PULLED AND GOING WITHOUT HAVING TEETH TO EAT FOR SUCH YEAR AND A HALF...THE REMADE DENTURES finally came in.  But, these still would not fit either.  I could not eat or drink with them because they go too far back in my mouth and gag me--I can not even get my tongue out far enough to wet my lips because they compress the tongue. It is impossible to drink with them, let alone eat.  The dentist tried again to grind them down and everything but to no avail...and finally told me to "just get used to it".  I find this reprehensible...I have no teeth, cannot eat solid food, and am told to "get used to it"!  The top and bottom plate are way too thick (approximately 1/4 inch each) which is way too much, and they will not even fit "vertically" in my mouth...let alone going too far back as well. I went from 225 Lbs to 193 Lbs (loosing 32 pounds through being not able to eat properly and throughout this ordeal.

I believe that this was unconciounsable treatment and is complete deliberate indifference and should be criminal as well.  My constitutional rights were certainly violated in every aspect.  The unfortunate part is that another inmate here as well, at this Seagoville FCI, also has had to go through the exact same thing and has taken 14 months for him as well to get teeth.  This is not right.

ATTESTED TO AND AFFIRMED AS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE ON THIS THE   7th  Day of October, 2005, under Penalty of Perjury.

Page 2 of 2.

_Walter Waring_

**WALTER WARING**

# Appendix 12

**AFFIDAVIT OF**    GARY GADDY
35577-180
FCI Seagoville POB 9000
Seagoville, TX 75159-9000

I, GARY GADDY, Affiant, Do Hereby Attest and Affirm under penalty of perjury that the following facts are true and correct to the best of my knowledge, and being that I am over the age of Twenty One (21) years of age, of sound mind, and knowing the difference between the truth and untruth, do solemly affirm and attest that the foregoing is true and correct to the best of my knowledge:

**THAT:**

I got to Seagoville FCI on or about October 20, 2003. At such time I had scheduled to have pulled parts of my teeth (2 upper and 6 lower teeth) and to get complete dentures because the dentist said that I needed to have that done because of the status of such remaining teeth. I had wore partial dentures prior to entering prison so I am fully aware how dentures are suppose to fit.

It was on or about May, 2004, that my appointment finally arrived to have my teeth pulled. The pulled these teeth on or about such date. I was not provided any pain medication what-so-ever for the ensuing and subsequent pain other than the mild dose of Ibuprofen. After this I had no teeth.

The Dentist told me it would take about 6 months to get teeth (dentures) so I would have to "gum" my food for the time I'm without dentures and teeth. He said it would take this long because they are made at El Reno FCI and they have a lot of "lockdowns" there, or if one making the dentures went to the SHU then someone else would eventually pick up his work. This seemed awfully long to get dentures since I could get such outside in comparable civilian medical facilities within a week. This seemed also not right that I would not be able to eat solid food for this entire period.

They did two (2) impressions. It wasn't until about four (4) months later on or about September, 2004, that the wax impression was finally done. It then took about four (4) more months to get my dentures, on or about January, 2005. During the time I had to go without teeth and dentures I lost about 20 Lbs, going from 198 pounds to 178 pounds. This being because I could only eat cold, soft noodle-type food during these EIGHT (8) MONTHS WITHOUT TEETH OR DENTURES.

But, when the dentist tried to fit these dentures...they would not fit! The dentist trimmed the upper portion back and trimmed the bottom one. They went too far back in my mouth...since the top portion of the denture went too far back on the pallet, I couldn't even get my tongue to touch my lips let alone swallow liquid or eat. Finally, after trying to trim them repeatidly for about two months, on or about March, 2005, I tried them and they were still too big and the top ones were so heavy and so thick that they dropped down whenever I opened my mouth-- so it was obvious that I would not even be able to eat with these. So the dentist set them back to El Reno to get them fixed (rather than remake ones correctly). It took about two more months, until about June, 2005, until I got them back. This means that I went without teeth or dentures for about 13 Months, from about May, 2004 to June, 2005 (over a year). When they came back with a "hard liner" put in them, they were way too heavy and now even bigger. I could not even get them in my mouth and open my mouth at the same time to eat. I am well aware of how dentures are suppose to fit because I've worn them before, and these were not made correctly, the plate was about three (3) times as thick as it should be and were, in every sense of the word...worthless.

I have basically given up since then trying to get dentures because it does not seem that medical knows what they're doing and does not care. I still am forced to "gum" my food without teeth...and hope to get dentures when I get out of prison soon.

# Appendix 13

**AFFIDAVIT OF:**          **LEROY HENDERSON**
                           27007-177
                           FCI Seagoville  POB 9000
                           Seagoville, TX  77159-9000

---

I, **LEROY HENDERSON, Affiant,** Do Hereby State, Affirm, and Attest, Under
Penalty of Perjury that the following facts are true and correct to the best
of my knowledge.  I further Attest that I am of sound mind, over the age of Twenty
One (21) Years of age, and knowing the difference between the truth and untruth,
that the following is true and correct to the best of my knowledge:

**THAT:**

On May 7, 2005, Saturday, I was playing a basketball game here at Seagoville
FCI and became injurred and my nose was broken. This occurred at about 5:50 P.M. .
I immediately told and saw the Rec Officer and he **called the medical facility.**
After him having talked to the medical officer and explaining my situation he told
me to go directly over there for immediate treatment as my nose was bleeding
very profusely.  I did as instructed.  However when I got there, the doors were
locked.  **It wasn't unitl about three (3) Hours later that someone from medical
came to unlock the doors to let me in even though they had been called** and knew
that I was immediately coming over.  I got in at 8:50 P.M. .  The nurse saw me
and said that there was not anything she could do about my nose or my bleeding
(it was still bleeding profusely at that time as well).. She said the only thing
she could do for me was give me a "lay-in" for about three days and some pain
medicine (ibuprofen). . She also stated that I would be set up for an X-Ray to
see what damage was done.

My nose kept bleeding that night...I could not get it to stop until about
the next day late Saturday. On Sunday my medical condition appeared to stablize
and on Monday, 5-09-2005, I went to the medical facility to talk to them about
my medical situation.  I spoke to Ms. Fernandez and asked her what was her
diagnosis at which point she said "just as long as I can breath I would be
alright".  The next day I was scheduled for my X-Ray.  At about 4A.M. on
Tuesday, May 10, 2005, I awoke and noticed that my nose was bleeding heavily.
So at 6A.M. I went immediately to sick call because **I could not get my nose to
stop bleeding** (it was apparently not clotting or I do not have the ability to
form clots to stop bleeding, perhaps sickle-cell anemia).  I was told by medical
staff, **SCOTT CROW** AND **TODD RIDGE** and Doctor **JOSEPH CAPPS** that it was a nasal
fracture and it would eventually go away.  I accepted this advise and left.
This **bleeding profusely continued all that day and night** and took a toll on me
physically.  The bleeding continued **thru Wednesday and Thursday (5-12-2005)** and
did not clot up or stop.  I was very worried and concerned as well as started to
feel very weak.  **I again went to sick call to try to get help for my bleeding nose**
on Thursday.  Went I went in for my appointment that morning I told **SCOTT CROW**
and **TODD RIDGE** that the bleeding would not stop and I was starting to feel very
sick and weak from possibly the blood loss.  I also explained this to Doctor
**JOSEPH CAPPS** that day as well.  They all seemed to **turn a deaf ear to my medical
needs** and would not provide any care what-so-ever.  I returned to my unit.

My bleeding continued into Friday (5-13-2005) so I again went to sick call
to try and get help as I was feeling very, very sick from the blood loss.
I was seen by a different person that day and I plead with him to get me someone
who could help me from the hospital if no-one here would help me.  He seemed
frustrated by my persistance; he said he would set me **another appointment for**
**Tuesday (5-17-2005)** and that I would be taken to a "real doctor" if the bleeding

had not stopped by then.

However, over the weekend, my condition worsened to the point of me asking my unit guard on Saturday to call the Mess Hall boss to see if they could send me a plate of food, but the Lt. told them I had to walk over there (about a quarter mile away). On the next day, Sunday (5-15-2005) I wrote a note to my counselor in my unit, Mr. Swanson, to please come and check on me since I explained to him about my loss of blood and my condition. He did, and he called immediately for a wheel chair to take me back and forth to the rest room as needed. He said he was told after calling medical staff that the staff said it was just a nasal problem that would go away. But I was able to get permission to be wheeled, by another inmate, over to medical that Sunday. When I got there I saw an "oriental" medical staff member who checked me out (I believe his name was Nguyen). He advised the Lieutenant that I needed to go to the hospital. As they were wheeling me to the back gate in order to be transported by FCI van to the hospital, I fell over on the ground (this is because the wheel chair is broken with a wheel missing and was unstable). When this happened I **immediately threw up a large quantity of blood that had accumulated in my stomach.** At that point they told me to just lay there and they needed to call the ambulance. The Ambulance came and immediately hooked me up to an IV. This was some kind of clotting agent they used as they recognized my anemia and the failure of my blood to clott because after they did that my blood started to clot and the blood loss started to stop.

I was taken to Mesquite Hospital and seen by a Nigerian Doctor. **This doctor said I had developed pneumonia from the blood collecting in my lungs and my skin was yellow and that I needed an immediate blood infusion from the loss of blood. I had lost so much blood that it would take 6 units of blood to be put back in my system.**

**This doctor asked the guards why they continuously let these inmates get so bad before you bring them in....you bring them in almost dead.**

The blood infusion took about Three (3) Days and I was in the hospital all this time. The doctor told me if I had waited a couple of days more before getting in...I would have literally died from blood loss. This was very disturbing because had I not been persistent to try and get help that Sunday and waited for the appointment which was for Tuesday (to see if I would still be bleeding profusely at such time) I could very well ran out of blood and died before then as the doctor stated. This suffering and near brush with death is due to the pure deliberate indiffence of the medical staff and the method which they operate of never providing care to inmates. I am not the only one who has had these types of serious problems.

When I came back from the hospital I went to see Doctor JOSEPH CAPPS about getting surgery for my nose because the hospital specialist said I needed to have it to correct the break so no more damage would be done. He said he would put me in for surgery. However, when I filed my Administrative Remedies (the BP-8 and the BP-9) complaining about the lack of proper care that I had been provided and my near brush with death and the severe loss of blood and the failure of them to properly recognize my anemic blood that could not clot and help me....they denied me surgery. I feel like I am now being prevented from pursuing my due process rights of filing the Administrative Remedies for fear that I am going to be denied further medical treatment in the future for this injury and any other I might get. This is wrong.

DATE: _10-27-05_                    PAGE 2 of 2    _Leroy Henderson Jr._

SIGNED IN PENALTY OF PERJURY AS BEING                    LEROY HENDERSON
TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

AFFIDAVIT OF     **BOBBY JOE BURTON, JR.**
75272-079
FCI Seagoville
POB 9000
Seagoville, TX  75159-9000

---

I, **BOBBY JOE BURTON, JR., Affiant, Do Hereby Attest and Affirm** that the follwoing facts are true and correct to the best of my knowledge, and being that I am over the age of Twent One (21) Years of age and know the difference between the truth and untruth, do solemly affirm and attest that the foregoing is, infact, true to the best of my knowledge:

**THAT:**

On or about July or August, 2004, I went to sick call complaining of dizzyness, headache, earache, and swolen lymph glands under my chin.  I saw Mr. **TODD RIDGE.**  I informed him of all my symptoms.  **He just looked at me, and without any physical evaluation, without any "stethoscope, ear-scope, nose-scope" and without any physical touching of my body or lymph glands...MR. TODD RIDGE "diagnosed" me and said "I just needed to loose weight"** and that is what was wrong with me.  He would not do any further evaluation and I had to leave.
The next day I saw **WARDEN DAN JOSLIN** IN FRONT OF Building 61 when I was going to my GED school.  I stopped and asked Warden **DAN JOSLIN** and told him "Warden there's something wrong with me (I told him of my symptoms) but they won't see me in the infirmery and just tell me I need to loose weight instead of properly examining me".  Warden **DAN JOSLIN** just responded "go talk to them again".
That evening I went back to medical and told them that the Warden had said this. I saw Ms. Castillo.  She just told me that I needed to make sick call the next day.
The next morning I called my mother (because I was very worried about what could be wrong with me and/I could get no medical help here at Seagoville FCI) and told her my medical situation.  My mother called up after this and talked to my counselor Mr. ERICKSON and told him that I was in medical need and could get nobody to see me or attend to my medical needs.  Mr. Erickson called me into his office and told me this and my mom had told them that "if anything happened to me she was going to hold them liable".  Mr. erickson told me that my mom was very upset and asked me "what's the problem?".  I explained the situation.  He said "Burton, I'm going to call medical (and he did) and I want you to go over there." I then went over to medical.  When I got there Mr. **TODD RIDGE** came out and said **"I've already seen you and there's nothing wrong with you!"**  I then went back to my living unit.
For about the next 9 to 10 days I experienced the same symptoms and had alot of severe head pain and ear pain as well as the other symptoms.  The pain got worse and worse and I again tried **to get someone to help me** and went again to sick call.  I saw Mr. "Enriques" [sic] when I got there.  **He examined me with a Blood-pressure meter, throat scope, ear scope, nose scope and felt my glands and exclaimed "HOW DID 'RIDGE' OVERLOOK THIS SERIOUS EAR INFECTION IN BOTH OF YOUR EARS?!"**  I told him.  He called in **DOCTOR JOSEPH CAPPS** who also checked me out and said that I had a very serious ear infection in both ears.  Mr. **Enriques brought the negligence and deliberate indifference of Mr. TODD RIDGE to DOCTOR JOSEPH CAPPS' attention.**  They prescribed a month's worth of antibiotics to me (Bactrim I believe).
My Unit Manager, Ms. ROBINS, became aware via Mr. erickson of me and my medical situation.  She had called up to medical after my mom had called and after RIDGE had refused to treat me and "they [medical] told Ms. Robins that I was "being treated as medically necessary".  **This was, infact, a lie** (see 8/15/2004

**AFFIDAVIT OF BOBBY JOE BURTON, JR.    Page 2 of 2.**

Now I wanted to complain about the total lack of treatment given to me by the medical department and MR. TODD RIDGE so I filed a BP-9 "Request for Administrative Remedy" on 8/24/2004 which is the Form which is to go **directly to the warden.** I gave this to Ms. Robins. About three (3) days later, I was in the chow hall and Ms. Fernanders (sic), whom was the acting director of medical at that time, came up to me and said I need to come talk to her in her office. So later that day I went to her office. She said **"Ridge has alot of patients and he made a mistake---heck, everyone makes a mistake...and he's sorry he made a mistake...and 'everyone needs a second chance'."** SHE HAD MY BP-9 ON HER DESK. This was suppose to have gone to the warden and should not have been on her desk as this was not the proper due process. I said, I got to live here with these people and when I need medical treatment I must be able to get it and she said that Ridge would not do this to other people any more. Ms. Fernanders persuaded me to "cancel" the BP-9. I felt "pressured" like I had to do this because now medical had my BP-9 which should have been handled only by the warden DAN JOSLIN. This was not right.

Ms. Robins called me into her office later the next day and asked me what had happened. I told her and she said "Burton, you let him off the hook after what he did?" She said "if the shoe was on the other foot...he wouldn't do it for you." I told her that I feel that he's [RIDGE] is going to mess up real bad one day and that when that happens, all of the entire medical department is going to have to give account for their failure to supervise these people and for the medical department being just a 'sham'." I told her that I could have lost all my hearing in both my ears because of the sloppy and negligent job that the medical department had done letting me go almost three weeks with my infection getting worse and worse without anybody willing to even check me out. She understood and thought what had happened was not right.

AFFIRMED AND ATTESTED TO AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE UNDER PENALTY OF PERJURY ON THIS, the _6_ Day of October, 2005.

*Bobby Joe Burton Jr*

BOBBY JOE BURTON, JR.

5 INMATE REQUEST TO STAFF CDFRM

ARTMENT OF JUSTICE FEDERAL BUREAU OF PRISONS

| | |
|---|---|
| and Title of Staff Member) Dr Robins | DATE: 8/5/04 |
| oBBy Burton | REGISTER NO.: 75272-079 |
| GNMENT: Orderly | UNIT: 6 Building |

Briefly state your question or concern and the solution you are requesting. n back, if necessary. Your failure to be specific may result in no action being necessary, you will be interviewed in order to successfully respond to your

would like to know when you Called ical what was the out come of Convorsation. ... I am trying to file on dical do to I have wrote them before now they refuse to give proper medical attention. they really calling they self getting k at me for writing them up time. Thank you for your and cooperation

(Do not write below this line)

ON:

oke with Health Services and they indicated are being treated as medically necessary.

| Signature Staff Member | Date |
|---|---|
| Am Robbins | 8-9-04 |

/ - File; Copy - Inmate may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

REQUEST FOR ADMINISTRATIVE REMEDY

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Burton Bobby Joe (LAST NAME, FIRST, MIDDLE INITIAL) 75272-079 (REG. NO.) E6 (UNIT) (INSTITUTION)

**Part A- INMATE REQUEST** I am writing this report because the medical officer u unprofessional and very ruded to me on August 1st 2004. mr. ridge told me that he remember that I wrote him up and I had a common cold and have nothing coming. I told mr ridge that I was very ill and I ha flu like Symptoms he said; I agree, you are fat and out of shape. he I that to be rude and disrespectful. I went back to medical on the 9 or 10th of August 2004. Another physician mr Enriquez examined me i said, he don't know how mr. Ridge over looked my serious ear inf tion in both of my ears. the ear infection was so serious th I had to take a month worth of antibiotics. Because Dr Rid intently refuse to give me medication for my ear infection, I was afraid for my health I called my parent to inform th of my situation. my parents called here to Beckley and the re I would like for some one to look into this matter and check my medical files to varify my allegation

8/24/04 DATE

Bobby Burton SIGNATURE OF REQUESTER

**Part B- RESPONSE**

DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

CASE NUMBER:

ORIGINAL: RETURN TO INMATE

CASE NUMBER:

**Part C- RECEIPT**

Return to: LAST NAME, FIRST, MIDDLE INITIAL REG. NO. UNIT INSTITUTION

# Appendix 14

## AFFIDAVIT OF  GLEN BOLIVER

# 10328-078

FCI SEAGOVILLE    POB 9000
SEAGOVILLE, TX  75159-9000

---

I, GLEN BOLIVER_____, Affiant, Do Hereby Attest that the following facts are true and correct to the best of my knowledge, and being that I am over the age of Twenty One (21) Years of age and know the difference between the truth and untruth, do solemly affirm that the foregoing is, infact, true to the best of my knowledge:

### THAT,

In 2002 I had a severe motercycle accident. I sustained two certain injuries which are subject to this Affidav My right knee is in need of replacement, and my left leg had to have a brace installed on it with attached pins. In December 2002, the brace was taken off and removed. In August 2003, I entered the Federal prison system and was sent to Beaumont FCI where they analyzed both my knee and leg and concluded that I needed knee replacement surgery and also needed to have my leg holes fixed. However, in September, 2004, I was transferred to Seagoville FCI. My left leg, has holes that go down to the open bone from where the pins were attached. These holes are about three-eights inch in diameter. This is a serious condition and has been previously diagnosed as Ostiomylytis which would be infection of the bone marrow and requires a bone graft for this left leg. I am constantly in pain each and every day in my knees and my leg risks serious infection from the open holes.

