UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

**RECEIVED**

FEB 23 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| JOHN M. BEAIRD, ROBERT MIHAILOVICH and JOHN M. BEAIRD and ROBERT MIHAILOVICH on behalf of ALL SIMILARLY SITUATED INDIVIDUALS (FILED AS A CLASS ACTION COMPLAINT) <br> Plaintiffs <br> vs. <br><br> ALBERTO GONZALES (Individually), et. al. <br> Defendants | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> §    No. 06-2268-JDB |

---

EMERGENCY MOTION

FOR TEMPORARY RESTRAINING ORDER, EX PARTE

---

TO THE HONORABLE U.S. DISTRICT JUDGE OF SAID COURT:

COMES NOW, JOHN M. BEAIRD and ROBERT MIHAILOVICH, Plaintiffs, and JOHN M. BEAIRD and ROBERT MIHAILOVICH on behalf of ALL SIMILARLY SITUATED INDIVIDUALS ("Putative Class"), Plaintiffs in the above-styled and numbered cause of action and as Movants in this Motion, herewith files this EMERGENCY MOTION For Temporary Restraining Order, Ex Parte, for the good and meritorious reasons detailed, infra. Movants respectfully request this Emergency Motion Ex Parte for Preliminary Restraining Order be **GRANTED** in order to preserve the status quo and protect against further injuries. Movants show this Honorable Court as follows:

I.

Movants have filed a Complaint against the Defendants, supra, such Complaint being also filed as a Class Action Complaint. Movant's Complaint alleges numerous serious Constitutional violations of Movants' Constitutional and Federal rights, as well as duties owed to Movant by the named Defendants. Movants have alleged in Movants' Complaint in **Count 1** that the Defendants have violated, or caused to have violated, Movants' Eight Amendment rights against the imposition of cruel and unusual punishments, inter alia. Specifically with regards to such Eight Amendment violations upon Movants (and the Putative Class) are the deprivation of "Health Needs" as is defined in Plaintiffs' (Movants') Complaint along with numerous Constitutionally offensive items. Such "Health Needs" being defined as: "the needs which are basic human needs of physical health, mental health, emotional health, the necessities of having a living environment free from Environmental Tobacco Smoke (ETS), of having an environment free from any other types of environmental toxin such as Asbestos, Black Mold, Mold, Diseases, the needs of clean air, clean water, and the needs of having an environment free of the risk of any spread of an infectious disease, the needs of safety and being in a safe and healthy environment, the needs of adequate living space, the needs of adequate degree of quiet, the needs of an adequate quantity of quiet-time, the needs for adequate recreation space, of adequate and proper (pursuant to applicable professional and societal standards) ventilation & degree of temperate environment, the needs of having adequate and properly cooked food, the needs of proper sanitation & hygine, the needs of adequate plumbing, toilet and shower facilities, the needs of being free of any other factors which may contribute to, accelerate, cause, exacerbate, or affect in a negative way the physical, emotional, or mental health of an individual ... " See Plaintiffs' Complaint at pgs 21 - 22.

II.

The Movant's Complaint is a Verified complaint which containes over 48 Sworn Affidavits evidencing very serious Costitutionally offensive conditions as alleged against the Defendants which is conduct of a "widespread" degree.

III.

This request for a TRO (ex parte) is based upon such sworn facts and verified Complaint, and Movants hereby incorporate by reference the Plaintiffs' Complaint and Appendixes to said Complaint as a part of, and as a factual basis, of this Emergency Motion, along with the specific EXHIBITS ATTACHED, herewith, to this Motion. This request is made to prevent imminent threat of future harm to Movants and to **preserve the status quo** pending a hearing on the preliminary injunctive relief. Such status quo being the prevention of **further Eighth Amendment violations** to Movants, as well as the Putative Class and the prevention of irreparable harm until a hearing can be held on the preliminary injunction. See Granny Goose Foods v. Brotherhood of Teamsters, 415 U.S. 423, 439 (1974). Such Irreparable Injury being the Eighth Amendment Constitutional violations upon Movants (and the Putative Class) as well as resulting damages from such as the pain and suffering and physical injuries, inter alia. See eg. Elrod v. Burns, 427 U.S. 347, 373 (1976)(loss of right to free speech under First Amendment is irreparable injury).