I contacted the medical unit at Seagoville and saw TODD RIDGE around September, 2004, whom said they would have to get the medical records from Beaumont FCI. These records were never obtained. I continued to complain and TODD RIDGE said I my right knee needed replacement surgery and my left leg, with the open holes, was endangered of getting infected with the open holes to any type of bacteria or infection. Although it took about five months to get this appointment from my complaining, there with TODD RIDGE was another medical person of name unknown at this time. He was apparently the orthopedic specialist. He said the same as TODD RIDGE that the knee needed replacing but that the holes needed to be fixed immediately because of the risk of infection. Because they had lost my medical records, this Doctor requested that X-Rays be ordered and done before he could continue. It took about two months more before a full series of X-Rays were done. I then met with this Doctor and with JOSEPH CAPPS, M.D. after this, and the Orthepedic Doctor said that he could not read the X-Rays which were done here at Seagoville FCI medical center because they were too dark and unreadable. Then, suprisingly, Dr. CAPPS, and the Orthepedic Doctor, said that we just don't need to do anything about the leg because that "the leg would be opening a can of worms we just don't want to get into now". I responded that they had said before that the leg with the holes needed immediate surgery because of the severe risk of infection and that I was constantly in severe knee pain and that they concurred that the knee needed to be replaced after the risk of infection from the leg was taken care of. Then Dr. CAPPS responded "well, if it swells up around that area and you start running a fever then come see me". I then responded "what about my knee and my severe and constant pain that you said had to be replaced to cure that" and Dr. CAPPS and the other Orthepedic Doctor responded "what's your out-date" [out-date being the release date from federal prison]; I responded that it was the year 2019. They responded "with the way things are right now [referring to the B.O.P.] it's going to be awhile". They told me to just use the weight machines and bear it until some indefinate date.

My legs risks serious infection from the open holes, especially with the rampant STAFF INFECTION that is around the Seagoville FCI, and my knee is in constant pain which is very severe at times and I sometimes have much trouble walking. I feel that I have been denied proper treatment of necessary medical care because they did not care and cared more about not going over budget in medical care costs to inmates. This last such conversation with Dr. CAPPS and the other Doctor was about June, 2005. It seems they just dragged everything out to procrastinate and avoid treating my medical needs.

Affiant Saith Further Not.          Date: 10-3-05

NOTARY PUBLIC UNAVAILABLE; Prisoner Rule Invoked and these STATEMENTS AND AFFIDAVIT MADE UNDER PENALTY OF PERJURY.

# Appendix 15

AFFIDAVIT OF    **WALTER WARING**
**15397-045**
**FCI Seagoville**
**POB 9000**
**Seagoville, TX  75159-9000**

I, **WALTER WARING**, Affiant, Do Hereby Attest and Affirm under penalty of
perjury that the following facts are true and correct to the best of my knowledge,
and being that I am over the age of Twenty One (21) Years of age, of sound mind,
and knowing the difference between the truth and untruth, do solemly affirm and
attest that the foregoing is true and correct to the best of my knowledge:

**THAT:**

I arrived at Seagoville FCI on or about September 2003 as a **self surrender**.
Prior to entering I had been diagnosed with a **Hernia** by my family doctor but
entering prison prohibited the needed treatment. On around September 2003,
with then current symptoms of such hernia being and having become very painful
and in great pain, such that if I moved, walked, or lifted something the wrong
way I would double over in pain, I went to sick call. It would also become
extreme pain when I had gas or when constipated and I had to go to the restroom.
In addition to the hernia, I had symptoms (and did have) what is called
a "**Hydrocile**". A Hydorcile is a "inflamation" or something like that on the
male scrotum which is very highly painful. This manifested as a lsrge fluid like
deposit on my right scrotum and whenever I moved the wrong way or bumped into
something the wrong way I had pain which would be the equivelent of a man getting
hit in his scrotum.
I went to sick call on October 2003, I saw Mr. **TODD RIDGE** whom looked at
me and said that "I didn't have a hernia". I found this amazing, in that, I
had already been diagnosed by my family Medical Doctor as having a hernia, and
the pain I was experiencing was not from my imagination. He further stated, that
I did have a "Hydrocile" (this was obvious because it protrudes from the scrotum).
However, he stated that he wouldn't do anything about the Hydrocile because it
was not "life threatening". So he then gave me some Naproxen for pain. I went
back between TEN (10) to FIFTEEN (15) TIMES to medical complaining of these
**medical needs for treatment** up until about May, 2004; all the time complaining
of the intense and ongoing pain---but to no avail as Mr. RIDGE didn't treat me at all.
Finally, on around May, 2004, I got Mr. **TODD RIDGE** to order an ultrasound
when I had gone back one time..which he did. The ultra sound results came back
about three (3) weeks later and showed I had a **5.6 centimeter (2.25 inch)
Hydrocile in the right side of my scrotum**. Even though this was excrutiating pain,
TODD RIDGE said he wouldn't do surgery because it, again, "wasn't life threatenting".
He gave me some more Naproxen.
About June, 2004, I fell and brok my wrist (at least I believed that I had
broken my wrist at such time). I went to medical and saw Mr. WEAVER who wrapped
it up. I went back the next day for an **X-Ray** which was done. **They looked at the**
X-Ray and said that my wrist was not broken.  **THEN...ONE WEEK LATER, AFTER I HAD**
**ALREADY WENT BACK TO WORK AT CMS IN THE INSTITUTION..MEDICAL CALLED AND SAID THAT**
**INDEED-- MY WRIST WAS BROKEN AFTER ALL!** It certainly seemed they didn't know what
they were doing up there.
Then I went to see Doctor **JOSEPH CAPPS** and talked to him about my wrist and
why they said it wasn't broke and allowed me to go to work and work with a broken
wrist and then it was broke after all; additionally I told him about my **hernia** and
about my **hydrocile** as well. He then examined me and said that indeed I **did, infact,
have a hernia, and I had a hydrocile.** He put in to request a surgeon to examine me.

**About Two (2) Months later** in or around July-August, 2004, the surgeion came and I received notice of the surgery being ok'd for the Hydrocile. Doctor JOSEPH CAPPS said that the hernia had been declined but that it would be ok because "they would do both at the same time" so "it wouldn't look like I was getting two different operations--the one was declined". In December, 2004, nearly **ONE AND A HALF YEARS LATER after complaining** I went to surgery at **MESQUITE HOSPITAL.** The surgeon was **DOCTOR "Akura" of the hospital.** They said they did surgery on everything--the hernia and the hydrocile. **No antibiotics or pain medication was prescribed to me what-so-ever** and I was only given the 600mg of Ibuprofen.

When I got back to Seagoville on about December 18, 2004, I was in a lot of pain and bandages from the operation. I got to R & D (Receiving and Departure) at Seagoville FCI and asked for a wheel chair in order to get back to my living unit which was across the compound which was about a half mile away. They said they didn't have one and I could make it. So I had to walk back (very, very slowly) to my living unit on foot and was in severe pain and was still black and blue from the operation. I was never taken to the hospital for any followup.

Two weeks after surgery and after the swelling and black & blue had gone down, I noticed, and felt the pain, that the hydrocile was still there. It didn't appear to have been operated on at all. This was about January 2005.

I went back in January-February, 2005, and saw **TODD RIDGE** and informed him that my hydrocile was still there and I was still in severe pain from it. He said that "that's normal". In **February, 2005,** I sent an **Inmate Request to Staff to Doctor JOSEPH CAPPS** (see enclosed) regarding this. He wrote back that "everything was normal" in such respect and that could follow up in sick call every 30 to 60 days. This sounded absurd to me! I, **again, kept going back to complain of my medical needs and saw both TODD RIDGE** and Mr. Weaver. I was informed that there was nothing they could do because "you need surgery on the hydrocile". --- This, I already knew!

On September 23, 2005, I finally saw the surgeon Doctor "Akura" from the hospital (Mesquite Hospital) when he came here to Seagoville FCI. he examined me and said that, yes, I had the hydrocile and that it was now **4.6 centimeters (about 2 inches)** and it must have surgery. I asked **Doctor JOSEPH CAPPS** about getting this surgery, **again,** and he responded that **it could be up to a year.**

My medical needs have not been met at all, the constant misdiagnosis, and going in circles and begging to get treatment for the severe and constant pain that I am and was in is, I certainly believe, very unconstitutional. I believe that I have been treated with complete and deliberate indifference. This is not right.

SO ATTESTED TO AND AFFIRMED ON THIS THE _7th_ Day of October, 2005, in penalty of perjury as being true and correct to the best of my knowledge.

Page 2 of 2.

_Walter Waring_

**WALTER WARING**

BP-S148.055    **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

FROM

TO:

| TO: (Name and Title of Staff Member) Dr. Capps C.O. | DATE: 2-8-05 |
|---|---|
| FROM: Walter Waring | REGISTER NO.: 15397-045 |
| WORK ASSIGNMENT: Const 3 | UNIT: 6 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

I had surgery on Dec. 17th for a hydrocile
and hernia. I have been to sick call on
this several times. Where the hydrocile was
is larger now and is very uncomfortable.
At sick call they say that is normal. I don't
see why it would get worse at surgery.

---

(Do not write below this line)
*********************************************************************
DISPOSITION:

Residual swelling after
such surgery may persist
for sometime. You should
follow-up by making sick call every 30-60 days

| Signature of Staff Member: J. CAPPS MD | Date: Received 2/8/05 |
|---|---|

Record Copy - File; Copy - Inmate



**U.S. Department of Justice**

**Federal Bureau of Prisons**

**Federal Correctional Institution**

**Seagoville, Texas   75159**

Date: _9 · 29 · 04_

MEMORANDUM FOR _Waring, Walter_
REG NUMBER: 15397-045 Unit: _E_

FROM:                     J. Capps, MD, Clinical Director
                          Chairperson, Utilization Review Committee

SUBJECT:                  Medical Case Review

This memo is to inform you of the findings by the Utilization Review Committee in response to the request
that was submitted by: ___Dr. Capps___, for you to see a specialist in the field of
_Surgery - Hydrocele - Approved_
_J - Hernia - Disapprove_
Your case was reviewed of the merits of it's medical need in keeping with community standards of health
care.

The committee has: _____ Approved          _____ Disapproved

If approved, due to security reason, we can not inform you of the medical trip.

If disapproved, why:

_____ No medical need at this time.

_____ This request is for ELECTIVE MEDICAL CARE, which is not medically needed at this time.

_____ The committee has determined that this medical problem needs further monitoring or further testing.

If disapproved, you have the right to appeal through the Administrative Remedy Process.

cc: Medical File

# Appendix 16

**AFFIDAVIT OF**          **RICHARD RILEY**
16323-180
FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

I, RICHARD RILEY, Do Hereby Attest and Affirm under penalty of perjury that
following facts are true and correct to the best of my knowledge.  I further
attest and affirm that I am of sound mind, am over the age of twenty one (21)
years of age, and know the difference between the truth and untruth and that
the following is true and correct to the best of my knowledge:

**THAT:**

I arrived here at Seagoville FCI on or about March 2003.  I have had hemroids
since I was 15 years old.  Prior to entering prison, around late 2002, I was
advised by doctors from colonoscopy that I should have surgery, but I had to
come into prison and this was unable to be done prior to such.
In my preliminary medical here Mr. **TODD RIDGE** wrote down that I had blood in
the rectum.  In around March, 2005, I had been having severe bleeding from the
rectum area.  I went to the medical department here and saw Mr. Nguyen [sic].  He
examines my rectal area and says I don't have bleeding.  This was very strange,
in that, it was Lt. Bennett who saw blood soaked thru my kackie uniform pants from
thru my underwear and she noticed such leaking to my outside pants.  I had been
starting to experience continued bleeding from the **painful bleeding hemroids.**
**Mr. Nguyen's prescribed treatment was to "drink warm water and exercise".**
I asked to see Doctor **JOSEPH CAPPS** that day and he was "sarcastic" with me
stating that "all you got is hemroids".  I had also lost a lot of weight between
about September, 2004 and March, 2005 **I had lost about 40 pounds (from 205 lbs to
165 lbs) during this period from the continuing daily blood loss.**  This blood
loss would occur whenever I used the toilet and would literally "drain" from my
rectum area.  Over several weeks it would taper off to normal bleeding.
I could not get any medical treatment in any fashion for this painful and
terrible condition.
On about October 10, 2005, I went to use the restroom in my building that
I'm assigned to (Building 53) and start having severe stomache cramps and then
**blood "pours" out with clots from my rectum** area.  I have to flush several times
because of the fluid build up in the toilet.  This is about 6 P.M. .  I then
get up and feel dizzy and lightheaded and then fall down and get back up.  I find
one of the people in my unit, Jerry wells, and he goes to look for the guard.
The Guard calls to the medical facility, the guard (officer Smith) explains to
medical my situation as I was sitting outside the door for  a long period of time
dring this.  At this point in time I passed out because the next thing I remember
is that I was laying on an examining table at medical with two smelling salse
capsules shoved all the way into my nose.  Two inmates had wheeledchaired me over
to medical while I was unconcious.  No medical personel even bothered to come to
the unit after I had passed out nor did any staff officials transport me in
such urgent situation.
When on the examining table with the capsules shoved all the way up into my
nose , one of the inmates who had wheeled me over there and was there inside with
me (Darin) told the nurse "he can't breath with those stuck all the way up his nose".
The nurse pulls them out.  This happens as I am coming to and am gasping for air with
these capsules blocking my nose and airway.  She then tells the other inmates to
leave.

DATE: 11-07-05  _[signature]_    PAGE 1 of 2    _[signature]_

PAGE 2 of 2 ; AFFIDAVIT OF **RICHARD RILEY**

In the room with me were the nurse and **Mr. Poland** whom is one of the general compound supervising guards. Mr. Poland asks me "what did you stick up your rear?" I responded, "nothing, look at my medical charts and you can see what I've been having severe problems with this in the recent past". Mr. Poland and the nurse ask these questions for about 5 minutes. Mr. Poland asks if I have any tatoos. All of this while I am in severe pain and just regained conciousness. This continues until the nurse rolls me over and pulls down my pants and says "oh--this is just hemroids!" She then says **"oh, you need surgery---but this is just hemroids."** Then she says that "she can poke them back in" and starts poking. I scream in pain and she stops. I ask to go to the hospital because it is obvious from this entire series of continued occurrences, and from this event, that I have lost, and continue to lose, a good deal of blood. **She (the nurse) ask if I have any proof--did I have a sample of this blood lost.** This was an absolute absurd question at that time. I tell her the events that have just transpired while I was in the restroom in Building 53 and so she then leaves to go look in the restroom to "verify my stoty". After about an hour she returns. While the nurse had left, ... Mr. Poland stayed there.

While there with **Mr. POLAND he states to me "I wish a real stabbing would happen on this cyardm. I love the sight of blood."** He then proceeds to tell me that it is his last day before his weekend begins and that he gets to go home soon. His conduct and comments are absolutely disgusting and inhumane.

When the nurse comes back she starts unrolling a suppository to put into me. I say..oh no, I'm in too much pain for that. She says.."you're refusing treatment". I ask her to get some kind of proper treatment for these bleeding and ulcerated hemroids protruding from me which continue to give me severe bleeding and continued blood loss. She says she won't. She then says that "I'd better not get another call from you because I'm the one on call tonight". Mr. POLAND gets next to her and says "you do understand don't you?

**The next day** I go to sick call and see **TODD RIDGE** and he says "you're fine--don't worry about it." I tell him that I'm bleeding and need a colonoscopy to see if there is any additional things happening there in addition to the severe bleeding hemroids. I tell him that I need surgery for this problem. **TODD RIDGE says "you're not going to get it..you won't get a conlonoscopy unless the blood loss is life threatening, and you won't get surgery unless it (hemroids) is the size of a watermelon".**

I have complained to the Assistant Warden **MARNE BOYLE** to no avail and cnnot get any medical attention to treat my medical problem which leaves me in severe pain and continued and constant bleeding. This is complete and total deliberate indifference by the B.O.P. and its employees and violates the very standards of American decency. I am very concerned for my health and constantly worry if I have some kind of other internal bleeding which is the source of this but I cannot get any attention or treatment for my medical needs here what-so-ever.

DATE: 11-7-05

SIGNED IN PENALTY OF PERJURY AS    RICHARD RILEY
BEING TRUE AND CORRECT TO THE
BEST OF MY KNOWLEDGE.

PAGE 2 of 2

**NOTE: I went to sick call the next day and blood work was taken. Then he noted internal bleeding on a rectal exam. Then Three days later I returned and it was at that time that the following ensued (following pertaining to the comments referenced next).

# Appendix 17

AFFIDAVIT OF     **ROBERT BRYAN HOLCOMB**
**26107-180**
**FCI SEAGOVILLE   POB 9000**
**SEAGOVILLE, TX   75159-9000**

I, ROBERT BRYAN HOLCOMB, Do Hereby State, Affirm, and Attest under penalty of perjury that the following is true and correct, and that I am over the age of twenty one years of age, of sound mind, and knowing the difference between the truth and untruth, that the following is true and correct:

**THAT,**

I am age 46.  I arrived here at Seagoville FCI (Camp) on or about August, 2002. On or about December, 2003, I started feeling sick with pain and suffering in the abdomen, running a fever, etc..  I reported this pain and suffering and all of my conditions to the medical department and to Mr. "Nguyen" [sic], at sick call. Additionally I reported feeling worse again at sick call to Mr. SCOTT CROWE.