IV.

An application for a TRO must contain the following: 1) Affidavit(s) based on personal knowledge, or by verified complaint; 2) All elements necessary for injunctive relief: a) the substantial likelihood of success on

the merits; b) the TRO is necessary to prevent injury; c) the threatened harm outweighs the harm a TRO would inflict on the non-movant; and d) the TRO would serve the public interests.  See FRCP Rule 65.

V.

The Movants have submitted not only a Verified Complaint based on personal knowledge, but also numerous Sworn Affidavits all based on personal knowledge, as well as, herewith, attaches (See Exhibits) additional Affidavits based on personal knowledge of Movants.  Based on the substantive factual documentation submitted by Movants both in the Plaintiffs' Complaint & Appendix, and in this Motion, Movant has a substantial likelihood of success on the merits of Count 1, inter alia.    Numerous courts have repeatidly held the same factual conditions to which Movants are subjected and inflicted with are, and have been, clear constitutional violations, especially in the area of "Health Needs", inter alia.    See e.g. Rhodes v. Chapman, 69 L Ed. 2d 68 (1981)(generalized violative conditions noted); Wilson v. Seiter, 501 U.S. 294 (1991)(right against corporal punishment or threat of corporal punishment and the imposition of unnecessary and wanton infliction of pain); Battle v. Anderson, 446 F. Supp. 516 (E.D. OK 1977)(same); Capps v. Atiyeh, 495 F. Supp 802 (D. OR 1980)(same); Mata v. Saiz, 427 F3d 745 (10th Cir. 2005)(same); Harper v. Showers, 174 F3d 716 (5th Cir. 1999)(right to be free of deprivations of sleep, quiet, and quiet time); Williams v. Edwards, 547 F2d 1206 (5th Cir. 1977)(right to adequate and proper ventilation and temperate environment, right to adequate health needs, and right to be free of inhumane and abusive conditions of confinement, torturous of inhumane treatment or conditions, and conditions which violate the standards of civilized decency); Ramos v. Lamm, 639 F2d 559 (10th Cir. 1980)(same); Alberti v. Sheriff of Harris County, Texas,

446 F. Supp (S.D. Tex 1975)(same); see also Convention Against Torture, International Covenant on Civil and Political Rights, Dec. 16, 1966 arts 7, 10, G.A. Res 2200A (XXI), U.N. GAOR, 21st Sess. Supp. nov. 16 at 51, U.N. Doc. A/6316, 999 U.N.T.S. 171, available at: www.unhchr.ch/html/menu3/b/a/_ccpr.htm ; (hereinafter "ICCPR") such Treaty having been ratified by the UNITED STATES. Clearly, Movants stand a substantial likelihood of success on the merits in such matters.

## VI.

The TRO is necessary to prevent injury and harm and to preserve the status quo of no further injurious conduct. The infliction, and threat of infliction, upon Movants, and the Putative Class, on an ongoing and continuous basis, in the subjecting said parties to housing within BUILDING 9 (the SHU & Administrative Detention) is what gives rise to the need for said TRO, inter alia. Whereby the conditions of such confinement as detailed in the Movants' Verified Complaint (see Complaint Appendix pages A2-13, A2-14, A2-15, A2-17, A2-19, A2-35 thru A2-42; see also Appendixes A2-2 thru A2-3; and even more specifically Appendixes A-24, A-25, A-26, A-27, A-28, and A-29 as well as the enclosed Exhibits (Affidavit).