Mr. NGUYEN [sic] **gave me no examination what-so-ever**, did not take any blood-pressure readings, no temperature readings, etc.  However, he issued a prescribed treatment of **"drink warm water".**

Mr. SCOTT CROWE, whom I saw a week later (around December, 2003) at which time I reported to him my continued pain and suffering in the upper abdomen and lower side, accompanied with constipation, and that my condition had not gotten any better, but instead had worsened considerably, including much increased pain on a constant basis. Mr. SCOTT CORWE, at that time gave me **no examination what-so-ever** nor did he take any readings. His "prescription" upon such "non-existant exam" was to "take it easy". He was aware that I had seen Mr. NGUYEN just recently to that visit, and I informed Mr. Crowe that my condition had worsened considerably.  Mr. Crowe then told me to "come see him in a few days if I still had the fever and pain".  Again, no exam or treatment as before.

I went back to sick call around 3 days later I again saw Mr. CROWE.  I again relayed to him my condition of pain and suffering, and that it was growing constantly worse.  My impression was Mr. SCOTT CROWE was a Medical Doctor.  However, again, Mr. CROWE performed **no examination what-so-ever**, and again came up with a "prescribed treatment" of "go back to bed and we're going to get Dr. Duckworth to give you an examination.  This was approximately **two (2) weeks after the initial complaint of my pain and suffering was made known to the medical department** and the above-indicated individuals.

Dr. DUCKWORTH then came out to the Camp that evening and does a physical (contact) examination on me and concluded her diagnosis as **"you have Appendicitis"**. This was approximately 6:00 P.M. .  Then about an hour later, Mr. SCOTT CROWE came to my bunk at the Camp and took me to Mesquite Hospital.  Because I am minimum security (Camp) inmate, a C.O. or guard is not required to accompany me to the hospital as I could effectively go by myself.  In this case, Mr. Crowe chose to go with me.  I was taken to Mequite Hospital and went directly to the Emergency Room and they had, apparently, already been advised or faxed my condition and situation and an Iranian Doctor (believe Dr. "Hokurra" [sic]) did bloodwork and sent for an immediate ultrasound examination.  The technician did the ultrasound and I was admitted to a room at the hospital.  The doctor came back and advised me, and Mr. Crowe, that I had **fluid around my appendix** and said I had a "laranoscopy" and that they were going to have to operate to remove my Appendix.

..... Continued on Page 2 ...  _R.H._

Page 2 of Affidavit of ROBERT BRYAN HOLCOMB

I went to surgery the next morning. They didn't know why there was fluid build up around my Appendix, and advised that the Appendix may have been ok...but they removed it anyway.

From the ultrasound, SCOTT CROWE said (several weeks later in my chronic care work, around June, 2004) that "there's an indication of an **enlarged spleen or liver** and that your Blood Flag Count for AFP registered high **indicating possible liver cancer**". Mr. Crowe and Doctor JOSEPH CAPPS who was also there to tell me this specifically. Capps said he was going to order more bloodwork. This was on or auround June, 2004.

Nothing happened. No blood work was taken. Then I go in around October, 2004 for chronic care (Heppititus) and have blood work done for that and I ask then about the High count for liver cancer or whatever. I saw at this time Mr. Weaver and Doctor JOSEPH CAPPS. They said they were going to order a CT Scan and pelvis. Nothing happens.

every month I would go in to ask about all of these tests which were suppose to be performed because of my mental anguish and concern of having possible liver cancer or some other "undiagnosed" condition which was causing this that't without catching and treating it in a timely manner would be exacerbated by any delay. Each time they would tell me "well it's been ordered but not scheduled".

Then, I became fed up and asked them for a copy of the Order which supposedly had been made originally (around June, 2004) for all of these tests. This was about July, 2005. Then, they took blood on July 2, 2005 and did the chemistry: Lab # 220303, I.D. 26107-180, Fed. Med. Ctr. Clinical Lab, Old Hwy 75 Butner, NC 27509, (919)-575-3900, Lab Supervisor = Bob Latina, showing AFP aa 21.10 Flag HI. At 21.10, Normal showing to be 0 - 15 ng/ml.

I now await on the CT Scan/Pelvis. They kept, again, putting me off, and said that the hospital had not been able to get it scheduled in. Then, finally on February 14, 2006, I sent a "Cop Out" (Informal Resolution Request) to Doctor JOSEPH CAPPS regarding this total failure to properly treat my medical needs and conduct needed examinations. Then I received, on March 29, 2006, a written "Approval Letter" from the Utilization Review Jiomittee Case Review decision signed by Doctor JOSEPH CAPPS stating these tests had been approved. Obviously, now years after they were first required and stated as being medically needed! And again ... no action has taken place. I have asked repeatidly since then about getting these done, and am continually to have anxiety, mental anguish, sleepless nights, and generally emotional distress worrying about whether I have cancer and whether, now, that it has gotten worse during this time and could have been caught earlier had these tests been properly done when they were stated that they were needed ... and I was told they had been "ordered". As of this date, June 12, 2006, these tests still have not been done!

I have been afraid to file a BP-9 and Administrative Remedies on this total lack of proper medical care because it is well known, and I have personally seen, that when an inmate(s) complain about the poor medical or foot dragging or improper medical treatment dispensed by the staff at Seagoville that the staff "retalliates" by a number of means including shaking down the inmate and his personal locker by singling him out, by shipping the inmate away from here which causes strife when the inmate has his family in the Dallas area and has frequent visits and shipping him may place him hundreds of miles away from his family, and they also retalliate in other ways such as locking the inmate up in the SHU (which has 120 degree temperatures in the summer with absolutely no ventilation) under the

CONTINUED ON Page 3........

Page 3 of Affidavit of ROBERT BRYAN HOLCOMB.

---

"guise" of "for medical evaluation", etc. .    This has had and does have
a **"chilling effect"** on preventing inmates from freely pursuing their due
process rights of filing Administrative Remedies (BP-9, BP-10, BP-11).  I
have personally seen this take place.

These acts are wrong and should have never be allowed to occur.  I am
attaching herewith a copy of the Federal Medical Center Clinical Lab Report,
My Cop-Out dated February 14, 2006, the Approval Letter from Doctor Capps dated
March 29, 2006, as a part of this Affidavit evidencing the facts recited.

I further authorize that all my medical records may bee released if
needed to document or prove any improper procedures or treatment or deliberate
indifference of Seagoville B.O.P. staff in the course of litigation against
them, the B.O.P., and the United States.    My signature below shall also
be authorization for the release of all available medical records of mine
which is maintained by the B.O.P. to the attornies for the Plaintiffs in
the cause of action JOHN M. BEAIRD, et. al. vs. HARLEY G. LAPPIN, et. al.
to be released to such attornies or Plaintiff party prosecuting said
litigation.


AFFIANT SAITH FURTHER NOT.



DATED THIS 6-12-2006 DAY OF JUNE, 2006.



                                        _Robert Bryan Holcomb_____
                                        ROBERT BRYAN HOLCOMB



_JB Deese_____
(Witness)



                        PAGE 3 of 3

# FEDERAL MEDICAL CENTER CLINICAL LABORATORY
### OLD HIGHWAY 75
BUTNER, NC 27509

Laboratory Supervisor:    (919) 575-3900    Page: 1 of 1
Bob Latina    Printed: 07/22/2005 @ 18:11

============================================
FINAL REPORT
*** SENSITIVE - LIMITED OFFICIAL USE ***
============================================

Name: HOLCOMB. ROBERT          Lab #: 220303          ID: 26107-180

Test          Result                    Flag          Reference Range/Units

## CHEMISTRY

AFP          aa    21.10                    HI          0.00 - 15.00 ng/mL

*CT scan abd./pelvis ordered!* (handwritten)

**REVIEWED**

JUL 25 2005

A. S. DUCKWORTH, MD
FCI SEAGOVILLE, TX

aa  This AFP test is approved for oncology
    purposes only.
          Legend
High = HI  Low = LO  Critical = CR  Abnormal = AB

ID: 26107-180                      DOB: 01/01/1900  Age: 105y  Sex: M
Name: HOLCOMB. ROBERT              Lab Accn: 220303
Ordered By: DUCKWORTH                              Reviewed_____
Collected: 07/21/05@ 06:18         Location: Seagoville FPC

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| ~~TO~~ FROM: (Name and Title of Staff Member) Dr. Capps | DATE: 2-14-2006 |
|---|---|
| ~~FROM~~ TO: Robert Holcomb | REGISTER NO.: 20107-180 |
| WORK ASSIGNMENT: Powerhouse | UNIT: FPC S1004L |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

Somehow I've been dropped from cronic care and
havn't gotten bloodwork since the middle of 2005.
I have low platelet count of 61 and high count
for APF 21.10. Plus, have ordered a CT scan
of my pelves for enlarged liver or spleen that is
nearly a year old and I havn't been yet.
They've known about this since Nov. of 2003
when I had appendix surgery at Mesquite
in 2003. I feel like they've put me on the back
burner and I need to keep up to date on this.
I'll have no insurence when released so I need all the help I
can get. Thank you Robert Holcomb

(Do not write below this line)

DISPOSITION:

① You are still in Chronic Care clinic

② We discussed that you will be
considered for further testing
for your Hepatitis C this date, but
that treatment is not indicated given current
information and protocol

| Signature Staff Member J. CAPPS MD | Date Received 3/16/06 |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94


Printed on Recycled Paper



Date: 03-29-2006

Inmate Name:   Holcomb, Robert

Reg. # 26107-180

Unit:   *CAmP*

RE:     Utilization Review Committee
        Case Review decision

Dear patient:

     Your request was reviewed and you have been approved for the following:
\_\_\_\_\_  **Institution issue NON Steel Toe Shoe (low quarters)**

\_\_\_X\_ Your case was reviewed and approved.  your procedure or appointment will be scheduled
accordingly.

\_\_\_\_\_ Your case was reviewed and will need a close follow up by your primary care physician

\_\_\_\_\_ At this time your procedure is on hold, and re-submission of the request will be
considered if  medically indicated.  Please watch call out.

\_\_\_\_\_ Your case was reviewed and it is considered an elective procedure that can wait until you
are released from federal custody. The request for the procedure is denied. We will
continue to monitor and provide treatment as necessary.

\_\_\_\_\_Other_____

Dr. J. Capps, MD          *J. CAPPS*
Clinical Director
FCI Seagoville, TX

cc: Medical Record

# Appendix 18

**JESUS ANDRADE, No.:** 12006- 179

Against the advice of private physician, B.O.P, without permission, proceded to remove stabilized, tissue encapsulated bullet in head, where I had no symptoms or seizures. This resulted in seizures occasionally and severe when not provided medication, which occurred. **JOSEPH CAPPS, M.D., refuses to provide medication even where most recent Mesquite hospital physician ordered such to be given.** This is a denial of prescribed medical treatment by the operating physician by Doctor Capps and the B.O.P. . Most recent **seizure occurred the week of December 10, 2005, on There was no emergency medical staff AVAILABLE EVENINGS. NO DOCTOR AVAILABLE.** My temperature **reached 106 degrees farenheit, and was only held down from getting higher by a guard, Mr. Fraser insisting on ice and a towel.** Transport out of the building from the beginning of the seizure **took approximately 35 minutes. The medical cart was broken with a flat tire.** Inmates had to help carry out of the compound to a waiting ambulance. **B.O.P. tried to coerce to sign a release in order to recdeive emergency medication even though vision is poor, and especially poor in that type situation!.** This is grossly inhumane treatment and unconsbitutional!

**DATE:** 12-23-05

JESUS ANDRADE

**RANDALL CLARK, No.** 11443- 078

Have untreated arthritis with pain. Likely bacterial ulcer occurred in the summer 2005 with severe vomiting and nausea and pain. Although medication controls nausea and vomiting, have never been thoroughly diagnosed to include the bacterial basis form of ulcer. All I'm given is Tylenol for the pain. This is not adequate arthritis treatment and none has ever been done. Tylenol at high doses is dangerous to the liver. There appears to be no plan for arthritis treatment or antiinflamitory treAtment or any variation of pain control or treatment plan.

**DATE:** 12-22-05

RANDALL CLARK

**WILLIAM WATSON, No.** 78794-080

Untreated severe testical inflammation and swelling in 2006 Reported this dangerous and debilitating and urgent problem is the summer of 2005. T was left to suffer on the yard mowing maintenance detail for many months and **never treated.** Medical said they would have it diagnosed, but never did. To date - I still suffer, including now **severe swelling and enlargment about three times normal size. Need help!**

Date: 12-22-05

William Watson

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DEC 2 9 2006

FILED

06 2268 30

# Appendix 19

The Office of Professional Responsibility
United States Department of Justice
20 Massachusetts Avenue, N.W., Suite 5100
Washington, D.C. 20530
Attn: Mr. H. Marshall Jarrett, Counsel

Dear Sirs,

I hope, after reading the attached accounting, you will agree with me that the dental department at FCI Seagoville should be held accountable for the gross neglect and irresponsible manner in which my treatment has been handled. I am suffering because of the inept treatment I have received. I desperately need your influence to champion my cause to the Bureau of Prisons. FCI Seagoville should provide the services needed or allow me the opportunity to seek real professional treatment outside the confines of FCI Seagoville. I am at the camp facility and would gladly obtain my own dental treatment if provided the opportunity rather than lose two teeth. I understand the Bureau of Prisons has a budget that is strained to the max. Wrongly, though, the medical and dental shortcuts are now becoming more and more common because of these financial shortages.

Thank you for your time and interest.

Sincerely Yours,

H. Wayne Griffin
31335-177
FCI Seagoville
P.O. Box 9000
Seagoville, TX 75159-9000

06 2268 FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Complaint against FCI Seagoville Dental Department

The dental department of FCI - Seagoville has been woefully derelict in the care and treatment of two cavities found in November of 2005. At that time I was examined by Dr. Downing and cavities were found under the crowns of teeth #18 and #19. He told me I would be placed on his list for work to be done. In June of 2006 with no treatment having been received, the pain in that area was becoming more extreme. I went to the dental facilities but Dr. Downing was out that week so I was seen by a Dr. Baker. At that time, Dr. Baker informed me she didn't do that kind of "fancy work" but she would pull tooth # 19. I declined having the tooth pulled because a great deal of care and expenses had been placed in the crowning of the tooth. I was going to come back to see Dr. Downing because he had already explained before that he would pop the crowns on both teeth, repair the cavities and reseat the crowns on each tooth. However, before I could see Dr. Downing I was transferred to the Seagoville camp. The inmates at the camp are only seen by Dr. Baker. I once again approached Dr. Baker and again she told me she would only pull the tooth. So again I wrote to Dr. Downing pleading for his assistance. I was shortly thereafter instructed to report to Dr. Baker for x-rays. At that time I was again told that she would only pull tooth 19. She also said that she did not see anything wrong with tooth #18. Both Dr. Downing and the hygienist, Lisa, discovered the cavities in both the #18 tooth as well as one in the #19 tooth the previous November. If I was seen by my personal dentist both teeth would have been treated and saved in November of 2005. I wrote again to Dr. Downing at the end of August, 2006. Finally, in the first week of October, I received a response dated 9-8-06 even though it was not delivered to me for a month. The response was handled exactly the same way that everything else has been regarding this matter. Dr. Downing wrote that tooth "#18" would need to be removed because of the x-rays. However, Dr. Downing has not seen my x-rays as of the dated of this filing. The x-rays are kept in my file at the camp where I am located. The #18 tooth has a small cavity on the outside at the gum line under the crown. Tooth #19 appears on the x-rays to have a much larger area of decay. However, the tooth could be and would be repaired if seen and treated by a professional dentist. The removal of two repairable teeth is just wrong. It is also against the basic fundamental beliefs of the American Dental Association members. Better services are available in third world countries than are provided at the FCI Seagoville Camp.

# Appendix 20

## AFFIDAVIT of JOHN KILLIP
04292-064
FCI Seagoville   POB 9000
Seagoville, TX   75159-9000

I, JOHN KILLIP, Affiant, do hereby state, affirm, and attest under penalty of perjury that the following is true and correct to the best of my knowledge. I further affirm and attest that I am over the age of twenty one (21) years of age, of sound mind, and know the difference between the truth and untruth and that the following is true and correct to the best of my knowledge:

THAT:

I have repeatidly gone to medical requesting a hearing aid. I have a hearing problem and it is so bad that I have to sit out in the main area of our building trying to hear the intercome speaker that announces the visits and have frequently almost missed my visits because I cannot hear my name called. This is further aggravated by the extremely high noise level that is constant within our living unit because of the massive overcrowded conditions.

However, when I have requested to be tested for my hearing at medical they have repeatidly informed me that they have no way to test me here for my hearing because either the machine is broken or they do not have one. I have asked to be sent out to have my hearing tested so I can get a hearing aid so I can hear but have repeatidly been denied this as well. It is very difficult not being able to hear properly in this enviornment. They should have working equipment or fix it or send people out to outside facilities for proper medical care when they are unable to provide the most basic of medical tests and care. This violates my constitutional rights to proper medical care and further affects my safety.

DATE: _11-13-05_

_[signature]_
JOHN KILLIP

FILED
DEC 29 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Appendix 21

DECLARATION:    STATE OF TEXAS

COUNTY OF DALLAS

### AFFIDAVIT

I, TERRY BRAXTON #04292-078, being of sound mind, over the age of Twenty One (21) Years of age, and having personal knowledge of such, do hereby attest, affirm, and state, under penalty of perjury, that the following is true and correct

THAT:

Between the period of on or about June, 2006, to October, 2006, I have been repeatidly requesting to be medically attended to numerous times with no avail and no treatment. I was taken off my heart medicine and prescribed some other type which caused severe reactions. B.O.P. officials were not responsive in any manner regarding my reactions to such new medication and the failure of the new medication to treat my severe heart condition.

On or about October 17, 2006, after already having requested medical care to no avail, I passed out and fell while going to the restroom. Other inmates witnessed this and kept diligent documentation regarding such. At approximately 10:15 P.M. (15 minutes after I had passed out) the Nurse (Ms. GIFFORD) finally arrived; she was in an unconcerned and flippant attitude. At 10:20 P.M. GIFFORD attempts to have me lifted off the floor and put onto a wheel chair. This is without any physical or exam what-so-ever or inspection for neck or back injuries from the fall. I advised her I was having severe chest pains, pains in my back, arms, and head and requested to be seen immediately by a doctor and to go to the hospital for emergency care at once. At 10:28 GIFFORD finally decides to take my blood pressure (BP). On her first attempt it registered 144/106, then she did another attempt and it registered 160/140. At 10:30 P.M. GIFFORD attempts to get an EKG on my heart ... she hooks me up to the EKG machine and then fiddles with it for awhile, but **the batteries on the EKG Machine are Completely Dead!** It's a good thing I didn't need to have the "defibulator" used on me (for heart attack victims) because the EKG machine which is necessary to defibulate someone in order to read the heart rythems would be completely useless! I was suffering from some kind of heart ailment, although. Then at 10:32 P.M. GIFFORD takes another Blood Pressure reading, it was 153/93. Then she says she "needs to call the doctor". Gifford then leaves me **unattended** for approximately 30 minutes until 10:58 P.M. when she returns. At approximately 11:00 P.M. the EMS finally arrives. They are told the EKG machine was broke, etc. They immediately take me outside into the ambulance.