## VII.

As may be seen on a widespread and conclusive basis of fact, the conditions of such cells within BUILDING 9, whereby the cells are designed for only one person and most of the times there are two to three individuals forced into one, with one forced to sleep on a mattress on the floor next to the filthy toilet with urination and feces splashing upon him; there being no forced mechanical fresh air ventilation what-so-ever, the windows either being

completely sealed over whereby no air enters into such cells, or the windows being busted out and wide open with the elements of the cold or heat infesting the unprotected inmates within such cells. The temperatures within such cells, on information and belief, have been measured by a correctional officer at as high as 118 Degrees Fahrenheit in the summer months to as cold as 45 Degrees Fahrenheit in the winter months.    Moreover, the sanitary and health conditions of such cells would make even a reasonable person view such as violative of the Constitution.    As detailed in Movant's Affidavit attached, herewith, as Exhibit 1, Movant was recently subjected to such conditions on February 7, 2007, when the Defendants relocated Movant there, not for any disciplinary infraction or improper conduct, but, rather, because of a medical test which required isolation.    Because there are no adequate "Medical Care System"(see definition in Plaintiffs' Complaint @ pg 22 - 23) and, thus, no adequate facilities for such medical test isolation, Movant was thus, subjected, as is the normal case, to the violative conditions of Building 9 segregated housing cell.    The conditions experienced by Movant comport with all of the other Sworn Affidavits regarding the inhumane conditions of Building 9. As detailed in Movant's Affidavit, these conditions are ongoing and current (Movant subjected to such on February 7 thru February 8, 2007).    Movant has been furthered injured from Defendants' conduct by such.    As is the norm with people housed in Building 9, the Movant (Mihailovich) was housed in a cell which was filthy, had a mattress on the floor with no bed, massive quantity of old paint-chips all over the floor (Movant is hereby attaching as an Exhibit to this Motion and to the Plaintiffs' case as a whole a **"physical Exhibit"** of such **"paint chips"** which were completely covering said filthy cell in order to preserve said physical evidence as part of the Official Record and also as a part of and exhibit to this Motion [see Exhibits 2 & 3] (hereby Labeled as

Plaintiffs' Exhibit #A1 and A2); each envelope contains similar samples which this Honorable Court may open for inspection and Movants request same be thereafter resealed by the court), as well as the other grotesquely inhumane conditions of lack of hygine, water, inter alia. See Exhibit 1 Affidavit. These conditions present in Building 9 and to which the Movants, and the Putative Class, are ongoingly subjected, bespeak a pattern of repeated examples of Defendants' Deliberate Indifference [1] to Plaintiffs' suyffering, see Ramos v. Lamm, 629 F2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981), are "unnecessary and wanton inflictions of pain that are totally without penological justification", Greg v. Georgia, 428 U.S. 153, 183 (1976), Estelle v. Gamble, 429 U.S. 97, 103 (1976)(same); Rhodes v. Chapman, 69 L Ed 2d 59, 68 (1981), which necessitate Federal District Court action by way of such restraining order. Moreover, courts have previously spoken and enjoined against the practice of mattresses on the floor as present in Building 9. See Capps v. Atiyeh, 495 F. Supp 802, 806 n.4 (D. OR 1980)("I have, however, included a specific provision enjoining repetition of the mattress-on-the-floor practice"). Such ongoing infliction and subjugation of housing in Building 9 deprive individuals of "basic human needs", Helling v. McKinney, 125 L Ed 2d 22 (1993), are "inhumane", Farmer v. Brennan, 128 L Ed 2d 811 (1976), and are "incompatible with 'civilized standards of humanity and decency' '"', Estelle v. Gamble, supra at 102, and **GRANTING** of this Motion for TRO is necessary to prevent injury (and future injury) and to **preserve the status quo of no further injuries.**

## VIII.

The Defendants would incur no harm from **GRANTING** of this request for TRO as the **small number of inmates** whom are periodically housed within BUILDING

---

[1] See Exhibit 4; In a letter to his client, an "Officer of the Court", attorney Mr. Price, states he spoke to (on information and belief) Ms. MARNE BOYLE, ASSISTANT WARDEN, such official and employee of Defendants **admits and** "agreed that **the conditions [in BUILDING 9] were quite 'dreadful' "**.