They then take my Blood Pressure. **The doctors and the EMS personel all** later stated that the Nurse (GIFFORD) did not know how to properly take blood pressure and was doing it completely wrong because my blood pressure at the time (taken in the EMS Ambulance) was 37/92! The start emergency treatment on me and administer IV's and state that my blood pressure is life threatening low and they cannot transport me to the hospital until they are able to stablize my condition as I also may have a heart attack. They are able to bring my blood pressure up enough to emergency transport me to the hospital where I spent the next 3 weeks in the hospital because of the complete inadequate medical care system that I am and was subject to.

I was later prescribed medication that I should have already been on for my severe heart condition. Fludrocartisone acetate 0.1 mg Tab. The doctor at the

*T.W.B.*

DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

hospital told me that what the B.O.P. had me taking was useless and should never have been prescribed. I was later told by one of the Physician's Assistant after I returned to Seagoville that the medication I must have for my heart was not being issued by the B.O.P. because it is too expensive; he further stated that another Physician's Assistant knows that two other people here at the camp (of 160 people) should also be prescribed this medicine, but that the other Physician's Assistant is going to let them die, or whatever, and not prescribe it because it costs too much. This is not right!

The health care system is completely inadequate within the B.O.P. and at Seagoville FCI and is frought with Deliberate Indifference to the lives of human beings. Ms. GIFFORD left me completely unattended when I had life-threateningly low blood pressure and immediate need for heart treatment for over a half hour. Further, to take over one hour to have emergency treatment even arrive or made available is inhumane and violates the most basic standard of medical care in a civilized world. All of this is not right.

DATE: NOVEMBER 27, 2006


TERRY BRAXTON, 04292-078

# Appendix 22

INTENTIONALLY LEFT BLANK

# Appendix 23

**AFFIDAVIT OF**

**RONALD KRUEGER**

**09361-078**
FCI SEAGOVILLE
POB 9000
SEAGOVILLE, TX  75159-9000

I, **RONALD KRUEGER, Affiant,** Do Hereby Attest, Affirm, and State under penalty of perjury that the following is true and correct to the best of my knowledge. I further state and affirm that I am over the age of Twenty One (21) years of age, of sound mind, and know the difference between the truth and untruth, and that the following is true and correct to the best of my knowledge:

**THAT:**

I am aged 41 years of age. Prior to entering incarceration for the offense of "Felon in Possession" of a gun, which occurred by me having owning and possessing a gun on my own ranch and having to defend myself and ranch against intruders. I had had a prior crime many years earlier in my youth which made me a felon in possession

Prior to entering federal prison, I had obtained treatment for my severe case of **psoriasis** through **ultraviolet light treatment** (**"puma treatment"**). This is basically laying in a tanning bed type situation for about twice, sometimes three times, per week. This kept the disease and its painful effects when it progresses extensively under complete control without need for any medication.

Upon entering Federal prison, I first went to Three Rivers FCI where, instead of "tanning bed treatment" they gave me a pill called **METHOTREXATE SODIUM.** They however, told me that they could not, nor could I take, this medication **for period of longer than one year because it could damage my liver** if so done.

I came to Seagoville FCI in around May 2003, after approximately 8 months at Three Rivers FCI. Once arriving here I saw medical and was concerned about keeping my painful and severe psoriasis under control. After **waiting a very long time, medical finally sent me out to see a specialist, Demotologist Doctor Gardner.** She examined me and prescribed 10 pills of the Methotrexate for a short period only until I could get the severe condition under control. She advised that such medication **could only be safely continued for a very short period because of the potential to cause severe liver damage.** These pills (methotrexate 2.5mg) had to be taken all at once (10 pills) each Friday. She indicated that I had to have special shots or ultraviolet treatment after this short duration of taking this medicine and told medical services such prescription.

These pills made me extremely sick all the time when taking them. It would cause upset stomache, nausea all the time, I would throw-up at least two times a week, I would have constant flu-like symptoms, as well as the depressing of my immune system.

Then approximately 1 year later (2004) because of continued physical pain I finally was sent again to see Doctor Gardner. **When Doctor Gardner found out that I was still being given METHOTREXATE by the medical staff & B.O.P. -- she became furious and said to them as well as prescribed that I have shots in** ...

AFFIDAVIT OF RONALD KRUEGER  pg 2

---

in the liver.  Doctor Gardner specifically prescribed that **I not be given METHOTREXATE pills but instead prescribed a shot thearpy.** she additionally ordered a Liver Biopsy.

When I came back to Seagoville facility, about the next week I went to medical and spoke to **DOCTOR JOSEPH CAPPS AND TODD RIDGE.** I asked them about getting the shots that **the doctor had prescribed for me to take.** DOCTOR JOSEPH CAPPS looked at me and plainly stated **"you can either keep taking the pills of suffer".** This was around Nov-Dec, 2004.  I argued with him and Ridge, and CAPPS told me to get out of his office.  **DOCTOR JOSEPH CAPPS** in the process stated to me **"why should the B.O.P. spend all this money on you to make you feel better when you won't be able to afford the shots when you get out".** This was appalling because for one, he does not know that I do not have medical coverage or cannot afford my own care when I get out, or infact, that instead I could restart taking the ultraviolet treatment that I had taken before I came in, like I was doing previously, without having to resort to strong medication or shots-- but this ultraviolet treatment (as simple as it was) was refused to be provided to me by the medical staff and the B.O.P.  Further, DOCTOR JOSEPH CAPPS was aware of the **pain and suffering** that I constantly went through with my severe cases of psoriasis which caused my skin to constantly hurt all over my back, arms, legs, and as well caused me to have extreme trouble sleeping.  DOCTOR JOSEPH CAPPS AND RIDGE **continued to issue and prescribe me METHOTREXATE against the Specialists, Doctor Gardner's, specific instructions and prescription not to, and to have me take the shots instead or another form (ultraviolet) of treatment.**

About the Spring of 2005, I went back to the specialist, Demotologist Doctor Gardner.  **Again, she was appalled that the B.O.P. was continuing the pill treatment of methotrexate** and indicated she was going to write a stern letter to DOCTOR CAPPS about the failure to follow the prescribed treatment.  She indicated that the Methotrexate **WAS KILLING MY LIVER.**

After returning to Seagoville, they finally gave me the shots for about 12 weeks (perhaps because of the pressure from Doctor Gardner and them worrying about liability).  The shots were to be given in a series-- 12 weeks of shots, 12 weeks without shots, then 12 weeks again with shots, alternating like that. However, after I had completed the first cycle-- 12 weeks on and then 12 weeks off, the medical department **put me back on the "outlawed treatment" of taking the METHOTREXATE again.** When I went back to Doctor Gardner after persistent complaints after having had to restart the MethotrexaTE TREATMENT after about 6 to 8 weeks of it, when I should have instead have been ~~as~~ at such time the shots, **DOCTOR GARDNER "blew her top"** and said **"NO WAY, YOU HAVE TO GET OFF THE METHOTREXATE BECAUSE YOUR LIVER IS NOT GOING TO HOLD UP!"** She then wrote another stern letter and prescription to DOCTOR JOSEPH CAPPS and MR. RIDGE. regarding such.  She also ordered that another Biobsy be done.  (Both biobsies were done by Dr. Wadd).

*R. ss V*

AFFIDAVIT OF RON KRUEGER;  pg 3 of 3

Upon my return to Seagoville and I asked both **MR. RIDGE and DOCTOR JOSEPH CAPPS** about getting the shots or another form (ultraviolet treatment) of proper medical treatment, as the Doctor had specifically ordered instead of methatrexate, JOSEPH CAPPS and MR. RIDGE both told me that "you can either keep taking **the METHATREXATE or suffer -- your not going to get the shots or any other type of treatment".** This was very upsetting because that meant I either had to endure constant pain and suffering or risk continued damage to my liver and body.

The biopsy came back around October 2005, and **MR. RIDGE TOLD ME THAT I NOW HAD "BRIDGING OF THE LIVER".** After constant requests to go back to the specialist, Doctor Gardner, because of the test results, I went to see her around December, 2005. **AGAIN she could not believe that the medical services section of the B.O.P. had me (then) continuing to take and prescribe the methatrexate -- even after the bridging of the liver damage which was severe now had, and was, continuing to occur.**

Doctor Gardner, who is located in Garland, Texas around Beltline and Kingsley, then stated "what they're doing to you is wrong". "If you need any help in pursuing this with the court or litigation -- I'd be happy to testify; they have damaged your liver now".

Additionally, as blood levels of liver function must be monitored through monthly blood taking, monthly blood taking was also originally ordered by Doctor Gardner. **Since around October 2005 to now (almost 3 months) I have not even had my blood taken** as is suppose to be done to monitor my liver ability to function.

I believe that these B.O.P. personell and the B.O.P. like to see people like me endure **pain and suffering** with complete **deliberate indifference.** And when it gets to a certain point -- they would just prefer that we die off and not have to bother with us any more. This is completely wrong, immoral, and greatly unconstitutional. I am not a hardned criminal. I had a crime when I was young which precluded me from even possessing hunting guns on my ranch. I broke that law when I had a firearm on my ranch to protect my family and property from intruders. I was sentenced to five years for such. Even though I believe that that type sentence is unrightous for such type situation, it in no way gives the B.O.P. or its employees the right to completely turn a deaf ear to my medical suffering and continue to harm me by giving me a medicine that they know will, and has, irreperably damaged my liver beyond repair. This is not only unconstitutional-- but I believe that it is criminal. **HELP!**

DATED ON THIS THE 4th DAY OF JANUARY, 2006.

*Ronald Krueger*

pg. 3 of 3                    RONALD KRUEGER

EVIDENCE OF CORPORAL PUNISHMENT

AND

LIVING CONDITIONS

AND

EFFECTS OF MASSIVE OVERCROWDING

# Appendix 24

AFFIDAVIT OF WILLIAM NAKAZA, 16717-179 FCI Seagoville

I, WILLIAM NAKAZA, do hereby state, affirm, and attest that all of the following is true and correct and that I have personal knowledge of these facts, and that I am over the age of twenty one years, of sound mind, and knowing the difference between the truth and untruth state the following is true and correct:

THAT:

I came to Seagoville to serve a short sentence. I was recently was in Iraq, serving in the U.S. Army. I was severely injurred while on regular patrol while in Operation Iraqui Freedom in 04-05. This injury occurred from a remote-detonated road-bomb while I was in the unit Humm-V. I had tendons severed, nerve damage, along with other injuries. I relate this as it is pertinent to my experience here at Seagoville.

On or about June 29, 2006, I overslept in going to my job duties. I was immediately placed in Building 9 (SHU) to await a hearing. I spent 32 days in such location. The conditions of the cell (although made for one has two people in it 24 hours a day locked-down). This cell was inhumanely hot. Over 100 to 110 degrees 24 hours a day. I went from weighing 178 pounds to 162 pounds (which my body mass at my young age is mostly muscle with little fat, thereby making this loss very significant). This occurring in the 32 days there in the extremely inhumane conditions. There was no ventilation what-so-ever as the windows had been sealed shut with a metal plate, and there was no forced air ventilation into the room. Further, the walls rediated intense heat because of the complete lack of ventilation and because of the sun radiating on the building. I sufferred suffering from the heat and lack of air. Compared to Iraq with being in a flak jacket, this was much worse. We never even made the prisoners of war endure these conditions. I could not breath and felt many times there like I was sufficating because of the heat, lack of air circulation, and lack of ventilation. We were given only a few cups of ice during the day which didn't last long each time. I could not sleep during the nights because you never stopped sweating. I informed the guards of all of these conditions to no avail.

Additionally, another inmate from my camp, Mr. BOBBY COX was in the cell when I got there. He had already been there for one month for having a cell phone. He did not look the same. He looked very physically stressed and in "bad" condition. He had lost what easily appeared to be over 20 pounds from the constant heat and sweating. More concerning was the lack of medical treatment he wasn't receiving as he had sat on the stool of the steel desk which should have been bolted to the wall but was not and the whole table fell over on him injuring his back. Cox was in constant pain and suffering from sharp back pain, numbness in both legs, not eating from the intense pain in combination with the constant heat over 100 degrees and profuse sweating and total lack of air ventilation. He repeatidly asked for medical treatment from the guards, the medical personel whom visited, and Warden Boyle whom also came to the door at one point and was knowledgable of his complaints and condition. After complaining for several weeks, the medical dept. finally gave him only 275mg of naproxen -- nothing to what he needed, and having no effect for the condition he appeared to be because of his back injury. He was in constant extreme pain.

Mr. Cox asked repeatidly for an Administrative Remedy Form (BP-9) in order to claim his grievances on his lack of medical care and the inhumane conditions in the cell of Building 9. They did not provide him one. Finally after several weeks, they gave him a BP-9; this being conveniently past the time allowed to properly file a BP-9 when the cause of action accrues.

Although the staff, including the warden, were aware of these conditions within the building and cells, and of the suffering of the occupants because of the inhumane conditions, and were aware of Mr. Cox's failure to receive any proper medical care, they did nothing except were conveniently "ignored by these parties".

This totally inhumane treatment is why I referenced my time spent in Iraq because the conditions that our prisoners were placed in there, are alot better and humane compared to the conditions that I have had to experience here. These conditions are nothing short of CORPORAL PUNISHMENT -- that which we were prohibited from metting out in any form or fashion to the POW's in Iraq. This is absolutely wrong and inhumane.

AUGUST 4, 2006

WILLIAM NAKAZA

# Appendix 25

**AFFIDAVIT OF**     **THOMAS SCHULZE**
33165-177
FCI Seagoville   POB 9000
Seagoville, TX   75159-9000

---

I, THOMAS SCHULZE, Affiant, Do Hereby state, affirm, and attest that the following facts are true and correct to the best of my knowledge.  I further attest that I am over the age of twenty one (21) years of age, of sound mind, and know the difference between the truth and untruth and that the following is true and correct totthe best of my knowledge:

**THAT:**

I arrived here at Seagoville FCI in July, 2005, to begin serving my sentence.  When I got here I was told that I was going to be sent to the "SHU"-- not because I had done anything wrong---but because there was no bed space on the compound.  Hence, I went to be celled in the SHU (Special Housing Unit).  I spent approximately six (6) days there in "Building 9" --the SHU.  While I was houlsed there, my cell consisted of aproximately 50 square feet of total space, most of this space being taken up by a bunk bed and an in-room toilet/sink; and a small metal desk.

These housing conditions were deplorable and plainly unconstitutional.  There were three (3) of us housed in this same cell 23 hours per day for every day.  Since it was so crowded, where even two (2) people in this size room 23 hours per day would itself ḥe beyond what should be constitutional, there was absolutely no room to stretch out.  Once more---**I had to sleep on the floor (mattress laid on the floor next to the filthy toilet).**  Because I slept on a mattress which was put on the floor--and it was right next to the filthy toilet, **every time someone would go to the toilet -- the urine would splash down onto my mattress and on me.**

We were provided no toothbrush or toothpaste for four (4) days even though it was repeatidly requested.  Further, there were no hygine products (i.e. soap) provided either.  Consequently, after using the restroom, there was no way to clense or sanitize your hands before eating.

There was absolutely **no ventilation** at all in this cell.  Temperatures in July within the cell **must have easily reached 105 degrees** and remained constantly extremely hot without any fresh air or ventilation at all.  I constantly sweated all the time and could not sleep in this type of "corporal punishment".  Further, since showers were only provided on Monday, Wednesday, and Friday it was impossible to obtain any relief from the profuse sweating from the constant heat and lack of any ventilation what-so-ever.  My sheets remained constantly **soaked with sweat**...and we were not provided with a new set of linnen or sheets at all...the same sweat-soaked, and urine-splattered sheet had to be used by me while I was there.  Because of these extremely inhumane conditions I got little or no sleep for the entire period and I lost a good deal of weight from the continued sweating and intense heat for such prolonged period

DATE: 11-14-05                      _Thomas Anne Schulze_
                                    THOMAS SCHULZE

FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

06 2268

# Appendix 26

**AFFIDAVIT OF** DONNELL ALLEN SR.

#31264-177

FCI SEAGOVILLE   POB 9000
SEAGOVILLE, TX   75159-9000

   I, **DONNELL ALLEN SR.**      , Affiant, Do Hereby Attest that the
following facts are true and correct to the best of my knowledge,
and being that I am over the age of Twenty One (21) Years of age
and know the difference between the truth and untruth, do solemly
affirm that the foregoing is, infact, true to the best of my
knowledge:
      **THAT,**
   I was sent to Building 9 (SHU) during the period of approximately June, 2005,
and was there for **7** days. While I was there, I was housed in a cell which was
very tiny and made only to hold one inmate, however, three (3) inmates were housed
in my cell. I had to sleep on a mattress on the floor which was next to the open
toilet. The others could not go to the toilet unless they walked on my "bed". Then,
I moved my mattress next to the door...but since the room was not wide enough for
my mattress positioned that way, it was too short, so I had to sleep and lay "balled
up" because I couldn't lay flat all the way because there was not enough space. It
was very very crowded in that small cell. We had to stay in there 24 hours a day
except for when they allowed us to go to the exercise area for one (1) hour per day
on weekdays.
   This area and cell was very, very hot. Probably 105 degrees. It has no ventilation
of any fresh air at all. Although there is a window..it is closed up by a metal plate
and there is no air that is able to get in from it what-so-ever. We are only allowed
showers once every third day. So when you take a shower...it does not good because you
come back to the very hot room and start sweating again. Because of the intense heat and
lack of any ventilation in the cells, you sweat 24 hours a day, seven days a week. The
mattress must be constantly turned over because the bed wreaks with sweat. They only
provide fresh sheets once per week. Such conditions are very inhumane.
   When I was there, around July  , 2005, they brought new transferred inmates into
the cells because there was not any room to house them on the main compound (as usual).
They made these new transferrees stay there in these type conditions. One of the new
transferees, an older man whom brought with him many medications was put in a cell with
two other people. It was so hot in his cell that at about 7:00P.M. that night he passed
out and fell and hit the floor with a large "bang". The others in his cell yelled for
help to the guard. They came and took him out for about 30 minutes. Then they brought
him back, although I heard the guards who thought he should be sent over to the J1 jail
unit where it is air conditioned, the Lieutenant said no, he has to stay there. Then
about an hour later the guy passed out again and the other cell-mates had to yell for
help again. All this because of the very hot heat and lack of ventilation there.
The guards, then the second time, then got a fan and opened the food-door and aimed
the fan into this guy's crowded cell instead of taking him to medical or taking him
to a cooler location.
   The conditions in these cells are very inhumane in the crowding two and even three
people in there...especially making one sleep on the floor next to a dirty toilet. Also
because they are not ventilated and get very, very hot all the time.