9 could, instead, be housed in the Detention Center Jail Unit on the Seagoville FCI Compound as has been done many times in the past until the Defendants chose to pursue the present course of constitutionally violative conduct in the current use of BUILDING 9. Because the design capacity of Building 9 **is only 36 inmates**, such Temporary Restraining Order prohibiting further housing of any inmates within Building 9 on the Seagoville FCI Complex would not burden the Defendants in properly and constitutionally housing such inmates within the Jail/Detention Center facilities. Moreover, the Defendants should be abiding by Constitutional reqirements anyway, and the threatened harm of continued and ongoing subjugation of Movants, and the Putative Class, of being housed or detained in any manner within Building 9 outweighs the Defendants' any harm which may be remotely effected by having to utilize properly designed Detention & Jail facilities for such housing the limited number of individuals as may be necessary from time to time.

IX.

This is **"public interest litigation"** regarding matters of Constitutional concern. What more can be in the public interest than ensuring that the Constitution is still **the law of the land**, and as such, the GRANTING of this Motion for TRO, Ex Parte, would serve the public interests; additionally, as such, and that there is no risk to the Defendants in the GRANTING of this TRO, and that Movants are similarly without the ability to post bond, the court is requested not to require security or bond as a requirement for issuance of such TRO.

X.

The Movants should not be required to "provide notice" to Defendants, such

that, such notice and the time required there-of would deprive Movants of the protections of being subjected in the interim to further violative conduct and further damage the "status quo", as well as would subject Movants to reprisals and chilling effects associated, there-of, as Movant has also alleged in Plaintiffs' Complaint is a common custom, practice, and policy of the Defendants when individuals pursue relief through Administrative or Court action. **such TRO injunctive relief being narrowly drawn.**

XI.

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, **MOVANTS PRAY THAT,** upon review of this Motion, being that Movants satisfy all requirements for the GRANTING of a Temporary Injunction and Restraining Order against Defendants, their employees, agents, and representatives, Movants requests that this Honorable Court ISSUE a TRO which shall immediately ENJOIN and PROHIBIT any inmates from being housed, detained, or otherwise held within BUILDING 9 of Seagoville FCI until such time as this Honorable Court rules otherwise after a Hearing for Preliminary Injunction is held.

Movants further Pray That this Honorable Court EXPEDITE Ruling on this Motion without delay and on an EMERGENCY BASIS as styled, and GRANT any and all other relief to which this Honorable Court may provide.

Respectfully Submitted,

JOHN M. BEAIRD

ROBERT MIHAILOVICH

**VERIFICATION**

I, JOHN BEAIRD, and ROBERT MIHAILOVICH, DO HEREBY AFFIRM AND ATTEST THAT THE FACTS CONTAINED HEREIN ARE TRUE AND CORRECT, ON THIS FEBRUARY 17, 2007.

**E X H I B I T     1**

AFFIDAVIT OF ROBERT MIHAILOVICH, FED. I.D. 33446-177
P.O. BOX 9000, SEAGOVILLE, TEXAS 75159

---

I, Robert Mihailovich, being of sound mind, over the age of Twenty-One (21) years of age, and having personal knowledge to attest to such, do so Attest, Affirm, and State under Penalty of Perjury that the following is true and correct, and knowing the difference between truth and untruth do state the following facts, **THAT**:

On February 12, 2007; around 7:15 A.M., I was escorted by Mr. Weaver, a FCI medical staff employee, to segregated housing on the second floor of "building 9" commonly known as "the hole of building 9" by staff and inmates. I was transferred from the camp to the compound for medical tests which required me to be segregated from the FCI compound inmates. Mr. Weaver said, you better "bring your coat because it gets cold in the hole". Upon arriving at "the hole" in building 9, Mr. Weaver explained why I was there and instructed the staff to make sure I had plenty of water. Mr. Weaver continued to explain that the only reason that I was there was to collect a twenty-four (24) hour urine sample for lab testing. At processing, I was stripped searched and provided back my socks, t-shirt, shoes, and issued a thin yellow pair of pajama type pants. Neither my long sleeve shirt, nor pants, nor coat was returned to me. I was handcuffed and removed to a housing room where I would remain until my release from the hole of building 9.