**Affiant Saith Further Not.**         Date: 9-26-05

FILED
DEC 29 2006
Y MAYER WHITTINGTO
U.S. DISTRICT
OC 2268

          Donnell Allen, Donnell All
                                    ,Affiant

# Appendix 27

**AFFIDAVIT OF   LARRY FRIEND**
08826-062
FCI Seagoville   POB 9000
Seagoville, TX   75159-9000

---

I, **LARRY FRIEND**, Affiant, affirm, attest, and state under penalty of perjury that the following facts are true and correct, and that further, I am over the age of Twenty One Years of age, of sound mind, and know the difference between the truth and untruth, and that the following is true:

**THAT:**

I arrived to Seagoville FCI on or about November 10, 2005 (Thursday). Upon my arrival, because there was no space to put me on the coupound I was forced to be housed in BUILDING 9 (the SHU). The cell was no more than approximately 60 square feet, contained a bunk bed, a small desk unit, and a toilet-sink unit -- all of which took up part (a majority of) the 60 square feet of total living space.

There were **three people** forced to house in this tiny area. Because there was no space --- **I was forced to sleep on the floor on a dirty mattress next to the filthy toilet.** Everytime someone went to the toilet, the urine and material splashed on my bedding and mattress. In fact, **the toilet was leaking at the base and water leaked throughout the floor area.** We used a wet towel to try to keep soaking up the water and wringing out the water so the towel could absorb more of the leaking filthy water. **We had to wring out the wet towel about 12 times per day during my time there.** I advised the guards of these conditions but no action was taken. The guards were fully aware of all such conditions that existed in the cells.

Additionally, **I repeatidly requested hygine products** (soap, clean towels, tooth paste, tooth-brush, hand soap, of the guards, in particular guard Mr. Payton but we were not provided with anything. I also was without a pillow and repeatidly requested that but was not provided with it either. On the Saturday that I was there we **ran out of toilet paper** and repeatidly requested to be provided with toilet paper by asking the guards and orderlies repeadily...but they told us **they were out of toilet paper.** We continuously on Saturday asked to be provided with toilet paper as we all had to use the restroom. But we were not provided with any. We must have asked all of the guards about 15 to 20 times for toilet paper but they would not provide any.

I was also not provided my perscribed medication for the period that I was there and needed such. This period was from Thursday when I arrived until late Ssturday night (approx 8:00 p.m.). I needed Rantidine for my Acid Reflux disorder, Diczlomine for my Irritable Bowel Syndrom, and Tylonol for my Chronic Headaches or some other pain medication. Although I informed the Physician's Assistant whom came each day about this needed medication...he dod not provide any and neither did the guards whom were asked repeatidly. I sufferred **pain and suffering from this lack of needed medication.** I further sufferred **pain and suffering** from the living conditions, laying on the floor next to the filthy toilet, the lack of hygine, and the failure to be provided toilet paper --- especially with my irritable bowel syndrom. It was very cold during the nights because being in November, there was no internal ventilation (either heating or cool air flow) and there was absolutely **no fresh air flow at all.** The ambient air temperature probably was around 50 degrees because of the outside temperatures and lack of any protections from the climate in the cell itself. This caused me to incur pain and suffering, lack of sleep, and an intense aggravation of pain from my arthritis due to the continued dampness & wetness inside the cell and the cold. We were forced to stay inside this crowded cell with three people for 23 hours per day. These conditions and the resulting pain and suffering represent the deprivations of the most basic and civilized needs and the staffs' deliberate indifference to such even having been on notice from us informing them of all of these and the resulting pains and sufferings.
AFFIANT SAITH FURTHER NOT.

DATE: 4-18-06    [signature]

# Appendix 28

**AFFIDAVIT OF**   **ROGER BLYTHE**
03216-013
FCI SEAGOVILLE  POB 9000
SEAGOVILLE, TX  75159-9000

I ROGER BLYTHE, **Affiant**, do hereby attest, affirm, and attest under penalty of perjury that fhe following is true and correct to the best of my knowledge, and further state, attest, and affirm that I am over the age of twenty one (21) years of age, of sound mind, and know the difference between the truth and untruth and and that the following is true to the best of my knowledge:

**THAT:**

On November 18, 2005, I was given a disiplinary report for using a copy machine in building 1 where I work. Although I had been given permission to use this machine to do the work for the education department, the secretary there had given me this in a retalliation for an instance in which she was "dressed down" from the warden approximately 8 months earlier for attempting to take some of my property and the warden found out about it. This disiplinary conduct report is now on appeal and the Lieutenant has verified that I did, in fact, have permission to be using the copy machine for the purpose which i was using it for on the education department's behalf.

The subject of this Affidavit, though, is the conditions of the SHU (Building 9) when I was put there after I was given this "shot".

There, in Building 9, (the "SHU"), I spent 4 nights in a **filthy room with no glass in the window, the temperature was well below 40 degrees at night.** We asked for something to block the window to stay warm **but was refused till the 3rd night** when a guard gave us a sheet. **It was still cold, I couldn't sleep and didn't sleep. It didn't help that I'm a diabetic and have poor circulation (I am 51 years of age),** as this plainly states in my medical records.. **I was also refused 3 times medicine prescribed for diabetes, Glyubride, and for my esophagas, Omeprazole. I was refused once by the medical director herself who came there.**

By the third day, **I was to the point of passing out, cold sweats, severe dizziness, due to no medicine and improper diet and the enviornmental conditions.** Over this 4 days, **I was also given spoiled milk twice.** I was refused an extra blanket to protect me from the outside cold due to no glass in the entire window. Although I was put into the SHU on 11/18/2005, I was not given clean underware or a shower till 11/21/2005 --- three days later. And only 1 set of pants and shirt the entire stay!. These conditions have not only inhumane, they not only would violate the Geneva Convention, they plainly are violative of the American Constitution, and the American public deserve to know the truth about prison conditions --- the Iraqians have it better from what I've seen!

I was released on 11/22/2005 at about 2P.M. when someone from the front office realized that I had been put into the SHU and should not have been. I have a spotless record on this compound in the years I've been here, and Lieutenant Bennet has indicated she is going to testify that I should not have been given any disiplanary action because I had proper permission. But, this plainly gave me a chance to see what inhumane conditions exist in Building 9 and how people (inmates) are treated there with no proper temperatures or protection from enviornment, filth, spoiled food, etc. . This is wrong.

AFFIANT SAITH FURTHER NOT.

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DEC 2 9 2006

# Appendix 29

## AFFIDAVIT OF PAUL WYATT
15759064
FCI Seagoville   POB 9000
Seagoville, TX   75159-9000

I, PAUL E. WYATT, Affiant, hereby state, attest, and affirm, under penalty of perjury, that the following facts are true and correct to the best of my knowledge, and that further I am over the age of twenty one years of age, of sound mind, and know the difference between the truth and untruth and that the following is true and correct to the best of my knowledge:

**THAT:**

I recently became incarcerated at Seagoville FCI. On my first month I was paid only "maintenance pay" of $5.25, and my second month I was paid $5.25 on the same pay, and on the third month I was paid $/7 ˉ and then on the fourth month again paid "maintenance pay" of $5.25.

I was initially "coerced" by my counselor, Mr. Swanson, to signing under duress a "Contract" known as an "FRP Contract". I was told by him that if I did not agree to pay to the B.O.P. $25.00 per quarter, then I would be sent to the SHU (special housing--Building 9) and also suffer other penalties. I, therefore, signed such. The problem was, they did not pay me enough to even make this payment. I barely made $25.00 for the quarter. Consequently **I had no money to buy hygine products, soap, toothpaste, stamps for mailing letters to my family, money to make telephone calls to my family, aspirine, cold pills, shampoo, washing powder for my cloths, etc. or any needed necessities.** When I found out that at least $75.00 per month is suppose to be exempt from such funds deposited into an inmate's account in order that these things can be purchased by an inmate according to 28 CFR § 545.11, and that I should not even be subject to an FRP payment and should be "Temp-Exempt" because my 6 months deposits are almost nothing as described above, my counselor told me that he would not do that. I asked for a BP-9 to pursue my due process claim that this was wrong. He refused to give me one and told me that **"I could make my time 'easy' or make my time 'hard' "** -- implying that if I filed on either him or on this issue (a BP-9, 19, and 11) that there would be resulting retalliation upon me. This was my new counselor--Mr. Roberts. I went to my unit manager and then ultimately obtained a BP-9 form from Mr. Roberts.

**Even though I hand delivered my BP-9 to WARDEN DAN JOSLIN at lunch mainline** on 9/20/2005 as is evidenced by my note of delivery on the BP-9, the Warden did not date the grievance being submitted until 10/4/2005 **-- almost two weeks later!** Then, I received a "response from the warden" on the BP-9 on 10/26/2005 but, as noted on when I received such on the form, it was delivered to me on 10/26/2005 -- 10/17/2005 -- almost 2 weeks later the Warden "dated" it 10/4/2005. Thus, even though it is suppose to be booked when given to staff they illegally extended any processing of this BP-9 by over a whole month. This is typical of how due process is attempted to be denied and delayed from what I have seen.

DATE: 12-12-05

PAUL E. WYATT

FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
06 2268

WYATT #15759-064

WYATT, Paul
Register No. 15759-064
Remedy No.: 390723-F1

FCI Seagoville, Texas

This is in response to your Request for Administrative Remedy receipted October 4, 2005, wherein you request to be placed on Temporary Exempt status in the Inmate Financial Responsibility Program (IFRP) and have your previous payment returned to your account based on an inappropriate payment plan.

Research into your request reveals that on July 7, 2005, you agreed to participate in the IFRP by making $25 quarterly payments on your court imposed financial obligations of $200 assessment and $6,948 restitution. Your unit team established this payment plan based on the deposits in your trust fund account over the last six months. You made your first $25 quarterly payment on September 13, 2005. This is a voluntary program and you may withdraw your participation at any time.

You indicate that this payment plan is not appropriate based on Program Statement 5380.08, Inmate Financial Responsibility Program. This Program Statement permits an exclusion of $75 per month from your trust fund account to be used for the Inmate Telephone System (ITS). However, this exclusion is to be applied after payment of the minimum IFRP payment plan for $25 per quarter. Records indicate you have had $150.20 deposited into your trust fund account in the last six months. As a result, it appears that your unit team has developed an appropriate payment plan for your case and you do not appear eligible for Temporary Exempt status.

Based on the above information, the relief you seek is denied.

If you are not satisfied with this response, you may appeal to the South Central Regional Director, 4211 Cedar Springs Road, Suite 300, Dallas, Texas 75219, via BP-DIR-10, within 20 calendar days of the date of this response.

_____          10/7/05
(Dan John, Warden)                Date

recieved through Institutional mail
on 10-26-05  By myself Paul Wyatt

_____
Wyatt paul

10/4/2005
DATE

BP-229(13)
APRIL 1982

RECIPIENT'S SIGNATURE (STAFF MEMBER)

---

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

REQUEST FOR ADMINISTRATIVE REMEDY

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

From: Wyatt   Paul   E.        15759-064    D-54    FCI Seagoville
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

Part A- INMATE REQUEST

I petitioning to be put on temporary Exemption from FRP. I also would like the $75 that was taken out of my account returned. I was told I could make my $25 or make my time easy by Mr. Roberts (counselor). I don't wish my time hard. I don't see how it could be easy, I was under threat coercision when I signed the FRP contract. Mr. Swanson told me to sign it to stay in general population. I stay out of the special $75 a month should be exempt (sic) to better maintain Telephone communications under Title 28 spt part B Codes of Federal Regulations 545.11 section 7

recieved at lunch (mainline) to warden Dan Joslin
10/2/05

_____
SIGNATURE OF REQUESTER

Part B- RESPONSE

_____
DATE

Valid response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days.

WARDEN OR REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 390723-F1

CASE NUMBER: _____

Part C- RECEIPT

Return to: Wyatt   Paul                 15759-064   D-54          FCI
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
DATE            RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

EVIDENCE OF LIVING CONDITIONS

AND

ENVIRONMENT

AND

OTHER MATTERS RELEVANT

# Appendix 30

AFFIDAVIT OF          JOHN BEAIRD
                      14355-179  FCI Seagoveille
                      POB 9000
                      Seagoville, TX  75159-9000

I, JOHN BEAIRD, Affiant, Do Hereby Attest, Affirm and State, under penalty
of perjury that the following facts are true and correct to the best of my
knowledge. Affiant further states, affirms, and attests that I am over the
age of twenty one (21) years of age, of sound mind, and knowing the difference
between the truth and untruth, that the following facts are true to the
best of my knowledge:

THAT:

I currently am housed in Building 54 of Seagoville FCI. I am housed within
a room with nine other inmates (10 inmate total). This room is what was originally
designed and used as a Day-Room for watching television or card games or reading.

Within this room I have approximately only a two foot wide corridore next to
my bunk bed for a distance of approximately five feet. It is five feet because
a locker takes up about a foot of the space at the end of the bed against the wall.
Consequently, I have only about 2 feet x 5 feet of actual living space within
my room. Each other inmate is the same respectively. And-- a portion of this
space is itself taken up by a metal folding chair. This leaves no fire corridore
space next to any bed for emergency egress purposes. Further, this Ten (10)
Square Feet of living space does not even afford enough space to streatch out in.

Additionally, outside my room is the central area. This area is where the
Televisions have been relocated to from within the Day-Rooms where they were.
The noise levels outside my room reach constant levels of thr roar of a football
stadium or train station all the way from the morning hours continuously through
the day (especially on weekends) until mostly midnight). The noise levels of this
crowd of over 100 inmates (ususlly on a constant basis--hooping and hollering
and reacting to the television or sports events is so loud continuously that it
completely drowns out my earphones when trying to listen to my radio. This gives
an idea of how loud the noise levels are. This allows me no available time for
any peace or quiet and has effected my physicological well-being and provides
constant increased stress levels.

Smoking is rampant within the Building. I can not go into a restroom without
coming out smelling like the Marlburro Man. As I experience allergies to smoke
I am constantly experiencing allergic reaction in the form of rashes and have to
result to constantly buying allergy pills. The "alleged policy" against smoking
is just a facade. The no smoking policy is basically non-existant as smoking
is condoned pursuant to a "defacto policy" allowing it. There does not exist any
enforcement of such policy. Thus, I am constantly, as well as others, exposed to
vast amounts of second hand smoke, and have been for over two years. This being
forced upon me. Although I have brought this matter up to institution staff on
repeated occassions, as well as have many other inmates, the staff is completely
deliberatly indifferent to the resulting health hazards and physical discomfort
and "pain" which results from this second hand smoke, as well as from the
constant high levels of noise within the living unit.

There are no available Day-Rooms within our building. I have no desk to
even write on within my room, nor does anyone else. These conditions being constant,
continuous, and ongoing and result in physical harm, psyicological harm, as
well as violate the eighth Amendment prohibitations against cruel and unusual
punishment which this most certainly may be termed

KELLY, Ronald D.
Register No.: 15592-064
Remedy No.: 392484-F1

FCI Seagoville, Texas

This is in response to your Request for Administrative Remedy receipted October 21, 2005. You state that the eating utensils are not labeled as Kosher. Milk marked kosher is offered to another religious group and you are requesting the same, and the inmates issuing the Certified Diet you are not receiving three hot meals per day and Food Service serves dry cereal every day. You also state that you have waited in line to replenish the items stolen off the tray. You request to receive hot meals (not just entrees only) like the rest of the inmate population.

A review of your issues reveal that the tray makeup and issuance procedures are being followed in accordance with Program Statement 4700.04, and the updated memorandum dated March 2004, hot entrees offered from the updated menu. The certified menus are being followed. There are seven hot entrees offered from the updated menu. Six out of seven hot entrees are served Monday through Saturday during the dinner meals and one hot entree served during Sunday brunch. Dry cereal is disposable ware is available to all participants. All trays are double wrapped for protection from contamination ware and proper handling. The milk served on the inmate population is a Kosher product. A Rabbi has supervised and reviewed the dairy vendor. There have been a few occasions when items from the Certified Diet meal have been stolen from the tray, but staff immediately corrected the problem.

Based on the above information, your Request for Administrative Remedy is denied.

If you are not satisfied with this response, you may appeal to the South Central Regional Director, 4211 Cedar Springs Road, Suite 300, Dallas, Texas 75219, via BP-DIR-10, within 20 calendar days of the date of this response.