The floor of the room was filthy and completely covered with paint chips of all sizes, ranging from fine particles to chips half the size of a dollar bill. The paint chips were numerous and impossible to avoid. They were in the wash basin, in the bedding, on the window ledge, and adhered to my shoes. I found myself in disbelief as I uttered out loud to myself, "I can't believe this". Attached to this affidavit and entered into evidence are two envelopes, each containing actual samples taken from the building 9 room where I was housed for a day and a half.

It was cold, damp, and windy outside and my attention turned to finding a way of keeping warm. The glass was broken out in the rooms single window and the window opening was secured by some sort of wire mesh covering. The covering was not solid and appeared to resemble a ventilation cover, securing the opening, without restricting light or air flow from the outside. Neither could the construction help protect from the cold outside.

Concreted into the floor was a steel plate raised approximately two (2) inches off the concrete floor, covered with a inch thin

Page 1 of 3    _Rem_

hard cotton mattress, a sheet, a torn and depleted pillow, and a table cloth type blanket. The blanket was not solid linen but was a perforated styled blanket. I have never been able to sleep on my back and the lack of padding in the mattress covering the steel plate cause me severe shoulder and hip pain and I left "the hole" limping because of hip pain and suffering. Since the bed is only raised about two inches above the concrete the blanket laid partially in the paint chips covering the floor. As I tossed in turned on the steel plate, repositioning myself, curling up, and pulling the blanket around me in an attempt to keep warm more and more paint chips worked into the bedding. I actually brushed paint chips off my clothing the following morning.

The sink basin was stainless steel, you had to push a button for water delivery, which forcefully skirted out of a hole about the diameter of a pencil. When pushing the button the water skirted up into the air, missing the basin, and covered my t-shirt with a significant amount of hot water. There was no way of controlling the volume or distance of the water flow with the push buttons. My chest and stomach was scalded the first time I used the facet because the water was extremely hot (near boiling - really). Thus, I had absolutely no supply of drinking water or any other liquid in direct violation of the doctors order. After using the toilet, my bottom was scalded because I discovered there was no cold water supply to the toilet. Then I discovered there was no toilet paper so I cleaned myself with an envelope from off the floor. Since there was no cold water facet I cleaned my hands by "quickly flashing" the tips of my fingers through the hot water to moisten them and dried my hands on my blanket.

Other then the thin pillow, sheet, and blanket, nothing else was provided in the room. There were no towels, no soap, no trash receptacle, no drinking cup, no way of cleaning the room, and no way of soaking up the accumulating water off the floor from the skirt hole, etc. Nothing except the afore mentioned bedding. A building 9 staff member passed down the hall and I yelled out at him asking if he could do anything about my conditions. He said, "your in the hole now camper, everyone is treated the same, you can expect nothing until the door is opened and they let you out".

I was provided a four (4) ounce sealed plastic bag of orange cool-aid for lunch to drink. To drink the cool-aid an individual would have to tear a hole in the bag with ones teeth and then seal ones mouth around the hole and suck out the cool-aid. I declined to drink the cool-aid because of the health factors of sealing my month around something of unknown origin; and because, I was unable to properly cleanse my hands before handling something that needed to be put into my mouth. I went all day with nothing to drink until I managed to talk a inmate orderly out of a six (6) ounce foam cup, which I filled with hot water and set on the window seal to cool.