_[signature]_
Dan Joslin, Warden

*Rec'd 11-17-05*
*11-17-2005*

*← Guards Initials*
*Date given to Inmate*
*Warden's Date*
*11/6/05 — Date*

*(8 Days from date warden signed & dated response until it was delivered to the Inmate)*

---

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

KELLY, RONALD D.
LASTNAME, FIRST, MIDDLE INITIAL   15592-064   D - 54   SEAGOVILLE FCI
                                  REG. NO.     UNIT     INSTITUTION

INMATE REQUEST

-9 WAS HAND DELIVERED TO Mr. Pedraza ON OCTOBER 18, 2005 @ 730 A.M/P.M.
Ina..both contained generally the same content. I was unable to take to Staff Focus, one to Mr. Pedraza the ... free to request; and is not taking place as indicated. The response from Mr. Fishman on 10/3/2005, only chow behind the serving line. I have learned that none of the ... since his response of 9/13/05, "Kosher". Further, these items must be placed on the trays (that are handling), not handed out by the ... hand religious ballefs all items on the tray must be Kosher as this is my sincerely held religious belief. I is also how I ... I should receive the hot meals (not just entrees only) ... the tray off the commissary. I have been seeking ... turn to fat loosing such muscle because of the disparity in the content ... my ... prated to the rest of the inmate population. For the past two weeks we have had at either the sole flesh or the salisbury soy steak protein, or tuna and sardines for

Ron Koo
SIGNATURE OF REQUESTER

APPROVED
NOTE:
FILED BY INMATE ON 10/0/05

BUT NOT Rec'd as
"being Recieved's to start the
20 day statutory response time
Unit, until 10/21/2005 - 11 days Later

3.05
DATE
RESPONSE

RETURN TO INMATE

KELLY, Ronald D.
LASTNAME, FIRST, MIDDLE INITIAL
15592-064   D   SEA
REG. NO.   UNIT   INSTITUTION

CASE NUMBER: 392484-F1

RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

# Appendix 31

AFFIDAVIT OF    **LESTER NICHOLS**
09657-031
FCI Seagoville   POB 9000
Seagoville, TX   75159-9000

I, **LESTER NICHOLS**, Affiant, Do Hereby Attest, State, and Affirm that the following facts are true and correct under penalty of perjury to the best of my knowledge. I further attest and affirm that I am over the age of twenty one (21) years of age, of sound mind, and know the difference between the truth and untruth and that the following is true and correct to the best of my knowledge:

**THAT:**

I am housed in Building 54. I have been in this living unit for going on about two years. There is absolutely no day-room space in the building which to watch tv, play cards, or do other forms of recreation. This manifests to the problem that all of the inmates (sometimes as many as 200 at a time) congregate right outside my room (there are no doors on my room) and create extremely high noise levels playing cards, watching tv, sports, screaming, talking, and doing other forms of recreation. This continues from early in the morning to mostly late at night around midnight. It is impossible to have any quiet time at all, and the noise levels are like being at the super-bowl around the clock. This creates great anxiety and stress upon me and does not provide a healthy enviornment. As I am over the age of 60, this is certainly magnified on the adverse effects upon my health--both physical and mental well being.

The restroom is almost continually used for smoking. The tobacco smoke infiltrates the air within the building and since the air system is a closed system and the fresh air vents do not work it never leaves the building and just gets smokier and smokier. This second hand smoke is what I am forced to inhale day after day. Although there is not suppose to be any smoking in the building, because it is so over-crowded--the guard staff (1 for 350 inmates) is insufficient to even begin to police most all activity such as contraband and smoking. Furthermore, it is virtually completely "condoned" by the B.O.P. staff and the policy is never enforced and even when it is there are virtually no penalties doled out compared out with penalties for other very, very minor less serious infractions. Hence, there is an "unwritten policy" not to enforce the actual policy and just let it be rather than create a riot by not letting the smoker-inmates smoke within the building when the doors are locked. This forces me, and every other non-smokeing inmate, to be forced to continually inhale **second hand** smoke almost around the clock and be exposed to the health damages which such brings to us. This is wrong. This building unit has more than three times the number of inmates it is designed to house...consequently the effects of this massive-overcrowding cause deprivations and sufferings in numerous areas which is wrong and unconstitutional.

DATE: 11-30-05          DEC 2 9 2006          _____
                                             **LESTER NICHOLS**

FILED
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

06 2268

# Appendix 32

AFFIDAVIT OF    YASSER RIVERA
36918-180
FCI Seagoville    POB 9000
Seagoville, TX    75159-9000

I, **YASSER RIVERA**, do hereby state, attest, and affirm under penalty of perjury that the following facts are true and correct. I further attest and affirm that I am over the age of twenty one (21) years of age, of sound mind, and know the difference between the truth and untruth, and that the following facts are true and correct to the best of my knowledge.

**THAT:**

I have been incarcerated here at Seagoville FCI for approximately two years. During this time I have been housed in a room inwhich has only about 35 square feet of space per person, has no desk to write on, no trash recepticle, and the building has no day-room space. Consequently, at all hours of the day and night, perhaps **hundreds** of inmates are outside my front door making constant loud noise yelling, etc. while watching television, playing dominoes, cards, etc. because there are no day-rooms. This causes me to fail to get any meaningful or proper sleep because this noise continues all the way to midnight. It is the constant level of a "roar of a football stadium".

Additionally, there is constant smoking in the building---mostly in the restrooms. The staff ignore this even though it is suppose to be aginst the B.O.P. Policy. Because of this, you can not go into the restroom without coming out smelling like a cigarette. This constant and "forced" **exposure to second hand smoke** has caused me to develop allergies which my nose runs and my eyes waters when I come back to the building---this is so because the smoke and whatever else has infiltrated the air-conditioning system and since the fresh air inlet vent ports do not work on the building, and the air-conditioning filters either don't exist or fail to be cleaned properly (I have black dirt and dust that accumulates on the fresh-air inlet vent in my room coming out of the air-conditioning system that I constantly have to clean...this means that we are all breathing this filthy air constantly). These allergies only materialize when I come back to the building---not when I'm out at other buildings such as the library or at my work, etc.; this is particular from the living unit because of the filth of the air and the intense second hand smoke which is put into the building's air system and no fresh air is available to take it out--it is just recirculated once it goes back into the airconditioning system.

All of these matters have been repeatidly brought up to staff to no avail. Many people have complained about these exact matters above and no-one of staff cares about what is going on or the ill effects that these conditions which stem from the massive overcrowding create. This is not right.

AFFIANT FURTHER SAITH NOT.

DATE: 11-14-05

YASSER RIVERA

06 2268

FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Appendix 33

AFFIDAVIT OF JESUS J. GARZA
41022-179
FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

---

I, JESUS J. GARZA, Affiant, do hereby attest, affirm, and state under penalty of perjury that the following facts are true and correct to the best of my knowledge, and that I am over the age of twenty one years of age, of sound mind, and know the difference between the truth and untruth and that the following is true and correct to the best of my knowledge:

**THAT:**

I have worked in managing restaurants and Wendy's chains as a mulitple-unit manager.  I have worked in such restaurant management for over 10 years before my recent incarceration here at Seagoville FCI.  I know how proper sanitation and health is suppose to be conducted.  In the last couple of weeks, as an employee of the Seagoville dining/food facility, we have been instructed that because **there is a big "Program Review" being conducted for the week of December 12 to 16,** 2005, that we must clean where no cleaning is ordinarally or ever done.  For example, the counters, appliances, etc. are all usually sprayed down with water only on each and every night.  This is one of the first times we have ever used soap or any other cleaning instruments such as sponges, disinfectant, etc.  Usually, no such cleaning ever goes on.  in fact, there is usually **no soap even put into the dish-tray washer and only water sprays on the food trays that people eat out of.**  Further, I often see food still caked on the food trays that are put through the sprayer that go to the segregation unit --- these trays that the inmates there eat out of are never clean.,. only rinsed off by the washer machine.

On December 11, 2005, our supervisor met with us, Mr. Casas, and told us that **if any of the inspectors doing the Program Review ask about the "checking of food temperature" to tell them that we go to him and ask for his thermometer...this being purely false and fraudulent...** just doing this to try to get past the Program Review.  In fact, the temperatures of the food and of the meat is never taken...often times the meat like the chicken is fed to inmates and the inside is still pink--"raw".  No temperature checking is ever done..there are just too many inmates which have to be served and this alsong with the overburdened system causes the basic health and safety checks like checking proper temperature in chicken that is cooked to insure against **salminilla poisening** is just never done.  From my days in the restaurant busisess I know what goes on is very, very wrong and presents severe health and safety concerns.  Additionally, this lying to the **"Program Review Inspectors"** in order **to make it appear that the institution is complying with all proper procedures is very, very wrong.**  It is trying to be made to appear that "this" is how it always is--this cleanness, when it is just "a flash in the pan-one time occurrence."  In fact, during the week, we have not been fed the normal meals, the fryer is completely not used in order that the kitchen does not get dirty---this is kind of like let's not eat this week umtil the inspection is over and then we will go

DATE: _12/12/05_

JESUS J. GARZA

# Appendix 34

AFFIDAVIT OF    **JOHN KILLIP**
04292-064
FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

I, **JOHN KILLIP**, Affiant, Do Hereby State, Affirm and Attest
that the following is true and correct to the best of my knowledge
and further attest that I am over the age of twenty one years of
age, of sound mind, and know the difference between the truth and
untruth and that the following is true and correct to the best of
my knowledge:

**THAT:**

Over the last several months, July, 2005 to the present, I
have had **roaches crawl out of my corn flakes and other food items.**
I have taken this matter of sanitation problems to the Food
Administrator Mr. Molina and told him that these bugs crawling
out of my food makes it unclean as well as unsanitary. He just
**laughed and said just get another tray, "that's just part of the
way things are, so you'll just have to make do with what (and how)
we feed you".**  This is absolutely ridiculous. I don't see that
the staff cares at all about doing what is right and sanitary and
healthy. My complaint, as well as others, fall on completely
deaf ears of people (staff) who just don't care about the
needs and health and safety of inmates. Someone needs to do
something about these very immoral conditions, even though this
is just a small example of what is truely is inhumane about
what goes on and is allowed to happen around here.

DATE:    _11-13-05_

JOHN KILLIP

06 2268

FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Appendix 35

AFFIDAVIT OF    **RONALD D. KELLY**
15592-064
FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

I, **RONALD D. KELLY,** Affiant, do Hereby Attest, Affirm, and State, under penalty of perjury, that the following is true and correct to the best of my knowledge.  I further state that I am over the age of twenty one (21) years of age, of sound mind, and know the difference between the truth and that the following is true and correct to the best of my knowledge:

**THAT:**

I work in the food services section at Seagoville FCI as an inmate. On numerous occasions I have had to complain to the food services management staff about my Kosher Diet tray (I am Jewish).  Specifically I have complained to Mr. Molina and Mr. Fishman.  My complaints were about the unclean conditions of the food tray and the food served.

Once in particular, after a complaint about my food being stolen off my Kosher Tray (stolen within the plastic wrapped being punctured) I was asked to go back into the Kosher food preparation area to fix my own "Kosher" food tray. However, the B.O.P. staff member did not want to go back into the food preparation area.  This is because the lights had been turned off and they advised that once the lights are turned off back there **all the roaches come out,** and they could not stand that.  So I went back there myself, turned the lights on, and sure enough **thousands of roaches came scurrying to get out of the light and away--it was disgusting.**  This is suppose to be one of the "cleanest" areas in the food services building--where the "Kosher" food trays are prepared for Jewish inmates.

Later on, I was asked to help in the dish room and got to talking with a couple of other inmates who worked there and told them about the incredible roaches infestation...and they said""heck, that ain't nothing--watch this" and they took the hose that is used to wash down the walls and floors in there and **sparayed it behind the counter and the tray rack and hundreds of roaches came floating and scurrying out.**  One said that when he comes in the morning that **bugs are crawling all over the trays and glasses.**  I again informed the head of food service, Mr. Molina, about this very unclean and unsanitary conditions that exist but to no avail.  These conditions are filthy and inhumane and I would never be allowed if people knew how bad they were in a facility outside the B.O.P.

DATE: 11 · 13 · 05                    RONALD D. KELLY

06 2268

FILED
DEC 2 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Appendix 36

AFFIDAVIT OF  ISMAEL VASQUEZ
#24990-079
FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

I, ISMAEL VASQUEZ, Affiant, Do Hereby Attest under penalty of perjury the following facts are true and correct to the best of my knowledge, and being that I am over the age of Twenty One (21) Years of age, of sound mind, and knowing the difference between the truth and untruth, do solemly affirm and attest that the foregoing is true and correct to the best of my knowledge:

**THAT:**

On or about the month of April, 2005, a plumbing repair took place in Building 10 at Seagoville FCI where I am housed towhich I observed, due to **excessive water leaks from the plumbing** located above the showers on the first floor restroom ceiling.  A 4 x 8 feet and 3/4 inch thick piece of plywood was removed from the area directly above these showers to expose the pipes that were leaking which looked as if they **had been leaking for a long period of time, years perhaps.**  The water leaks became so **severe** that the water was running all the way to and down the wall having caused the wall paint to swel, the water had, also, through the years, **rotted the wrapping** that holds the **insulation on the pipes,** which proved to give way when I first saw the sheet of plywood on the restroom floor leaning aginst the wall.

The elbow joints, the T joints, and part of the straight run were not on the pipe, part of it **was on the shower compartment and around 1/4 cubic of feet pipe insulation debree was laying against the wall,** some of it was **on the floor** between the shower compartments and the sheet of plywood inside the restroom where we, all the inmates, had to walk through to get to the urinals.  More than one hundred are housed in this building and about half of us use the first floor restroom at least one time during the day, **we tracked the pipe insulation that had fallen on the floor between the shower compartments and the plywood--throughout the entire building.**

I roughly estimate the **amount of insulation fallen** to be in the vicinity of **one cubic feet.**  Later that day, the orderly (inmate) in charge of cleaning up the restroom **swept the insulation** clean, causing that **highly "friable" material** to spread all over the air inside the building.

NOTE:  "Friable Asbestos Material" means any material containing more than one percent (1%) asbestos as determined using the method specified in appendix A, subpart F. 40 CFR part 763 section 1.  polarized Light Microscopy, that when dry, can be crumbled, pulverized, or reduced to powder by hand pressure. If the asbestos content is less than 10 percent as determined by a method other than point counting by polarized light microscopy (PLM), verify the asbestos content by point counting using PLM.  -- Source Federal Register Tuesday Nov 20, 1990, Part III Enviornmental Protection Agency, 40 CFR Part 61 "National Emission Standards for Hazardous Air Polutants; Asbestos NESHAP Revision; Final Rule", page 48415; also known and shown in 40 CFR § 61.140.

This building was **built before the 1950's,** therefore, my calculations for this material to be Asbestos cannot be wrong and appears to be, infact Asbesto. A **sample should have been taken, or inspection should have been done before** the pipe repair project was started to **protect not just the inmate workers but also all of the inmates housed in the building.**  Obviously, this did not happen. All of this took place the first day of the project.

Page 1 of 3.    _Ismael Vasquez_    10/3/2005

By the end of the first day, not just the workers that took that heavy piece of plywood down were **contaminated with Asbestos**, but the **entire building and the inmates houlsed within in were as well.** The worst exposed were the inmate crew that brought the piece of plywood down due to the position that they needed to be in order to hold the piece and the amount of insulation on top had to slide down as well as any debree along with it that had come off. These people **were bathed with the Asbestos insulation or may have "eaten" some in the process.**

The next day, in the main line at lunch, I spoke with **Warden DAN JOSLIN** and explained to him what had taken place inside the restroom located on the first floor, which could make someone liable for the **"occurrence" injury** and not just punitive damages that Asbestos causes. **Mr. DAN JOSLIN** said he would look into it. That made the second day.

On the third day, the sheet of plywood was back up on the ceiling. The plumbing crew (inmates) were ordered to nail the piece of plywood back to the ceiling. Non of the people (inmates) involved that took it down or put it back up had any knowledge of the **consequences that Asbestos Containing Material (ACM) causes, nor did they know that they had been exposed to such ACM.** Had they known this, or had anyone known it was Asbestos besides me at the time, most likely the personel doing the project would not have came close to it. Like I explained to **WARDEN DAN JOSLIN**, we are all aware that Asbestos causes lung cancer.

It is clear that the person in charge of that project **ignored N.E.S.H.A.P. rules** because **many of the people were exposed**, and we are just as human as anyone else.

Approximately two months later, the staff in this facility decided that new plumbing was needed, not just repair. It was decided that new plumbing would be done over a prolonged time in increments and the three restrooms located within the building. Demolition was started on one of the restrooms on the second floor restrooms, the one facing the East. It may have been the third day of demolition, which needed to be done first prior to repairs, that at this point the crew had advanced to the walls.

The crew (inmate crew) had advanced to the top of the walls having torn down the old tile. At this point, they had also **exposed and disturbed part of the Asbestos Containing Material of the insulation** on the pipes that came from the bottom restroom, the pipes were behind the walls. The same pipes that had been repaired before. Apparently, Mr. **AARON LEFTWICH**, Safety Director for Seagoville FCI became aware of the **Asbestos that was exposed** because it was at that time the crew was ordered that the project was to stop immediately.

At that time, the inmate crew was removed from the area and the entrance to the restroom (which does not have doors to the remainder of the building) was **"roped off" with yellow barricade tape**, thus leaving the dust **containing Asbestos fibers which formed a big cloud inside the second story, to move freely thoughout the entire building.** A large fan was placed to move the air and reduce the dust---which at that time covered the floor in the halls within the Building 10. **Again,** all of the dust (containing **Asbestos fibers**) that was scattered throughout the entire building was first swept and picked with a dust pan. A day or two after the project was stopped, Mr. **AARON LEFTWICH**, Safety Director, was taking notes inside the restroom. At that point I stopped by to use the next restroom as I live in the same building. I stopped to see what was happening. I told him that the **barricad tape was not going to prevent the Asbestos from spreading all through the building.** He said "how did you know it is Asbestos?" I replied that, before I was incarcerated, I was in charge of a company, which is also on my Presentencing Report (PSI), doing everything from Asbestos inspections, Asbestos Abatement Projects, and Consulting and that even though my certification was expired (because it expires every year) I was **Supervisor Certified and Licensed in the State of Mississippi for all types of**

AFFIDAVIT OF ISMAEL VASQUEZ,    PAGE 3 OF 3

Asbestos related projects and my credentials show that I have been doing this type of work since 1988.  I also told him that he needed to have inspected this area of the project before any demolition could take place.  He looked unhappy with my comment, I walked away because I'm an inmate and fear retaliation.

Some two weeks later, a crew of people from the outside civilian world, came and were working inside the first floor restroom, they had put a plastic flap on the door...it looked like the typical Asbestos abatement crew by the way the door flap was set--it's a form of containment.  There was no barricade tape.

A guard was standing outside the door, even though the EPA and N.E.S.H.A.P. rules state that signs should be posted to warn anyone from coming inside an area (either during day or night when the guard would not be there) while being abated.  I stopped and talked with the guard.  He had no idea of my experience and I asked him if there was "drop-bagging" (of the Asbestos Containing Material) taking place inside.  His answer was yes!  I asked him once more and he said YES!   I told him that I thought this was suppose to be a "GLOVE-BAG PROCEDURE".  He disliked that comment and told me to get away from there and I told him that I lived in this building and so I had nowhere else to go.  He understood.

In viewing the asbestos abatement crew coming out of the building, they carried the plastic enclosed material.  The bags were marked as they should be with warnings of ABESTOS CONTAINING MATERIAL WITHIN.  These are clear--Asbestos Labeled Bags used in abatement operations.  However, there were never any H.E.P.A. vacume, there was no sign of any water sprayer bottles or encapsulant, and there were no air monitors around the area and throughout the building as required.  No air monitoring or monitors was seen during the abatement process which took approximately two weeks, nor were air samples taken inside the areas of the building to test for air quality and contamination levels within the building.