Page 2 of 3  *Rem*

My sealed room was at the end of the hallway and "the hole" is truly an segregated "out of sight"-"out of mind" housing unit. There is no way of communication with any staff member who always remains unseen and unreachable and there is no "panic button" in case of an emergency. The only contact is with inmate orderlies who rush delivers food through a slot in the door but have no ability to aid. I could not manage to get toilet paper until the following morning around 7 A.M. and if not for the inmate who slipped me a foam cup, I might never have been provided a way of drinking water.

Temperatures dropped below freezing outside that night. My cell had no mechanical ventilation and no mechanical heat input and with the glass broken out the room temperature probably never exceeded 40 degrees. Day temperatures were barely above freezing all day long.

I got no sleep the entire period of my incarceration in building 9, because of the severe and inhumane conditions. I experienced severe thirst, real pain, and endured suffering throughout the entire period of my nine (9) building incarceration. Upon returning to the Seagoville FCI Camp, my pain and suffering continued, both hips, both shoulders, and my back ached and I walked with a limp for the better part of a week. Because there was no way of cleaning myself, I avoided going to the bath room which caused stomach cramping. I also suffered constipation, upon returning to the camp, because of the dehydration and lack of liquids.

I have heard from many inmates about the inhumane conditions of building nine (9), but nothing could have prepared me for what I actually experienced while incarcerated there. I can now personally testify that the conditions there are inhumane and any reasonable person would consider incarceration in such conditions as "cruel and unusual" punishment. The conditions and treatment received at building nine are well below the standards provided to a dog housed in a kennel cage. Building nine (9) of the Seagoville FCI represents a "lack of decency" that would be unimaginable and hard to understand for most of America.

AFFIANT SAITH FURTHER NOT.

EXECUTED ON FEBRUARY 17, 2007

ROBERT MIHAILOVICH

Page 3 of 3

E X H I B I T     4

# MILNER & FINN

### ATTORNEYS AT LAW

INTERNATIONAL CENTER-PHASE IV
SUITE 1950, LOCK BOX 9
2828 NORTH HARWOOD STREET
DALLAS, TEXAS 75201
TELEPHONE (214) 651-1121
FACSIMILE (214) 953-1366
WWW.JMICHAELPRICE.COM

J. MICHAEL PRICE II
BOARD CERTIFIED - CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

August 3, 2006

Mr. Daniel Jay Phillipi
Reg. No. 34964-177
Federal Correctional Institution
P O Box 9000
Seagoville, Texas 75159-9000

Dear Mr. Phillipi:

I was very concerned when I received your letter of July 27, 2006. It took me a day to reach someone at the prison that could explain the situation to me, but here is the information I was given.

The woman in the prison office confirmed everything in your letter, including that you were in an non air-conditioned building. She agreed that the conditions were quite dreadful. The building which you described is a temporary housing facility for persons waiting to be admitted into the camp. She stated that inmates are always sent there first, for anywhere from 1 to 30 days, depending on the availability of space in the camp. I was not aware of this procedure.

Her records reflect that you were moved to the camp on July 31, 2006. You therefore should now be in the facility you and I were expecting you to be in. When asked if you were now able to begin your drug rehabilitation program, she said she was unsure about that. She said that your case manager was an excellent manager, and would be able to help you arrange for that, as well as any other programs you might be interested in.

I strongly urge you to work with your case manager to get involved in the rehabilitation program as soon as possible. However, you should also keep in mind that even with his assistance, this may not happen immediately, and may in fact take some time and patience. Just let him know that not only do you want to participate, you need to participate, a fact that is reflected in your pre-sentencing report.

I am hopeful things have improved for you. Please write me back so that I know things are now moving in the right direction.

Very truly yours,

J. Michael Price II

JMPII/tb

**E X H I B I T      5**

STATE OF TEXAS   )
                 )   AFFIDAVIT OF JIMMIE DALE HELMS
COUNTY OF DALLAS )


I, Jimmie Dale Helms, hereby attest the following to be a true
statement.