All of us in our building as well as the inmate workers have been exposed to Asbestos dust and fibers (most probably for a period of many months) between the time of the initial exposure to the time of the abatement (although the dust and fibers which were tracked and traveled in the air throughout the building upon initial contamination of course have never been properly checked or abated).

This represents deliberate indifference of the B.O.P. and staff to inmates,

EXECUTED AND ATTESTED TO ON THIS THE _3_  Day of October, 2005, in penalty of perjury, that the aforesaid facts are true, and correct to the best of my knowledge.

Page 3 of 3.                ISMAEL VASQUEZ

APPENDIX   37

AFFIDAVIT OF    **KENNETH BOWIE**
15395-064
FCI Seagoville    POB 9000
Seagoville, TX    75159-9000

---

I, **KENNETH BOWIE**, Affiant, do Hereby Attest, Affirm and state
under penalty of perjury, that the following facts are true and
correct to the best of my knowledge. I further affirm and attest
that I am of sound mind, over the age of twenty one (21) years of
age, and know the difference between the truth and untruth and
that the following is true and correct to the best of my knowledge:

**THAT:**

On or about the month of April, 2005, I, as an inmate worker
working at CMS Construction Unit #2, along with five other inmate
workers, were ordered to remove the ceilings, walls, and tiles
of the bathroom in Building # 10 because of ongoing problems of
leaks, etc. In the process of tearing down the ceiling above such
restroom, when I removed a plywood panel located above the first
floor bathroom showers (on such ceiling), a substantial amount of
**Asbestos insulation debris** which had accumulated from fallen off
the asbestos insullated piping fell onto my face and I inhaled
it as well as was substantially exposed to it all over. There was
also a good bit that had fallen in and around throughout the room.

I am familiar with Asbestos insullation, having been in the
reconstruction business for many years, and since we were working
on a building which was well over 50 or 60 years old or more, the
staff should have known that the piping was fully wrapped with
asbestos insullation and that it should have checked such and
proceded with proper safety equipment and procedures before ordering
the inmate workers to completely remove all of the ceilings and
walls which would fully expose it to everyone in the building and
most importantly--directly upon us the inmates whom were doing the
construction work. Upon this discovery, we stopped the project.

The asbestos was removed by an outside entity, however they
did not appear to use the required procedure of HEPA filters and
cleaning out all of the asbestos debris after they manually picked
the asbestos off the pipes and off the wood where it had fallen and
placed it in plastic bags. The asbestos continued to be present in
the dust and debris even after the workers left several days after
we had stopped the project. This, obviously exposed everyone within
the building who breathed the air within Building 10 to asbestos
contamination because it was tracked through-out and the particles
were not contained as they should have been. We had no safety equipment
what-so-ever at any point. The pipes were of the old **black cast iron
pipes** within the building which have now been outlawed as a health
hazard. We left the asbestos on the pipes and on the wood above
the ceiling and put the plywood sheet cover back on the ceiling.
This asbestos still is now able to infiltrate within the air from
the air cavities and are free to continue to contaminate the builing.

DATE _11-29-05_  ~~DEC 2 9 2006~~                 _Kennet Bowr9_        **06 2268**

NANCY MAYER WHITTINGTON, CLERK

APPENDIX   38

**AFFIDAVIT OF:**    **RICK SCHUBEL**
69088-080
FCI Seagoville, POB 9000
Seagoville, TX 75159-9000

---

**I, RICK SCHUBEL, Affiant Do Hereby State and Affirm,** under penalty of perjury, that the following facts are true and correct to the best of my knowledge. I further attest and affirm that I am of sound mind, over the age of twenty one (21) years of age, and know the difference between the truth and untruth and attest that the following is true to the best of my knowledge:

**THAT:**

I worked, and have worked in the past, substantially with HVAC and air-conditioning systems. While here at Seagoville FCI I was working in the CMS services department doing HVAC work within the compound. On or about the Spring of 2002 I was told to service the air-conditioning system at the commissary building. This was the unit that works the freezer unit. My boss was Mr. Tunnell. [sic]. **I was having to put at least 20 to 30 pounds of Freon in this unit about twice a week because of the leaks.** This continued for a very lengthy period. I told my boss that we needed to fix this leak because it was illegal under the **EPA Clean Air Regulations to be "venting Freon"** like this unit was doing. My boss replied, **"we're the government and they [EPA] don't mess with us"** (Mr. "Tunnell" [sic]). Apparrently it is viewed that they don't have to comply with the law like everyone else.

So I asked the General Manager, Mr. Davis, for a Freon Sniffer so I could find the leak myself because our old sniffer had been inoperable for some time and we had no working sniffer. He agreed to purchase one.

However, during this time, the entire unit shut down. All the ice cream in the freezer was lost. So this event occurred at the time all the ice-cream was lost in the Spring of 2002 and at the time we purchased this sniffer for about $400.00. I thought it strange that Mr. Tunnell also did not have a license for this area and was ordering me to keep filling this unit up with Freon (and such large quantity) knowing all along that I told him that this was in violation of the law. But being that disobeying a direct order is an infraction I had to follow such orders or suffer disiplinairy consequences.

The lines were replaced inside the building by running a new line and the unit was got back up running again.

This period of Freon loss and replacement of 20 to 30 pounds two times per week for approximately one and one half months. So I estimate that as **360 pounds of Freon was vented into the enviorment by this deliberate indifference;** all in violation of EPA Clean Air Act which requires that leaks be fixed and all Freon releases be recorded and Freon recovered from being released. This concerns me because I now believe that this same thing may be occurring with the air conditioning system in Building 9 which serves the Medical Facilities and the Captain's and Lieutenant's office as I have heard that that is probably the case. This would also be wrong, and in violation of established law and further evidence of the attitude of complete deliberate indifference that exists.

10-21-05
DATE

RICK SCHUBEL

**FILED**    06 2268

DEC 2 9 2006

APPENDIX   39

**AFFIDAVIT OF    RONALD D. KELLY**
15592-064
FCI Seagoville  POB 9000
Seagoville, TX 75159-9000

I, **RONALD D. KELLY**, Affiant, do Hereby Attest, Affirm, and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, and I further attest that I am over the age of twenty one years of age, of sound mind, and know the difference between the truth and untruth and that the following is true and correct:

**THAT:**

I work in the dining & food service facility. This past week, December 4-10, 2005, all kitchen workers were informed they would be staying several hours longer than the regular time period to do extra cleaning because of a big National Program Review to be done the week of December 12-16, 2005. They wanted to make things appear <u>like</u> they were always clean and everything was proper for that <u>one week</u> until the review was done. We were cleaning areas that are usually never scrubbed or cleaned and hadn't been for what looked like years.

Inmate James Taylor was helping me in our assigned area. At about 7:30p.m., B.O.P. Kitchen Staff Manager <u>Mr. Casa</u> told James Taylor to go to the inmate clerk's office. At aroud 8:30p.m. (December 4, 2005) I went back to that office to see what they had Mr Taylor working on. He was signing different forms (safety sheets) <u>forging</u> different <u>inmate signatures.</u> I asked him "what are you doing?" He said Mr. Casas told me to sign all these sheets going back several months to make it appear the inmates themselves had sign them <u>in order that everything would look like</u> the place was <u>in compliance</u> with all health and safety procedures. I told him that this is against the law to forge official government documents. He told me he was ordered by Mr. Casas to do this and as an inmate if he didn't follow orders he could be sent to the "SHU" (Building 9)

On December 5, 2005, the clean up crew was again told me would be staying late again-doing the same thing. Again James Taylor and I were put together cleaning up. I asked Mr. Taylor again about forging all those papers I saw them doing for Mr. Casas. He said "you know how evil these people are, there's nothing that can be done about this." At about 7:00p.m. Mr. Casa again called James Taylor to the clerk's office and again I saw then forging more papers like before. I took a break and again talked to Mr. Taylor about doing that type of stuff and that it was wrong. Mr. Casas walked by and seen me watching what was being done and looking at the Bakery safety sheet and stepped into the office and said I don't need you to be in here at this time. I told him I was just taking my break. He asked me to go back to the main serving area.

Later that eveing Mr. Casas came by and I said "hey I have a couple questions". Shoot-he says. I told him that I thought it was against the law to be <u>falsifying official government documents</u> and <u>forging signatures</u>, etc. He told me that no-one will probably ever look at them and besides he was following orders-you know how "shit" rolls down hill. I asked him what if someone takes you to court-he (Mr. Casas) said "I hope they spell my name right"-"besides there's no one smart enough ..."

FILED DEC 2 9 2006 NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT

I asked James Taylor about this and getting a statement to include with mine. He told me "hey, I would like to but you know how they (prison officials) are as soon you file something on them- they will try to retalliate or ship you off to other facilities. He said, "heck, even the courts bow down to them." He said that if anything ever went to court on any of this that he would come and tell the truth but he wants the protection from the court when he does.

I have worked in the kitchen for a long period now and in all my time there I have only sighed two forms-one showing I was told I worked in the kitchen, and one showing the new soap being used. I have not signed any other type of safety sheets or even monthly pay-sheets for that matter. I believe that my signature has likely, like all the other inmates, been forged numerous times in order to create all the falsified documents that purport to show this facility being in compliance with procedures, policies, health codes, and safety codes-when that is just not true, it's based on falsified documents. Sooner or later this stuff will catch up with all of them.

Date: _12·17·05_

RONALD D. KELLY

APPENDIX  40

AFFIDAVIT OF **TOMMIE L. MITCHELL**
57797-080
FCI Seagoville  POB 9000
Seagoville, TX  75159-9000

I, TOMMIE L. MITCHELL, AFFIANT, Do Hereby Attest, Affirm, and
State under Penalty of Perjury that the following facts are true
and correct to the best of my knowledge.  I further state, attest
and affirm that I am of sound mind, over the age of twenty one
(21) years of age, and know the difference between the truth and
untruth and that the following facts are true and correct to the
best of my knowledge:

**THAT:**

I have been at Seagoville FCI since April, 1999.  During this period of
time I have held an inmate job working at UNICORE facility within the Seagoville
cmpound.  During this time I have had the main mob of dispensing tools and
"punping" chemicals for the inmate workers.  Such "pumping of chemicals" being
accomplished by a hand pump from a 55 gallon drum containg the chemicals into
the individual gallon bottles that the workers would have or into the spray
containers needed by them.

During my entire period as an inmate worker at Seagoville FCI I have **never**
**received any type of safety briefing what-so-ever.**  A "Safety Log Sheet" would
be brought to me for me to sign which the B.O.P. staff told me to sign these
sheets.  This I understood to be a direct order to which if I would not comply
then I would be subject to sanctions.  So I complied each month and signed such
sheet which puported to make it appear that I had received a "Safety Briefing"
when in fact I have never received one even to this day.  This obviously made it
appear that Seagoville FCI was complying with procedures, policies, laws, and
safety requirements...when in fact none of this is correct.

Working with chemicals--the manufacturer provides what is called an "MSDS
Sheet" which lists all of the hazards and safety precautions which **must be take taken**
**and observed** with such hazardous chemicals, as well as the associated health
and life threatening hazards that such chemical poses.  **I was made to do my job**
**for at least six (6) months before I even saw an MSDS Safety Sheet on some of**
**the hazardous chemicals that I was made to handle.  Let alone, no one at that time**
**even showed me how to interpret such a sheet which I now know the importance of.**
I had to handle these very hazardous chemicals for over five (5) years without
any of my superiors (FCI Seagoville staff) ever once giving any type of safety
briefing or training in the hazardousness of such chemicals.

On one occasion, around the Summer of 2004, Mr. AARON LEFWICH, Safety Director
of Seagoville FCI, came around to my job area.  He was looking around and reading
a MSDS Sheet on one of the chemicals ("Albatross Superkleen S.P.I.F., which
contains a mixture of Dichlormethane and Tetrachlorethylene which are known
carcinogens").  This particular chemical was a powerffull cleaning solvent
that was used to remove the the printed ink from the pants which numbers the
pants parts as well as grease, etc.  This particular chemical I had to dispense
to Mr. Creamer in one gallon bottles whom used this chemical to spray on the
clothes to remove the ink printed on them.  This solvent had to be manually sprayed
on each and every clothes part by hand sprayer.  Mr. Creamer sprayed **thousands**
(sometimes as many as 600 per day) of pants removing such ink.  In the room
that he had to spray this he used a hand sprayer, and there was no ventilation,
or masks or gloves, or any other type of protective or safety gear or

equipment provided. Neither was I nor Mr. Creamer, nor any other inmates who had to use this very hazardous chemical provided any safety gloves; consequently, we all endured years of direct exposure to our skin and our lungs. When Mr. AARON LEFTWICH read the MSDS sheet on this chemical, he remarked "hell, this stuff will kill you!" Yet, even after he recognized the extreme life-threatening hazards of this chemical and the safety precaustions which should have (must) been followed --- and realizing that without adequate protection, adequate ventilation, and actual safety briefings were needed--- he just went about his business as though he did not care about the safety and welfare of us inmates. I now, looking back, recognize that his attitude was complete deliberate indifference to the safety and health needs regarding us inmates. In fact, this "attitude" is the "status quo" of the other staff at Seagoville FCI and apparently the B.O.P. as well.

It was not until late in 2002 that any vents were even installed in this area. However, the use of the chemical continued without any safety briefings be conducted and without any other type of proper safety gear being provided such as respirators, gloves, masks, etc. I know that I have so much exposure of this chemical on my arms that my watch has lost all of its plating and color from such exposure...I can't even imagine the extreme exposure that Mr. Creamer has suffered, in that, he was the primary worker whom was responsible for spraying almost all of the uniforms that the Seagoville facility produced cleaning the ink off of each one. This would be in the thousands; and this all being done in a room which had no ventilation, and neither were any safety equipment, masks, gloves, ventilators, safety briefings, etc. provided to him either.

I believe that this attitude of falsifying records and the deliberate indifference to the health, safety, and needs of us inmates is wrong and violates the law and my constitutional rights as well and should not occur.

AFFIANT FURTHER SAITH NOT.

_11 - 3 - 2005_

DATE
_11 - 3 - 2005_

_Tommie L. Mitchell_

TOMMIE L. MITCHELL
_Tommie L. Mitchell_
_11 - 3 - 2005_

PAGE 2 of 2

*******************************************************************************

APPENDIX   41

AFFIDAVIT OF:   **JOSE A OLMEDO**
05123-112
FCI Seagoville   POB 9000
Seagoville, TX  75159-9000

_____

I, JOSE A OLMEDO  , Affiant, Do Hereby Attest, Affirm, and State under
penalty of perjury, that the following facts are true and correct to the best of
my knowledge. I further state, attest, and affirm that I am of sound mind, over
the age of twenty one (21) years of age, and know the diffenenct between the truth an
untruth and that the following facts are true and correct to the best of my knowledg

**THAT:**

I have been an inmate at Seagoville FCI  for several years and employed in
various positions while an inmate. I ~~am curtently~~ was "Lead Man" at the UNICORE
facility a part of Seagoville FCI.     former

It is a **common practice and occurence** (unwritten policy) that the Safety
Briefing Sheets are given to inmates to sign **without any safety briefings ever
being done.** This makes it appear on the "official records" and "on paper"
that proper **compliance to laws, policies, and things are occurring when,
in fact, they never have...this is a basic falsification by B.O.P. staff of
Seagoville FCI of records**--thus giving an erroneous impression of what is
actually occurring or has occurred. This being a common practice.

One of my jobs, as Lead Man, at this UNICORE Seagoville FCI facility was
to personally take the "safety sheet" around to the inmates, on orders from my
staff member boss, to get the sheet completely signed by every inmate working.
This sheet purported to make it appear that monthly "safety briefings" had been
hale...when, in fact, none since I've been here have ever been held. I felt
that this was wrong, but, I had to do this because it was **an order from
official Seagoville FCI staff** and the B.O.P. policy states and it is commonly
known that **failure to follow a direct order will suffer reprimand.** Thus, I
was under direct order to have these monthly safety reporting requirements
on such safety sheets take place which made it appear that Seagoville FCI was
properly in compliance when they were not nor had ever been.

This "falsification of records" as this is a common practice and occurrence
at Seagoville FCI from what my vast experience has shown.

**AFFIANT SAITH FURTHER NOT.**

_11/03/05_
DATE

_Jose A. Olmedo_
JOSE A OLMEDO

**FILED**

DEC 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

APPENDIX   42

U.S. Department of Justice

Federal Bureau of Prisons

## Central Office Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attach-
ments must be submitted with this appeal.

From: __Creamer, James E.__     __13975-001__     __F-10__     __Seagoville__
       LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

Part A—REASON FOR APPEAL (It should be noted that the Regional Office response was signed on
4-4-2005, however I recieved it on 5-4-2005. extension was requested. See attachment).
In light of all the evidence submitted supporting my claim the Central safety committee, warden
Dan Joslin, and the Regional Director has set forth to deny the finding of Dr. Nabeel Syed, M.D
the Material Safety Data Sheet (MSDS), specifing its dangers to the user or users without the
proper safety equipment. In the 7years I was employed by Unicor Seagoville I was never issued
gloves, protective clothing, nor a respirator. At the present I am 75years of age and have
worked the better part of 20years with some form of hazardous chemical within the confines of
(3) three Unicor Textile plants. It is impossible that these chemicals can be completely
excluded as a source of origin, and take no blame for the same symtons it claims to cause to th
users if the proper safety equipment isn't used. Inwhich case I was never issued.
I am asking that Bureau of Prisons, Administrative Remedy Section please take a careful look at
the evidence set forth in the following pages and a decision based on the evidence provided
by a certified Doctor, Dr. Nabeel Syed, M.D. and the(MSDS) Material Safety Data Sheets provided
by the makers and distributers of such chemicals and the years inwhich I handled this chemical
inside the Unicor Textle factory be the bases of any decision, and not an out right denial
as if this chemical is harmless to the user which would be contrary to the manufacture lable.

_____      _James E. Creamer_
       DATE                   SIGNATURE OF REQUESTER

Part B—RESPONSE

## FILED

DEC 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*06 2268*

_____
       DATE                                  GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE                      CASE NUMBER: _____

Part C—RECEIPT

                                            CASE NUMBER: _____

Return to:

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

| From: | CREAMER JAMES E. | 13975-001 | 10 | SEAGOVILLE |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL**

The inmate accident compensation manual instructs in plain language that inmates hurt in the work place should be compensated in compliance with (section 4126 of Title 18 United States code). The evidence set forth in this appeal does and will show that [Albatross- Perchlorethylene or Tetrachloroethylene], is the cause of my current medical conditions. This appeal will show that this chemical is a very hazardous and dangerous toxin which inters thru the skin and respiratory system causing redness, burning, drying and cracking of the skin (dermatitis) and may cause **"LIVER AND KIDNEY DAMAGE"**...