1.  On 01-23-07 at 0900 Hours a code 305 incident report was
generated for my minor infraction of possessing a colored towel
(IRN: 1558727).  At 1860 Hours and unsuspecting of the incident
report, I was escorted from the Camp into the Federal
Correctional Institution to Lieutenant Jackson's office. I was
served the incident report and taken to Building 9's Special
Housing Unit commonly known as "The Hole".

2.  I was locked into Cell 302 with Inmate Sewell--a gentleman
who had committed no violation.  Mr Sewell had transferred to
Seagoville's Camp but because of no bed space due to substantial
overcrowding, he had been locked in the hole for several weeks
waiting for a bed--to which I conveniently provided.  Cell 302
had absolutely no fresh air ventilation or circulation.  The
vent in the solid steel door was covered with plexi-glass.  The
glass windows had been broken and removed although a thick steel
plate with tiny holes was mounted over the outside window which
assured no air circulation was possible. The heater blasted non-
stop which made the cell unbearably warm even though it was cold
outside.

3.  Cell 302 had no water to drink as the combo sink/toilet
water faucets produced hot water only.  When I sat on the toilet
(and before my cell-mate could warn me) and I flushed, hot
swirling water burnt my testicles while the stainless steel
seat/rim encasing the water burnt my buttocks and back of my
legs.

-1- *JH*

4. I occupied Cell 302 for two days during which time I questioned the orderly regarding the hot water problems. The orderly explained how during the summer months the hole reaches temperatures in excess of 120 degrees and inmates often resort to using their bed sheets to seal off the crack under the steel entry door. They then flood the toilets and lay on the floor in the standing toilet water as relief from the excessive heat. The hot water supposedly prevents this from happening. Other occupants claimed the cold water lines in the old building were rotten and unusable.

5. My mattress in Cell 302 was nasty and smelled of feces and body odor. It had insulation sprouting and shooting out everywhere. The pillow was no better. The walls had old paint hanging and chipping off in huge pieces and someone had wrote their name on the wall in blood.

6. On 01-25-07 I was moved downstairs and locked into a cell originally designed for a single man which already contained two inmates, Clark and Perez. Mr Clark being the youngest insisted on taking the mattress on the floor, next to the filthy toilet. Numerous other sized cells contained four men, two of which were forced to sleep on the tiny cell floors--though its hard to imagine where.

7. On 01-26-07 I was moved to the cell next door where I stayed until 01-29-07 when I was returned to the Camp. Ironically, this cell was like sleeping in an ice box though the hot water conditions improved during the daylight hours. However, the mattress and pillow was as nasty and smelly as ever, decades of plaster and paint were blistering and pealing, and the toilet constantly overflowed.

8. Staff and inmates alike are aware of the severe and inhumane conditions of the hole. Numerous staff have expressed the opinion that the practice should be outlawed and the place

-2-

condemned.  The hole is a place used to silence inmates and deter complaints and make existing problems fade away. Inmates are routinely locked in the hole for no legitimate reason-- therefore, the inmate is allegedly under investigation. I personally know of many such examples.  With one fifteen minute phone call every 14 days and limited access to writing material, coupled with controlling the outgoing mail and complaints (in may case letters were delayed nearly two weeks before mailed), makes filing any sort of grievance from the hole, by design, restrictive at best.

SWORN UNDER the PENALTY OF PERJURY this 18th day of February, 2007.

JIMMIE D HELMS
#23139-077
P O Box 9000
Seagoville, Texas 75159

E X H I B I T   6

AFFIDAVIT OF WILLIAM NAKAZA, 16717-179 FCI Seagoville

I, WILLIAM NAKAZA, do hereby state, affirm, and attest that all of the following is true and correct and that I have personal knowledge of these facts, and that I am over the age of twenty one years, of sound mind, and knowing the difference between the truth and untruth state the following is true and correct:

THAT:

I came to Seagoville to serve a short sentence. I was recently was in Iraq, serving in the U.S. Army. I was severely injurred while on regular patrol while in Operation Iraqui Freedom in 04-05. This injury occurred from a remote-detonated road-bomb while I was in the unit Humm-V. I had tendons severed, nerve damage, along with other injuries. I relate this as it is pertinent to my experience here at Seagoville.