The Central Safety Committee and Warden Dan Joslin both has set out to point my medical conditions in every direction other than Albatross, treating it as if it is a harmless detergent rather than a dangerous and life threatening chemical agent kept behind locked doors acknowledging such.

**CONTINUE ON BACK..**

03-04-05
DATE

James E. Creamer
SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____
DATE

_____
REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

**Part C—RECEIPT**

CASE NUMBER:

APPENDIX 43

## AFFIDAVIT OF    RONALD D. KELLY

FCI SEAGOVILLE    POB99000
Seagoville, TX   75159-9000

I, **RONALD D. KELLY, Affiant,** do hereby state, affirm, and attest that the following is true and correct under penalty of perjury, and that I am over the age of twenty (21) years of age, of sound mind, and know the difference between the truth and untruth and that the following is true to the best of my knowledge:

**THAT:**

In the reviewing and research into Eighth Amendment violations here at Seagoville FCI, and in the area of medical deliberate indifference, and other instances of blatent Eighth Amendment violations by the Defendnats in this cause of action, there were so much an abundance of meritorious claims and acts which could have been included within the Appendixes, but because a preliminary cuttoff had to take place, in order that these pleadings be filed, no other Affidavits were included. This is to say, that approximately **50 to 75 additional instances, acts, or Eighth Amendment claims** (many medical) could have been additionally included but for times sake.

Additionally, there is a fear amoung numerous inmates that making their meritorious issue known by pursuing their due process rights, when in some cases some very serious medical deliberate indifference has taken place, these rights being either by Administrative Remedy, Court Action, or Affidavit here, that the Defendants in this cause of action would take retaliatory action against said inmates. These inmates, who have legitimate claims, have all indicated they would be a witness in court and to their personal experience of serious Eighth Amendment violations.

It is recommended that the court Order the Defendants to make available Administrative Remedies (BP-9's, BP-10's, & BP-11's) to inmates upon request rather than now where they are denied many times when an inmate wishes to pursue a due process claim. Further, it is recommended that after this litigation is filed, that a duplicate copy of these Administrative Remedies be disclosed by copy upon filing to the court, such that a complete picture of the **vast Eighth Amendment violative practices is made very clear to the court.**

EXECUTED ON THIS THE 21st Day of December, 2005.

06 2268

RONALD D. KELLY

FILED
DEC 29 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

APPENDIX  44

BP-S148.055 INMATE REQUEST TO STAFF CDFRM
P 58

## U.S. DEPARTMENT OF JUSTICE    FEDERAL BUREAU OF PRISONS

| | |
|---|---|
| To: (Name and Title of Staff Member) | DATE: |
| Mr. Madrid, Asst. Warden; Mr. Scott Uhey | November 15, 2005 |
| | REGISTER NO.: |
| COIN BEAIRD | 14355129 |
| | UNIT: |
| WRK ASSIGNMENT: | D - 54 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

SUBJECT: Possible Mis-appropriation of Federal Funds and Failure to Follow codified Bureau of Prison Policy Statements on Inmate Trust Fund Money.

This request addresses the issue as stated above. Recently, an Electronic Scoreboard for basketball was purchased from Inmate Trust Fund Monies. The purchase price was approximately $9,000.00. This is surprising, in that, I do not at seagoville, FCI. Team which has received a Federal basketball goals of an NBA standard and belief approximately $9,000.00 each Breakaway. It would also been purchased, we now have in the confters of "home" to offer NBA players more importantly, the Inmate Trust Fund Monies are specifically prohibited from being NON-RELATED PURCHASE of ELECTRONIC SCOREBOARDS. See P.S. 4500.04 referencing that thus, would be immediate mis-appropriation of Inmate Trust Fund Dollars. funds must be immediately purchased with Inmate Trust Fund Account and such urged from whatever source necessary to the Inmate Trust Fund Account and such tey for monies inappropriately lost or spent, including personal liability as the Trust Fund Manual on 611 (commonly referred to as the "Zimmer Amendment") which application to law 105-277, lined in the B.O.P. Directed to as the "Zimmer Amendment" which application to 105-277, to have been violated by this purchase and additionally violated Public law 105-277, 200, 112 Stat. 2581-113; also Pub.L. 105-119, Title VI § 611; December ber 29, 1999, 113 stat. 1501A-54; also Pub.L. 105-277, Div. A, § 101(Title VI § 611)

(Do not write below this line)

POSITION:

---

### SIDE 1 CONTINUATION:

October 21, 1998, 112 Stat. 2681-113; also Pub.L. 105-119, Title VI § 611, November 26, 1997, 111 Stat. 2517; also Pub.L. 104-208, § 101(a) (Title VI, § 611) September 30, 1996, 110 Stat. 3009-66; also Pub.L. 104-134, Title I, § 101(a) (Title VI, § 611) April 26, 1996, 110 Stat. 1321-66. Further, Pub.L. 101-647, Title XXXV § 2907 November 29, 1990, 104 Stat. 4915. Further, Pub.L. 101-647, Title XXXV § 2907 November shall, to the extent practicable, take such measures as are appropriate to cut costs of contraction. Such measures may include reducing expenditures for amenities such as for an ELECTRONIC SCOREBOARD (especially when we already have a working manual scoreboard at the BUILDING color television or pool tables. It would appear that the EXORBITANT EXPENSES two of them) (especially for basketball) ($9,000) and breakaway-saw BASKETBALL GOALS ($6,200 each for any amenity) is a complete waste of the current ones are working and particularly unsafe in the appear that broken hyping wheels for the law library. Currently, it would is combined with appearance of money especially when the expense of maintenance pay find the "Seagoville Team," to fund the "Seagoville Team" or "Team" the funds required to fix or fund over-crowding and a fund shortage) is utilized. It would are a misappropriation and illegal use of Inmate Trust Fund Monies and must be returned to such account.

Windows, at the purchase for the Commissary for THREE (3) "bullet-Proof" Extra Security violation of use of $2,600.00 each out of Inmate Trust Fund Monies also represents a Account. The Inmate Trust Fund Monies and must be returned to the Inmate Trust Fund been oblige which these above normal windows represent. The Inmate Trust Fund Account specifically prohibits any of upgrades (such as "Bullet-Proof Level Security") and with normal windows and additional expense for "Bullet-Proof Level Security" would same out of the S & E Account. This adequate trust fund monies—for this possibility of the S & E Account and of $4,800.00) outside the adequate of of these expensive items—for the S & E Account such if more out of ($3 x $2,800.00 = represent-tation of Trust Fund Monies in violation of law. These funds, $8,400.00, must be returned to the Inmate Trust Fund and S&E Account associated with security related purchases, must be returned

Finally, the costs charged for copies in the library (.50¢ each) represent an excessive mark-up for copies in the library (.50¢ each) represent an excessive mark-up in violation of B.O.P. Policy statement 4300.04 such copy machine, a specifically an excess of 20% greater than actual costs in the extreme unit which is similar Sanyo Model 3515 (Social Security Number 620496026469), is a very small type business 3b,531 each copies. The costs are available at local office stores for less than a half copies. The costs associated have been there for less than a cost of less than for two cartridges (per page; 2) Toner, which costs could be 1) Paper which would not be already $21.00; 3) Amortization—such cartridge which lasts for 7,000 copies thus averages about maintenance agreement. The cost of the machine or the lease over about 4% such $4.00 copy. The current charge is $.18 per copy. The electronic vending Can easily be reproduced with additional purchases, no such cost would only come into play on t

B.O.P. Program Statement 4500.04, 6/22/2004, Chapter 4523 Page 4 (Tobacco sold through the Commissary) states expressly, that costs related to "vending operation for services is internally operated programs, and 1) need to provide the Trust Fund a minimum mark-up mark-up which would. Further, B.O.P. Policy. These copies should be correctly priced to reflect a correct pricing puts an undue burden on inmates and their legal transactions an excessive and illegally evident be corrected to comply with policy as this represents a violation of B.O.P. Policy.

(Do not write below this side for continuation.)

06 2268

FILED

DEC 29 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

APPENDIX   45

## ADDITIONAL ADMINISTRATIVE REMEDY REQUESTS (BP-9's)

### and

### THEIR RESPECTIVE RESPONSES FROM THE WARDEN

The following Administrative Remedy Requests (BP-9's) and each one's respective Response from the Warden of Seagoville FCI are incorporated as part of these Pleadings and as part of this Appendix.

Although the Plaintiffs have requested these materials through the Freedom of Information Act, 5 U.S.C. § 552, in conjunction with 28 C.F.R. § 513.43 which encourages inmates to use "the local access 'inmate request to staff' procedure for FOI requests", rather than the standard FOI procedure for non-inmates, and that, these items requested are allowed to be delivered and disclosed to inmates pursuant to the Freedom of Information Act (see 28 C.F.R. § 542.19 "Access to indexes and responses" by inmates), **the Defendants have attempted to conceal these responses and BP-9's filed and their contents** through their repeated requests to produce such and their deliberate failure to provide such according to the Freedom of Information Act.

Therefore, the Plaintiffs **incorporate the contents, and each of the following BP-9's and their respective Responses from the Warden**, by reference, whereby such documents being eventually forthcoming by use of Federal Subpoena, or by the Defendants eventually deciding to evade compliance with law (the Freedom of Information Act):

The following Administrative Remedy Requests and each ones respective Response from the Warden:

Numbers:  351538;  352969;  355508;  355804;  360075;  360084;
360719;  362087;  362095;  362491;  362701;  362702;  362848;
364440;  364978;  364983;  365030;  365694;  366314;  371848;
371851;  373420;  377004;  377008;  378317;  379883;  380430;
380922;  380006;  381007;  383146;  385304;  385311;  386853;
386853;  387689.



06 2268

FILED

DEC 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ms. Blakely FCI
2113 N. Hwy 175
Seagoville, TX 75159

CERTIFIED MAIL No. 7000-1670-0004-3960-9408
RETURN RECEIPT REQUESTED

Dear Ms. Blakely,

Please find enclosed (1) "Inmate Request to Staff" (commonly referred to as a BP-8, or informal resolution request). I am having to send this to you via Certified Mail because I have not been able to give it to you via "inmate mainline" as I have not seen you there the last several weeks, and additionally am hesitant about using the internal institutional mail because the last time that I requested information pursuant to the Freedom of Information Act (FOI Act), 5 U.S.C. § 552, the "Inmate Request to Staff" was never received or lost in such institutional mail system.

Thank you very much for forwarding to me the information I requested on the "Administrative Remedy Index" (Local). The enclosed Inmate Request to Staff (BP-8) now follows-up on such information provided. Thank you very much in advance for assisting me in this matter and in your providing this additional information pursuant to the FOI Act, 5 U.S.C. § 552, and 28 CFR § 513.43 (inmate access to FOI disclosable material---inmates are encouraged to use the simple local access procedure via Administrative Request to Staff).

Sincerely,

JOHN BEARD
46355179 FCI Seagoville
PB 9000
Seagoville, TX 75159-9000

cc: FILE
    Hon. Sheila Jackson Lee

---

BP-S148.055  INMATE REQUEST TO STAFF CDFRM
SEP 98  THIS IS A BP-8 REPLY REQUESTED WITHIN THREE (3) DAYS
U.S. DEPARTMENT OF JUSTICE                         FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) | DATE: |
|---|---|
| MS. BLAKELY | 1 November, 2005 |
| FROM: | REGISTER NO.: |
| JOHN BEARD | 14355179 |
| WORK ASSIGNMENT: | UNIT: |
| ID | D-54 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)  DELIVERED BY CERTIFIED MAIL # 7000-1670-0004-3960-9408

Dear Ms. Blakely,

It is my understanding from you that this institution (Seagoville) did not maintain the 12 month "Administrative Remedy Index" for the previous 12-month period prior to 9-22-2004 and that is why when I previously requested the 12-month index that I was only provided with the index from 9/22/2004 to 10/04/2005. If this is not correct, please advise me and provide the missing portion of such index for such 24 month period.

Pursuant to the F.O.I. Act, 5 U.S.C. § 552, in conjunction with 28 C.F.R. § 513.43 providing that inmates are encouraged to use the simple local access procedures via administrative Request to Staff for FOI requests, I am requesting to be supplied copies of the following Administrative Remedies (BP-9's) (sanitized as appropriate) and that there be at no cost and such copies in the excess of 100 copies are to be provided at $.10 each. That being so, please limit any such additional charge not to exceed $25.00. The "Responses" which may have been submitted in the original request. Please provide these within the time period prescribed by law and by statute pursuant to 5 U.S.C. § 552.

THE FOLLOWING ADMINISTRATIVE REMEDIES AS FILED AND THEIR RESPECTIVE RESPONSES:

Numbers:
354538; 352969; 355308; 355404; 360075; 360084; 360719;
362087; 362095; 362691; 362701; 362702; 363848; 364440; 364978;
364983; 365030; 365093; 365694; 366314; 371864; 371851; 373620;
371304; 377008; 378317; 379983; 380430; 380922; 381007;
383146; 383304; 383311; 386853; 387689.   *  *  *  THANK YOU.

(Do not write below this line)

DISPOSITION:

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

| Postage | $ .37 | Postmark Here |
|---|---|---|
| Certified Fee | 2.30 | |
| Return Receipt Fee (Endorsement Required) | 1.75 | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $4.42 | |

Sent To  Ms. Blakely, FCI Seagoville
Street, Apt No.; 2113 N. Hwy 175
City, State, ZIP+4  Seagoville, TX 75159

7000 1670 0004 3960 9408

BEAIRD, John
Register No.: 14355-179

Response to Inmate Request to Staff Member

This is in response to your Inmate Request to Staff Member received on November 5, 2005, requesting additional Administrative Remedy logs and Administrative Remedy responses. As discussed and agreed upon with you through your Counselor, Administrative Remedy logs were provided for a 12-month period as these were retrievable through the automated log. Logs were pulled for the period of 09/10/2004 through 09/10/2005. This is the Administrative Remedy "Date Received" column.

For the remainder of your request and in accordance with Bureau of Prisons Program Statement 1351.05, Release of Information, you will need to submit your request in writing to the Freedom of Information Section, General Counsel Office, 320 First Street, N.W., Washington, D. C. 20534.

Tonya Blakely, Program Coordinator                    November 10, 2005

Received by Inmate
on 11/17/2005

APPENDIX  46

DallasNews.com

The Dallas Morning News

nesday, November 8, 2006

By CHUCK LINDELL / Austin American-Statesman

# Supermax prison short of staff

## As costs cut, assaults rise at high-security address of Nichols, McVeigh

State Rep. Buffie McFadyen (left) meets with Supermax prison guard union officials Mike Schindwein and Barbara Batulis to discuss staffing and safety issues at the Colorado facility.

BLKE FISK/Associated Press



Theodore Kaczynski, the Unabomber, is among the violent criminals at Supermax.

## BRIEFS

**killed in Cleveland fire; 3 people hurt**

**t flooding kills 1, causes evacuations**

**ion worker, 19, held in death of actress**

**s Picasso painting can be auctioned**

*From wire reports*

06 2268

FILED

DEC 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

APPENDIXES

THE ENCLOSED APPENDIXES ARE ENTERED AS PART OF THE PLEADINGS, AND ARE ENTERED INTO THE RECORD AS <u>FACT</u>.    THESE PROVIDE EVIDENCE IN FACT OF THE WIDESPREAD NATURE OF THE INDIVIDUAL CLAIMS MADE IN THE SPECIFIC AREA BY THE PLAINTIFF.

CONTENTS OF APPENDIXES:

<u>EVIDENCE OF INADEQUATE MEDICAL CARE SYSTEM</u>

A-1    LEGAL STANDARDS RELEVANT TO THIS CASE
A-2    "FACTS" SECTION: VERIFIED STATED FACTS
A-3    JOHN BEAIRD; EXHAUSTION OF ADMINISTRATIVE REMEDIES
A-4    MIHAILOVICH
A-5    GARZA ... 9 Pages
A-6    BLOUNT ... 4 pgs
A-7    MERIWEATHER ... 3 pgs
A-8    MERIWEATHER ... 2 pgs
A-9    BURTON ... 3 pgs
A-10   BAILEY ... 3 pgs
A-11   WARING ... 3 pgs
A-12   GADDY ... 2 pgs
A-13   HENDERSON ... 6 pgs
A-14   BOLIVER ... 2 pgs
A-15   WARING ... 5 pgs
A-16   RILEY ... 3 pgs
A-17   HOLCOMB ... 7 pgs
A-18   ANDRADE/CLARK/WATSON ... 2 pgs
A-19   GRIFFIN ... 3 pgs
A-20   KILLIP ... 2 pgs
A-21   BRAXTON ... 3 pgs
A-22   Blank
A-23   KRUEGER ... 4 pgs

<u>EVIDENCE OF CORPORAL PUNISHMENT & LIVING CONDITIONS</u>

A-24   NAKAZA ... 3 pgs
A-25   SHULZE ... 2 pgs
A-26   ALLEN ... 2 pgs
A-27   FRIEND ... 2 pgs
A-28   BLYTHE ... 2 pgs
A-29   WYATT ... 3 pgs

<u>EVIDENCE OF LIVING CONDITIONS, SAFETY & ENVIRONMENTAL HAZARDS & OTHER MATTERS</u>

A-30   JOHN BEAIRD ... 3 pgs
A-31   NICHOLS ... 2 pgs
A-32   RIVERA ... 2 pgs
A-33   GARZA ... 3 pgs
A-34   KILLIP ... 2 pgs
A-35   KELLY ... 2 pgs
A-36   VASQUEZ ... 4 pgs
A-37   BOWIE ... 2 pgs
A-38   SCHUBEL ... 2 pgs

A-39 KELLY ... 3 pgs
A-40 MITCHELL ... 3 pgs
A-41 OLMEDO ... 2 pgs
A-42 CREAMER ... 3 pgs
A-43 KELLY ... 2 pgs
A-44 JOHN BEAIRD ... 2 pgs
A-45 Incorporation By Reference of Other Documents

EVIDENCE OF NATIONWIDE SYSTEMIC PROBLEMS
A-46 ADX FLORENCE FACILITY ... 2 pgs
A-47