On or about June 29, 2006, I overslept in going to my job duties. I was immediately placed in Building 9 (SHU) to await a hearing. I spent 32 days in such location. The conditions of the cell (although made for one has two people in it 24 hours a day locked-down). This cell was inhumanely hot. Over 100 to 110 degrees 23 hours a day. I went from weighing 179 pounds to 162 pounds (which my body mass at my young age is mostly muscle with little fat, thereby making this loss very significant). This occurring in the 32 days there in the extremely inhumane conditions. There was no **ventilation** what-so-ever as the windows had been sealed shut with a metal plate, and there was no forced air ventilation into the room. Further, the walls rediated intense heat because of the complete lack of ventilation and because of the sun radiating on the building. I sufferred suffering from the heat and lack of air. **Compared to Iraq with being in a flak jacket**, this was much worse. We never even made the prisoners of war endure these conditions. I could not breath and felt many times there like I was sufficating because of the heat, lack of air circulation, and lack of ventilation. We were given only a few cups of ice during the day which didn't last long each time. I could not sleep during the nights because **you never stopped sweating.** I informed the guards of all of these conditions to no avail.

Additionally, another inmate from my camp, Mr. BOBBY COX was in the cell when I got there. He had already been there for one month for having a cell phone. He did not look the same. He looked very physically stressed and in "bad" condition. He had **lost what easily appeared to be over 20 pounds from the constant heat and sweating.** More concerning was the **lack of medical treatment he wasn't receiving** as he had sat on the stool of the steel desk which should have been bolted to the wall but was not and the whole table fell over on him injuring his back. Cos was in **constant pain and suffering from sharp back pain, numbness in both legs,** not eating from the intense pain in combination with the constant heat over 100 degrees **and profuse sweating and total lack of air ventilation.** He repeatidly asked for medical treatment from the guards, the medical personel whom visited, and Warden Boyle whom also came to the door at one point and was knowledgable of his complaints and condition. After complaining for several weeks, the medical dept. finally gave him only 275mg of naproxen -- nothing to what he needed, and having no effect for the condition he appeared to be because of his back injury. He was in constant extreme pain.

Mr. Cox asked repeatedly **for an Administrative Remedy Form** (BP-9) in order to claim his grievances on his lack of medical care and the inhumane conditions in the cell of Building 9. They did not provide him one. Finally after several weeks, they gave him a BP-9; this being conveniently past the time allowed to properly file a BP-9 when the cause of action accrues.

Although the staff, including the warden, were aware of these conditions within the building and cells, and of the suffering of the occupants because of the inhumane conditions, and were aware of Mr. Cox's failure to receive any proper medical care, they did nothing except were conveniently **"ignored by these parties".**

This totally inhumane treatment is why I referenced my time spent in Iraq because the conditions that our prisoners were placed in there, are alot better and humane compared to the conditions that I have had to experience here. These conditions are nothing short of CORPORAL PUNISHMENT -- that which we were prohibited from metting out in any form or fashion to the POW's in Iraq. This is absolutely wrong and inhumane.

AUGUST 4, 2006

WILLIAM NAKAZA   _[signature]_

*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLUMBIA*

**JOHN M. BEAIRD, et al ,**
Plaintiff(s),

vs.                                    **Civil Case No. 06-2268 (JDB)**

**ALBERTO GONZALES, et al**
Defendant(s).

## NOTICE REGARDING EXHIBIT

Pursuant to the procedures for filing documents electronically, as outlined in the

previous Order of the Court, this Notice serves as notification that Exhibits 2 and 3 to the

Motion for Temporary Restraining Order have been filed in paper form in a the Clerk's

Office.  They are available for public viewing  and copying between the  hours of 9:00

a.m. and  4:00 p.m., Monday through Friday.

**NANCY MAYER-WHITTINGTON**

Clerk

February 27, 2007